UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――――

DAVID L. KIRBY, III,

                               Plaintiff,

v.                                               5:24-cv-0522
                                               (BKS/TWD)

MAMOUN ABRAHAM, [1]

                               Defendant.

―――――――――――――――――――――――――――

APPEARANCES:

DAVID L. KIRBY, III
*Plaintiff, pro se*
05002304
Onondaga County Justice Center
555 South State Street
Syracuse, NY 13202

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

## I.    INTRODUCTION

      On April 15, 2024, *pro se* Plaintiff David L. Kirby, III, commenced this action by filing a complaint naming the Syracuse Police Department as the sole defendant. Dkt. No. 1. Plaintiff did not pay the Court's filing fee or file a motion to proceed *in forma pauperis* ("IFP"), and the Court administratively closed the case. Dkt. No. 2. Plaintiff subsequently submitted a complete application to proceed IFP, and the case was reopened. Dkt. Nos. 3, 4, 5. On June 14, 2024, the undersigned granted Plaintiff's IFP application and performed an initial review of the complaint.

―――――――――――――――――――――――――――

[1] For reasons discussed below, the Clerk is directed to update the docket to substitute "Mamoun Abraham" for Defendant John Doe.

Dkt. No. 6.  On June 24, 2024, Plaintiff filed an amended complaint.  Dkt. No. 7.  In light of

Plaintiff's amended complaint, the Court terminated the pending Report-Recommendation, and

referred the action back to the undersigned for an initial review of the amended complaint.[2]  Dkt.

No. 9.

## II.    SUFFICIENCY OF THE AMENDED COMPLAINT

Because Plaintiff is proceeding IFP and is a prisoner suing one or more government

employees, his amended complaint must be reviewed in accordance with 28 U.S.C. §

1915(e)(2)(B) and 28 U.S.C. § 1915A(b).[3]

### A.    Relevant Legal Standard

The Court shall dismiss a complaint in a civil action if it is frivolous, malicious, fails to

state a claim on which relief may be granted, or seeks monetary relief against a defendant who is

immune from such relief.  *See* 28 U.S.C. § 1915(e)(2)(B)(i)-(iii); 28 U.S.C. § 1915A(b).

A claim is frivolous when it "lacks an arguable basis either in law or in fact."  *Neitzke v.*

*Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*,

550 U.S. 544 (2007); *see also Denton v. Hernandez*, 504 U.S. 25, 33 (1992) (holding that "a

finding of factual frivolousness is appropriate when the facts alleged rise to the level of the

---

[2]  The Court will also consider the two letters, Dkt. Nos. 10 and 11, filed by Plaintiff.  See Dkt. No. 12.

[3]  *See* 28 U.S.C. § 1915A(c) ("As used in this section, the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program.").  Prisoners are not exempt from paying the full filing fee even when they have been granted permission to proceed IFP.  *See* 28 U.S.C. § 1915(b)(1); *see also Cash v. Bernstein*, No. 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010) ("Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Id.* (citing 28 U.S.C. § 1915(b) and *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

irrational or the wholly incredible"); *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) ("[A]n action is 'frivolous' when either: (1) the factual contentions are clearly baseless . . . or (2) the claim is based on an indisputably meritless legal theory.").

To survive dismissal for failure to state a claim, a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This short and plain statement of the claim must be "plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The statement of the claim must do more than present "an unadorned, the-defendant-harmed-me accusation." *Id*. It must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal punctuation and citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

In reviewing a *pro se* complaint, the court has a duty to show liberality toward *pro se* litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and should exercise "extreme caution . . . in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted).

Generally, before the Court dismisses a *pro se* complaint or any part of the complaint *sua sponte*, the Court should afford the plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993).

**B.    Summary of the Amended Complaint** [4]

Plaintiff brings this action against Defendant John Doe, a Syracuse Police Officer.  Dkt. No. 7.  In the "Statement of Facts" section, Plaintiff states, in full:

> John Doe hit me with his police car while he was off-duty working as an security guard.  The results of me getting hit by car my neck, arm on right side and upper body collarbone was hurting very bad.  I had to walk to court holding my arm in my left hand after being deny an arm slang by Justice Center medical staff.  Also after that I was placed in handcuffs.  Also John Doe illegally searched me which is violating my rights 4th Amendment he searched me after hitting me with car and placing me in handcuffs.  Then I was sent to hospital.  And that is false arrest and false imprisonment.

*Id*. at 4.  Plaintiff lists his first claim as "excessive force" and his second claim as "unconstitutional conditions of confinement."  *Id*. at 5.  Plaintiff seeks monetary damages.  *Id*.

On July 2, 2024, Plaintiff filed a letter stating, "Officer Mamoun Abraham was the officer that struck me with deadly force using his car off-duty knowing that he was not supposed to do that."  Dkt. No. 10.  On August 14, 2024, Plaintiff filed another letter, stating, in part, "Brandon Hanks used excessive force, violated my 4th Amendment right by his unreasonable

---

[4]  Plaintiff utilized the Court's form complaint for civil rights actions under 42 U.S.C. § 1983.  Citations to Plaintiff's amended complaint will be to the pagination generated by CM/ECF, the Court's electronic filing system.  Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

search which led to false arrest and false imprisonment because my rights were violated and no probable cause to arrest me."[5]  Dkt. No. 11.

## III.  ANALYSIS

Plaintiff brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983"), which establishes a cause of action for "'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)) (footnote omitted).  "Section 1983 itself creates no substantive rights, [but] . . . only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

To state a valid claim under Section 1983, a plaintiff must allege that the challenged conduct: (1) was attributable to a person acting under color of state law; and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States.  *Whalen v. Cnty. of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997).

### A.    Defendant John Doe

The Court has reviewed Dkt. No. 10, wherein Plaintiff has identified the Doe defendant by name.  Therefore, the Court construes Dkt. No. 10 as a request to substitute the name of

---

[5]  At the top of the letter, Plaintiff lists three civil action numbers: 5:21-cv-886, 5:24-cv-124, and 5:24-cv-522.  Dkt. No. 11.  Thus, the letter was filed in all three of Plaintiff's cases.  The Clerk's Office and the Court should not be tasked with determining which case Plaintiff's filing should be filed in.  In this District, if a litigant has more than one action pending, any paper filed in a case must contain and relate to one civil action number unless the civil actions have been consolidated by the Court.  Any motion or other papers purporting to relate to more than one action will not be accepted for filing and may be stricken by the Court.  N.D.N.Y. L.R. 10.1(c)(1).  On August 15, 2024, Plaintiff was advised by Text Order in *Kirby v. Hanks*, 5:24-cv-0124 (MAD/ML), proper case identification is required for all filings, which should include a case number, case name, and what relief Plaintiff is seeking.

"Mamoun Abraham" for John Doe, which is granted.  While piecemeal pleadings are generally

not accepted by the Court, an exception will be made since the letter was filed while the

amended complaint was still under initial review.  The amended complaint will be deemed to

name Mamoun Abraham in place of John Doe and the Court will conduct its initial review

accordingly.[6]

B.    **Color of State Law**

By its terms, Section 1983 applies only where the defendant acts "under color of any

statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of

Columbia."  42 U.S.C. § 1983; *Kern v. City of Rochester*, 93 F.3d 38, 43 (2d Cir. 1996) ("[A]

plaintiff must allege a violation of rights secured by the Constitution or laws of the United States,

and that such violation was committed by a person acting under the color of state law.").  A

"defendant in a § 1983 suit acts under color of state law when he abuses the position given to

him by the State."  *West v. Atkins*, 487 U.S. 42, 49-50 (1988).  By contrast, "acts of officers in

the ambit of their personal pursuits are plainly excluded."  *United States v. Giordano*, 442 F.3d

30, 42-43 (2d Cir. 2006) (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945) (plurality

opinion)).

"[T]here is no bright line test for distinguishing 'personal pursuits' from activities taken

under color of law."  *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994).  A defendant acts under

color of state law for the purposes of Section 1983 when he exercises a power "possessed by

---

[6] The Court reaches a different result, however, with respect to Dkt. No. 11.  Because Plaintiff's
letter includes three civil action numbers, the submission does not include a caption and, based
upon the allegations in the letter, it is not clear which action Plaintiff intended this letter to
supplement, the Court does not construe Dkt. No. 11 as a request to amend the amended
complaint.  Moving Forward, Plaintiff is advised he may not attempt to amend his pleadings in a
piecemeal manner.  *See* L.R. 15.1.

virtue of state law and made possible only because the wrongdoer is cloaked with the authority

of state law." *Colombo v. O'Connell*, 310 F.3d 115, 117-18 (2d Cir. 2002) (citation omitted).

The "focus" of the color of law inquiry is on "whether there was an abuse or misuse of a power

conferred upon [the state employee] by state authority," and "look[s] to the nature of the officer's

act, not simply his duty status." *Pitchell*, 13 F.3d at 548-49.

Courts therefore "look at a variety of factors, including, *inter alia*, whether the officer:

(1) was off-duty; (2) identified himself as an officer of the law; (3) was in uniform; (4) was

authorized to make an arrest at the time; (5) was carrying handcuffs; (6) was carrying any

weapons; (7) flashed a police badge; and (8) placed the plaintiff under arrest or otherwise

detained her." *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 372 (S.D.N.Y. 2007).  An individual

engaging in conduct as a private actor can still be liable under Section 1983, but only if he "is a

willful participant in joint action with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27-

28 (1980).  "Conclusory allegations that [the] private individual conspired or took concerted

action with state actors will not suffice" to establish this element.  *Lienau v. Garcia*, No. 12-CV-

6572, 2013 WL 6697834, at *5 (S.D.N.Y. Dec. 19, 2013) (citation and internal punctuation

omitted).

Mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be

liberally construed, *see, e.g.*, *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir.

2008), the Court assumes for purposes of initial review that defendant Abraham was acting under

color of state law.

### C.    Excessive Force

As noted above, Plaintiff lists excessive force as his first claim.  Dkt. No. 7 at 5.  "'[A]ll

claims that law enforcement officers have used excessive force . . . in the course of an arrest,

investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard.'" *Ketcham v. City of Mount Vernon*, 992 F.3d 144, 148-49 (2d Cir. 2021) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis and internal quotation marks omitted)).  Examining the reasonableness of the force used "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id*. (quoting *Graham*, 490 U.S. at 396).  An officer may not constitutionally employ "a degree of force beyond that which is warranted by the objective circumstances of an arrest." *Cugini v. City of New York*, 941 F.3d 604, 612 (2d Cir. 2019).  Additionally, "[w]hile handcuffs must be reasonably tight to be effective, overly tight handcuffing may constitute excessive force." *Lynch ex rel. Lynch v. City of Mt. Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008).

It is well-established "that the use of entirely gratuitous force is unreasonable and therefore excessive." *Tracy v. Freshwater*, 623 F.3d 90, 99 n.5 (2d Cir. 2010).  But "'[n]ot every push or shove' amounts to a Fourth Amendment violation.  Indeed, a '*de minimis* use of force will rarely suffice to state a Constitutional claim.'" *Acosta v. City of New York*, No. 11 Civ. 856, 2012 WL 1506954, at *10 (S.D.N.Y. Apr. 26, 2012) (citing *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 2005)).

Here, Plaintiff's explanation of the alleged incident with defendant Abraham is conclusory and vague.  He has not listed a date on which he was "struck" by the police vehicle and has not described *any* facts surrounding the alleged incident.  Thus, Plaintiff has not

provided "a short and plain statement of the claim showing that he is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Accordingly, the Court recommends dismissal of the excessive force claim without prejudice for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A).

**D.    False Arrest and False Imprisonment**

Liberally construed, Plaintiff alleges he was subjected to "false arrest and false imprisonment." Dkt. No. 7 at 4. A claim for false arrest or false imprisonment "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause . . . ." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citing *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995)). Such claims are one and the same because "[f]alse arrest and false imprisonment overlap; the former is a species of the latter." *Wallace v. Kato*, 549 U.S. 384, 388 (2007); *see also Jenkins v. City of New York*, 478 F.3d 76, 88 n. 10 (2d Cir. 2007) ("False arrest is simply false imprisonment accomplished by means of an unlawful arrest.") (citation omitted).

"A section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." *Jenkins*, 478 F.3d at 84 (citing *Weyant*, 101 F.3d at 852). Accordingly, to state a claim for false arrest and imprisonment, "a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (citing *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)) (internal punctuation omitted). An arrest is privileged if it is based on probable cause. *Jenkins*, 478 F.3d at 84 ("The existence of probable

cause to arrest constitutes justification and is a complete defense to an action for false arrest.")
(internal punctuation and citations omitted).  "In general, probable cause to arrest exists when the
officers have knowledge or reasonably trustworthy information of facts and circumstances that
are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested
has committed or is committing a crime.  *Weyant*, 101 F.3d at 852.

Here, Plaintiff alleges in wholly conclusory fashion he was subject to a false arrest and
false imprisonment.  He alleges no facts related to his arrest suggesting there was no probable
cause for his arrest.  Further, to the extent that Plaintiff may be claiming that the alleged
unlawful search led to his arrest and, thus, the arrest was unlawful, said claim does not set forth a
cognizable false arrest claim because the "fruit of poisonous tree" doctrine applied in criminal
cases to exclude evidence derived from an unlawful act—e.g., an unlawful search or seizure—
does not apply to § 1983 actions.  *See Tinsdale v. Hartley*, 442 F. Supp. 3d 569, 573 (W.D.N.Y.
2020) (citing, *inter alia*, *DiMascio v. City of Albany*, 205 F.3d 1322 (Table), No. 99-7653, 2000
WL 232053, at *1 (2d Cir. 2000) ("We have held . . . that the fruit of the poisonous tree doctrine
is inapplicable to civil § 1983 actions." (internal punctuation omitted))).

Therefore, the Court recommends dismissal of Plaintiff's false arrest or false
imprisonment claim without prejudice for failure to state a claim upon which relief may be
granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A).

### E.    Illegal Search

Plaintiff also alleges he was searched "illegally" by defendant Abraham.  Dkt. No. 7 at 4.
The Fourth Amendment protects individuals "against unreasonable searches and seizures."  U.S.
Const. amend. IV.  "A warrantless search is 'per se unreasonable . . .  subject to only a few
specifically established and well-delineated exceptions.'"  *United States v. Elliott*, 50 F.3d 180,

10

185 (2d Cir.1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). A search incident to an arrest, however, "constitutes an exception to the warrant requirement" imposed by the Fourth Amendment. *Riley v. California*, 573 U.S. 373, 382 (2014). Nevertheless, there are limitations upon the scope of an appropriate search incident to an arrest. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995). Indeed, whether a search incident to an arrest was lawful turns upon whether such search was reasonable. *Id*. The permissibility of a search "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989).

Here, the Court finds Plaintiff's allegations regarding the alleged illegal search are entirely conclusory and insufficient to plead a plausible cause of action. Plaintiff merely alleges that defendant Abraham "searched me which is violating my rights," Dkt. No. 7 at 4, "but fails to support this assertion with any supporting factual allegations." *Lautman v. Vill. of Saugerties, N.Y.*, No. 1:13-CV-00264 (MAD), 2014 WL 1653189, at *6 (N.D.N.Y. Apr. 23, 2014) (citing *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994)); *see also Cannon v. Wood*, No. 9:10-cv-1332 (GTS/RFT), 2011 WL 7071100, *7 (N.D.N.Y. Aug. 12, 2011) (dismissing the plaintiff's illegal search claim where the plaintiff merely "states in a conclusory fashion that he was subjected to an illegal search" and the complaint was "devoid of any factual allegations to support this claim").

Accordingly, the Court recommends dismissal of Plaintiff's illegal search claim without prejudice for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A).

### F.    Conditions of Confinement

Plaintiff lists "unconstitutional conditions of confinement" as his second claim.  Dkt. No. 7 at 5.  Even when liberally construed, it is entirely unclear to the Court what "conditions" Plaintiff claims are "unconstitutional" or who was personally involved in the constitutional violation or when and where the alleged deprivation occurred.  Accordingly, the Court recommends dismissal of Plaintiff's condition of confinement claim without prejudice for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A).

### G.    Rule 10

Plaintiff refers to the "Justice Center medical staff" in the body of the amended complaint.  *See* Dkt. No. 7 at 4.  Rule 10(a) of the Federal Rules of Civil Procedure provides that, "the title of the complaint must name all the parties."  Fed. R. Civ. P. 10(a).  A party not named in the caption of the complaint is not a party to the action.  *Abbas v. U.S.*, No. 10-CV-0141, 2014 WL 3858398, at *2 (W.D.N.Y. Aug. 1, 2014) (holding that the failure to name the individual defendants against whom the plaintiff intends to assert claims makes it "infeasible for the Court to determine which of the individual officers mentioned in the body of the complaint should be deemed to be defendants to which claims").

Accordingly, the Court does not construe any claims in the amended complaint to be asserted against the Justice Center medical staff.  *See Whitley v. Krinser*, No. 06-CV-0575, 2007 WL 2375814, at *1 (W.D.N.Y. Aug. 15, 2007) ("If people are not also named in the caption of the [ ] complaint, they will not be defendants in the case.").

Even if the amended complaint was liberally construed to assert a Fourteenth Amendment medical indifference claim against the Justice Center medical staff, the claim would

12

fail for two reasons.  First, "[p]leadings that do not differentiate which defendant was involved in the unlawful conduct are insufficient to state a claim." *Ying Li v. City of New York*, No. 15-CV-1599, 2017 WL 1208422, at *6 (E.D.N.Y. Mar. 31, 2017); *see also Wright v. Orleans Cnty.*, No. 14-CV-0622, 2015 WL 5316410, at *13 (W.D.N.Y. Sept. 10, 2015) (noting in a Section 1983 case that "[g]roup pleading is insufficient for purposes of Rule 8(a)(2) which requires a short and plain statement of the claim showing that the pleader is entitled to relief" (citation and internal punctuation omitted)); *Holmes v. Allstate Corp.*, No. 11-CV-1543, 2012 WL 627238, at *7 (S.D.N.Y. Jan. 27, 2012) ("Rule 8(a) is violated where a plaintiff, by engaging in 'group pleading,' fails to give each defendant fair notice of the claims against it."); *see, e.g.*, *Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 493-94 (S.D.N.Y. 2014) (dismissing without prejudice excessive force claim asserted against "members of the 'Special Search Team' and 'ESU Officers'" and noting that, "[t]o the extent that [plaintiff] does not know the names of the members of the Special Search Team or ESU Officers involved, he may name 'John Doe' defendants and include as much identifying information as he has knowledge of, for the purpose of filing an amended complaint" should he choose to do so).

Second, to state a Fourteenth Amendment medical indifference claim, a detainee "must meet two requirements: (1) that Plaintiff[ ] had a serious medical need . . ., and (2) that the Defendants acted with deliberate indifference to such needs." *Charles v. Orange Cnty.*, 925 F.3d 73, 86 (2d Cir. 2019) (citing *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); and *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017)).  A detainee's medical need is "sufficiently serious" where it "contemplates a condition of urgency such as one that may produce death, degeneration, or extreme pain." *Charles*, 925 F.3d at 86 (citing *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)).  To satisfy the deliberate indifference requirement, a pretrial detainee "can allege either

that the defendants *knew* that failing to provide the complained of medical treatment would pose a substantial risk to his health or that the defendants *should have known* that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health." *Id*. at 87 (emphasis in original).

Here, even if Plaintiff had alleged a defendant's personal involvement, Plaintiff's sparse allegations do not satisfy either prong of a plausible deliberate indifference to medical needs claim. Plaintiff's conclusory allegation that "I had to walk to court holding my arm in my left hand after being deny an arm slang by Justice Center medical staff" is insufficient given that the Second Circuit has made clear that "mere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703. "Nor does the fact that an inmate might prefer an alternative treatment, or feels that he did not get the level of medical attention he preferred." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citing *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)).

Thus, dismissal without prejudice would also be warranted for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A).

## IV. CONCLUSION

For these reasons, the Court recommends Plaintiff's amended complaint be dismissed in its entirety for failure to state a claim upon which relief may be granted. In recognition of his *pro se* status, the Court also recommends Plaintiff be granted leave to file a second amended complaint to cure the deficiencies identified above.[7] *See Ruffolo*, 987 F.2d at 131.

---

[7] If the District Court adopts this Report-Recommendation, the second amended complaint must comply with Rules 8 and 10 of the Federal Rules of Civil Procedure. Any second amended

**WHEREFORE**, it is hereby

**ORDERED** that the Clerk provide the Superintendent of the facility, designated by Plaintiff as his current location, with a copy of Plaintiff's inmate authorization (Dkt. No. 4), and notify the official that this action has been filed and that Plaintiff is required to pay the Northern District of New York the statutory filing fee of $350.00 in installments, over time, pursuant to 28 U.S.C. § 1915;[8] and it is further

**ORDERED** that the Clerk provide a copy of Plaintiff's inmate authorization (Dkt. No. 4) to the Financial Deputy of the Clerk's Office; and it is further

**ORDERED** that the Clerk update the docket to substitute Mamoun Abraham for John Doe; and it is further

**RECOMMENDED** that Plaintiff's amended complaint (Dkt. No. 7) be **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915(A) for failure to state a claim upon which relief may be granted; and it is further

**RECOMMENDED** that Plaintiff be granted leave to file a second amended complaint that cures the deficiencies identified in this Report-Recommendation; and it is further

---

complaint should contain *all* factual allegations relevant to Plaintiff's claims, including, when possible, the dates, times, and places of the alleged underlying acts, as well as each individual who committed each alleged wrongful act, and the paragraphs should be correctly numbered. Any second amended complaint should allege facts demonstrating the personal involvement of any named defendant. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). Any second amended complaint will replace the existing amended complaint and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Jeanty v. Sciortino*, No. 6:22-CV-319 (BKS/TWD), 2023 WL 2931863, *14 (N.D.N.Y. Apr. 13, 2023).

[8] Plaintiff will also be required to pay fees he may incur in this action, including copying and/or witness fees.

**ORDERED** that the Clerk provide Plaintiff a copy of this Report-Recommendation and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), Plaintiff has fourteen (14) days within which to file written objections to the foregoing report.[9]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**IT IS SO ORDERED.**


Dated:  October 25, 2024
        Syracuse, New York


Thérèse Wiley Dancks
United States Magistrate Judge

---

[9]  If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Case 5:24-cv-00522-BKS-TWD   Document 15   Filed 10/25/24   Page 17 of 186
Lienau v. Garcia, Not Reported in F.Supp.2d (2013)
2013 WL 6697834

2013 WL 6697834
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Raymond LIENAU, Plaintiff,

v.

P.O. Angel GARCIA, Individually, P.O.
Donald Peters, Individually, Detective
Timothy Tausz, Individually, Rachel Willgoos,
Individually, and Town of Yorktown, Defendants.

No. 12–CV–6572 (ER).
|
Dec. 19, 2013.

## *OPINION AND ORDER*

RAMOS, District Judge.

**\*1** Plaintiff Raymond Lienau ("Plaintiff" or "Lienau")
brings this action pursuant to 42 U.S.C. § 1983 against
Officer Angel Garcia ("Garcia"), Officer Donald Peters
("Peters"), Detective Timothy Tausz ("Tausz"), and the Town
of Yorktown ("Yorktown") (collectively, the "Municipal
Defendants") and Rachel Willgoos ("Willgoos"), alleging
unlawful arrest and malicious prosecution. Amended
Complaint ("Am.Compl.") (Doc. 15). The Municipal
Defendants have cross-claimed against Willgoos for
indemnification and contribution. Doc. 17. Currently before
the Court is Defendant Willgoos' motion to dismiss the
Amended Complaint, as well as the Municipal Defendants'
cross-claim. Doc. 18. For the reasons set forth below,
Defendant Willgoos' motion to dismiss is GRANTED.

## I. Factual Background
The following facts are taken from the allegations in the
Amended Complaint, which the Court accepts as true for
purposes of this motion.[1] *Famous Horse Inc. v. 5th Ave.
Photo Inc.,* 624 F.3d 106, 108 (2d Cir.2010).

[1]    The parties dispute whether the Court can consider
the documents attached to the Declaration of
Courtney Wen (Doc. 20) in determining the
sufficiency of Plaintiff's allegations on Willgoos'
motion to dismiss. As the Court finds that the

allegations contained in the Amended Complaint
fail to state a § 1983 claim against Willgoos, *see
infra,* the Court need not consider the extraneous
evidence attached to Defendant's motion papers.

### a. Background Allegations
Plaintiff and Willgoos were married in 2000 and had three
children together. Am. Compl. ¶ 17. In 2005, they got
divorced and agreed to joint custody of their children,
although Plaintiff alleges that he had physical custody of the
children the majority of the time. *Id.* ¶ 19. Plaintiff alleges
that prior to the commencement of the divorce, Willgoos
made numerous false allegations of abuse against him "in
attempts to gain order[s] of protection so that [she] could
obtain custody of the couple's children and obtain exclusive
use of the marital residence." *Id.* ¶ 22.

On November 7, 2002, Willgoos commenced a proceeding
in the Superior Court of Connecticut seeking an order of
protection and immediate custody of the couple's children.
*Id.* ¶ 23. Willgoos filed an Affidavit for Relief from Abuse
("November 7 Affidavit"), "in which she falsely stated
that Plaintiff had for the last eight months engaged in a
continually escalating pattern of behavior including verbal,
mental and physical abuse." *Id.* Plaintiff alleges that the
false allegations "were made with malice and [with] the
specific intent to obtain an order which gave [Willgoos]
custody of the children," and that at the time that Willgoos
filed the Affidavit, there was no evidence of any physical
injury corroborating her allegations of abuse. *Id.* ¶¶ 24, 26.
As a result of Willgoos' Affidavit, Plaintiff was ordered to
surrender to the Norwalk Police Department and was issued
a summons to report to the state court. *Id.* ¶ 28. Plaintiff
alleges that officers from the Norwalk Police Department
contacted his father, who was an active duty detective with
the Yorktown Police Department at the time, to inform him of
Willgoos' allegations against Plaintiff. *Id.* ¶¶ 27, 29. Plaintiff's
father then informed his fellow Yorktown police officers
that "his son's wife was making false allegation[s] of abuse"
against Plaintiff. *Id.* ¶ 30.

**\*2** Plaintiff alleges that as a result of Willgoos' November
7 Affidavit, the Connecticut state court awarded her an *ex
parte* order of protection against Plaintiff. *Id.* ¶ 31. However,
immediately prior to the hearing on the order, Willgoos
withdrew her Affidavit and the proceeding was dismissed. *Id.*
¶ 32.

Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 18 of 186
Lienau v. Garcia, Not Reported in F.Supp.2d (2013)
2013 WL 6697834

Approximately four months later, on March 20, 2003, Willgoos filed another Affidavit for Relief from Abuse ("March 20 Affidavit") in the Superior Court of Connecticut, "in which she falsely alleged that Plaintiff continuously hit her, poked her in the face, shoved her to the floor while she was holding a child and that said events occurred in front of the children." *Id.* ¶ 34. Plaintiff alleges that Willgoos made the allegations in the Affidavit with knowledge that they were false and "with malice and spite, so that she could again use the legal system as a tool to advantage herself and harm the Plaintiff." *Id.* ¶ 37. As a result of the March 20 Affidavit, the Connecticut state court awarded another order of protection to Willgoos. *Id.* ¶ 38. Plaintiff alleges that Willgoos again withdrew the March 20 Affidavit immediately prior to the hearing on the order of protection, and that the proceeding was therefore dismissed. *Id.* ¶ 39.

Plaintiff further claims that after his father's retirement from the Yorktown Police Department,[2] he remained in contact with various police officers and "made it known to the Yorktown Police officers that [Defendant] Willgoos had repeatedly made false allegations of abuse." *Id.* ¶ 41. Accordingly, Plaintiff alleges that the "lack of merit" of Willgoos' claims "were common knowledge among members of the Yorktown Police Department by virtue of the fact that Plaintiff's father had discussed the fabricated complaints with other officers" at the police department. *Id.* ¶ 42.

2     The Amended Complaint does not indicate the date of Plaintiff's father's retirement.

Plaintiff further alleges that on or about March 1, 2008, Willgoos attacked Plaintiff with a knife after Willgoos had become enraged that Plaintiff's mother had visited the children. *Id.* ¶ 44. Plaintiff reported the attack to Officer McGuinan at the Yorktown Police Department, however, Officer McGuinan refused to file a report or arrest Willgoos "despite obvious evidence of a knife wound to the Plaintiff's hand." *Id.* ¶ 45. Plaintiff alleges that the following day, Willgoos falsely claimed to the Yorktown Police Department that Plaintiff had assaulted her. *Id.* ¶ 46. Willgoos signed a supporting deposition in which she falsely stated that on March 1, 2008, Plaintiff punched her in the head and face, grabbed her and threw her on the bed and ripped off her shirt, and that that she sustained a bloody nose and bumps on her head. *Id.* ¶ 49. Plaintiff claims that although there was no physical evidence of the alleged assault, he was nevertheless arrested by members of the Yorktown Police Department and charged with assault in the third degree, and that Willgoos

obtained an order of protection "based upon [the] fabricated allegations of abuse." *Id.* ¶¶ 48, 52.

*3  On March 3, 2008, Willgoos filed a petition in family court requesting full custody of the children, falsely alleging, *inter alia,* that Plaintiff hit her in the head with a closed fist, causing pain in her jaw and a bloody nose, threatened to break her personal belongings, and then grabbed her and ripped her shirt. *Id.* ¶¶ 53–54; *see also id.* ¶¶ 56–57. Plaintiff alleges that the March 3, 2008 petition was withdrawn prior to the court conducting a hearing "because Willgoos knew the allegations contained therein were meritless and fabricated." *Id.* ¶ 59.

Plaintiff generally claims that prior to February 4, 2010, Willgoos had "perpetrated a pattern, scheme and modus operandi whereby ... she attempted to gain leverage ... in the custody litigation by making numerous baseless allegations of abuse against Plaintiff to various members of law enforcement [,] including the Yorktown Police Department." *Id.* ¶ 60. Plaintiff further alleges that the Municipal Defendants were aware of Willgoos' pattern of making false complaints of abuse in an attempt to gain a tactical advantage in the pending custody action. *Id.* ¶ 61.

### b. The February and April 2010 Arrests and Resulting Prosecution of Plaintiff

On or about January 18, 2010, Willgoos filed an application for sole custody, in which she "again made false allegations that Plaintiff had physically abused her." *Id.* ¶ 63. Plaintiff alleges that the application for custody was denied on February 1, 2010 and that thereafter, Willgoos "became enraged, combative, angered and resentful and devised a plot to seek retribution against the Plaintiff by again making fabricated allegations ... of criminal activity to both have Plaintiff falsely arrested/prosecuted and to enable her to make a further petition for custody." *Id.* ¶¶ 64–65.

On February 4, 2010, Plaintiff dropped the couple's son off for visitation with Willgoos. *Id.* ¶ 68. When Plaintiff called Willgoos' residence later that day to speak with his son, who was sick at the time, he learned that Willgoos had left their son with Willgoos' boyfriend, in violation of a court order that required Willgoos to advise Plaintiff of the names of any individuals who would be babysitting their children. *Id.* ¶¶ 69–71. Upon learning that Willgoos had left their son in the care of her boyfriend, Plaintiff called Willgoos to discuss the situation; however, Plaintiff alleges that in the middle of their conversation, Willgoos hung up on him. *Id.* ¶¶ 72–73. Plaintiff claims that Willgoos knew that when she hung up on

Plaintiff, he would call back to continue the conversation, and that each time Plaintiff "reinitiated the call," Willgoos would either answer the call and immediately hang up on him or let the call go to voicemail. *Id.* ¶¶ 76–78.

Although Plaintiff claims that Willgoos "knew that [he] was calling with a legitimate purpose and [that] it was her intentional disconnecting of the calls that prompted Plaintiff to reinitiate the calls," Willgoos nevertheless contacted the Yorktown Police Department and reported to Defendant Garcia that Plaintiff was harassing her. *Id.* ¶¶ 79–80. Plaintiff alleges that Willgoos knowingly reported false information to Garcia and other members of the police department, including that Plaintiff threatened her, that Plaintiff said, "heads will roll, you fucking wait," and that Plaintiff repeatedly called her with no legitimate purpose other than to annoy, harass and alarm her. *Id.* ¶¶ 81, 84. Plaintiff further claims that Willgoos failed to inform Garcia or other officers of the motivation for Plaintiff's calls, i.e., to discuss the care of their sick child, *id.* ¶ 82, and that Plaintiff made the false statements "out of malice, spite and retribution for her application for custody of the children" and "for the specific purpose of instigating Plaintiff's baseless arrest and prosecution," *id.* ¶¶ 83, 85, 94–95.

**\*4** On or about February 4, 2010, Garcia arrested Plaintiff for aggravated harassment "without a warrant and without probable cause to believe that Plaintiff had committed any crime or violation." *Id.* ¶¶ 88–89. Garcia prepared and signed a misdemeanor information charging Plaintiff with aggravated harassment in the second degree, and forwarded same to the District Attorney's office. *Id.* ¶ 90. Following Plaintiff's arraignment, the court issued an order of protection against him. *Id.* ¶ 101. Plaintiff alleges that by preparing the misdemeanor information, Garcia "initiated and continued a prosecution against the Plaintiff without probable cause to believe the prosecution could proceed and with malice." *Id.* ¶ 91. Additionally, Plaintiff claims that prior to the trial on Plaintiff's claims, Willgoos falsely informed the prosecutor that Plaintiff called her with the specific intent to harass and annoy her and, thus, along with the other Defendants, "induced the prosecutor to initiate and continue a baseless prosecution." *Id.* ¶¶ 96–98, 104.

Plaintiff further claims that on or about April 7, 2010, when Plaintiff was dropping one of his children off with Willgoos, she failed to provide Plaintiff with certain information that she was required to provide pursuant to a court order. *Id.* ¶¶ 115–16. Plaintiff advised Willgoos that he was going to the police department to file a complaint about her refusal to abide by the court order. *Id.* ¶ 117. Plaintiff alleges that Willgoos subsequently contacted the Yorktown Police Department and falsely complained that Plaintiff had violated an order of protection by threatening her. *Id.* ¶¶ 119–20. Plaintiff alleges that Willgoos conveyed this false information "for the sole purpose of having Plaintiff baselessly arrested and prosecuted for a crime he did not commit in anticipation of pursuing yet another baseless application to the Family Court for sole custody." *Id.* ¶ 121. Based upon Willgoos' "fabricated account and contrived complaint," Defendant Peters arrested Plaintiff "without a warrant and without probable cause" and charged him with criminal contempt in the second degree. *Id.* ¶¶ 124, 127. Peters also prepared and signed a misdemeanor information "which contained materially false statements of fact" and forwarded it to the prosecutor. *Id.* ¶¶ 130–31. Following Plaintiff's arraignment, another order of protection was issued against him. *Id.* ¶ 133. Plaintiff claims that Willgoos again repeated the false allegations against Plaintiff to the prosecutor prior to the case being tried. *Id.* ¶ 134.

The aforementioned charges were resolved in Plaintiff's favor on August 9, 2011 when the Honorable Ilan D. Gilbert dismissed the charges against him. *Id.* ¶¶ 106, 135.

## II. Legal Standard

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all of the factual allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor. *Famous Horse Inc.,* 624 F.3d at 108. However, this requirement does not apply to legal conclusions, bare assertions, or conclusory statements. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to state a claim to relief that is plausible on its face.' " *Id.* (citing *Twombly,* 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly,* 550 U.S. at 556).

## III. Plaintiff Fails to Sufficiently Plead Joint Action Between Willgoos and the Municipal Defendants

**\*5** Willgoos argues that the Amended Complaint should be dismissed in its entirety as against her because she is not a state actor and Plaintiff has failed to sufficiently plead "joint

Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 20 of 186
Lienau v. Garcia, Not Reported in F.Supp.2d (2013)
2013 WL 6697834

action" between Willgoos and the Municipal Defendants. Def.'s Mem. L. (Doc. 19) at 10–13.

In order to state a claim under § 1983, a plaintiff must allege a constitutional violation committed under color of state law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50 (1999). "[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Id.* at 50 (internal quotation marks and citation omitted). However, a plaintiff may maintain a § 1983 claim against a private actor if the plaintiff sufficiently alleges that the private actor "is a willful participant in joint action with the State or its agents." *Dennis v. Sparks,* 449 U.S. 24, 27–28 (1980) ("Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions.") (citation omitted). "The touchstone of joint action is often a 'plan, prearrangement, conspiracy, custom, or policy' shared by the private actor and the police." *Forbes v. City of New York,* No. 05 Civ. 7331(NRB), 2008 WL 3539936, at *5 (S .D.N.Y. Aug. 12, 2008) (citing *Ginsberg v. Healey Car & Truck Leasing, Inc.,* 189 F.3d 268, 272 (2d Cir.1999)). To establish joint action, a plaintiff must show "that the private citizen and the state official shared a common unlawful goal; the true state actor and the jointly acting private party must agree to deprive the plaintiff of rights guaranteed by federal law." *Bang v. Utopia Rest.,* 923 F.Supp. 46, 49 (S.D.N.Y.1996). "The Supreme Court has also explained joint action through the concept of a 'meeting of the minds' between law enforcement and private individuals." *Forbes,* 2008 WL 3539936, at *5 (citing *Adickes v. Kress & Co.,* 398 U.S. 144, 158 (1970)).

Moreover, to state a plausible § 1983 claim against a private individual, "[c]onclusory allegations that [the] private individual conspired or took concerted action with state actors will not suffice." *Watson v. Grady,* No. 09 Civ. 3055(KMK), 2010 WL 3835047, at *8 (S.D.N.Y. Sept. 30, 2010) (citations omitted). Rather, a plaintiff must allege "a sufficiently close nexus between the State and the challenged action of the private party so that the action of the latter may be fairly treated as that of the State itself, or that the private actor was jointly engaged with state officials in a conspiracy to deprive the plaintiff of his constitutional rights." *Id.* (internal quotation marks and brackets omitted) (quoting *Bhatia v. Yale Sch. of Med.,* 347 F. App'x 663, 664–65 (2d Cir.2009) (summary order)); *accord Johnson v. City of New York,* 669 F.Supp.2d 444, 450–51 (S.D.N.Y.2009) ("[A] plaintiff must allege that the private entity and state actors carried out a

deliberate, previously agreed upon plan, or that their activity constituted a conspiracy or meeting of the minds .") (internal quotation marks, brackets and citations omitted).

**\*6** Case law in this Circuit is well-established that the provision of information to a police officer—even if that information is false or results in the officer taking affirmative action—is insufficient to constitute "joint action" with state actors for purposes of § 1983. *Young v. Suffolk Cnty.,* 705 F.Supp.2d 183, 196 (E.D.N.Y.2010) ("The provision of information to or summoning of police officers, even if that information is false or results in the officers taking affirmative action, is not sufficient to constitute joint action with state actors for purposes of § 1983.") (citing *Ginsberg,* 189 F.3d at 272) ("[Defendant]'s provision of background information to a police officer does not by itself make [Defendant] a joint participant in state action under § 1983[and] Officer Fitzgerald's active role in attempting to resolve the dispute after [Defendant] requested police assistance in preventing further disturbance also does not, without more, establish that [Defendant] acted under color of law.")); *Valez v.. City of New York,* No. 08 Civ. 3875(DLC), 2008 WL 5329974, at *1, *3 (S.D.N.Y. Dec. 16, 2008) (holding that plaintiff failed to state a claim under § 1983 against his landlords based on allegations that the landlords gave the police false information that plaintiff was planting marijuana in his yard "out of malice and in an effort to get [the plaintiff] ejected from the home he was renting" where plaintiff failed to "allege facts suggesting that defendants and the police had any meeting of the minds or intent to conspire"); *see also Del Col v. Rice,* No. 11 Civ. 5138(MKB), 2012 WL 6589839, at *8 (E.D.N.Y. Dec. 18, 2012) ("In order to satisfy the joint activity requirement, there needs to be something more than an allegation that the private party supplied information, even false information, to the police.") (citing *Stewart v. Victoria's Secret Stores, LLC,* 851 F.Supp.2d 442, 446 (E.D.N.Y.2012) ("A private party supplying information or seeking police assistance 'does not become a state actor ... unless the police officers were improperly influenced or controlled by the private party.' ") (alteration in original) (citations omitted)).

Similarly, if a police officer's actions are based on the officer's own independent judgment, rather than the directive of the private party, the private party will not be deemed a state actor. *See Young,* 705 F.Supp.2d at 196 (citing *Shapiro v. City of Glen Cove,* 236 F. App'x 645, 647 (2d Cir.2007) ("No evidence supports [Plaintiff]'s contention that [the private defendant] acted jointly with the [municipal] defendants to deprive her of her constitutional rights, and ample evidence

Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 21 of 186
Lienau v. Garcia, Not Reported in F.Supp.2d (2013)
2013 WL 6697834

shows that the [municipal] officials who searched her house exercised independent judgment rather than acting at [the individual defendant's] direction."); *Fisk v. Letterman,* 401 F.Supp.2d 362, 377 (S.D.N.Y.2005) ("[A] private party who calls the police for assistance does not become a state actor unless the police were influenced in their choice of procedure or were under the control of the private party."); *Serbalik v. Gray,* 27 F.Supp.2d 127, 131–32 (N.D.N.Y .1998) ("[A] private party does not act under color of state law when she merely elicits but does not join in an exercise of official state authority.") (citations omitted).

**\*7** Here, Willgoos argues that the Amended Complaint fails as a matter of law "because it contains nothing more than conclusory allegations of concerted action between Willgoos and [the] Municipal Defendants." Def.'s Mem. L. at 12. Plaintiff, on the other hand, argues that the Amended Complaint sufficiently alleges that Willgoos acted jointly with the Municipal Defendants "by making malicious and knowing false accusations," thereby instigating Plaintiff's arrest and "jointly act[ing] with the police defendants by fabricating a contrived statement to baselessly continue the prosecution, thereby joining in the exercise of state authority." Pl.'s Mem. L. Opp. (Doc. 21) at 14. In support of his "joint action" theory, however, Plaintiff merely sets forth conclusory allegations of concerted action in the Amended Complaint which, standing alone, are insufficient to state a claim against a private actor under § 1983. Specifically, Plaintiff summarily alleges that at all relevant times, Willgoos "engaged in joint action with the state actor defendants," Am. Compl. ¶ 16, that the Municipal Defendants "were complicit in Rachel Willgoos' scheme to ... victimize Plaintiff," *id.* ¶ 43, that Willgoos was "a willful participant in the false arrest and prosecution of the Plaintiff," *id.* ¶ 85, *see also id.* ¶¶ 98, 123, and that Plaintiff "acted jointly with [Defendants] in causing the arrest of Plaintiff by knowingly and intentionally providing false information that Plaintiff had yelled at her and threatened her," *id.* ¶ 128. Plaintiff fails to allege *any* specific facts or events demonstrating that the Municipal Defendants were in fact aware of or participants in Willgoos' alleged "scheme," or from which the inference can be drawn that that Willgoos and the Municipal Defendants had a plan or prearrangement to violate Plaintiff's constitutional rights. Indeed, Plaintiff himself *admits* in his opposition papers that merely providing information to a police officer does not transform a private actor into a state actor, and that a private actor only becomes a state actor for § 1983 purposes when she "takes a more active role and jointly engages in action with state actors." Pl.'s Mem. L. Opp. at 14. Here, however,

Plaintiff has failed to allege any facts suggesting that Willgoos did, in fact, directly engage with the Municipal Defendants or take an active role in the arrest of Plaintiff.

Moreover, Plaintiff does not allege any facts suggesting that Willgoos exercised control or undue influence over the Municipal Defendants. To the contrary, Plaintiff's allegations establish that Willgoos reported certain incidents regarding Plaintiff to the police, and that the police exercised independent judgment in arresting Plaintiff. Indeed, Plaintiff himself admits that prior to both his arrests by the Municipal Defendants, orders of protection had been issued against him by the state court. *See* Am. Compl. ¶¶ 52 (March 2008 order of protection), 101 (February 2010 order of protection). Moreover, with respect to Plaintiff's February 2010 arrest, Plaintiff *admits* that the incident giving rise to Willgoos' complaint to the police department—i.e., that Plaintiff repeatedly called Willgoos after she had hung up the phone on him-did, in fact, occur, although he claims that he was calling for a legitimate purpose. *See id.* ¶¶ 76–79. Accordingly, even accepting Plaintiff's allegations as true for purposes of Willgoos' motion to dismiss, it was reasonable for the Municipal Defendants to arrest Plaintiff based upon allegations that he had violated the existing orders of protection by harassing and threatening Willgoos.

**\*8** Although Plaintiff alleges that Willgoos' complaints to the police were fabricated, he does not allege that the Municipal Defendants actually *knew* that Willgoos' allegations were false or that Willgoos ever indicated to them that she was making such allegations in order to gain leverage in her custody case. Plaintiff's general allegation that the Municipal Defendants *should* have known that Willgoos' allegations were false because Plaintiff's father had previously told members of the Yorktown Police Department that Willgoos was fabricating allegations against Plaintiff, *id.* ¶¶ 41–43, 61–62, 87, 92, 122, is insufficient to state a claim that *Willgoos* and the Municipal Defendants acted pursuant to a deliberate, previously-agreed upon plan to violate Plaintiff's constitutional rights.

The cases upon which Plaintiff relies in support of his argument that Willgoos acted jointly with the Municipal Defendants are distinguishable from the facts at issue here, as they involve allegations of *direct involvement* and *active participation* by the private defendant in the alleged state action.[3] *See, e .g., Anilao v. Spota,* 774 F.Supp.2d 457, 500–02 (E.D.N.Y.2011) (holding that plaintiffs sufficiently alleged "joint action" where private defendants arranged a meeting

with the district attorney "for the purpose of ... pressuring [the district attorney] to file an indictment that he would not otherwise have filed against the plaintiffs," where the private defendants and the County defendants subsequently "agreed that the indictment [of plaintiffs] ... was procured, in part, through the use of false testimony ... as well as by the withholding of exculpatory evidence," and where the County defendants "agreed to do what was necessary to procure the indictment, for the sole benefit of the [private defendants]") [4]; *Young,* 705 F.Supp.2d at 191, 198–99 (holding that private actor defendants were more than "mere complainants" where plaintiff alleged that defendants "brought garbage, debris, urine, feces and other matters" into the plaintiff's residence while she and her children were absent "in order to create unsanitary, uninhabitable, and unsafe conditions therein," subsequently summoned the police to the residence, "authorized or consented to the search (even though they allegedly lacked such authority), and accompanied the police on the alleged unlawful search itself"); *Watson,* 2010 WL 3835047, at *8 (holding that plaintiff plausibly stated a claim that private defendant was working in concert or conspiring with state actors to maliciously prosecute plaintiff where private defendant worked with state actors "to frame allegations against Plaintiff" and state actors "ignored facts that would exonerate Plaintiff in order to protect [the private defendant]"). [5]

[3]      Contrary to Plaintiff's contention, in *TADCO Constr. Corp. v. Dormitory Auth. of the State of New York,* 700 F.Supp.2d 253 (E.D.N.Y.2010), the court did not "implicitly [hold] that the alleged actions sufficed to establish action under the color of law." Pl.'s Mem. L. Opp. at 16. Rather, the court did not decide the issue *at all* in light of the defendants failure to "challenge plaintiffs' claim that [they] were acting under color of state law." *TADCO Constr. Corp.,* 700 F.Supp.2d at 262. Plaintiffs' reliance on *Stampf v. Long Island R.R. Auth.,* No. 07 Civ. 3349(SMG), 2011 WL 3235704 (E.D.N.Y. July 28, 2011), is similarly misplaced. In that case, the court considered whether an individual who encouraged the authorities to act may be held liable for malicious prosecution under New York law. *Id.* at * 1. Contrary to Plaintiff's contention, the court *did not* address the question of whether that individual defendant's actions in lying to the police constituted "joint action" sufficient to hold the defendant liable under § 1983. *Id.*

[4]      As to a second set of private actor defendants, the court in *Anilao* held that allegations that the defendants "filed complaints against plaintiffs with the New York State Education Department and the Suffolk County Police Department" were insufficient to render the private parties "state actors" for purposes of § 1983 liability. *Id.* at 503. Thus, the court found that "in the absence of any allegations that [the private defendants] were more directly involved in the investigation and prosecution of plaintiffs," the § 1983 claims against the private defendants should be dismissed. *Id.*

[5]      Plaintiff also relies on *Weintraub v. Bd. of Educ. of City of New York,* 423 F.Supp.2d 38, 58 (E.D.N.Y.2006), which contains broad language suggesting that a civilian who makes a false statement to a police officer can be held liable for joint action under Section 1983. *Id.* at 58 ("If a victim makes false statements to the police, with the intent to have an innocent person arrested ... she may not only be held accountable for false imprisonment under state tort law, but under federal law, for invoking the state's power to intentionally violate a citizen's constitutional rights."). However, cases interpreting *Weintraub* have limited its application to the narrow circumstances presented in that case, which involved allegations demonstrating a long-standing vendetta by the private defendant against the plaintiff. *See Samtani v. Cherukuri,* No. 11 Civ. 2159(CBA)(RER), 2012 WL 1657154, at *4 (E.D.N.Y. May 11, 2012) (citing cases), *vacated on other grounds,* 2012 WL 1821413 (E.D.N.Y. May 18, 2012); *see also Thomas v. City of New York,* No. 12 Civ. 5061(FB)(SMG), 2013 WL 3810217, at *4–*5 (E.D.N.Y. July 23, 2013) (holding that "[u]nlike the longstanding vendetta in *Weintraub,* which consisted of 11 acts over more than 1 year, plaintiff alleges just 3 acts occurring within 1 week," and that "even assuming that the [private] defendants made a false report to the police, bad faith cannot be inferred from [that] act alone"). Moreover, at least one court has questioned whether *Weintraub* was even correctly decided under relevant Supreme Court precedent. *Samtani,* 2012 WL 1657154, at *4. Another case on which Plaintiff relies, *Coakley v. Jaffe,* 49 F.Supp.2d 615 (S.D.N.Y.1999), is similarly

Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 23 of 186

distinguishable, as there, the plaintiffs alleged that the private defendants, who conspired to obtain an unwarranted criminal indictment against the plaintiffs, actually worked with the district attorney, whose "connivance" they eventually obtained. *Id.* at 620. The plaintiffs alleged that the district attorney then conducted "a flawed investigation" and purportedly impeded the plaintiffs' ability to defend themselves. *Id.*

Unlike the private defendants in the aforementioned cases, Willgoos is alleged *only* to have provided information—albeit false information—about Plaintiff to the Municipal Defendants. Other than conclusory allegations that Willgoos acted jointly with the Municipal Defendants, Plaintiff fails to set forth *any* allegations that Willgoos was directly involved or actively participated in the subsequent arrest and prosecution of Plaintiff. Accordingly, as Plaintiff's conclusory allegations of joint action are insufficient to state a § 1983 claim against Willgoos—a private actor—the Amended Complaint must be dismissed as against Willgoos. [6]

---

[6]  Willgoos argues in the alternative that dismissal of the Amended Complaint is proper because, even assuming Plaintiff sufficiently alleged joint action, he fails to state a claim for malicious prosecution under New York law. Def.'s Mem. L. at 15. As the Court finds that Plaintiff has failed to allege joint action between Willgoos and the Municipal Defendants, Plaintiff's Amended Complaint is dismissed in its entirety against Willgoos, and it therefore need not address the sufficiency of Plaintiff's underlying allegations of Defendants' constitutional violations.

### IV. The Municipal Defendants' Cross–Claim is Dismissed

**\*9** The Municipal Defendants cross-claimed against Willgoos pursuant to CPLR § 3019 [7] and/or for "indemnification and apportionment of responsibility, if any." Doc. 17. Willgoos moves for dismissal of the cross-claim on several bases. *See* Def.'s Mem. L. at 22–24. The Municipal Defendants have not filed any papers in response to Willgoos' motion to dismiss their cross-claim.

---

[7]  CPLR § 3019(b) states: "(b) Subject of cross-claims. A cross-claim may be any cause of action in favor of one or more defendants or a person whom a defendant represents against one or more

defendants, a person whom a defendant represents or a defendant and other persons alleged to be liable. A cross-claim may include a claim that the party against whom it is asserted is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant."

The Court finds that dismissal of the Municipal Defendants' cross-claim is warranted. As an initial matter, Plaintiff has failed to state a § 1983 claim against Willgoos, as discussed *infra,* and the Municipal Defendants merely rely on Plaintiff's deficient Amended Complaint in support of their cross-claim for contribution. Dismissal is therefore warranted on that basis alone.

Even assuming *arguendo* that Plaintiff sufficiently stated a § 1983 claim against Willgoos, however, case law in this Circuit is clear that there is no right to contribution or indemnification under § 1983. *See Castro v. Cnty. of Nassau,* 739 F.Supp.2d 153, 184 (E.D.N.Y.2010) ("No right to contribution exists under § 1983. Nor is there a federal right of indemnification under the statute.") (citations omitted); *Mason v. City of New York,* 949 F.Supp. 1068, 1079 (S.D.N.Y.1996) ("[F]ederal law does not establish a right to contribution under Section 1983."). Courts in this Circuit have also consistently held that a defendant cannot incorporate state law claims for contribution or indemnification under § 1983 pursuant to 42 U.S.C. § 1988. [8] *See, e.g., Greene v. City of New York,* No. 08 Civ. 243(RJD)(CLP), 2010 WL 1936224, at \*4 (E.D.N.Y. May 12, 2010) ("Even assuming that New York law provides for a right to contribution under these circumstances ... permitting the [Defendant] to invoke a state law right to contribution on Greene's federal claims asserted under Section[ ] 1983 ... would be inconsistent with Congress's purpose of deterring the deprivation of constitutional rights in enacting [that] statute[ ]."); *Crews v. Cnty. of Nassau,* 612 F.Supp.2d 199, 213 (E.D.N.Y.2009 ("[T]his Court agrees with the clear majority of courts that, in general, permitting a right of contribution under Section 1983 would conflict with the policies underlying the statute and is, therefore, inapplicable to defendants in Section 1983 actions."); *Mason,* 949 F.Supp. at 1079 ("[C]ontribution among joint tortfeasors in Section 1983 cases would conflict impermissibly with the statutory goal of deterrence and is impermissible under the third prong of the Section 1988 test.").

---

[8]  42 U.S.C. § 1988 states: "The jurisdiction in civil ... matters conferred on the district courts by the provisions of [42 U.S.C. § 1983] ... for the

Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 24 of 186
Lienau v. Garcia, Not Reported in F.Supp.2d (2013)
2013 WL 6697834

protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil ... cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause...."

Accordingly, as the Municipal Defendants' cross-claim against Willgoos relies entirely on Plaintiff's deficient Amended Complaint, and as case law in this Circuit is clear that there is no right to indemnification or contribution under § 1983, the Municipal Defendants' cross-claim is dismissed.

**V. Conclusion**

For the reasons set forth above, Willgoos' motion to dismiss the Amended Complaint and the Municipal Defendants' cross-claim is GRANTED. Accordingly, the only remaining Defendants in this case are the Municipal Defendants, i.e., Officer Angel Garcia, Officer Donald Peters, Detective Timothy Tausz, and the Town of Yorktown. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 18.

**\*10** The remaining parties are directed to appear for a conference on this matter on **Friday, January 24, 2014 at 3:00 pm.**

It is SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 6697834

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Acosta v. City of New York, Not Reported in F.Supp.2d (2012)
Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 25 of 186

2012 WL 1506954

2012 WL 1506954
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Anthony ACOSTA, Plaintiff,

v.

CITY OF NEW YORK, Inspector Michael Harrington, in
his individual and professional capacity, Police Officers
Michael Mazzilli and Police Officers "John Does" in
their individual and professional capacities, Defendants.

No. 11 Civ. 856(KBF).
|
April 26, 2012.

*MEMORANDUM & ORDER*

KATHERINE B. FORREST, District Judge.

**\*1** Plaintiff Anthony Acosta, a self-described Hispanic
male and former police officer with the New York City
Police Department ("NYPD"), brings this action against
defendants the City of New York (the "City"), Inspector
Michael Harrington (in his individual and professional
capacities), Police Officer Michael Mazzilli (in his individual
and professional capacities), and an unspecified number of
John Doe police officers. [1] Plaintiff alleges that as part of,
and subsequent to, a 2008 altercation that occurred while
plaintiff was off-duty, defendants engaged in discrimination
and retaliation in violation of Title VII of the Civil Rights
Act of 1964 ("Title VII"), 42 U.S.C. §§ 1981 and 1983, the
New York State Human Rights Law ("NYSHRL"), New York
State Exec. Law § 296 *et seq.,* and the New York City Human
Rights Law ("NYCHRL"), New York City Admin. Code § 8–
107 *et seq.,* the use of excessive force in violation of 42 U.S.C.
§ 1983, and were acting under color of state law pursuant
to unlawful policies in violation of *Monell v. Department of
Social Services,* 438 U.S. 658 (1978).

[1]     Plaintiff lists certain "John Doe" police officer
defendants in the caption of the Amended
Complaint-and makes certain allegations against
them. (*See, e.g.,* Am. Compl. ¶ 14.) However,
plaintiff has not identified those officers and there
is no indication that plaintiff has attempted to
ascertain their identities from the City. No service

has been effectuated on those John Does and
thus, they are not properly before this Court.
Accordingly, the Court only construes plaintiff's
claims against those defendants who were properly
served.

The City of New York along with defendants Harrington
and Mazzilli have moved to dismiss plaintiff s Amended
Complaint pursuant to Rule 12(b)(6) of the Federal Rules
of Civil Procedure. For the reasons that follow, defendants'
motion is granted.

FACTUAL BACKGROUND [2]

[2]     For purposes of deciding the instant motions, the
Court accepts as true all well-pleaded allegations
in plaintiff's Amended Complaint and draws all
reasonable inferences in plaintiff's favor. *See Levy
v. Southbrook Int'l Invs., Ltd.,* 263 F.3d 10, 14 (2d
Cir.2001).
        In connection with plaintiff's opposition to the
motion, plaintiff submitted various documents
not referenced in, or integral to, the Amended
Complaint. (*See* Decl. of Rocco G. Avallone in
Opp'n to Mot. to Dismiss (Dkt. No. 22) Exs. B–G.)
Consideration of such documents is inappropriate
on a motion to dismiss, *see DiFolco v. MSNBC
Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir.2010),
and the Court has not done so in connection with
deciding the instant motion.

On December 17, 2008 at approximately 11:05 p.m., plaintiff,
at that time a uniformed member of the NYPD with the rank
of Sergeant, was exiting a restaurant and bar near 1490 First
Avenue in New York City, while off duty. (Am. Compl.

(Dkt. No. 18) ¶¶ 15, 16, 18.) After plaintiff entered his
own car, through his car window he witnessed a separate
vehicle strike an individual. (*Id.* ¶ 18.) Plaintiff exited his
car to investigate and, in the process of trying to protect an
allegedly "dark skinned and possible [*sic* ] Hispanic" cab
driver from "being attacked by several [intoxicated] off duty
police officers from the 19th Precinct," was struck by a 2 x
4 piece of wood by a John Doe police officer. (*Id.*) Plaintiff
then identified himself (presumably to the John Doe police
officer) as a police officer. (*Id.* ¶ 18.)

Plaintiff alleges that Captain Pla from the 19th Precinct, [3] one of the NYPD officers at the scene of the incident, failed to take any action to protect either (a) plaintiff, who was attempting to take the 2 x 4 away from one of the John Doe off-duty police officers, or (b) the "dark skinned cab driver." (Am.Compl.¶ 19.) Plaintiff finally wrestled the 2 x 4 into his possession, after which an NYPD vehicle arrived at the scene. (*Id.* ¶ 21.) At that time, plaintiff purportedly identified himself as a police officer, and attempted to inform the "plain clothes" police officers about the car accident and altercation between the cab driver and the off-duty police officers. (*Id.*)

[3]     At all times relevant to the complaint, plaintiff was
        with the 30th Precinct. (Am.Compl.¶ 10.)

Plaintiff then purportedly approached Officer Mazzilli, identified himself as a police officer, and informed him of the altercation between the off-duty police officers and the cab driver-and pointed out the off-duty officers. (Am Compl. ¶ 23.) In response, defendant Mazzilli allegedly yelled at plaintiff to remove his hands from his pockets, grabbed plaintiff's wrist, pushed plaintiff's hands into his pockets, but then maneuvered plaintiff's elbow to try to remove plaintiff's hands from his pockets. (*Id.* ¶¶ 24–25.) At that time, plaintiff again informed defendant Mazzilli that he was an on-duty police officer, [4] to which Mazzilli responded that he did not care, punched plaintiff in the chest, threw plaintiff to the ground, and handcuffed plaintiff's left wrist. (*Id.* ¶¶ 25–26.)

[4]     Plaintiff alleges that he told defendant Mazzilli,
        "I'm a Sergeant. I'm on the job." (Am.Compl.¶ 25)
        despite the fact that plaintiff alleges earlier in the
        Amended Complaint that he was off-duty at the
        time of the alleged altercation (*id.* ¶ 18).

**\*2** Defendant Mazzilli then attempted to handcuff plaintiff's right arm behind his back but could not due to limited mobility resulting from a prior surgery. (Am.Compl.¶¶ 26–27.) Plaintiff allegedly pleaded with Mazzilli to stop, explained the problem with his right arm, and requested that two sets of handcuffs be used; Mazzilli obliged. (*Id.* ¶ 27.) A "plain clothes" John Doe police officer subsequently inquired if plaintiff was armed, and, upon learning he was not, removed both sets of handcuffs and placed plaintiff in an SUV. (*Id.* ¶ 29.) Thereafter, plaintiff was transported to the 19th Precinct for interrogation. (*Id.* ¶ 30 .)

Plaintiff alleges that defendant Inspector Michael Harrington approached him prior to his interrogation, informed him that

he was not a subject of the investigation of the assault against the cab driver, but that he should lie during questioning regarding both what had occurred between the John Doe officers and the cab driver and what had occurred between plaintiff and Officer Mazzilli. Harrington then allegedly provided plaintiff with the version of the story he should tell to protect the off-duty police officers. (Am.Compl.¶¶ 31, 34–35.) According to plaintiff, Harrington provided his directives in front of two Sergeants–Mulvey and Cosmo-who allegedly were delegates from the Sergeants Benevolent Association. (*Id.* ¶¶ 32, 34.) Plaintiff informed Sergeants Mulvey and Cosmo of what had occurred, after which Mulvey informed plaintiff that it was inadvisable to go to the hospital for his purported injuries because the investigators "were looking to suspend Plaintiff" and a hospital visit would make plaintiff look "uncooperative and guarantee a suspension." (*Id.* ¶¶ 32, 33.) Based on that information, plaintiff allegedly did not seek medical attention subsequent to his interrogation. (*Id.* ¶ 33.)

Plaintiff, however, purportedly informed defendant Harrington that he would refuse to provide the story that Harrington had requested he give. (Am.Compl.¶ 31.) It is alleged, however, that "defendants" never interviewed the John Doe police officers who had seen the altercation between Mazzilli and plaintiff. (*Id.* ¶ 44.) Mulvey then spoke to Harrington and informed plaintiff that plaintiff was going to be placed on "Modified status;" he was placed on such status shortly thereafter. (*Id.* ¶ 36.) The Amended Complaint does not contain an explanation of the meaning of being placed on modified status.

Plaintiff alleges that he was also "issued Charges and Specifications" on August 18, 2009, and October 29, 2009, for failing to lie during his interrogation "to protect the white police officers" who were involved in the December 17, 2008 altercation with the cab driver. (*Id.* ¶ 38.) Plaintiff does not explain what charges or specifications were issued against him, or what it means to have charges and specifications issued. Then, on January 8, 2010, plaintiff alleges that he was placed in "Level II discipline monitoring" for approximately nine months. (*Id.* ¶ 39.) Again, plaintiff fails to explain what Level II discipline monitoring is or what precisely that meant in the context of plaintiff's job as an NYPD Sergeant.

**\*3** Plaintiff retired on October 2011—over two years later than he allegedly planned to retire. (Am.Compl.¶¶ 40, 41.) Plaintiff allegedly could not retire in March 2009 when planned because he purportedly could not obtain a "Good Guy" letter based on his placement on Level II status. (*Id.*

¶ 41.) Plaintiff also alleges that he had to forfeit a private security job, with a purported $140,000 annual salary, that he "had lined up" without the "Good guy" letter. (*Id.*) Plaintiff also alleges damages associated with failing to obtain overtime or special assignments based upon his modified and Level II statuses. (*Id.* ¶ 43.) It is further alleged that "defendants" continued their retaliation in unspecified ways through October 2011 because plaintiff would not accept a penalty for the charges. (*Id.* ¶ 45.)

## PROCEDURAL HISTORY

Plaintiff commenced this action on November 23, 2011. (Dkt. No. 1.) On January 3, 2012, defendants requested a pre-motion conference related to an anticipated motion to dismiss plaintiff's original complaint, in response to which the Court set a briefing schedule. (Dkt. No. 10.) Defendants moved to dismiss the original complaint on January 18, 2012. (Dkt. No. 12.)

The Court held the initial pretrial conference in this matter on January 27, 2012. (*See* Dkt. No. 14.) At that conference, the Court informed plaintiff's counsel that plaintiff could withdraw his original complaint and file an amended complaint, taking into consideration defendants' motion to dismiss, or proceed on its original complaint and, if such complaint was found defective, any dismissal would be with prejudice. (*See id.*) In addition, the Court notified plaintiff's counsel at the conference that, given that plaintiff had been given notice of the defects in the original complaint from defendants' motion to dismiss the original complaint, plaintiff would be given a single chance to amend the complaint. In other words, the Court stated that if defects remained in any amended complaint, any dismissal would be with prejudice —*i.e.*, without leave to amend.

Plaintiff elected to amend his complaint (Dkt. No. 15), and filed the Amended Complaint on February 10, 2012 (*see* Dkt. No. 18). Plaintiff asserts claims under 42 U.S.C. § 1983 against the City and defendants Harrington and Mazzilli for racial discrimination, hostile work environment, and excessive force (Count One),[5] for violations of Title VII against the City (Count Two), New York State Human Rights Law, N.Y. Exec. Law § 296, *et seq.* against all defendants (Count Three), New York City Human Rights Law, N.Y. City Admin. Code § 8–107 *et seq.* against all defendants (Count Four), 42 U.S.C. § 1983 for violations of constitutional rights under *Monell v. Department of Social Services,* 438 U.S. 658

(1978), against the City (Count Five), and 42 U.S.C. § 1981 for discrimination and retaliation (Count Six).

5    Plaintiff's claims are asserted in conclusory fashion, bur defendants-and the Court-construed them as broadly as possible on this motion to ensure that all potential claims were encapsulated by this decision.

Defendants filed the instant motion to dismiss on March 1, 2012, plaintiff opposed the motion on March 21, 2012, and the motion was fully briefed as of March 28, 2012. (Dkt.Nos.19, 21, 23.)

## DISCUSSION

### I. LEGAL STANDARD

**\*4** To survive a Rule 12(b)(6) motion to dismiss, "the plaintiff must provide the grounds upon which [its] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 321 (2d Cir.2010) (quoting *Twombly,* 550 U.S. at 570). *See also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (same). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. In applying that standard, the court accepts as true all well-plead factual allegations, but does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Id.* If the court can infer no more than "the mere possibility of misconduct" from the factual averments-in other words, if the well-pleaded allegations of the complaint have not "nudged claims across the line from conceivable to plausible," dismissal is appropriate. *Twombly,* 550 U.S. at 570; *Starr,* 592 F.3d at 321 (quoting *Iqbal,* 129 S.Ct. at 1950).

As an initial matter, plaintiff's claims fail because they do not meet the standard promulgated by *Twombly* and *Iqbal.* In particular, plaintiff's Amended Complaint is, as Judge McMahon recently put it, "a recitation of a false syllogism: (1) I am (insert name of a protected class); (2) something bad

happened to me at work; (3) therefore, it happened because I am (insert name of protected class)," *Bermudez v. The City of* New York, 783 F.Supp.2d 560, 581 (S.D.N.Y.2011). But the *sine qua non* of a race-based discrimination or retaliation claim is that discrimination or retaliation was *because of race.* As discussed further below, plaintiff fails to connect the dots between the alleged adverse actions and his membership in a protected class. The Court will address each of plaintiff's claims, including his excessive force and *Monell* claims, *seriatim.*

## II. EMPLOYMENT DISCRIMINATION

### A. CLAIMS UNDER TITLE VII, 42 U.S.C. §§ 1981 & 1983, and NYSHL

Claims of employment discrimination brought pursuant to Title VII are analyzed under the familiar burden-shifting analysis set forth in *McDonnell–Douglas Corp. v. Green,* 411 U.S. 792, 802–803, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The same applies to claims of employment discrimination pursuant to 42 U.S.C. § 1983 and the NYSHL. *See Spiegel v. Schulmann,* 604 F.3d 72, 80 (2d Cir.2010) (N.Y.SHRL); *Boykin v. KeyCorp.,* 521 F.3d 202, 213 (2d Cir.2008) ( § 1983). Under that framework, a plaintiff bears the initial burden of establishing a *prima facie* case of discrimination, and must demonstrate (1) membership in a protected class; (2) qualifications for the position; (3) an adverse employment action, and (4) circumstances giving rise to an inference of discrimination. *Collins v.* New York City Transit Auth., 305 F.3d 113, 118 (2d Cir.2002); *Graham v.* Long Island R.R., 230 F.3d 34, 39 (2d Cir.2000) ( § 1983).

**\*5** However, the *McDonnell–Douglas* test is "an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 510, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). An "employment discrimination plaintiff need not plead a prima facie case of discrimination" on this motion; instead, as long as the complaint gives the defendant "fair notice" of the plaintiff's claim, "the grounds upon which it rests" and "indicate[s] the possibility of discrimination and thus present[s] a plausible claim for disparate treatment," the complaint satisfies Rule 8 fa) of the Federal Rules of Civil Procedure. *Boykin,* 521 F.3d at 214–16. Of course, "[t]he *Iqbal* plausibility standard applies in conjunction with employment discrimination pleading standards." *Jackson v. New York St. Dep't of Labor,* No. 09 Civ. 6608, 2012 WL 843631, at \*2 (S.D.N.Y. Mar.12, 2012) (quotation marks and citation omitted).

Although plaintiff does allege an "adverse" employment action—*i.e.,* that he was denied overtime and special assignments based on his Level II and modified status (Am.Compl.¶ 43)—he fails to raise a plausible inference that the action was taken on account of his race or national origin. Rather, plaintiff specifically alleges that the adverse employment action—being placed on modified status and Level II discipline monitoring—resulted from him refusing to "lie" when he was interrogated about the incident between the John Doe police officers and the cab driver. (*See* Am. Compl. ¶¶ 31, 35, 36, 38 ("In retaliation for failing to follow Defendant Harrington's unlawful directive regarding testifying falsely during Plaintiff's interrogation, ... Plaintiff was issued Charges and Specifications ...".) Plaintiff does not connect the fact that he is Hispanic to any of the alleged adverse actions taken against him other than alleging that the John Doe officers were white. (*See* Am. Compl. ¶ 38.) That is fatal to his discrimination claims. *See Int'l B'hood of Teamsters v. U.S.,* 431 U.S. 324, 335, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

Plaintiff attempts to show that he was treated differently than the John Doe officers by intimating that "defendants" did not question the John Doe officers about the altercation between plaintiff and Mazzilli. (*Id.* ¶ 44.) Plaintiff does not make any allegations about what the John Doe defendants were or were not told to say about the incident. Nor does plaintiff allege that the officers did *not* face disciplinary charges or changed "status" as a result of the incident between themselves and the cab driver. Indeed, plaintiff specifically alleges that he was told that if he did not lie, "some NYPD officers would get disciplined." (*Id.* ¶ 35.)

The Amended Complaint's allegations provide the distinct impression that plaintiff faced the alleged adverse action due to his purported failure to lie to protect other NYPD officers —not based upon his race. Even assuming the truth of those allegations, as the Court must on this motion, it does not provide any basis for the Title VII, sections 1983 and 1981, and NYSHRL claims asserted here. *See Iqbal,* 129 S.Ct. at 1949. In other words, the Amended Complaint fails to advance a plausible claim for disparate treatment under those statutes. Accordingly, those claims are dismissed.

### B. NYCHRL

**\*6** Although employment discrimination claims under the NYCHRL are "to be evaluated separately from counterpart claims brought under Title VII," *Kolenovic v. ABM Indus. Inc.,* 361 Fed. Appx. 246, 248 (2d Cir.2010), to effectuate

the statute's "uniquely broad and remedial" purpose, *Kaur v. New York City Health & Hosp. Corp.,* 688 F.Supp.2d 317, 339 (S.D.N.Y.2010) (quotation marks omitted); *see also Price v. Cushman & Wakefield, Inc.,* 808 F.Supp.2d 670, 688 (S.D.N.Y.2011) ("Claims under the City HRL must be given an independent liberal construction." (quotation marks, citation, and alterations omitted)), claims of employment discrimination under the NYCHRL likewise are subject to the *McDonnell–Douglas* burden-shifting analysis, *see Spiegel,* 604 F.3d at 80; *Pilgram v. McGraw–Hill Cos.,* 599 F.Supp.2d 462, 468 (S.D.N.Y.2009) ("[T]he standard for all Title VII, section 1981, [NYSHRL] and [NY]CHRL employment discrimination claims is the same."); *Fowler v. Scores Holding Co., Inc.,* 677 F.Supp.2d 673, 682 (S.D.N.Y.2009). "[A]t a minimum, employment discrimination claims [under NYCHRL] must meet the standard of pleading set forth in *Twombly* and *Iqbal* ...." *Goodman v. Port Auth. of* New York & New Jersey, No. 10 Civ. 8352, 2012 WL 664531, at *16 (S.D.N.Y. Feb.29, 2012).

Plaintiff's NYCHRL employment discrimination claim fails under both *McDonnell–Douglas* and *Twombly/Iqbal* for the same reason as its federal and state counterparts-*i.e.,* the absence of allegations connecting the purported adverse employment actions to plaintiff's race. As discussed in connection with the Court's analysis of plaintiff's employment discrimination claims under federal and state law, there is no plausible inference that plaintiff's placement on modified status or Level II disciplinary monitoring resulted from his race. Rather, plaintiff's own allegations state that plaintiff was subjected to adverse actions because he failed to lie to protect other NYPD officers, as instructed by defendant Harrington. (*See, e.g.,* Am. Compl. ¶¶ 31, 35, 36, 38.) Accordingly, even under the NYCHRL's liberal construction, plaintiff's employment discrimination claim under NYCHRL is dismissed.

### C. RACE DISCRIMINATION UNDER 42 U.S.C. § 1981

Section 1981 of chapter 42 of the United States Code provides,

> All persons ... shall have the same right ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security

of persons and property as is enjoyed by white citizens....

42 U.S.C. § 1981(a).

Claims of employment discrimination under section 1981 are analyzed under the same framework as discrimination claims under Title VII and section 1983. *Patterson v. Cnty. of Oneida,* 375 F.3d 206, 225 (2d Cir.2004); *see also Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69 (2d Cir.2000) (§ 1981); *Jermott v. Coughlin,* 85 F.3d 61, 67 (2d Cir.1996) ( § 1983).

*7 Where a defendant is a state actor, claims may only lie under 42 U.S.C. § 1983 for violations of rights under 42 U.S.C. § 1981. *Jett v.* Dallas Indep. Sch. Dist., 491 U.S. 701, 735, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Gladwin v. Possi,* 403 Fed. Appx. 603, 604–05 (2d Cir.2010) (the plaintiff's " § 1981 claims are encompassed by her § 1983 claims, and both are therefore analyzed under § 1983" (citing *Jett,* 491 U.S. at 735)).

Here, to the extent that plaintiff seeks to assert claims against defendants Harrington and Mazzilli in their official capacity or against the City, those claims are analyzed under section 1983 and are dismissed for the reasons set forth in Part II.A., *supra.* To the extent that plaintiff seeks to bring claims against them under section 1981, the claims are dismissed against the City and against Harrington and Mazzilli in their official capacity. *Bermudez,* 783 F.Supp.2d at 576.

## II. HOSTILE WORK ENVIRONMENT

### A. UNDER TITLE VII, 42 U.S.C. §§ 1981 & 1981, and NYSHRL

Under federal and New York state law, a hostile work environment claim is sufficiently plead where the complaint alleges that the plaintiff's workplace was "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quotation marks and citations omitted); *see also Patterson,* 375 F.3d at 227; *Kumaga v.* New York City Sch. Constr. Auth., 27 Misc.3d 1207(a), 2010 WL 1444513, at *8 (N.Y.Sup.Ct. Apr.2, 2010) (N.Y.SHRL). In looking at the totality of the circumsirancers, a court may also consider certain factors, among others, to determine whether

a work environment is "hostile"—*e.g.,* the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's "work performance." *Harris,* 510 U.S. at 23.

The question of "hostility" of a work environment is both subjective—*i.e.,* did the plaintiff find it hostile-and objective—*i.e.,* would a reasonable person have found it hostile. *Harris,* 510 U.S. at 21–22. The "hostility," however, must be borne of "animus towards [the plaintiff] as a result of [his] membership in a protected class." *Sullivan v. Newburgh Enlarged Sch. Dist. Clarence Cooper,* 281 F.Supp.2d 689, 704 (S.D.N.Y.2003). Severity is a hallmark of a hostile work environment claim. Such claims "are not intended to promote or enforce civility, gentility or even decency." *Ennis v. Sonitrol Mgmt. Corp.,* No. 02–CV–9070, 2006 WL 177173, at *9 (S.D.N.Y. Jan. 25, 2006).

The rubric just described applies similarly to hostile work environment claims under 42 U.S.C. §§ 1981 and 1983, and the NYSHRL. *Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 609 § 2d Cir.2006); *Ferraro v. Kellwood Co.,* 440 F.3d 96, 99 (2d Cir.2006).

**\*8** As with plaintiff's employment discrimination claims, the hostile work environment claims under Title VII, 42 U.S.C. § 1983, and NYSHRL fail because there are no allegations that any animus subjective or objective stemmed from plaintiff's "membership in a protected class." Merely using the words "Hispanic" in reference to himself and "white" in reference to the John Doe police officers in his Amended Complaint does not create a plausible inference of hostility based upon race or national origin. *See Bermudez,* 783 F.Supp.2d at 581. There is simply nothing alleged to demonstrate that race factored into defendants' alleged actions. Thus, the hostile work environment claims under Title VII, 42 U.S.C. §§ 1981 & 1983, and the NYSHRL are dismissed.

**B. NYCHRL**

The NYCHRL's "liberal construction" lowers the standard for a hostile work environment claim brought under its auspices. *Bermudez,* 783 F.Supp.2d at 579; *see also Farrugia v. N. Shore Univ. Hosp.,* 13 Misc.3d 740, 820 N.Y.S.2d 718, 724 (N.Y.Sup.Ct.2006) ("The New York City Human Rights Law was intended to be more protective than the state and federal counterpart."); *Loeffler v. Staten Island Univ. Hosp.,* 582 F.3d 268, 278 (2d Cir.2009) ("claims under the [NYCHRL] must be given an independent liberal

construction" (quotation marks omitted)). A "hostile work environment" for purposes of the NYCHRL is one where there is "differential treatment" period. *Williams v. New York City Housing Auth.,* 61 A.D.3d 62, 77, 872 N.Y.S.2d 27 (1st Dep't 2009). In other words, all that is required to sustain a NYCHRL "hostile work environment claim" is "unequal treatment" based upon membership in a protected class. *Id.* Questions of "severity" or "pervasiveness" go to damages only-not to liability. *Id.* at 76, 872 N.Y.S.2d 27.

As discussed above, plaintiff fails to allege that he was treated differently from the John Doe police officers. There are, as mentioned, no allegations that the John Doe police officers did not face disciplinary charges or were not placed on modified status. The Amended Complaint states in conclusory fashion only that plaintiff believed that the John Doe police officers were not questioned in connection with the altercation. (Am.Compl.¶ 44.) But there are no allegations that any questioning—or lack thereof—was based upon race. Accordingly, the Amended Complaint fails to state a hostile work environment claim under the NYCHRL.

**III. RETALIATION**

**A. UNDER TITLE VII,** 42 U.S.C. §§ 1981 & 1981, and NYSHRL

Plaintiff also asserts that defendants retaliated against him based upon his participation in a protected activity—*i.e.,* speaking the truth—in violation of Title VII, 42 U.S.C. §§ 1981 & 1983, [6] and the NYSHRL. Claims of retaliation "under those" statutes are generally analyzed in the same way, with the same standards of liability. *See Schiano,* 445 F.3d at 608 (Title VII & NYSHRL); *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107 (2d Cir.2004) (§ 1983); *Choudhury v. Polytechnic Institute of New York,* 735 F.2d 38 (2d Cir.1984) (§ 1981).

6     Because plaintiff has abandoned his First
      Amendment claim, the claim for retaliation under
      section 1983 may not lie concurrently with one
      under Title VII. *Saulpaugh v. Monroe Community
      Hosp.,* 4 F.3d 134, 143 (2d Cir.1993).

**\*9** A plaintiff adequately states a claim for deprivation of equal protection rights stemming from retaliation for complaining about discrimination pursuant section 1983 where the complaint alleges the plaintiff suffered a "materially adverse employment action," which was "causally connected" to the plaintiff's engaging in a

**Acosta v. City of New York, Not Reported in F.Supp.2d (2012)**
Case 5:24-cv-00522-BKS-TWD   Document 15   Filed 10/25/24   Page 31 of 186
2012 WL 1506954

"protected activity." *Patane v. Clark,* 508 F.3d 106, 112 (2d Cir.2007); *Bermudez,* 783 F.Supp.2d at 575. A plaintiff engages in a protected activity when he "oppose [s] any practice made an unlawful employment practice by Title VII, or because [he] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII." *Bermudez,* 783 F.Supp.2d at 575 (quotation marks and alterations omitted).

An adverse employment action is one that materially and adversely alters the terms and conditions of employment. *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 446 (23 Cir.1999). A "materially adverse change is, for example, "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.*

Here, plaintiff argues in his opposition to the motion to dismiss that the protected activity in which he engaged was "complaining to the uniformed officers at the scene and at 19th Precinct regarding the actions of Harrington, Mazzilli, and P.O. John Does regarding his unequal and discriminatory treatment on account of his race, national origin...." (Mem. Of Law in Opp'n to Defs.' Mot. To Dismiss the Am. Compl. (Dkt. No. 21) at 18.) However, no such allegation appears in the Amended Complaint. It is axiomatic that a complaint cannot be amended by assertions made in an opposition brief. *In re Livent, Inc. Noteholders Sec. Litig.,* 151 F.Supp.2d 371, 432 (S.D.N.Y.2001). Thus, plaintiff's assertion in his opposition cannot form the basis for any allegations of protected activity. And without any alleged protected activity, the claims under Title VII, 42 U.S.C §§ 1981 and 1983, and the NYSHRL must fail. *See Patane,* 508 F.3d at 112.

The only protected activity alleged in the complaint is plaintiff's filing of charges with the EEOC. (*See* Am. Compl. ¶ 6.)[7] That filing occurred on January 22, 2010.(*Id.*) The closest in time "adverse action" taken against plaintiff-*i.e.,* the January 8, 2010 placement of plaintiff on Level II discipline monitoring-occurred *prior* to the EEOC filing, though. (*Id.* ¶ 39.)[8] The Level II discipline monitoring thus cannot be "causally connected" to the filing of the EEOC charges such that there is a basis for a retaliation claim. *Cf. Butts v. New York City Dep't of Housing Preservation & Dev.,* 307 Fed. Appx. 596, 599 (2d Cir.2009) ("The plaintiff can establish the causal connection indirectly by showing that the protected

activity was closely *followed* by discrimination ..." (emphasis added)).

[7]   Plaintiff's refusal to "lie" to "protect" other NYPD officers does not constitute a "protected activity" for purposes of a retaliation claim. *See Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir.2000) ( "The term 'protected activity' refers to actions taken to protest or oppose statutorily prohibited discrimination.").

[8]   Plaintiff asserts in wholly conclusory fashion that "[d]efendants continued to retaliate against [him] up until his retirement in October 2011...." (Am.Compl.¶ 45.) That allegation does not come close to meeting the standard set forth in *Twombly* or *Iqbal* and thus, the Court will not credit it on this motion.

**\*10**   Accordingly, without any allegations in the Amended Complaint supporting a protected activity and an adverse employment action, plaintiff's retaliation claims fail under Title VII, 42 U.S.C. §§ 1981 & 1983, and the NYSHRL. *See Desir v. City of* New York, 453 Fed. Appx. 30, 35 (2d Cir.2011).

#### B. NYCHRL

As with discrimination and hostile work environment claims under the NYCHRL, claims of retaliation under the NYCHRL must be evaluated separately from its federal and state counterparts to effectuate the statute's "uniquely broad and remedial purpose." *See Loeffler,* 582 F.3d at 278; *accord Melie v. EVCI/TCI College Admin.,* 374 Fed. Appx. 150, 153–54 (2d Cir.2010). The same analysis employed for retaliation claims under Title VII and NYSHRL applies to retaliation claims under the NYCHRL. *Anderson v. Davis Polk & Wardwell LLP,* ––– F.Supp.2d ––––, 2012 WL 734120, at \*13 (S.D.N.Y. Mar.6, 2012). Even though the standard for a NYCHRL retaliation claim is "broader" or "lower" than the same claim under its federal or state counterparts, plaintiff's failure to establish a causal connection between any protected activity and an adverse employment action likewise dooms plaintiff's retaliation claim under the NYCHRL. *See Dixon v. Int'l Federation of Accountants,* 416 Fed. Appx. 107, 110 n. 1 (S.D.N.Y.2011).

#### IV. EXCESSIVE FORCE IN VIOLATION OF 42 U.S.C. § 1983

Plaintiff asserts that defendant Mazzilli used excessive force against him in violation of his constitutional rights pursuant to 42 U.S.C. § 1983. A claim for excessive force in violation of the Fourth Amendment is analyzed with objective reasonableness. *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Stephenson v. Doe,* 332 F.3d 68, 77 (2d Cir.2003). That standard

> requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Graham,* 490 U.S. at 396. "Not every push or shove" amounts to a Fourth Amendment violation. *Id.* Indeed, a "de minimus use of force will rarely suffice to state a Constitutional claim." *Romano v. Howarth,* 998 F.2d 101 105 (2d Cir.2005). Further, a plaintiff must allege that he sustained an injury to maintain an excessive force claim. *Wims v. N.Y.C. Police Dep't,* No. 10 Civ. 6128, 2011 WL 2946369, at *4 (S.D.N.Y. July 20, 2011). Such injury need not be severe, however. *Robison v. Via,* 821 F.2d 913, 924 (2d Cir.1987) ("If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe.").

Plaintiff alleges that Officer Mazzilli pushed his wrist into his pocket, punched him in the chest, threw him to the ground face first, forcibly handcuffed his left arm, and attempted to manipulate his right arm into handcuffs as well. (Am.Compl.¶¶ 25–26.) It is further alleged that after plaintiff informed defendant Mazzilli of a prior surgery which rendered plaintiff's right arm unable to be fully brought behind his back, Mazzilli used a second set of handcuffs "so that [plaintiff's] right arm would not have to be pulled back." (*Id.* ¶ 27.)

**\*11** As an initial matter, the handcuffing itself cannot support plaintiff's excessive force claim. *Wims,* 2011 WL 2946369, at *5 ("Merely placing tight handcuffs on a suspect is not enough for an excessive force claim."). More importantly, plaintiff does not allege "any specific or identifiable physical or mental harm beyond [ ] conclusory assertion[s] which, standing alone, [are] insufficient under

*Twombly* and *Iqbal.*" *Id.* (*See* Am. Compl. ¶¶ 32 (plaintiff informed Sergeants Mulvey and Cosmo that he "was injured and wanted medical attention"), 33 ("Plaintiff chose to wait until after being interrogated to seek medical attention"), 46 (plaintiff "suffered emotional and physical damages" "[a]s a result of these incidents").) That failure dooms plaintiff's excessive force claim. Accordingly, it must be dismissed. [9]

[9]
> In *Wims,* the court dismissed the excessive force claim despite the "liberal construction" accorded to complaints filed by *pro se* plaintiffs. 2011 WL 2946369, at * 1, 5. The failure to allege a specific and identifiable injury is more egregious here where plaintiff is represented by counsel, where plaintiff was "on notice" of the deficiency related to the failure to allege a specific and identifiable injury (*see* Mem. Of Law in Support of Defs. Mot. To Dismiss Compl. (Dkt. No. 13) at 22), and where the complaint has been amended once at plaintiff's own election subsequent to that "notice."

## V. *MONELL* CLAIM

To state a claim for municipal liability under *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a plaintiff must allege that " 'policies or customs that [were] sanctioned by the municipality led to the alleged constitutional violation.' " *Missel v. Ctny. of Monroe,* 351 Fed. Appx. 543, 545 (2d Cir.2009) (quoting *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006)). A *Monell* claim can survive a motion to dismiss where the plaintiff

> make[s] factual allegations that support a plausible inference that the constitutional violation took place pursuant to either a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policy making authority for the municipality.

*Id.*

Plaintiff has failed to set forth factual allegations that would support a plausible inference that the City's "policies" or "customs" caused Harrington's—or even Mazzilli's-alleged

violations of plaintiff's rights. The complaint is similarly devoid of allegations regarding any policy promulgated by the City requiring NYPD police officers to "lie" to "protect" other NYPD officers when they commit constitutional or NYPD-regulations violations.

Plaintiff alleges that the "City of New York failed to train its police officers as to display a deliberate indifference to the constitutional rights [of] those within the City of New York." (Am.Compl.¶ 71.) But that allegation standing alone does not create a plausible inference that any of Harrington's and Mazzilli's complained-of violations-regardless of whether those violations relate to plaintiff's claim for disparate treatment, hostile work environment, or retaliation were made pursuant to any City-mandated policy. That allegation is merely a recitation of the element of the cause of action-something the Court cannot credit on this motion. *Iqbal,* 129 S.Ct. at 1949. Accordingly, the *Monell* claim must be dismissed.

## CONCLUSION

For the aforementioned reasons, defendants' motion to dismiss is GRANTED.

**\*12** Because plaintiff elected to amend the complaint in response to defendants' motion to dismiss the original complaint where nearly identical arguments to those raised on this motion, having the benefit of the Court's explicit admonition that any pleading deficiencies would be deemed with prejudice on a subsequent motion to dismiss, plaintiff's request for leave to amend is DENIED. Accordingly, the dismissal of the Amended Complaint is with prejudice.

The Clerk of Court is directed to terminate any pending motions and terminate this action. Judgment is to be entered for defendants the City of New York, Michael Harrington, and Michael Mazzilli.

SO ORDERED:

IN RE ADULT FILM COPYRIGHT INFRINGEMENT LITIGATION

This Document Relates to:

11 Civ. 7564(KBF)

11 Civ. 7999(KBF)

11 Civ. 8172(KBF)

11 Civ. 9550(KBF)

11 Civ. 9618(KBF)

11 Civ. 9688(KBF)

11 Civ. 9689(KBF)

11 Civ. 9703(KBF)

11 Civ. 9705(KBF)

11 Civ. 9706(KBF)

11 Civ. 0129(KBF)

11 Civ. 1077(KBF)

11 Civ. 1169(KBF)

Master Case No. 11 Civ. 7564

### *MEMORANDUM & ORDER*

On March 13, 2012, this Court issued an order stating, in part, that plaintiffs shall identify Doe defendants, who have requested to proceed anonymously, by IP address and Doe number only—*i.e.,* plaintiffs must not reveal the identity of these Doe defendants in public filings. On April 18, 2012, in contravention of this order, plaintiff in Member Case No. 11 Civ. 9706 named a Doe defendant-who had submitted a request to proceed anonymously that was received by plaintiff-in a public filing. [1] This document has been removed by the Court.

[1]     Counsel shall broadly construe filings by *pro se* plaintiffs and err on the side of interpreting filings as requests to proceed anonymously when there is any indication that they might be such requests.

Should counsel for plaintiffs again disobey a Court order in this consolidated action, plaintiffs may be subject to sanctions including dismissal of their actions pursuant to Federal Rule of Civil Procedure 41(b).

Plaintiff is directed to mail this Order to the Doe defendant named in plaintiff's filing.

2012 WL 1506954

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1506954

End of Document    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 232053

205 F.3d 1322
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. See Federal Rule of Appellate
Procedure 32.1 and this court's local Rule 32.1.1. for
rules regarding the citation of unpublished opinions.)
United States Court of Appeals, Second Circuit.

Paul DiMASCIO, Plaintiff-Appellant,

v.

CITY OF ALBANY, Ronald McLaughlin, Joseph
Hughes, John Doe, Individually and as Agent, Servant
and/or Employee of the Albany Police Department,
and various other Agents, Servants, and/or Employees
of the Albany Police Department whose names
are presently unknown, Richard Roe, Individually
and as Agents, Servants, and/or Employees of the
Albany Police Department, and various other Agents,
Servants and/or Employees of the Albany Police
Department whose names are presently unknown,
Jane Roe, Individually and as Agents, Servants, and/
or Employees of the Albany Police Department, and
various other Agents, Servants and/or Employees
of the Albany Police Department whose names
are presently unknown, Defendants-Appellees,
Sol GREENBERG, Individually and in his official
capacity as Albany County District Attorney, and his
agents, representatives and employees, Defendant.

No. 99-7653.
|
Jan. 26, 2000.

Appeal from the United States District Court for the Northern
District of New York, McAvoy, Chief Judge.

**Attorneys and Law Firms**

Edward B. Flink, Edward Flink Associates, Latham, NY, for
appellant.

Stephen J. Rehfuss, Brennan, Rehfuss & Liguori, P.C.,
Albany, NY, for appellees.

Present WINTER, Chief Judge, PARKER and
SOTOMAYOR, Circuit Judges.

**Opinion**

**\*1** UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED AND DECREED that the
judgment of the District Court is hereby AFFIRMED.

Paul DiMascio appeals from Chief Judge McAvoy's adverse
grant of summary judgment on appellant's claims under 42
U.S.C. § 1983 holding that he is collaterally estopped to
litigate the issue of whether appellee-police officers had
probable cause to stop his vehicle. Appellant contends that,
as a matter of New York law, he may re-litigate the probable
cause determination because he has presented evidence that
the officers committed perjury in testifying as to the events
leading up to the stop of appellant's vehicle. Appellant also
argues that the district court erred in granting summary
judgment against him without allowing further discovery. We
affirm.

It is well established that appellant's Section 1983 claims
against appellees for false arrest and false imprisonment must
fail if the appellee-officers had probable cause to arrest him.
*See, e .g., Smith v. Edwards,* 175 F.3d 99, 105 (2d Cir.1999);
*Curley v. AMR Corp.,* 153 F.3d 5, 13 (2d Cir.1998). At the
suppression hearing in appellant's criminal case, the Albany
City Court found that the arresting officers had probable cause
to stop appellant's vehicle-based on a reasonable suspicion
that appellant had been engaged, or was about to engage, in
criminal activity-and probable cause to seize evidence either
within their plain view or discovered upon a reasonable search
of appellant's vehicle.

Appellant argues that he is not collaterally estopped from
re-litigating the Albany City Court's probable cause
determination int his Section 1983 action because he can
show that the arresting officers committed fraud, perjury,
withheld evidence, or otherwise acted in bad faith at the
suppression hearing. *See Colon v. City of New York,* 455
N.E.2d 1248, 1250-51 (N.Y.1983) (plaintiffs may overcome
presumption of probable cause arising from a grand jury
indictment through a showing of bad faith conduct);
*Brown v. Roland,* 627 N.Y.S.2d 791, 792 (App.Div.1995)
(pretrial probable cause determination creates presumption
that plaintiff may overcome through a showing of bad
faith fraud or perjury). According to appellant, the arresting
officers perjured themselves at that hearing by giving false
testimony as to what appellant did before he was stopped.
However, there is no dispute that, after the officers made
the stop, they found the handgun and knives in appellant's
vehicle.

Accordingly, appellant's theory that the officers lacked probable cause to arrest him is founded on the "fruit of the poisonous tree" doctrine, or, as applied to this case, the notion that the officers necessarily lacked probable cause to arrest him for unlawful possession of the knives and gun because they lacked probable cause to make the stop that led them to discover this evidence. We have held, however, that the fruit of the poisonous tree doctrine is "inapplicable to civil § 1983 actions." *Townes v. City of New York,* 176 F.3d 138, 145, 149 (2d Cir.) (Section 1983 claim for false arrest does not lie against officers who had probable cause to arrest claimant after discovering handguns in unlawfully stopped taxi cab; "lack of probable cause to stop and search does not vitiate the probable cause to arrest[ ] because ... the fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant"), *cert. denied,* 120 S.Ct. 398 (1999). Thus, even assuming that the arresting officers lacked probable cause to stop appellant's car, there is no evidence from which a reasonable jury could conclude in this Section 1983 action that the officers lacked probable cause to arrest appellant for unlawful possession of the gun and knives. Indeed, he was actually convicted for possession of one of the weapons. Accordingly, the district court did not err in granting summary judgment to appellees on appellant's false arrest and unlawful imprisonment claims.

**\*2** The court also did not err in granting judgment to appellees on the malicious prosecution claim. A malicious prosecution claim under Section 1983 will not lie where there is probable cause to prosecute. *See Posr v. Court Officer Shield # 207,* 180 F.3d 409, 417 (2d Cir.1999); *Rounseville v. Zahl,* 13 F.3d 625, 628 (2d Cir.1994). Neither the parties nor the district court addressed the probable-cause-to-initiate-a-prosecution issue apart from the probable-cause-to-arrest issue. After carefully reviewing the record, however, we find-in light of our holding that the officers had, for purposes of this civil action, probable cause to arrest appellant-no evidence that appellees lacked probable cause to initiate the criminal proceeding against appellant. Moreover, even assuming appellees lacked probable cause to institute proceedings against appellant, they would not be liable for

malicious prosecution damages incurred after the Albany County District Attorney independently decided to prosecute appellant. *Cf. Townes,* 176 F.3d at 147 (police officers not liable for allegedly unlawful conviction "in the absence of evidence that the police officer misled or pressured the [state trial judge] who could be expected to exercise independent judgment" in ruling on motion to suppress unlawfully seized evidence).

Finally, we reject appellant's argument that the district court erred by granting summary judgment against him without allowing further discovery. Under Fed.R.Civ.P. 56(b), a party against whom a claim is asserted may move for summary judgment "at any time." Rule 56(f) provides that "[s]hould it appear from the affidavits of a party opposing the motion that the party cannot *for reasons stated* present by affidavits facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit ... discovery." Fed.R.Civ.P. 56(f) (emphasis added). Appellant did not proffer any reasons to the district court why appellees' summary judgment motion was premature. *See Hudson River Sloop Clearwater, Inc. v. Department of the Navy,* 891 F.2d 414, 422 (2d Cir.1989) (party seeking additional discovery prior to disposition of summary judgment motion must file affidavit with district court stating (i) what facts are sought; (ii) how they create genuine issue; (iii) what effort has been made to obtain them; and (iv) why efforts have been unsuccessful). Accordingly, the district court did not err in deciding the motion without allowing further discovery. *See Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137 (2d Cir.1994) ("[T]he failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.").

We therefore affirm.

**All Citations**

205 F.3d 1322, 2000 WL 232053 (Table)

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1653189

2014 WL 1653189
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Leonid LAUTMAN, Plaintiff,

v.

The VILLAGE OF SAUGERTIES, NEW YORK;
William Murphy, individually, and in his official
capacity; Robert Yerick, individually, and in his
official capacity as trustee and officer of the Village
of Saugerties; Kelly Myers, individually, and in his
official capacity as Trustee and Officer of the Village
of Saugerties; Vince Buono, individually, and in his
official capacity as Trustee and Officer of the Village
of Saugerties; Patrick Landewe, individually, and in his
official capacity as Trustee and Officer of the Village
of Saugerties; Don Hackett, individually and in his
individual capacity as Trustee and Officer of the Village
of Saugerties; Mary Frank, Individually, and in her
official capacity; Alexander Wade, individually, and
in his official capacity; Eyal Saad, Individually, and in
his official capacity; County of Ulster, New York; Paul
Vanblarcum, Individually, and in his official capacity
as Sheriff of Ulster County; Donald Ryan, Individually,
and in his official capacity; Laura Romano, Individually;
Wilson, Elser, Moskowitz, Edelman & Dicker, LLP;
Alexander Betke, II, Esq., in his professional and
personal capacity; Alissa Yohey, Esq., in her professional
and personal capacity; and Peter Lauricella, Esq, in
his professional and personal capacity, Defendants.

No. 1:13–cv–00264 (MAD/CFH).
|
Signed April 23, 2014.

**Attorneys and Law Firms**

Leonid Lautman, Brooklyn, NY, pro se.

Drake, Loeb Law Firm, Adam L. Rodd, Esq., Ralph L.
Puglielle, Jr., Esq., of Counsel, New Windsor, NY, for
Defendants The Village of Saugerties; William Murphy;
Robert Yerick; Kelly Myers; Vince Buono; Patrick Landewe;
Don Hackett; Mary Frank; Alexander Wade; and Eyal Saad.

Cook, Tucker Law Firm, Michael T. Cook, Esq., of Counsel,
Kingston, NY, for Defendants County of Ulster; Paul
VanBlarcum; Donald Ryan; and Laura Romano.

Wilson Elser Moskowitz, Edelman & Dicker, LLP,
Anastasios P. Tonorezos, Esq., of Counsel, New York, NY,
for Defendants Wilson, Elser, Moskowitz, Edelman & Dicker,
LLP; Alexander Betke, II, Esq.; Alissa Yohey; Esq.; Peter
Lauricella, Esq.

## MEMORANDUM–DECISION AND ORDER

MAE A. D'AGOSTINO, District Judge.

## I. INTRODUCTION

**\*1** In a complaint dated March 8, 2013, Plaintiff commenced
this civil rights action pursuant to 42 U.S.C. §§ 1983, 1985
and 1986, alleging various violations of his constitutional
rights. On August 30, 2013 and September 30, 2013,
Defendants moved to dismiss pursuant to Rules 12(b)(6) and
12(b)(5) of the Federal Rules of Civil Procedure. See Dkt.
Nos. 12, 17, 20. After his response deadline had already
expired, Plaintiff requested an extension of time to respond
until January 3, 2013, which the Court granted. See Dkt. Nos.
24, 25. Despite being granted this extension, Plaintiff has still
failed to respond to the pending motions.

Currently before the Court are Defendants' unopposed
motions to dismiss Plaintiff's complaint.

## II. BACKGROUND

In this action, Plaintiff alleges that the Village of Saugerties
and certain officials and employees, William Murphy,
Robert Yerick, Kelly Myers, Vince Buono, Patrick Landewe,
Don Hackett, Mary Frank, Alexander Wade, and Eyal
Saad (collectively referred to as the "Village Defendants"),
conspired with Defendants County of Ulster, Paul Van
Blarcum, Donald Ryan, and Laura Romano (the "County
Defendants") and the law firm of Wilson, Elser, Moskowitz,
Edelman & Dicker, LLP—the Village's counsel—to deprive
him of his real property by commencing and prosecuting
a special proceeding against him seeking the demolition of
an unsafe and dangerous structure situated on certain real
property located at 51 Livingston Street in the Village of

Saugerties that, at the time, was owned by Plaintiff. *See* Dkt. No. 1 at ¶¶ 29–33.

Plaintiff is a resident of Brooklyn, New York, and the former owner of real property located at 51 Livingston Street in the Village of Saugerties, County of Ulster. *See* Dkt. No. 1 at ¶ 5. Plaintiff alleges that in March of 2007, the Village commenced a special proceeding against him in New York State Supreme Court, Ulster County, seeking relief permitting it to demolish the structure situated on the real property located at 51 Livingston Street. *See id.* at ¶ 33. The verified petition in the underlying state-court proceeding sought the demolition of the aforesaid structure because it was allegedly unsafe and dangerous.

Although somewhat unclear, Plaintiff appears to allege that Defendants Saad and Wade submitted affidavits in support of the Village's verified petition that omitted various facts that Plaintiff believes should have been included. *See id.* at ¶¶ 34–81. Plaintiff further appears to disagree with conclusions and findings set forth in those affidavits, including their interpretation of the New York State Property Maintenance Code and the Village Zoning Code. *See id.* Plaintiff also claims that Defendant Saad submitted "false" affidavits in support of two contempt motions made by the Village. *See id.* at ¶¶ 82–85. Moreover, Plaintiff alleges that Defendant Meyers admitted in a letter to the state court that she "illegally enter[ed] the Subject-property and conduct[ed] therein unreasonable search in violation of the Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution." *Id.* at ¶ 85. Plaintiff also alleges that Defendant Saad and Village's counsel—the Wilson Elser Defendants—"engaged in the obstruction" of the hearing held in the underlying special proceeding. *See id.* at ¶ 97.

**\*2** As to the County Defendants, Plaintiff alleges that they conspired with the Village Defendants to transfer his property to the Village without providing notice of the auction sale. *See id.* at ¶ 32.

### III. DISCUSSION

#### A. Standard of review

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark,* 508 F.3d 106, 111–12 (2d Cir.2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir.2006) (quoting *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir.2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed.R.Civ.P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]' " *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting [*Twombly,* 550 U.S.] at 557, 127 S.Ct.1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly,* 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the [ ] complaint must be dismissed[,]" *id.* at 570.

Despite this recent tightening of the standard for pleading a claim, complaints by *pro se* parties continue to be accorded more deference than those filed by attorneys. *See Erickson v. Pardus,* 551 U.S. 89, 127 (2007). As such, *Twombly* and *Iqbal* notwithstanding, this Court must continue to "construe [a complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests." *Weixel v. Bd. of Educ.,* 287 F.3d 138, 146 (2d Cir.2002).

#### B. 42 U.S.C. § 1983

**\*3** Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws."

Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 39 of 186
Lautman v. Village of Saugerties, N.Y., Not Reported in F.Supp.3d (2014)

2014 WL 1653189

*Rizzo v. Goode,* 423 U.S. 362, 370–71 (1976) (quoting 42 U.S.C. § 1983). Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained. *See Brown v. Coughlin,* 758 F.Supp. 876, 881 (S.D.N.Y.1991) (citing *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481, *reh. denied,* 445 U.S. 920, 100 S.Ct. 1285, 63 L.Ed.2d 606 (1980)). As such, for a plaintiff to recover in a section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions. *See id.* (citing *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)) (other citation omitted).

**C. Rooker–Feldman doctrine**

"The *Rooker–Feldman* doctrine provides that the lower federal courts lack subject matter jurisdiction over a case if the exercise of jurisdiction over that case would result in the reversal or modification of a state court judgment." *Hachamovitch v. DeBuono,* 159 F.3d 687, 693 (2d Cir.1998) (citation omitted). "Such jurisdiction is lacking because within the federal system, only the Supreme Court may review a state court judgment." *Id.*

In *Exxon Mobil,* the Supreme Court held that the *Rooker–Feldman* doctrine "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceeding commenced and inviting district court review and rejection of those judgments." *Exxon Mobile Corp., v. Saudi Basic Industries Corp.,* 544 U.S. 280, 284 (2005). In light of *Exxon Mobile,* the Second Circuit has held that "there are four 'requirements' that must be met before the *Rooker–Feldman* doctrine applies." *Green v. Mattingly,* 585 F.3d 97, 101 (2d Cir.2009) (citation omitted).

"First, the federal court plaintiff must have lost in state court. Second, the plaintiff must 'complain[ ] of injuries caused by [a] state-court judgment [.]' Third, the plaintiff must 'invite district court review and rejection of [that] judgment[ ].' Fourth, the state-court judgment must have been 'rendered before the district court proceedings commenced'—i.e., *Rooker–Feldman* has no application to federal-court suits proceeding in parallel with ongoing state-court litigation."

*Green,* 585 F.3d at 101 (quoting *Hoblock v. Albany County Bd. of Elections,* 422 F.3d 77, 85 (2d Cir.2005)). "The first and fourth requirements 'may be loosely termed procedural,' while the second and third requirements 'may be termed substantive.' " *Id.*

*\*4* Defendants argue that the Court must dismiss Plaintiff's complaint because Plaintiff's claims are barred by the *Rooker–Feldman* doctrine. The Court agrees with Defendants that many of Plaintiff's claims are barred by the *Rooker–Feldman* doctrine. Specifically, any claims which would call into question the validity of any state-court judgment entered against Plaintiff. *See Crestview Village Apartments v. U.S. Dept. of Housing and Urban Development,* 383 F.3d 552, 556 (7th Cir.2004) (holding that "[a] finding by the district court that defendants did, as Crestview alleges, conspire to bring unsubstantiated lawsuits would undermine the state court's implicit holding that the state action was justified") (citation omitted); *see also Shooting Point v. Cumming,* 368 F.3d 379, 384 (4th Cir.2004) (finding that *Rooker—Feldman* precluded jurisdiction over plaintiff's claim that state transportation regulations were selectively enforced against the plaintiff, as a "district court finding of selective enforcement ... would clearly contravene the state court's [implicit] judgment" that the plaintiff was "properly subject to the [ ] regulations"); *Garry v. Geils,* 82 F.3d 1362, 1368 (7th Cir.1996) (finding the plaintiffs' claim that the defendants brought a state condemnation action against them due to political retaliation barred by *Rooker—Feldman,* as "the injury alleged was only complete when the state court actually condemned the property"). Although many of Plaintiff's claims are barred by the *Rooker–Feldman* doctrine, due to the sparse facts and conclusory nature of the claims, the Court cannot hold that all of Plaintiff's alleged claims are barred by the *Rooker–Feldman* doctrine. As such, the Court will address the merits of the claims.

**D. Equal Protection**

The Equal Protection Clause requires the government to treat all similarly situated people alike. *See Harlen Assocs. v. Incorporated Vill. of Mineola,* 273 F.3d 494, 499 (2d Cir.2001) (citing *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). A plaintiff may proceed under the Equal Protection Clause as either a "class of one," *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000) (*per curiam* ) (citations omitted), or under the theory of "selective enforcement," *Diesel v. Town of Lewisboro,* 232 F.3d 92, 103 (2d Cir.2000) (citation omitted).

The Second Circuit has "described selective enforcement as a 'murky corner of equal protection law in which there are surprisingly few cases.' " *Diesel,* 232 F.3d at 103 (quoting *LeClair v. Saunders,* 627 F.2d 606, 608 (2d Cir.1980)). Nevertheless, it is well settled that a plaintiff must meet a two-pronged test in order to successfully demonstrate selective enforcement under the Fourteenth Amendment. *See Cine SK8, Inc. v. Town of Henrietta,* 507 F.3d 778, 790 (2d Cir.2007) (quotation omitted). "[T]o succeed on a 'selective enforcement claim,' a plaintiff must show: '(1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Sebold v. City of Middletown,* No. 3:05–CV–1205, 2007 WL 2782527, *26 (D.Conn. Sept. 21, 2007) (quotation omitted); *see also Cine SK8,* 507 F.3d at 790 (quotation omitted); *Church of the Am. Knights of the Ku Klux Klan v. Kerik,* 356 F.3d 197, 210 (2d Cir.2004) (holding that "[a] selective enforcement claim requires, as a threshold matter, a showing that the plaintiff was treated differently compared to others similarly situated"). In particular, a "plaintiff must present evidence comparing [him]self to individuals that are 'similarly situated in all material respects .' " *Sebold,* 2007 WL 2782527, at *26 (quoting *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir.2000)).

**\*5** To prevail on a "class of one" equal protection theory, a plaintiff must show that the defendant "intentionally treated [him] differently from others similarly situated and that there is no rational basis for the difference in treatment." *Neilson v. D'Angelis,* 409 F.3d 100, 104 (2d Cir.2005), *overruled on other grounds, Appel v. Spiridon,* 531 F.3d 138 (2d Cir.2008) (quoting *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)). [1] The plaintiff's burden on a "class of one" claim is "extremely high," and a plaintiff cannot prevail absent a *prima facie* showing that he is "identical in all relevant respects" to the individuals with whom he compares himself. *Id.* (citation omitted). Specifically, the plaintiff must establish that

[1]    The Court notes that *Neilson* involved the application of the class-of-one equal protection theory in the public employment context. Subsequent to the decision in *Neilson,* however, the Supreme Court explicitly held that "the class-of-one theory of equal protection does not apply

in the public employment context." *Engquist v. Or. Dep't of Agric.,* 553 U.S. 591, 595 (2008). Thus, the Second Circuit "overrule[d] [*Neilson* ] ... to the extent that it conflicts with the holding of *Engquist."* *Appel v. Spiridon,* 531 F.3d 138, 139–40 (2d Cir.2008). Nevertheless, the Second Circuit's discussion in *Neilson* regarding the level of similarity necessary to support a class-of-one equal protection claim has not been overruled. *See Smith v. Fischer,* No. 9:07–CV–1264, 2009 WL 632890, *10 n. 30 (N.D.N.Y. Feb. 02, 2009) (quotation and other citations omitted).

"(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake."

*Analytical Diagnostic Labs, Inc. v. Kusel,* 626 F.3d 135, 140 (2d Cir.2010) (quotation and footnote omitted).

In the present matter, the Court finds that Plaintiff has failed to allege a plausible claim under either Equal Protection theory. Plaintiff does not allege that, compared with other similarly situated persons, he was selectively treated. In fact, Plaintiff fails to allege any comparators. Further, Plaintiff fails to allege that any alleged selective treatment was based upon impermissible considerations such as race, religion, or an intent to inhibit or punish the exercise of constitutional rights, or based upon a malicious or bad faith intent to injure him.

Based on the foregoing, the Court grants Defendants' motions to dismiss as to Plaintiff's Equal Protection claims.

**E. Illegal search**

Regarding his illegal search claim, Plaintiff alleges that the Village Defendants "illegally enter[ed] upon his property[.]" Dkt. No. 1 at ¶ 30. Further, he claims that, in a March 8, 2010 letter, Defendants Myers and Saad "admitted illegally entering the [s]ubject-property and conducting therein unreasonable search in violation of Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution." *Id.* at ¶ 85. Finally, Plaintiff alleges that "Defendants Myers and Saad jointly and severally, in their individual capacities, under color of law as Village of Saugerties officers, violated plaintiff's clearly established right to be free from unreasonable searches under the

Case 5:24-cv-00522-BKS-TWD Document 15 Filed 10/25/24 Page 41 of 186

Fourth and Fourteenth Amendments to the United States Constitution, protected through 42 U.S.C. § 1983." *Id.* at ¶ 119.

The Fourth Amendment protects individuals in their homes "against unreasonable searches and seizures." U.S. Const. amend. IV. "A warrantless search is 'per se unreasonable ... subject to only a few specifically established and well-delineated exceptions.' " *United States v. Elliott,* 50 F.3d 180, 185 (2d Cir.1996) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).

**\*6** It is firmly established that the Fourth Amendment only proscribes unreasonable searches and seizures. *See Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 619 (1989) (citations omitted). The permissibility of a search " 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' " *Id.* (quotation and other citation omitted).

In *Ruggiero v. Krzeminski,* the Second Circuit held that although a search conducted without a warrant is

> presumptively unreasonable ... [t]he operation of this presumption ... cannot serve to place on the defendant the burden of proving that the official action was reasonable. Rather, the presumption may cast upon the defendant the duty of producing evidence of consent or search incident to an arrest or other exceptions to the warrant requirement. However, the ultimate risk of nonpersuasion must remain squarely on the plaintiff in accordance with established principles governing civil trials.

*Ruggiero v. Krzeminski,* 928 F.2d 558, 563 (2d Cir.1991) (internal and other citations omitted).

In the present matter, the Court finds that Plaintiff's allegations regarding illegal search are entirely conclusory and insufficient to plead a plausible cause of action. Plaintiff merely alleges that Defendants Myers and Saad conducted an unreasonable search, but fails to support this assertion with

any supporting factual allegations. *See First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir.1994); *see also Cannon v. Wood,* No. 9:10–cv–1332, 2011 WL 7071100, \*7 (N.D.N.Y. Aug. 12, 2011) (dismissing the plaintiff's illegal search claim where the plaintiff merely "states in a conclusory fashion that he was subjected to an illegal search" and the complaint was "devoid of any factual allegations to support this claim").

Based on the foregoing, the Court grants Defendants' motions to dismiss as to Plaintiff's illegal search claim.

**F. Due Process**
Plaintiff alleges that, "[a]s a result of the misconduct by the Defendants Plaintiff has been deprived of his right to equal protection of the laws, and the due course of justice is impeded, in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983." Dkt. No. 1 at ¶ 115. Although not addressed by Defendants, the Court believes that, liberally construed, Plaintiff may be attempting to allege a due process claim.

In order to prevail on a Fourteenth Amendment procedural due process claim pursuant to 42 U.S.C. § 1983, "the plaintiff must show (1) that he possessed a protected liberty or property interest; and (2) that he was deprived of that interest without due process." *Rehman v. State Univ. of N.Y. at Stony Brook,* 596 F.Supp.2d 643, 656 (E.D.N.Y.2009) (citing *McMenemy v. City of Rochester,* 241 F.3d 279, 285–86 (2d Cir.2001)). "Property rights arise from ' "an independent source such as state law," [with] federal constitutional law determin[ing] whether that interest rises to the level of a "legitimate claim of entitlement" protected by the Due Process Clause.' " *Pichen v. City of Auburn, N.Y.,* 728 F.Supp.2d 192, 198 (N.D.N.Y.2010) (quotation and other citation omitted). The essential principle of procedural due process is that a deprivation of life, liberty or property should be preceded by notice and an opportunity for a hearing appropriate to the nature of the case. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985) (citation omitted). However, "[w]here there is a meaningful postdeprivation remedy, there is no due process violation ." *Gudema v. Nassau County,* 163 F.3d 717, 724 (2d Cir.1998) (citation omitted).

**\*7** Assuming that Plaintiff has sufficiently pled that he has a protected property interest, he has failed to plausibly allege that he was deprived of that interest without due process. Plaintiff's complaint primarily concerns court proceedings between himself and the Village Defendants, instituted

against him in the Ulster County Supreme Court. *See* Dkt. No. 1 at ¶¶ 33–85. Plaintiff had the ability to challenge any decisions reached by the Supreme Court through an appeal to the Appellate Division. As such, Plaintiff had available to him a post-deprivation remedy. *See De Asis v. New York City Police Dept.,* 352 Fed. Appx. 517, 518–19 (2d Cir.2009) (dismissing the plaintiff's due process claim because "a post-deprivation remedy was available, in the form of an Article 78 mandamus proceeding") (citing *New York State Nat'l Org. for Women v. Pataki,* 261 F.3d 156, 168 (2d Cir.2001)). Further, Plaintiff's allegations make clear that he had notice of the pending action and that Plaintiff was in constant communication with Defendants during the pendency of the action. *See* Dkt. No. 1 at ¶¶ 33–85. As such, Plaintiff was provided with notice of the pending action and afforded an opportunity to respond with any objections he had. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546 (1985) ("The essential requirements of due process ... are notice and an opportunity to respond").

Based on the foregoing, the Court finds that Plaintiff has failed to allege a plausible due process claim; and, therefore, the Court *sua sponte* dismisses Plaintiff's complaint to the extent that he has attempted to allege such a due process claim.

**F. Conspiracy claims**

To sustain a cause of action for conspiracy to violate a plaintiff's civil rights under section 1985(3), a plaintiff must allege and demonstrate that defendants acted with racial or other class-based animus in conspiring to deprive the plaintiff of his equal protection of the laws, or of equal privileges and immunities secured by law. *See United Bhd. of Carpenters & Joiners, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 834–39 (1983); *see also Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir.1994) (citation omitted). A plaintiff asserting a claim under section 1985(3) need not necessarily offer proof of an explicit agreement; a conspiracy can be evidenced circumstantially, through a showing that the parties had a " 'tacit understanding to carry out the prohibited conduct.' " *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir.1995) (quoting *United State v. Rubin,* 844 F.2d 979, 984 (2d Cir.1988)) (other citations omitted). This notwithstanding, in order to properly plead such a claim, a plaintiff must make more than "conclusory, vague, or general allegations of conspiracy." *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983) (citation omitted).

" 'To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.' " *Benitez v. Ham,* No. 9:04–CV–1159, 2009 WL 3486379, *18 (N.D.N.Y. Oct. 21, 2009) (quoting *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999)). A violated constitutional right is a natural prerequisite to a claim of conspiracy to violate such right. *See Malsh v. Austin,* 901 F.Supp. 757, 763–64 (S.D.N.Y.1995) (citation omitted). Thus, if a plaintiff cannot sufficiently allege a violation of his rights, it follows that he cannot sustain a claim of conspiracy to violate those rights. *See id.; see also Friends of Falun Gong v. Pacific Cultural Enterprise, Inc.,* 288 F.Supp.2d 273, 279 (E.D.N.Y.2003) (citations omitted); *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) (citation omitted).

**\*8** "A cause of action under § 1986 may be brought against anyone who had power to prevent or aid in a wrong actionable under Section 1985 and neglected to do so." *Amadasu v. Ngati,* No. 05CV2585, 2006 WL 842456, *7 (E.D.N.Y. Mar. 27, 2006) (citing *Mian,* 7 F.3d at 1088). "A 'plaintiff's failure to state a claim under Section 1985 is fatal to his Section 1986 claim.' " *Johnson v. Lynn–Caron,* No. 9:11–CV–0386, 2012 WL 3888175, *4 (N.D.N.Y. Sept. 7, 2012) (quotation omitted).

To withstand a motion to dismiss, the conspiracy claim must contain more than " 'conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights[.]' " *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (quotation omitted); *Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D .N.Y.1998) (holding that a mere allegation of conspiracy with no facts to support it cannot withstand a motion to dismiss). Specifically, the plaintiff must provide some factual basis supporting a "meeting of the minds," such as that the defendants "entered into an agreement, express or tacit, to achieve the unlawful end[;]" the plaintiff must also provide "some 'details of time and place and the alleged effects of the conspiracy.' " *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (quoting *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993)).

To the extent that Plaintiff is attempting to allege a conspiracy under 42 U.S.C. § 1985, his claim must fail because he does not allege that Defendants acted with racial or other class based animus in an effort to deprive him of his constitutional rights. *See United Bhd. of Carpenters & Joiners, Local*

Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 43 of 186
Lautman v. Village of Saugerties, N.Y., Not Reported in F.Supp.3d (2014)

2014 WL 1653189

*610, AFL–CIO,* 463 U.S. at 834–39. Since Plaintiff has failed to allege a plausible claim under section 1985, his claim under section 1986 fails as well. *See Johnson,* 2012 WL 3888175, at \*4 (quotation omitted). Similarly, Plaintiff's section 1983 conspiracy claim fails because he has failed to allege a plausible violation of any of his rights. *See Vega v. Artus,* 610 F. Sup.2d 185, 202–03 (N.D.N.Y.2009) (holding that "a Section 1983 conspiracy claim must not only allege a conspiracy, but the 'actual deprivation of constitutional rights.' 'Thus, if a plaintiff cannot sufficiently allege a violation of his rights, it follows that he cannot sustain a claim of conspiracy to violate those rights' ") (quotation omitted). Finally, Plaintiff's conspiracy claims are supported by only conclusory and vague allegations of a conspiracy, which are insufficient to state a plausible claim. *See Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (holding that dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper); *see also Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (finding that the plaintiff's allegations of conspiracy were insufficient despite specific claims of conspiracy to alter tapes and create illegal search warrants, as there was no basis for the assertion that the defendants actually conspired together to bring about these actions).

**\*9** Based on the foregoing, the Court grants Defendants' motions to dismiss Plaintiff's conspiracy claims.

### G. Municipal Liability

Since Plaintiff failed to plead a plausible violation of his rights, the Court grants Defendants' motions to dismiss as to the municipal Defendants. *See Mallgren v. New York City,* No. 13–cv–724, 2014 WL 988838, \*3 (E.D.N.Y. Mar. 12, 2014) (holding that a municipality can be liable under section 1983 only if a plaintiff can first show an underlying constitutional violation) (citation omitted).

### H. The Wilson Elser Defendants

Plaintiff's complaint makes clear that the Wilson Elser Defendants were acting in their positions as hired attorneys for the Village of Saugerties when the alleged violations occurred. Since the Wilson Elser Defendants were acting in a traditional manner, as counsel for the Village, Plaintiff has failed to allege that they were acting under color of state law. As such, the Court finds that, in the alternative, Plaintiff's complaint as to these Defendants must be dismissed. *See Angelico v. Lehigh Valley Hosp., Inc.,* 184 F.3d 268, 277 (3d Cir.1999) (stating that "[a]ttorneys performing their

traditional functions will not be considered state actors solely on the basis of their position as officers of the court"); *Rajapakse v. Baker Donelson Bearman Caldwell & Berkowitz, P.C.,* No. 13–cv–2328, 2013 3992523, \*8 (W.D.Tenn. Aug. 5, 2013) (holding that " 'attorneys do not become state actors by representing state or local governments' ") (quotation omitted).

### I. Plaintiff's state-law claims

Application of supplemental jurisdiction is discretionary, and "it requires a balancing of the considerations of comity, fairness to the litigants, judicial economy, and the avoidance of needless decisions of state law." *Federman v. Empire Fire & Marine Ins. Co.,* 597 F.2d 798, 809 (2d Cir.1979) (citation omitted). The Second Circuit has held that " 'if [all] federal claims are dismissed before trial ... the state claims should be dismissed as well.' " *Castellano v. Bd. of Trustees,* 937 F.2d 752, 758 (2d Cir.1991) (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)).

Although not clear what state-law claims Plaintiff is attempting to allege, in his complaint he alleges that "[t]he supplemental jurisdiction of this court over Plaintiff's state law claims is established under 28 U.S.C. § 1367(a)." Dkt. No. 1 at ¶ 3. Since the Court has dismissed all of Plaintiff's federal claims, it declines to exercise supplemental jurisdiction over their state-law claims and dismisses them without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

### J. Leave to amend

It has long been "well-established that 'outright dismissal for reasons not going to the merits is viewed with disfavor in the federal courts.' " *Harrison v. Enventure Capital Group, Inc.,* 666 F.Supp. 473, 479 (W.D.N.Y.1987) (quoting *Nagler v. Admiral Corporation,* 248 F.2d 319, 322 (2d Cir.1957)). For this reason, "dismissals for insufficient pleadings are ordinarily with leave to replead." *Stern v. General Elec. Co.,* 924 F.2d 472, 477 (2d Cir.1991). Leave to amend a pleading need not be granted, however, if it would be futile to do so. *See O'Hara v. Weeks Marine, Inc.,* 294 F.3d 55, 69 (2d Cir.2002) (citing *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 55 (2d Cir.1995)).

**\*10** In the present matter, the Court finds that Plaintiff's claims should be dismissed with prejudice. In addition to the *Rooker–Feldman* issues discussed above, it appears that most, if not all, of Plaintiff's claims are untimely under the

Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 44 of 186
Lautman v. Village of Saugerties, N.Y., Not Reported in F.Supp.3d (2014)

2014 WL 1653189

applicable three-year statute of limitations. Finally, this result is particularly appropriate in light of Plaintiff's failure to oppose Defendants' motion to dismiss. *See Banks v. No. 8932 Correctional Officer,* No. 11 Civ. 8359, 2013 WL 673883, *4 (S.D.N.Y. Feb. 25, 2013).[2]

[2]      Although not addressed in this Memorandum–Decision and Order, the Court notes that the Wilson Elser Defendants claim that Plaintiff has brought five (5) lawsuits against them since 2008 regarding their legal representation of the Village of Saugerties. *See* Dkt. No. 19 at 7–9 and exhibits attached thereto. Plaintiff has apparently failed to prosecute several of those matters, resulting in their dismissal.

Based on the foregoing, the Court dismisses Plaintiff's federal claims against all Defendants with prejudice.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motions to dismiss (Dkt. Nos. 12, 17, 20 and 26) are **GRANTED;** and the Court further

**ORDERS** that Plaintiff's federal claims are **DISMISSED with prejudice;** and the Court further

**ORDERS** that Plaintiff's state-law claims are **DISMISSED without prejudice;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1653189

---

                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 7071100
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Mark E. CANNON, Plaintiff,

v.

C.O. E. WOOD, Upstate Correctional Facility; Saint
Mary, Correctional Officer, Upstate Correctional
Facility; Relf, Correctional Officer, Upstate Correctional
Facility; Winston, Correctional Officer, Upstate
Correctional Facility; D. Price, Correctional Officer,
Upstate Correctional Facility; M. Eddy, Sergeant,
Upstate Correctional Facility; Nurse Holmes,
Upstate Correctional Facility; Bulis, Hearing
Officer, Upstate Correctional Facility, Defendants.

Civ. No. 9:10–CV–1332 (GTS/RFT).
|
Aug. 12, 2011.

**Attorneys and Law Firms**

Mark E. Cannon, Dannemora, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of
New York, Krista A. Rock, Esq., Assistant Attorney General,
of Counsel, Albany, NY, for Defendants.

## *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*\*1 Plaintiff brings this civil rights Complaint, pursuant to 42
U.S.C. § 1983, alleging Defendants violated his constitutional
rights while he was incarcerated at Upstate Correctional
Facility. Dkt. No. 1, Compl. Defendants moved, pursuant to
Federal Rule of Civil Procedure 12(b)(6), for dismissal of the
Complaint, Dkt. No. 22, which Plaintiff opposes, Dkt. No. 23.
For the reasons that follow, it is hereby recommended that
Defendants' Motion be **granted in part** and **denied in part.**

## I. BACKGROUND

The following recitation is derived from the Complaint and, in
accordance with the applicable standard of review, are taken
as true. *See infra* Part II.A.

At all times relevant to the events described in the
Complaint, Plaintiff was in the custody of the New York
State Department of Corrections and Community Supervision
(DOCCS) and was housed at the Upstate Correctional
Facility. During February 2010, Plaintiff wrote an inmate
grievance complaining that he had been denied access to
the barbershop. Compl. at ¶ 6(C). As a result of this grievance,
Plaintiff was scheduled a make-up haircut. *Id.* Thereafter,
Defendants Saint Mary and Winston came to Plaintiff's cell
and told him that because he wrote that grievance, he would
never receive another haircut for as long as he remained at
Upstate. *Id.* During the months of March, April, and May
2010, Defendants Saint Mary and Winston denied him access
to the barbershop, stating each time that Plaintiff should not
have written the grievance. *Id.* They also told him that he did
not deserve "level 3 status." *Id.* Plaintiff subsequently wrote
a grievance about this harassment.

On May 12, 2010, Defendant S. Price came to Plaintiff's cell
to retrieve his food tray. As Plaintiff was loading items onto
the tray, Defendant Saint Mary told Defendant Price to close
Plaintiff's feed up slot and stated that Plaintiff refused to give
back his feed up tray. *Id.* Thereafter, Defendant Sergeant M.
Eddy approached Plaintiff's cell and retrieved the food tray.
*Id.* at ¶ 6(D). Approximately ten minutes later, Defendants
E. Wood, Relf, and S. Price came to Plaintiff's cell and told
him to pack his belongings because he lost his level 3 status;
Plaintiff was then placed in a holding pen. *Id.* at ¶ 6(F).
Then, Defendants E. Wood, Relf, and Sergeant Eddy escorted
Plaintiff through a metal detector, which did not ring, and
then into a strip room where he was ordered to strip naked.
*Id.* After that, Plaintiff's hands were cuffed behind his back
and he was escorted out of the strip room. *Id.* at ¶ 6(G).
At that point, Defendant Wood grabbed Plaintiff's hair and
slammed his face against the wall. *Id.* at ¶ 6(H). Defendant
Relf grabbed Plaintiff's handcuffs and twisted his arm in
an upward fashion, causing pain in Plaintiff's shoulders,
elbows, and wrists. *Id.* Defendant Wood placed his thumb
behind Plaintiff's jawbone, between his ear and upper neck,
and pushed and applied pressure on the jawbone, causing
Plaintiff pain and dizziness. *Id.* Defendant Eddy watched
while this entire encounter ensued. *Id.* For three days, Plaintiff
experienced extreme pain in his jaw whenever he tried to eat.
*Id.* at ¶ 7. He also experienced extreme pain in his neck and
back and had trouble sleeping for approximately seven days.

*Id.* at ¶ 8. The pain he feels in his back and neck continue. *Id.* at ¶ 9.

**\*2** Thereafter, Plaintiff was taken to 11 Building and placed in a drug watch holding pen. *Id.* at ¶ 6(I). Defendant Nurse Holmes came to Plaintiff's cell, but left without examining Plaintiff, telling Sergeant Eddy that Plaintiff refused treatment. *Id.* Plaintiff's drug watch lasted seven days, at which point he was taken back to his cell in the 10 Building. *Id.* at ¶ 6(J).

As a result of the above, Plaintiff was issued a misbehavior report charging him with violent conduct, refusing a direct order, threats, and messhall violation. *Id.* On May 28, 2010, Defendant Bulis presided as the hearing officer during the disciplinary hearing for these charges. *Id.* at ¶ 6(K). At his request, Plaintiff called a witness and viewed the video tape of the alleged incident, during which he pointed out how he did not move during the assault by Defendants Wood and Relf. *Id.* at ¶¶ 6(K)-(L). At the conclusion of the hearing, Defendant Bulis found Plaintiff guilty of all charges. *Id.* at ¶ 6(M). He later told Plaintiff that he should not have written those complaints. *Id.*

## II. DISCUSSION

### A. Standard of Review

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (*overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at \*2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference,

a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (quoting *Cortec Indus. ., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 754 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

**\*3** A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1960, 173 L.Ed.2d 868 (citing *Twombly).* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1949, 173 L.Ed.2d 868. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In this respect, to survive dismissal, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* 440 U.S. at 555). Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 74, 74 L.Ed.2d 723 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and

common sense." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1950–51, 173 L.Ed.2d 868.

### B. Eleventh Amendment

Plaintiff brings this action against each Defendant in his or her individual and official capacity and seeks only monetary compensation. Compl. at ¶ 6(B). Defendants assert that they are entitled to Eleventh Amendment immunity as to any claims brought against them in their official capacities. We agree.

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although by its terms, the amendment bars suit by citizens of one state against another state, the Supreme Court has held that such amendment similarly bars suits against a state by its own citizens. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). The sovereign immunity provided for in the Eleventh Amendment prohibits suits against the state, including a state agency in federal court. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 98–101, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his or her official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.* 915 F.Supp. 525, 539 (N.D.N.Y.1995) (citing *Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994) & *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) (noting that a "claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the office").

*\*4* Since the only relief sought herein is compensatory monetary relief, Plaintiff's claims against all Defendants in their official capacities should be **dismissed**. Thus, we recommend **granting** Defendants' Motion on this basis.

### C. Personal Involvement

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at \*2 (S.D.N.Y. Sept.15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009).

Defendants assert that the allegations in the Complaint against Defendant S. Price do not amount to a stated cause of action. We agree. The factual allegations against Defendant Price are that he closed Plaintiff's feed-up tray as Defendant Saint Mary directed, and that he, along with Defendants Wood and Relf, told Plaintiff that his level 3 status was terminated. These factual allegations, taken as true, do not amount to a violation of any constitutional violation. Thus, Defendants' Motion to Dismiss should be **granted** as to Defendant Price due to Plaintiff's failure to allege any personal involvement on his part with regard to any wrongdoing.

### D. Claims Against Defendants Winston and Saint Mary

According to the factual allegations in the Complaint, Defendants Winston and Saint Mary are accused of denying Plaintiff access to the barbershop after Plaintiff filed a grievance regarding a missed appointment. After the filing of that grievance, Defendants Winston and Saint Mary told Plaintiff that he should not have complained and that he would never receive another haircut for as long as he was at Upstate. And, during the months of March, April, and May, Plaintiff was passed over whenever the barbershop schedule would make rounds. Plaintiff also contends that Defendants Winston and Saint Mary threatened Plaintiff's level 3 status and fabricated a lie that Plaintiff was being uncooperative with the retrieval of his food tray; an event Plaintiff asserts led to his loss of level 3 status and being placed on a drug watch.

Interpreting Plaintiff's claims as stated pursuant to the Eighth Amendment, Defendants assert that the claims against Winston and Saint Mary should be dismissed for failure to state a claim for relief. They argue that harassment and verbal threats are not actionable and that there is no violation of the Eighth Amendment based upon the denial of barbershop visits. We agree with the Defendants' assessments on both counts, [1] however, we interpret Plaintiff's claims slightly differently.

[1]    A claim brought under § 1983 is "not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (citing *Almutt v. Cleary,* 913 F.Supp. 160, 165–66 (W.D.N.Y.1996)); *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) (noting that ordinarily, a claim for verbal harassment is not actionable under § 1983). Also, in order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege that (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 297–99, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (citation omitted) (cited in *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996)). The denial of a haircut, even multiple haircuts, can hardly be categorized as a denial of the "minimal civilized measure of life's necessities" as to constitute a violation of the Eighth Amendment. *See, e.g., Black v. Cuomo,* 101 F.3d 681 (2d Cir.1996) (unpublished opinion) (noting that the denial of haircuts is not actionable under the Eighth Amendment).

**\*5**  The Court notes that Plaintiff has proceeded in this action *pro se* and that, as such, the Court is compelled to adhere to a policy of leniency when perusing claims stated in pleadings. *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *see also Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) ("[W]e read [a *pro se* litigant's] supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest."); *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, [plaintiff] has raised. In so doing, the court's imagination should be limited only by [plaintiff's] factual allegations, not by the legal claims set out in his pleadings."). Viewing the Plaintiff's claims liberally, it

is this Court's view that Plaintiff has stated a claim against Defendants Winston and Saint Mary for retaliation.

The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to retaliation for the exercise of a constitutional right, such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679–80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589–90 (2d Cir.1988). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *Gill v. Pidlypchak,* 389 F.3d 379, 381–83 (2d Cir.2004).

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d at 872 (citation omitted); *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) ("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." (citation omitted)), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

To state a First Amendment claim for retaliation, an inmate must demonstrate that (1) he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d at 492); *see also Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002).

Here, Plaintiff engaged in constitutionally protected activity when he filed a grievance about being denied a haircut. Defendants Winston and Saint Mary specifically referenced that grievance when they informed Plaintiff that he would never receive another haircut again. They thereafter denied Plaintiff the ability to sign up for barbershop visits, again referencing the grievance he wrote. The ensuing harassment of Plaintiff could be considered action that would have a chilling effect on an inmate's exercise of his First Amendment rights, or, stated another way, it could "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord,* 320 F.3d 346, 353

(2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d at 493). Plaintiff has alleged enough facts to set forth a claim for retaliation against these Defendants, which, at a minimum, allows him to go forward with some discovery. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (noting that when a plaintiff sets forth a "colorable suspicion of retaliation," some documentary evidence should be allowed to proceed); *Carpio v. Walker,* 1997 WL 642543, at *6 (N.D.N.Y. Oct.15, 1997) (citing *Flatherty v. Coughlin,* 713 F.2d at 13); *accord Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). As such, we recommend **granting** Defendants' Motion as to any claim raised by Plaintiff against Defendants Winston and Saint Mary regarding the Eighth Amendment or claims of harassments and threats. We further recommend **denying** Defendants' Motion with regard to the claim of retaliation against Defendants Winston and Saint Mary.

### E. Claims Against Defendants Wood, Relf, and Eddy

**\*6** In their Motion to Dismiss, Defendants urge the Court to dismiss the claims against Defendants Wood, Relf, and Eddy because Plaintiff states these claims in wholly conclusory terms. Defendants view these claims as "retaliatory assault" and, to the extent Plaintiff links this assault to the acts of Defendants Winston and Saint Mary, they argue that Plaintiff has not identified the protected conduct at issue that would prompt this retaliatory assault, nor a causal connection between the incidents between Plaintiff and Defendants Saint Mary and Winston, and these Defendants. We agree with Defendants that Plaintiff does not seem to link the two incidents, and thus, to the extent he asserts a retaliatory assault, such claim should fail. However, viewing Plaintiff's claims liberally and construing them to raise the strongest claim presented by the facts, we find that Plaintiff's claim against Defendants Wood, Relf, and Eddy are not rooted in the First Amendment, but rather the Eighth.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment and is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 666–67, 82 S.Ct. 1417, 8 L.Ed.2d 758 (cited in *Tramell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003)). In *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), the Supreme Court clarified the standards for determining whether an Eighth Amendment violation occurred in the context of excessive force. Specifically, the Court stated that, "whenever prison officials stand accused of using excessive physical force in

violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley [v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) ]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 503 U.S. at 6–7 (quoted in *Davidson v. Flynn,* 32 F.3d 27, 29 (2d Cir.1994)). To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must prove two components: (1) objectively, that the defendant's actions violated "contemporary standards of decency," and (2) subjectively, that the defendant acted wantonly and in bad faith. *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks and citations omitted).

Plaintiff's factual allegations adequately plead a plausible claim of excessive force. He asserts that while he was handcuffed, Defendant Wood grabbed his hair and slammed his face against the wall and also grabbed his jaw, placing pressure between his ear and upper neck. Plaintiff also alleges that Defendant Relf grabbed Plaintiff's handcuffs and twisted his arm upwards. As a result, Plaintiff suffered from pain, dizziness, inability to sleep, and difficulty eating. Plaintiff maintains that this assault was unprovoked, and that he, arguably, posed no security risk as he was secured in handcuffs during the entire altercation. We find that these factual allegations are enough to pass scrutiny under a 12(b)(6) analysis. Thus, we recommend **denying** Defendants' Motion on this ground.

**\*7** As for Defendant Eddy, Plaintiff asserts that he stood there during the entire assault and did nothing to stop Defendants Relf and Wood. This too is enough to state an Eighth Amendment claim that survives this level of scrutiny. *See Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citing *Farmer v. Brennan,* 511 U.S. 825, 832–33, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)) ("The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody."); *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) ("Prison officials have a constitutional duty to act reasonably to ensure a safe environment for a prisoner when they are aware that there is a significant risk of serious injury to that prisoner."); *see also Avincola v. New York State Dep't of Corr. Servs.,* 1998 WL 146280, at *3 (N.D.N.Y. Mar.27, 1998).

Further, a supervisor can be held liable when he or she has actual or constructive notice of unconstitutional practices,

but similarly acted with gross negligence or deliberate indifference in failing to act. *See Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989). "Such a supervisor may not escape the consequences of his or her failure to act by pleading the doctrine of qualified immunity." *Fossett v. Morris,* 1991 WL 67093, at *3 (S.D.N.Y. Apr.22, 1991). If indeed such an assault took place while Plaintiff was secured in handcuffs, and Defendant Eddy stood by without intervening on Plaintiff's behalf, then he too is liable for an Eighth Amendment violation. Thus, we recommend **denying** Defendants' Motion on this ground.

### F. Remaining Conclusory Claims

Plaintiff states in conclusory fashion that he was subjected to an illegal search, however, the Complaint is devoid of any factual allegations to support this claim. It is not clear how Plaintiff was subjected to an illegal search, nor whom perpetrated such search. As such, we recommend **granting** Defendants' Motion as to this conclusory claim.

Plaintiff claims that he was "illegally" placed on "the loaf" and a drug watch for seven days. Perhaps Plaintiff is attempting to assert an Eighth Amendment conditions of confinement violation. However, these conclusory allegations fail in that he has not alleged enough facts for the Court to assess whether the Eighth Amendment was violated, *ergo,* whether he was subjected to conditions that were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," which Defendants subjected him to these conditions, and whether such Defendants acted with the requisite culpable state of mind. *Wilson v. Seiter,* 501 U.S. 294, 297–99, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (citation omitted) (cited in *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996)). Thus, to the extent Plaintiff seeks to allege an Eighth Amendment violation based on the drug watch and diet loaf, Defendants' Motion should be **granted.**

Plaintiff also asserts that Defendant Bulis violated his right to due process. However, again, there are no factual allegations to support such a claim. First, Plaintiff does not allege the liberty interest at stake by which he was entitled to some measure of due process before being deprived therewith. *See Sandin v. Connor,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (noting that a prisoner is not entitled to due process protections unless the resulting restricting confinement subjected the prisoner to "atypical and significant hardship ... in relation to the ordinary incidents

of prison life"). Second, Plaintiff admits that during said hearing, he exercised his right to call witnesses and review requested evidence. Thus, even if Plaintiff had identified a liberty interest, he failed to allege facts supporting the notion that he was denied due process. *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Accordingly, Defendants' Motion should be **granted** and Defendant Bulis should be **dismissed** from this action.

 **\*8** Lastly, Plaintiff asserts that Defendant Nurse Holmes did not examine him after the altercation with Defendants Wood, Relf, and Eddy. This claim suffers the same fate of being far too conclusory.

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *see also Farmer v. Brennan,* 511 U.S. 825, 834–35, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hathaway v. Coughlin ("Hathaway I"),* 37 F.3d 63, 66 (2d Cir.1994). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency' that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06).

Here, Plaintiff provides no facts by which this Court could assess the seriousness of his injury, other than injecting conclusory statements about the level of pain he experienced, nor the subjective state of mind of Nurse Holmes. His sparse facts do not survive this initial review and we recommend **granting** Defendants' Motion on this ground and **dismissing** Nurse Holmes from this action.

### G. Qualified Immunity

The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Firzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988). The doctrine protects public officials from 'personally facing the risk of incurring ruinous liability in the form of money damages, which would deter qualified people from public service." *Eng v. Coughlin,* 858 F.2d at 895.

Case 5:24-cv-00522-BKS-TWD   Document 15   Filed 10/25/24   Page 51 of 186
Cannon v. Wood, Not Reported in F.Supp.2d (2011)
2011 WL 7071100

Qualified immunity is an affirmative defense that must be pleaded by the official claiming it. *Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The only pleading filed in the present case is the Original Complaint. Defendants have not raised this affirmative defense in a responsive pleading as set forth in FED. R. CIV. P. 8(c), but rather in their memorandum of law in support of their Motion to Dismiss. Generally, however, "the defense of qualified immunity cannot support the grant of a ... 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983); *see also McKenna v. Wright,* 386 F.3d 432, 435 (2d Cir.2004) (quoting *Green* ). An exception to this general rule exists where the complaint itself sets up, on its face, the qualified immunity defense; in such an occasion, dismissal for failure to state a claim would be appropriate. *Roniger v. McCall,* 22 F.Supp.2d 156, 162 (S.D.N.Y.1998) (citing *Green v. Maraio,* 722 F.2d at 1019); *see also McKenna v. Wright,* 386 F.3d at 435.

**\*9** Pursuant to this Court's analysis, the remaining claims are those against Defendants Winston and Saint Mary for retaliation and those against Defendants Wood, Relf, and Eddy for excessive force and failure to protect. A fair reading of the Complaint does not give rise to the qualified immunity defense. Indeed, it cannot be said that Plaintiff's rights were not clearly established at the time of the alleged constitutional violations. If a plaintiff had a "clearly established, constitutionally protected right that was violated, he or she must demonstrate that it was not objectively reasonable for the defendant to believe that his action did not violate such law." *Gill v. Hoadley,* 261 F.Supp.2d 113, 125 (N.D.N.Y.2003) (citing, *inter alia, Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211 (2d Cir.2003)); *see also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Lewis v. Cowan,* 165 F.3d 154, 166 (2d Cir.1999). Thus, the inquiry turns on the reasonableness of the Defendants' acts. The Second Circuit has held, however, that such analysis "turns on factual questions that cannot be resolved at [the motion to dismiss] stage of proceedings." *Taylor v. Vermont Dep't of Educ.,* 313 F.3d 768, 793 (2d Cir.2002); *see also McKenna v. Wright,* 386 F.3d 432, 434 (noting that the "qualified immunity defense can be presented in a Rule 12(b)(6) motion, but that the defense faces a formidable hurdle"). For these reasons, any adjudication as to the applicability of the qualified immunity affirmative defense would be premature since "[r]esolution of

qualified immunity depends on the determination of certain factual questions that cannot be answered at this stage of the litigation." *Denton v. McKee,* 332 F.Supp.2d 659, 666 (S.D.N.Y.2004).

Thus, we find that qualified immunity cannot be determined at this stage. Though we recommend **denying** Defendants' Motion on this ground, Defendants are not precluded from including this defense in their answer and raising it again at a more appropriate time when there is a complete record by which the reasonableness of Defendants' acts can be assessed.

## III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion to Dismiss (Dkt. No. 22) should be **granted in part and denied in part** as follows:

1. All causes of action should be **dismissed,** pursuant to the Eleventh Amendment, insofar as they are stated against the Defendants in their official capacities;

2. Defendant Price should be **dismissed** from this action based upon Plaintiff's failure to assert his personal involvement in any wrongdoing;

3. To the extent asserted, any Eighth Amendment conditions of confinement claims and other claims of harassment/verbal threats against Defendants Winston and Saint Mary should be **dismissed** for failure to state a claim;

4. To the extent asserted, any First Amendment retaliation claims against Defendants Winston and Saint Mary should survive and proceed to discovery;

**\*10** 5. To the extent asserted, any First Amendment retaliation claims against Defendants Wood, Relf, and Eddy should be **dismissed** for failure to state a claim;

6. To the extent asserted, any Eighth Amendment claims of excessive force and failure to protect against Defendants Wood, Relf, and Eddy should survive and proceed to discovery;

Cannon v. Wood, Not Reported in F.Supp.2d (2011)
Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 52 of 186
2011 WL 7071100

7. To the extent asserted, claims regarding the "illegal" search, imposition of diet loaf, and drug watch should be **dismissed** for failure to state a claim;

8. To the extent asserted, claims for due process violations against Defendant Bulis should be **dismissed** and Defendant Bulis should be **dismissed** from this action;

9. To the extent asserted, claims for Eighth Amendment medical indifference against Defendant Holmes should be **dismissed** and Defendant Holmes should be **dismissed** from this action;

10. Defendants' request for dismissal based on qualified immunity should be **denied** at this stage;and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 7071100

---

End of Document                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2375814
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Vidal WHITLEY, Plaintiff,
v.
Major KRINSER, Sgt. Robin Brown, Captain Winters,
Corporal Conklin, Deputy Johnson, Lt. Prinzi, Corporal
Carlo, Lt. Santillo, Sgt. Garcia, Major Kasacey,
Corporal Peck, and Deputy Galling, Defendants.

No. 06-CV-0575F.
|
Aug. 15, 2007.

**Attorneys and Law Firms**

Vidal Whitley, Willard, NY, pro se.

### DECISION and ORDER

WILLIAM M. SKRETNY, United States District Judge.

### *INTRODUCTION*

**\*1** By an Order dated February 8, 2007, plaintiff *pro se* Vidal
Whitley was granted permission to file a second amended
complaint in this action pursuant to 42 U.S.C. § 1983 to
specifically address issues relating to defendants Kasacey,
Krinser and Peck. For the reasons stated below, plaintiff's
second amended complaint is dismissed and the amended
complaint is allowed to go forward at this stage against all
named defendants except as to defendants Krinser, Kasacey
and Peck.

### *DISCUSSION*

Section 1915(e) (2)(B) of 28 U.S.C. provides that the Court
shall dismiss a case in which *in forma pauperis* status has been
granted if, at any time, the Court determines that the action
"(ii) fails to state a claim upon which relief may be granted."
Based on its evaluation of the complaint, the Court finds
that plaintiff's claims against defendants Krinser, Kasacey and
Peck must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)
(B)(ii) because they fail to state a claim upon which relief

may be granted. Despite direction to specify what Krinser,
Kasacey and Peck were responsible for, plaintiff's second
amended complaint does not allege sufficient facts to state
claims against Krinser, Kasacey and Peck.

In addition, plaintiff was directed that his second amended
complaint "should name in the caption all of the people
plaintiff wishes to hold responsible for each violation.
Plaintiff has alleged that people who are not named in the
caption were responsible for violation his rights. However,
if these people are not also named in the caption of the
second amended complaint, they will not be defendants in the
case." (Docket No. 11.) Because plaintiff has not named any
additional defendants in the second amended complaint, has
not included the allegations against the remaining defendants
named in his amended complaint, and has failed to state a
claim against Krinser, Kasacey and Peck, the second amended
complaint is dismissed in its entirety. However, because of
plaintiff's *pro se* status and his minimal literacy, the Court
will deem the amended complaint the operative pleading in
this case and allow it to proceed against all named defendants
except Krinser, Kasacey and Peck.

### *CONCLUSION*

For the reasons set forth above, plaintiffs claims against
defendants Krinser, Kasacey and Peck are dismissed pursuant
to 28 U.S.C. § 1915(e)(2)(B) and the amended complaint shall
be served on the remaining defendants set forth in the caption
above.

### *ORDER*

IT HEREBY IS ORDERED, that the claims against Krinser,
Kasacey and Peck are dismissed with prejudice pursuant to
28 U.S.C. § 1915(e)(2)(B); and,

FURTHER, the Clerk of the Court is directed to correct the
docket to reflect that Sgt. Robin Brown, Captain Winters,
Corporal Conklin, Deputy Johnson, Lt. Prinzi, Corporal
Carlo, Lt. Santillo, Sgt. Garcia and Deputy Galling are
defendants in this action; and,

FURTHER, the Clerk of the Court is directed to cause the U.S.
Marshal to serve the amended complaint (Docket No. 10) and
this Order upon the remaining defendants, Sgt. Robin Brown,
Captain Winters, Corporal Conklin, Deputy Johnson, Lt.

Whitley v. Krinser, Not Reported in F.Supp.2d (2007)
Case 5:24-cv-00522-BKS-TWD   Document 15   Filed 10/25/24   Page 54 of 186
2007 WL 2375814

Prinzi, Corporal Carlo, Lt. Santillo, Sgt. Garcia and Deputy
Galling.

**All Citations**

**\*2** SO ORDERED.

Not Reported in F.Supp.2d, 2007 WL 2375814

End of Document                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by  Jorgensen v. County of Suffolk,  E.D.N.Y.,  September 1, 2021

246 F.Supp.3d 578
United States District Court, E.D. New York.

YING LI, Plaintiff,

v.

The CITY OF NEW YORK, Det. Matthew Degnan,
Lt. Thomas Conforti, Det. David Moser, Lt. John
Perdoch, Det. John Phelan, P.O. Yatyu Yam, Sgt.
Guisella Rodriguez, Lt. Arthur Hall, Det. Michael
Heffernan, Sgt. Timothy Cai, Det. Douglas Lee, Det.
Dennis Chan, Sgt. "FNU" Manfredi ("First Name
Unknown"), ADA P. Leigh Bishop, Dr. Kristen
Landi, "John Does 1–15" (Names Fictitious and
Presently Unknown), Dr. Fernanda Kupferman,
and Flushing Hospital Medical Center, Defendants.

15–CV–1599 (PKC)
|
Signed 03/31/2017

**Synopsis**
**Background:** Arrestee brought § 1983 action against city,
city employees, including police officers who allegedly
investigated her, county assistant district attorney, and
hospital and one of its employees, alleging that she was
wrongfully accused of being responsible for the death of her
infant daughter. Defendants filed motions to dismiss.

**Holdings:** The District Court, Pamela K. Chen, J., held that:

[1] arrestee adequately alleged that officer participated in the
initiation of arrestee's criminal proceeding, as required to state
malicious prosecution claim;

[2] arrestee adequately alleged that physician participated in
the initiation of arrestee's criminal proceeding, as required to
state malicious prosecution claim;

[3] arrestee sufficiently alleged a favorable termination for
purposes of her malicious prosecution claim;

[4] arrestee's malicious abuse of process claim accrued, and
three-year statute of limitations began to run, when criminal
case against arrestee was dismissed;

[5] arrestee failed to state claim for failure to intervene;

[6] arrestee's allegations were sufficient to support conspiracy
claim; and

[7] arrestee's allegations were sufficient to support claim for
unreasonably prolonged detention.

Motions granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss; Motion to
Dismiss for Failure to State a Claim.

West Headnotes (128)

[1] **Federal Civil Procedure** 🔑 Matters
considered in general

In considering defendants' motion to dismiss
for failure to state a claim in § 1983 action
brought by arrestee against, inter alia, city and
its employees alleging that she was wrongfully
accused of being responsible for the death of
her infant daughter, district court would consider
criminal complaint against arrestee, given that
arrestee's amended complaint in § 1983 action
repeatedly referred to the criminal complaint,
and therefore incorporated it by reference. 42
U.S.C.A. § 1983; Fed. R. Civ. P. 12(b)(6).

1 Case that cites this headnote
More cases on this issue

[2] **Evidence** 🔑 Cities, towns, townships, and
villages
**Evidence** 🔑 Particular Cases

District court would take judicial notice
of indictment, transcript of criminal court
conference, and two press releases in § 1983
action brought by arrestee against, inter alia,
city and its employees alleging that she was
wrongfully accused of being responsible for the
death of her infant daughter, for the limited
purpose of establishing their existence and legal

Case 5:24-cv-00522-BKS-TWD   Document 15   Filed 10/25/24   Page 56 of 186
Ying Li v. City of New York, 246 F.Supp.3d 578 (2017)
2017 WL 1208422

effect, and determining the statements that they contained without considering the truth of those statements; the criminal court records and the press releases related to arrestee's allegations that the criminal case was terminated favorably to her and the date on which the criminal charges were dropped. 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

More cases on this issue

**[3]    Evidence** ⬅ Notice not taken

District court declined to take judicial notice of grand jury minutes in underlying criminal proceeding in § 1983 action brought by arrestee against, inter alia, city and its employees alleging that she was wrongfully accused of being responsible for the death of her infant daughter, given that city sought to rely on the substance and truth of the testimony set forth in those minutes, and not just the fact of the testimony being given or the date on which it was given. 42 U.S.C.A. § 1983.

More cases on this issue

**[4]    Civil Rights** ⬅ Substantive or procedural rights

Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of federal rights established elsewhere. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[5]    Civil Rights** ⬅ Nature and elements of civil actions

To state a claim under § 1983, a plaintiff must plausibly allege (1) that the defendants deprived him of a right secured by the Constitution or laws of the United States, and (2) that they did so under color of state law. 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

**[6]    Civil Rights** ⬅ Color of Law

As a general matter, liability under § 1983 is proper only with respect to individuals acting

under "color of state law," i.e., state actors, or individuals acting in concert with a state actor. 42 U.S.C.A. § 1983.

**[7]    Civil Rights** ⬅ Persons Liable in General

An individual defendant is not liable under § 1983 absent personal involvement. 42 U.S.C.A. § 1983.

4 Cases that cite this headnote

**[8]    Civil Rights** ⬅ Complaint in general

Pleadings that do not differentiate which individual defendant was involved in the unlawful conduct are insufficient to state a claim under § 1983. 42 U.S.C.A. § 1983.

31 Cases that cite this headnote

**[9]    Civil Rights** ⬅ Criminal law enforcement; prisons

Arrestee failed to allege personal involvement in criminal proceedings required to maintain action under § 1983 against police officers, alleging that she was wrongfully accused of being responsible for the death of her infant daughter; arrestee did not allege that any of the officers had even a minimal role in arresting, investigating, or prosecuting her. 42 U.S.C.A. § 1983.

**[10]    Civil Rights** ⬅ Vicarious or respondeat superior liability in general

Individual defendant may not be held liable under § 1983 merely by his connection to the events through links in the chain of command. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[11]    Civil Rights** ⬅ Arrest and detention

A claim for false arrest under § 1983, resting on the Fourth Amendment right to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as that under New York law. U.S. Const. Amend. 4;

N.Y.McKinney's Const. Art. 1, § 12; 42 U.S.C.A. § 1983.

4 Cases that cite this headnote

[12]  **Federal Courts** ← Constitutional rights, civil rights, and discrimination in general

In analyzing § 1983 claims for false arrest, courts generally look to the law of the state in which the arrest occurred. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

[13]  **False Imprisonment** ← Nature and Elements of False Imprisonment

Under New York law, a false arrest claim requires a plaintiff to show that the defendant intentionally confined him without his consent and without justification.

4 Cases that cite this headnote

[14]  **False Imprisonment** ← Nature and form of remedy

Pursuant to New York law, false arrest and false imprisonment are synonymous.

5 Cases that cite this headnote

[15]  **Civil Rights** ← Time to Sue

**Federal Courts** ← Civil rights and discrimination cases

Statute of limitations for § 1983 claims filed in federal court in New York is determined by New York State's statute of limitations for personal injury actions. 42 U.S.C.A. § 1983; N.Y. CPLR § 214.

4 Cases that cite this headnote

[16]  **Federal Courts** ← Computation and tolling

While the applicable limitations period of a § 1983 cause of action is determined by state law, the accrual date is a question of federal law. 42 U.S.C.A. § 1983.

[17]  **Limitation of Actions** ← Civil rights

Under federal law, a § 1983 false arrest claim accrues at the time that the alleged false arrest ends, i.e., when the arrestee becomes held pursuant to legal process, for example, when he is bound over by a magistrate or arraigned on charges. 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

[18]  **Limitation of Actions** ← Civil rights

Arrestee's § 1983 false arrest claim against, inter alia, city and its employees alleging that she was wrongfully accused of being responsible for the death of her infant daughter accrued, and three-year statute of limitations began to run, when arrestee made her initial appearance in state court or when she was arraigned on the indictment. 42 U.S.C.A. § 1983; N.Y. CPLR § 214.

More cases on this issue

[19]  **Limitation of Actions** ← Concealment of Cause of Action

**Limitation of Actions** ← Suspension or stay in general; equitable tolling

Doctrine of equitable tolling is not limited to fraudulent concealment.

More cases on this issue

[20]  **Limitation of Actions** ← Estoppel to rely on limitation

Equitable estoppel is applicable where the plaintiff knew of the existence of the cause of action, but the defendant's conduct caused plaintiff to delay in bringing suit.

[21]  **Limitation of Actions** ← Concealment of Cause of Action

**Limitation of Actions** ← Suspension or stay in general; equitable tolling

Under doctrine of equitable tolling based on fraudulent concealment, when a defendant fraudulently conceals the wrong, the statute

of limitations does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action.

More cases on this issue

**[22]**    **Limitation of Actions** 🔑 What constitutes concealment

**Limitation of Actions** 🔑 Suspension or stay in general; equitable tolling

To benefit from doctrine of equitable tolling based on fraudulent concealment, the plaintiff must submit non-conclusory evidence of conspiracy or other fraudulent wrong which precludes his possible discovery of harms that he suffered.

More cases on this issue

**[23]**    **Limitation of Actions** 🔑 Suspension or stay in general; equitable tolling

Arrestee's conclusory allegation that defendants' fraud, misrepresentation, and deception, prevented her from filing a timely § 1983 false arrest claim against, inter alia, city and its employees alleging that she was wrongfully accused of being responsible for the death of her infant daughter were insufficient to support equitable tolling of three-year limitations period. 42 U.S.C.A. § 1983; N.Y. CPLR § 214.

More cases on this issue

**[24]**    **Malicious Prosecution** 🔑 Nature and elements of malicious prosecution in general

To establish a malicious prosecution claim under New York law, a plaintiff must prove: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.

20 Cases that cite this headnote

**[25]**    **Civil Rights** 🔑 Criminal prosecutions

In establishing a violation of a Fourth Amendment right in relation to a § 1983 malicious prosecution claim, a plaintiff must demonstrate a sufficient post-arraignment deprivation of liberty. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[26]**    **Civil Rights** 🔑 Criminal prosecutions

The Fourth Amendment right implicated in a § 1983 malicious prosecution claim is the right to be free of unreasonable seizure of the person, i.e., the right to be free of unreasonable unwarranted restraints on personal liberty. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[27]**    **Malicious Prosecution** 🔑 Instigation of or participation in prosecution

In a malicious prosecution claim under New York law, to initiate or continue a criminal proceeding, a defendant must do more than report the crime or give testimony; he must play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.

10 Cases that cite this headnote

**[28]**    **Malicious Prosecution** 🔑 Presumptions and burden of proof

In a malicious prosecution claim under New York law, an active role in prosecution is inferred when a defendant had the plaintiff arraigned, filled out a complaining and corroborating affidavit, or signed a felony complaint.

8 Cases that cite this headnote

**[29]**    **Malicious Prosecution** 🔑 Instigation of or participation in prosecution

Defendant could have initiated a prosecution, for purposes of a malicious prosecution claim under New York law, by creating material, false

information and forwarding that information to a prosecutor or by withholding material information from a prosecutor.

13 Cases that cite this headnote

[30]  **Civil Rights** ← Criminal prosecutions
**Civil Rights** ← Criminal law enforcement; prisons

Arrestee's allegations that police officer swore to criminal complaint accusing her of being responsible for the death of her infant daughter adequately alleged that officer initiated prosecution, as required to state malicious prosecution claim against officer under § 1983. U.S.C.A. Const. Amend. 4; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

[31]  **Civil Rights** ← Criminal prosecutions
**Civil Rights** ← Criminal law enforcement; prisons

Arrestee's allegations that physician employed by city who swore under oath in criminal complaint against her, which accused her of being responsible for the death of her infant daughter, and made assertions that were false and "unsupportable by any medical science or clinical or forensic evidence," adequately alleged that physician participated in the initiation of arrestee's criminal proceeding, as required to state malicious prosecution claim against physician under § 1983. U.S.C.A. Const. Amend. 4; 42 U.S.C.A. § 1983.

[32]  **Malicious Prosecution** ← Mode of Termination

Under New York law, there are two ways to establish a favorable termination, for purposes of a malicious prosecution claim: (1) an adjudication of the merits by the tribunal in the prior action, or (2) an act of withdrawal or abandonment on the part of the party prosecuting the prior action.

2 Cases that cite this headnote

[33]  **Malicious Prosecution** ← Mode of Termination

Fact that a criminal prosecution never reached the merits does not preclude a plaintiff from alleging a favorable termination, for purposes of a malicious prosecution claim under New York law.

7 Cases that cite this headnote

[34]  **Malicious Prosecution** ← Mode of Termination

New York law does not require a malicious prosecution plaintiff to prove her innocence, or even that the termination of the criminal proceeding was indicative of innocence.

4 Cases that cite this headnote

[35]  **Malicious Prosecution** ← Mode of Termination

Under New York law, any final termination of a criminal proceeding in favor of the accused, such that the proceeding cannot be brought again, qualifies as a favorable termination for purposes of a malicious prosecution action, unless the disposition was inconsistent with the innocence of the accused.

2 Cases that cite this headnote

[36]  **Civil Rights** ← Criminal Law Enforcement; Police and Prosecutors

Arrestee's allegations that she was wrongfully accused of being responsible for the death of her infant daughter, and that district attorney had ultimately dismissed charges against her, sufficiently alleged a favorable termination for purposes of her malicious prosecution claim under § 1983, even though she did not allege the specific disposition of the underlying criminal case. U.S.C.A. Const. Amend. 4; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[37]** **False Imprisonment** False imprisonment and malicious prosecution distinguished

Under New York law, probable cause for malicious prosecution is different from probable cause for false arrest.

13 Cases that cite this headnote

**[38]** **Malicious Prosecution** Belief in guilt of accused

For a malicious prosecution claim under New York law, probable cause to prosecute consists of facts and circumstances that would lead a reasonably prudent person to believe the plaintiff guilty.

13 Cases that cite this headnote

**[39]** **Malicious Prosecution** Criminal Prosecutions

Under New York law, probable cause to prosecute is evaluated in light of the facts known or reasonably believed at the time the prosecution was initiated, as opposed to at the time of arrest.

7 Cases that cite this headnote

**[40]** **Malicious Prosecution** Finding of grand jury

Under New York law, a grand jury indictment gives rise to a presumption that probable cause exists and thereby defeats a claim for malicious prosecution.

2 Cases that cite this headnote

**[41]** **Malicious Prosecution** Finding of grand jury

Under New York law, if plaintiff is to succeed in malicious prosecution action after he has been indicted, he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith; plaintiff may demonstrate fraud or perjury through evidence establishing that the witnesses have not made a complete and full statement of facts either to the grand jury or to the district attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith.

5 Cases that cite this headnote

**[42]** **Civil Rights** Criminal law enforcement; prisons

Arrestee's allegations that grand jury indicted her based upon falsely reported facts in reports and search warrant affidavits, and fabricated oral statements of witnesses, in connection with accusation that she was responsible for the death of her infant daughter, and police officers failed to inform district attorney's office of exculpatory evidence and that hospital and physician made no efforts to seek a diagnosis other than "shaken baby syndrome," were sufficient to overcome presumption of probable cause afforded grand jury indictment, for purposes of arrestee's malicious prosecution claim under § 1983. U.S.C.A. Const. Amend. 4; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[43]** **Civil Rights** Attorneys, jurors, and witnesses; public defenders

Grand jury witness is entitled to absolute immunity in § 1983 actions. 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

**[44]** **Malicious Prosecution** Necessity

To plead a malicious prosecution claim under New York law, plaintiff must allege malice for each of the defendants.

7 Cases that cite this headnote

**[45]** **Malicious Prosecution** Nature and elements

**Malicious Prosecution** Motive of prosecution

In a malicious prosecution claim under New York law, malice may be shown by proving that the prosecution complained of was undertaken

Ying Li v. City of New York, 246 F.Supp.3d 578 (2017)
Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 61 of 186
2017 WL 1208422

from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff.

3 Cases that cite this headnote

[46]    **Civil Rights**  ← Criminal prosecutions

Arrestee's allegations that police officer signed criminal complaint accusing her of being responsible for the death of her infant daughter knowing that its content was false and fabricated adequately pled malice as to officer, as required to state malicious prosecution claim under § 1983. U.S.C.A. Const. Amend. 4; 42 U.S.C.A. § 1983.

[47]    **Civil Rights**  ← Criminal prosecutions

Arrestee's allegations that physician employed by city swore under oath in criminal complaint, which accused her of being responsible for the death of her infant daughter, and made a statement that was false and "unsupportable by any medical science or clinical or forensic evidence," adequately pled malice as to city physician, as required to state malicious prosecution claim under § 1983. U.S.C.A. Const. Amend. 4; 42 U.S.C.A. § 1983.

[48]    **Civil Rights**  ← Criminal prosecutions

Arrestee's allegations that, despite lab results showing high alkaline phosphatase and low calcium, consistent with metabolic bone disease, hospital and physician made no effort to seek a diagnosis other than "shaken baby syndrome," based on their motives in concealing exculpatory medical evidence in order to assist prosecutor, adequately pled malice as to hospital and physician, as required to state malicious prosecution claim under § 1983. U.S.C.A. Const. Amend. 4; 42 U.S.C.A. § 1983.

[49]    **Federal Courts**  ← Constitutional rights, civil rights, and discrimination in general

Court looks to state law for the elements of a § 1983 abuse of process claim. 42 U.S.C.A. § 1983.

[50]    **Process**  ← Nature and elements in general

Under New York law, a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with the intent to do harm without excuse of justification and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.

8 Cases that cite this headnote

[51]    **Process**  ← Process, what constitutes

In the context of an abuse of process claim under New York law, legal process means that a court issued the process, and the plaintiff will be penalized if he violates it.

6 Cases that cite this headnote

[52]    **Process**  ← Improper, ulterior, collateral, or unlawful purpose

The crux of a malicious abuse of process claim under New York law is the collateral objective element.

8 Cases that cite this headnote
More cases on this issue

[53]    **Process**  ← Improper, ulterior, collateral, or unlawful purpose

To plead collateral objective element of a claim under New York law for malicious abuse of process, a plaintiff must plausibly plead not that defendant acted with an improper motive, but rather an improper purpose; plaintiff must claim that the defendant aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution.

6 Cases that cite this headnote
More cases on this issue

[54]    **Limitation of Actions**  ← Civil rights

Arrestee's § 1983 malicious abuse of process claim against, inter alia, city and its employees alleging that she was wrongfully accused of being responsible for the death of her infant daughter accrued, and three-year statute of limitations began to run, when criminal case against arrestee was dismissed, without prosecution and following her husband's conviction, at which time prosecution's alleged purpose of using her as leverage to get her husband to plead guilty became clear. 42 U.S.C.A. § 1983; N.Y. CPLR § 214.

More cases on this issue

[55]    **Limitation of Actions**  Torts
        **Limitation of Actions**  Nature of harm or damage, in general

Under New York law, a claim for abuse of process accrues at such a time as the criminal process is set in motion, typically at arrest, against the plaintiff; however, accrual cannot be appropriate before such time as plaintiff is aware, or ought to be aware, of those facts providing a basis for his claim.

6 Cases that cite this headnote

[56]    **Process**  Probable cause

Under New York law, probable cause is not a complete defense to malicious abuse of process. U.S. Const. Amend. 4.

4 Cases that cite this headnote

[57]    **Process**  Particular cases

Arrestee's allegations that physician employed by city swore under oath in criminal complaint, which accused her of being responsible for the death of her infant daughter, and made a statement that was false and "unsupportable by any medical science or clinical or forensic evidence," and police officer signed criminal complaint knowing that its content was false and fabricated adequately pled involvement in the use of legal process, as required to state malicious abuse of process claim under New York law against physician and officer.

1 Case that cites this headnote

[58]    **Process**  Officers and public employees

Arrestee failed to allege certain police officers and other city employees participated in the investigation of the criminal case against her relating to the death of her infant daughter, including her arrest and detention, as required to maintain malicious abuse of process claim under New York law in § 1983 action against those officers and city employees. 42 U.S.C.A. § 1983.

[59]    **Civil Rights**  Arrest, search, and detention

Arrestee's conclusory allegations that all defendants in her § action, namely city, city employees, including police officers who allegedly investigated her, county assistant district attorney, and hospital and one of its employees failed to intervene to prevent other defendants from violating her constitutional rights not to be subjected to false arrest, malicious prosecution, and abuse of process, in connection with accusation that arrestee was responsible for the death of her infant daughter, failed to state § 1983 claim for failure to intervene. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

[60]    **Civil Rights**  Police, Investigative, or Law Enforcement Activities

Law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.

3 Cases that cite this headnote

[61]    **Civil Rights**  Police, Investigative, or Law Enforcement Activities
        **Civil Rights**  Use of force in general
        **Civil Rights**  Arrest and detention

Law enforcement officer who fails to intercede in conduct of other officers is liable for preventable harm caused by action of other officers if officer

observes or has reason to know that excessive force is being used, that citizen has been unjustifiably arrested, or that any constitutional violation has been committed by other law enforcement officials, and if observing officer had realistic opportunity to intervene to prevent harm from occurring.

4 Cases that cite this headnote

**[62]    Conspiracy** 👉 Definition and Elements in General

To survive a motion to dismiss on a plaintiff's § 1983 conspiracy claim, the plaintiff must allege(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[63]    Conspiracy** 👉 Civil rights conspiracies

Complaints asserting § 1983 conspiracy claims that contain only conclusory, vague, or general allegations that defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[64]    Conspiracy** 👉 Civil rights conspiracies

To state a § 1983 conspiracy claim against a private entity, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act. 42 U.S.C.A. § 1983.

**[65]    Conspiracy** 👉 Civil rights conspiracies

Arrestee's allegations that city employees, including police officers and physician, and hospital and its employee acted jointly in wrongfully accusing her of being responsible for the death of her infant daughter were sufficient

to support § 1983 conspiracy claim. 42 U.S.C.A. § 1983.

**[66]    Conspiracy** 👉 Intracorporate conspiracy doctrine in general

Under the intra-corporate conspiracy doctrine, there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment.

1 Case that cites this headnote

**[67]    Civil Rights** 👉 Arrest and detention

**Search, Seizure, and Arrest** 👉 Duration

**Search, Seizure, and Arrest** 👉 Duration of confinement in general; release

Unreasonably prolonged pretrial detention where exculpatory evidence is readily available can form the basis of a § 1983 claim against police officers as a violation of the Fourth Amendment's protection against unreasonable seizures. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[68]    Civil Rights** 👉 Arrest and detention

To state a § 1983 claim for unreasonably prolonged detention, plaintiff must allege that (1) she has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) the actions of the officers violated that right, and (3) the officers' conduct shocks the conscience. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

7 Cases that cite this headnote

**[69]    Criminal Law** 👉 Intervention of Public Officers

**Prisons** 👉 Duration of confinement; discharge and release

Ying Li v. City of New York, 246 F.Supp.3d 578 (2017)
Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 64 of 186
2017 WL 1208422

Arrestee's allegations that certain city employees, including police officers and physician, disregarded and concealed exculpatory evidence in criminal investigation relating to accusation that arrestee was responsible for the death of her infant daughter for over four years while arrestee remained in prison were sufficient to support § 1983 claim for unreasonably prolonged detention under Fourth Amendment. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

[70]  Criminal Law ⚬ Intervention of Public Officers
Search, Seizure, and Arrest ⚬ Duration
Search, Seizure, and Arrest ⚬ Duty to investigate; exculpatory evidence

Failure to obtain or disclose evidence that is only arguably exculpatory does not shock the conscience, for purposes of § 1983 claim for unreasonably prolonged detention under the Fourth Amendment. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

[71]  Constitutional Law ⚬ Local government
Fourteenth Amendment's prohibition against states depriving a person of life, liberty, or property, without due process of law, applies to municipalities. U.S. Const. Amend. 14.

1 Case that cites this headnote

[72]  Constitutional Law ⚬ Arbitrariness
Due Process Clause was intended to secure the individual from the arbitrary exercise of the powers of government. U.S. Const. Amend. 14.

2 Cases that cite this headnote

[73]  Constitutional Law ⚬ Procedural due process in general
Procedural due process requires that government action depriving an individual of substantial interest in life, liberty, or property be

implemented in a fair manner. U.S. Const. Amend. 14.

2 Cases that cite this headnote

[74]  Constitutional Law ⚬ Substantive Due Process in General
Substantive due process bars certain government actions regardless of the fairness of the procedures used to implement them, in order to prevent governmental power from being used for purposes of oppression. U.S. Const. Amend. 14.

[75]  Constitutional Law ⚬ Substantive Due Process in General
While a procedural due process claim challenges the procedure by which deprivation of liberty is effected, a substantive due process claim challenges the fact of the deprivation itself. U.S. Const. Amend. 14.

2 Cases that cite this headnote

[76]  Constitutional Law ⚬ Duration and timing of deprivation; pre- or post-deprivation remedies
Procedural due process violation occurs when the government deprives a person of a protected life, liberty, or property interest without first providing notice and an opportunity to be heard. U.S. Const. Amend. 14.

2 Cases that cite this headnote

[77]  Constitutional Law ⚬ Particular claims
Constitutional Law ⚬ Duration and timing of deprivation; pre- or post-deprivation remedies
To determine whether a § 1983 due process claim is plausibly alleged, the court evaluates the sufficiency of the allegations with respect to the liberty or property interest alleged and the process due before deprivation of that interest. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

[78]  **Constitutional Law** ← Right to fair trial in general

Fair trial claim is a civil claim for violations of a criminal defendant's Fourteenth Amendment due process rights. U.S. Const. Amend. 14.

8 Cases that cite this headnote

[79]  **Constitutional Law** ← Investigative activity in general

**Constitutional Law** ← Evidence

Defendant's due process right to a fair trial is violated when exculpatory evidence is withheld, i.e., when a *Brady* violation occurs, and also when an officer forwards fabricated evidence to prosecutors. U.S. Const. Amend. 14.

2 Cases that cite this headnote

[80]  **Civil Rights** ← Criminal prosecutions

**Constitutional Law** ← Right to fair trial in general

**Criminal Law** ← Official Action, Inaction, Representation, Misconduct, or Bad Faith

Plaintiff need not have gone to a full trial on the merits in order to have an actionable § 1983 due process claim based on the denial of a fair trial. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

7 Cases that cite this headnote

[81]  **Civil Rights** ← Criminal prosecutions

**Constitutional Law** ← Evidence

**Criminal Law** ← Responsibility of and for police and other agencies

Police officers can be held liable for *Brady* due process violations under § 1983 if they withhold exculpatory evidence from prosecutors. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

[82]  **Criminal Law** ← Responsibility of and for police and other agencies

Once a police officer turns over exculpatory evidence to the prosecutor, that officer satisfies

his constitutional obligations under *Brady*. U.S. Const. Amend. 14.

[83]  **Criminal Law** ← Constitutional obligations regarding disclosure

Elements of *Brady* violation are: (1) evidence at issue must be favorable to accused, either because it is exculpatory or because it is impeaching; (2) that evidence must have been suppressed by state, either willfully or inadvertently; and (3) prejudice must have ensued.

5 Cases that cite this headnote

[84]  **Criminal Law** ← Materiality and probable effect of information in general

To establish prejudice, as element of *Brady* violation, a plaintiff must show the evidence was material, i.e., whether the evidentiary suppression undermines confidence in the outcomes of the trial.

3 Cases that cite this headnote

[85]  **Constitutional Law** ← Search, Seizure, and Confiscation

**Constitutional Law** ← Investigative activity in general

**Constitutional Law** ← Evidence

**Criminal Law** ← Responsibility of and for police and other agencies

**Health** ← Records and duty to report; confidentiality in general

Arrestee's allegations that police officers and physicians failed to disclose exculpatory evidence in investigation of her infant's death, did not document or inform the district attorney's office of exculpatory evidence, and falsely reported facts in reports and search warrant affidavits, and that prejudice ensued because it resulted in her arrest, were sufficient to support procedural due process claim based on *Brady* violation in § 1983 action. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[86]    Criminal Law** 🔑 Requisites of fair trial

Fabrication of evidence constitutes a violation of the right to a fair trial. U.S. Const. Amends. 5, 6, 14.

15 Cases that cite this headnote

**[87]    Criminal Law** 🔑 Requisites of fair trial

To state a fair trial claim based on fabrication of evidence, a plaintiff must allege that an (1) investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result. U.S. Const. Amends. 5, 6, 14.

19 Cases that cite this headnote

**[88]    Constitutional Law** 🔑 Protection of Children; Child Abuse, Neglect, and Dependency

**Constitutional Law** 🔑 Search, Seizure, and Confiscation

**Constitutional Law** 🔑 Investigative activity in general

**Infants** 🔑 False reports and accusations

Arrestee's allegations that certain city employees, including police officers and physician, knowingly provided and/or swore to false information in criminal complaint, reports, and search warrant affidavits accusing her of being responsible for the death of her infant daughter were sufficient to support procedural due process claim against city employees based on fabrication of evidence in § 1983 action. U.S. Const. Amends. 5, 6, 14; 42 U.S.C.A. § 1983.

**[89]    Constitutional Law** 🔑 Protection of Children; Child Abuse, Neglect, and Dependency

**Infants** 🔑 Medical institutions and professionals in general

**Infants** 🔑 False reports and accusations

Arrestee's allegations that physician employed by hospital ignored evidence suggesting that her infant daughter's death was not caused by "shaken baby syndrome," including lab results that were consistent with metabolic bone disease, and provided false information to physician employed by city, who based her conclusions in criminal investigation on that false information, were sufficient to support procedural due process claim against hospital and its employee based on fabrication of evidence in § 1983 action. U.S. Const. Amends. 5, 6, 14; 42 U.S.C.A. § 1983.

**[90]    Limitation of Actions** 🔑 Civil rights

Fabrication of evidence claims accrue when the plaintiff learns that evidence was fabricated and an injury was caused by the fabrication. U.S. Const. Amends. 5, 6, 14.

4 Cases that cite this headnote

**[91]    Limitation of Actions** 🔑 Burden of proof in general

Because the statute of limitations is an affirmative defense, the burden is on the defendant to establish when a federal claim accrues.

**[92]    Limitation of Actions** 🔑 Civil rights

Allegation that arrestee always believed in her innocence was insufficient for city employees, including police officers and physician, to establish that her *Brady* violation and fabrication of evidence claims accrued at the time of her arrest in § 1983 action alleging that she was wrongfully accused of being responsible for the death of her infant daughter. U.S. Const. Amends. 5, 6, 14; 42 U.S.C.A. § 1983.

More cases on this issue

**[93]    Constitutional Law** 🔑 Substantive Due Process in General

Due process protection in the substantive sense limits what the government may do in both its legislative and its executive capacities. U.S. Const. Amend. 14.

[94]     **Constitutional Law** ⚫ Personal and bodily rights in general

**Constitutional Law** ⚫ Families and Children

**Constitutional Law** ⚫ Privacy and Sexual Matters

The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity. U.S. Const. Amend. 14.

[95]     **Constitutional Law** ⚫ Substantive Due Process in General

Criteria to identify what is fatally arbitrary, in context of substantive due process claim, differ depending on whether it is legislation or a specific act of a governmental officer that is at issue. U.S. Const. Amend. 14.

[96]     **Constitutional Law** ⚫ Egregiousness; "shock the conscience" test

For executive action to violate substantive due process, it must be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience; it is not enough that the government act was incorrect or ill-advised, rather, only the most egregious official conduct can be said to be arbitrary in the constitutional sense and therefore unconstitutional. U.S. Const. Amend. 14.

1 Case that cites this headnote

[97]     **Constitutional Law** ⚫ Protection of Children; Child Abuse, Neglect, and Dependency

**Infants** ⚫ Medical institutions and professionals in general

Arrestee's allegations that physician employed by city as well as hospital and its employee

failed to "exhaust all possibilities" before rendering "shaken baby syndrome" diagnosis in investigation of her infant daughter's death were insufficient to support substantive due process claim based on failure to investigate in § 1983 action. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

[98]     **Constitutional Law** ⚫ Arbitrariness

The due process right to be free from arbitrary government action, to the extent it exists, is the right to be free of arbitrary government action that infringes a protected right. U.S. Const. Amend. 14.

[99]     **Civil Rights** ⚫ Arrest and detention

Arrestee's allegations in § 1983 action that she was wrongfully accused of being responsible for her infant daughter's death and held for more than four years in pretrial detention, and that defendants, including hospital and its employee, encouraged this for the purpose of using her confinement as a "bargaining chip" to pressure her husband to plead guilty, were insufficient to support speedy trial claim against hospital and its employee, absent allegations supporting a causal link between conduct of hospital and its employee and the delay in arrestee's criminal case being resolved. U.S. Const. Amend. 6; 42 U.S.C.A. § 1983.

[100]     **Civil Rights** ⚫ Common law or state law torts

Section 1983 action, like its state tort analogs, employs the principle of proximate causation. 42 U.S.C.A. § 1983.

[101]     **Civil Rights** ⚫ Arrest and detention

The chain of causation between a police officer's unlawful arrest and a subsequent conviction and incarceration is broken by the intervening exercise of independent judgment, in civil rights action arising from arrest.

Ying Li v. City of New York, 246 F.Supp.3d 578 (2017)
Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 68 of 186
2017 WL 1208422

**[102] Civil Rights** Arrest and detention

Arrestee's allegations in § 1983 action that city employees, including police officers and physician, wrongfully accused her of being responsible for her infant daughter's death and that she was held for more than four years in pretrial detention for the purpose of using her confinement as a "bargaining chip" to obtain a guilty plea from her husband, coupled with her criminal case being dismissed shortly after her husband's conviction, were sufficient to state a speedy trial claim as to the city employees who were involved in her prosecution. U.S. Const. Amend. 6; 42 U.S.C.A. § 1983.

**[103] Constitutional Law** Conditions

Pretrial detainee's claim of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment. U.S. Const. Amends. 8, 14.

**[104] Civil Rights** Criminal law enforcement; prisons

**Civil Rights** Criminal law enforcement; prisons

Pretrial detainee's allegations in § 1983 action against city employees, including police officers and physician, as well as hospital and its employee, that defendants, inter alia, refused usual and customary medical services, forced her to give birth while handcuffed and shackled, refused her the opportunity to breastfeed or bond with her infant after childbirth, and took away her infant two-and-a-half days after delivery failed to support claim of unconstitutional conditions of confinement, absent factual allegations establishing the personal involvement of any defendant with respect to those conditions. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[105] Civil Rights** Criminal law enforcement; prisons

Arrestee's allegations in § 1983 action that city, with deliberate indifference, failed to provide adequate training for its police officers who worked on "shaken baby syndrome" cases or to properly instruct city employees of applicable laws were sufficient to state *Monell* claim against the city. 42 U.S.C.A. § 1983.

**[106] Civil Rights** Governmental Ordinance, Policy, Practice, or Custom

Municipality may be liable under § 1983 if a municipal policy or custom causes deprivation of rights protected by the Constitution. 42 U.S.C.A. § 1983.

11 Cases that cite this headnote

**[107] Civil Rights** Complaint in general

For a *Monell* claim to survive a motion to dismiss for failure to state a claim, a plaintiff must allege sufficient factual detail and not mere boilerplate allegations that the violation of the plaintiff's constitutional rights resulted from the municipality's custom or official policy. 42 U.S.C.A. § 1983; Fed. R. Civ. P. 12(b)(6).

12 Cases that cite this headnote

**[108] Civil Rights** Governmental Ordinance, Policy, Practice, or Custom

**Civil Rights** Lack of Control, Training, or Supervision; Knowledge and Inaction

A policy or custom may be established, for purposes of alleging municipal liability under § 1983, by any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers

exercised 'deliberate indifference' to the rights of the plaintiff. 42 U.S.C.A. § 1983.

12 Cases that cite this headnote

[109]   **Civil Rights**    Criminal law enforcement; prisons

Arrestee's allegations in § 1983 action that physician employed by hospital had a history of overzealously diagnosing "shaken baby syndrome," of which hospital was aware and with knowledge that law enforcement would rely on those conclusions in directing the course of an arrest and prosecution, and that hospital perpetuated policy of having its staff conduct investigations for non-medical purposes in order to see those accused of "shaken baby syndrome" arrested, prosecuted, and convicted, were sufficient to state *Monell* claim against hospital. 42 U.S.C.A. § 1983.

[110]   **Civil Rights**    Vicarious or respondeat superior liability in general

Doctrine of respondeat superior is not available to render a supervisor liable under § 1983 for the unconstitutional conduct of his subordinates. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

[111]   **Civil Rights**    Vicarious or respondeat superior liability in general

Just as a municipal entity cannot be held liable under § 1983 pursuant to the doctrine of respondeat superior, a private corporation cannot be held liable under respondeat superior for the allegedly unconstitutional conduct of its employee. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

[112]   **Civil Rights**    Adequacy, Availability, and Exhaustion of State or Local Remedies

**Civil Rights**    Existence of other remedies; exclusivity

There is no private right of action under the New York State Constitution where remedies are available under § 1983. 42 U.S.C.A. § 1983.

4 Cases that cite this headnote

[113]   **Civil Rights**    Government Agencies and Officers

District courts are encouraged to determine the availability of an absolute immunity defense in § 1983 action at the earliest appropriate stage. 42 U.S.C.A. § 1983.

[114]   **Civil Rights**    Attorney General and prosecuting attorneys

Prosecutors performing core prosecutorial functions are entitled to absolute immunity in § 1983 action. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

[115]   **Civil Rights**    Attorney General and prosecuting attorneys

Prosecutorial functions protected by absolute immunity in § 1983 action include conduct preliminary to the initiation of a prosecution, such as whether to present a case to a grand jury, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present. 42 U.S.C.A. § 1983.

[116]   **Civil Rights**    Attorney General and prosecuting attorneys

Prosecutor was entitled to absolute immunity in arrestee's § 1983 action alleging that she was wrongfully accused of being responsible for the death of her infant daughter, even though arrestee claimed that prosecutor concealed evidence and misrepresented facts. 42 U.S.C.A. § 1983.

[117]   **Civil Rights**    Attorney General and prosecuting attorneys

Prosecutor is entitled to absolute immunity in § 1983 action even in the face of allegations of deliberate withholding of exculpatory information or his knowing use of perjured testimony. 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

[118]    **Federal Courts** ⬥ Prosecutors and attorneys general

To the extent arrestee's claims against prosecutor in § 1983 action alleging that she was wrongfully accused of being responsible for the death of her infant daughter were asserted against prosecutor in her official capacity, they were barred because prosecutor acted on behalf of state, which was immune under the Eleventh Amendment. U.S. Const. Amend. 11; 42 U.S.C.A. § 1983.

[119]    **Civil Rights** ⬥ Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

Qualified immunity shields law enforcement officers from § 1983 claims for money damages provided that their conduct does not violate clearly established constitutional rights of which a reasonable person would have been aware. 42 U.S.C.A. § 1983.

[120]    **Civil Rights** ⬥ Defenses; immunity and good faith

Qualified immunity from § 1983 claims for money damages is an affirmative defense as to which the defendant officers or officials bear the burden of proof. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

[121]    **Civil Rights** ⬥ Government Agencies and Officers

**Civil Rights** ⬥ Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

In analyzing the applicability of qualified immunity from § 1983 claims for money

damages, courts conduct a two-step analysis: first, courts determine whether the facts show that the officer's conduct violated plaintiff's constitutional rights, and second, if there was a constitutional violation, courts determine whether the right was clearly established at the time of the officer's actions; courts are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. 42 U.S.C.A. § 1983.

[122]    **Civil Rights** ⬥ Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

Even if the constitutional right at issue was clearly established in certain respects, an officer is still entitled to qualified immunity from § 1983 claims for money damages if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context. 42 U.S.C.A. § 1983.

[123]    **Civil Rights** ⬥ Sheriffs, police, and other peace officers

Police officers were not entitled to qualified immunity as to arrestee's false arrest and malicious prosecution claims based on alleged fabrication of evidence and suppression of exculpatory evidence in § 1983 action alleging that she was wrongfully accused of being responsible for the death of her infant daughter; there were several plausible alternative explanations to "shaken baby syndrome" as the cause of death, including a genetic disorder and the child's prior medical history, that the officers chose to ignore. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

[124]    **Federal Civil Procedure** ⬥ Fact issues

Where district court could not find, as a matter of law, that physician employed by city was acting in a prosecutorial role rather than an investigatory one in connection with

accusation that arrestee was responsible for the death of her infant daughter, the availability of absolute immunity from arrestee's false arrest and malicious prosecution claims based on alleged fabrication of evidence and suppression of exculpatory evidence in § 1983 action could not be decided as a matter of law on motion to dismiss. 42 U.S.C.A. § 1983.

3 Cases that cite this headnote
More cases on this issue

[125]  **Civil Rights**  Persons Protected, Persons Liable, and Parties

Physician employed by hospital who had diagnosed arrestee's infant daughter with "shaken baby syndrome," and who allegedly took an active role in criminal investigation accusing arrestee of being responsible for the death of infant, was not entitled to statutory immunity under the New York Child Protective Services Act from arrestee's false arrest and malicious prosecution claims based on alleged fabrication of evidence and suppression of exculpatory evidence on motion to dismiss in § 1983 action. 42 U.S.C.A. § 1983; N.Y. Social Services Law § 413(1)(a).

[126]  **Federal Civil Procedure**  Pleading over

Although it is the usual practice upon granting a motion to dismiss to allow leave to replead, such leave should be denied where the proposed amendment would be futile. Fed. R. Civ. P. 15(a).

1 Case that cites this headnote

[127]  **Federal Civil Procedure**  Pleading over

An amendment to a pleading is considered futile if the claim is time-barred due to the expiration of the applicable statute of limitations period. Fed. R. Civ. P. 15(a).

1 Case that cites this headnote

[128]  **Federal Civil Procedure**  Form and sufficiency of amendment; futility

District court would deny as futile arrestee's request for leave to amend her complaint a second time in § 1983 action against city, city employees, including police officers who allegedly investigated her, county assistant district attorney, and hospital and one of its employees, alleging that she was wrongfully accused of being responsible for the death of her infant daughter; the court already permitted arrestee the opportunity to amend the complaint and urged her to correct certain deficiencies, however, arrestee did not heed the court's advice, nor make good use of that opportunity to prune her complaint of invalid claims or to add useful or relevant factual allegations or particularity to her complaint. 42 U.S.C.A. § 1983; Fed. R. Civ. P. 15(a).

More cases on this issue

**Attorneys and Law Firms**

**\*591** Corey T. Lee, C.T. Lee & Associates, Ameer Nadav Benno, Benno & Associates P.C., Poupa Jenny Marashi, New York, NY, for Plaintiff.

Qiana Charmaine Smith–Williams, New York City Law Department, Gregory John Radomisli, Brian Scott Osterman, Martin Clearwater & Bell LLP, New York, NY, for Defendants.

**MEMORANDUM & ORDER**

PAMELA K. CHEN, United States District Judge:

**\*\*1**  On March 26, 2015, Plaintiff Ying Li commenced this action against Defendants pursuant to 42 U.S.C. § 1983 ("Section 1983") and New York law. (See Dkt. 1.) Plaintiff's ten-count Amended Complaint alleges numerous theories of liability against Defendants. (See Dkt. 36, Amended Complaint ("Am. Compl.").) In general, Plaintiff alleges that she was wrongfully accused of being responsible for the death of her infant daughter. (Id.) The Amended Complaint makes claims against two groups of defendants: (i) the first group is **\*592** composed of the City of New York (the "City") and various City employees (collectively, the "City Defendants"), including twelve named New York City Police

Department ("NYPD") officers who allegedly investigated Plaintiff (the "Officer Defendants") [1]; Dr. Kristen Landi ("Dr. Landi"), a physician employed by the City; Queens County Assistant District Attorney P. Leigh Bishop ("ADA Bishop"); and fifteen "John Doe" defendants; and (ii) the second group is composed of Flushing Hospital Medical Center ("Flushing Hospital" or "FHMC") and one of its employees, Dr. Fernanda Kupferman ("Dr. Kupferman") (collectively, the "Medical Center Defendants").

[1]  The twelve individual NYPD Officer Defendants are Det. Matthew Degnan ("Det. Degnan"), Lt. Thomas Conforti ("Lt. Conforti"), Det. David Moser ("Det. Moser"), Lt. John Perdoch ("Lt. Perdoch"), Det. John Phelan ("Det. Phelan"), P.O. Yatyu Yam ("P.O. Yam"), Det. Sgt. Guisella Rodriguez ("Sgt. Rodriguez"), Lt. Arthur Hall ("Lt. Hall"), Det. Michael Heffernan ("Det. Heffernan"), Sgt. Timothy Cai ("Sgt. Cai"), Det. Douglas Lee ("Det. Lee"), Det. Dennis Chan ("Det. Chan"), Sgt. "FNU" Manfredi ("First Name Unknown") ("Sgt. Manfredi").
Of these individual Officer Defendants, Dets. Moser, Phelan, Heffernan, and Sgt. Manfredi are not represented. (Dkt. 69.)

Plaintiff asserts the following ten counts, of which eight are against all Defendants: Count 1 (false arrest and imprisonment), Count 2 (malicious prosecution), Count 3 (malicious abuse of process), Count 4 (failure to intervene), Count 5 (conspiracy), Count 6 (unreasonably prolonged detention), Count 7 (violation of due process), Count 8 (*Monell* liability against the City), Count 9 (*Monell*-type liability against Flushing Hospital), and Count 10 (violation of the New York State Constitution). Except for Count 10, all of Plaintiff's claims are alleged as federal claims pursuant to Section 1983.

Presently before the Court are two separate motions to dismiss filed by the two groups of Defendants pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"). For the reasons set forth below, both the City Defendants' and Medical Center Defendants' motions are GRANTED IN PART and DENIED IN PART. Furthermore, all claims against the following Defendants are dismissed in their entirety: ADA Bishop, Lt. Conforti, Det. Perdoch, Sgt. Rodriguez, Lt. Hall, Det. Lee, Sgt. Manfredi, P.O. Yam, Sgt. Cai, and Det. Chan.

**BACKGROUND**

**I. THE FACTS** [2]

[2]  The Court takes the allegations in the Amended Complaint as true, as it must on a motion to dismiss under FRCP 12. *See EEOC v. Port Auth. of New York & New Jersey,* 768 F.3d 247, 253 (2d Cir. 2014) ("[W]e accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.").

**\*\*2**  Early in the morning of October 23, 2007, Annie, the 8–1/2–week-old daughter of Plaintiff and her husband Hang Bin Li, suddenly went limp while being fed. (Am. Compl. ¶¶ 92, 95.) The Lis called 911 and took Annie to the emergency room at Flushing Hospital. (Am. Compl. ¶¶ 95, 98, 108.) Annie was unresponsive when she arrived at the emergency room, where she was revived and placed on life support. (Am. Compl. ¶ 98.) [3]

[3]  A medical report from that day indicated that Annie had no external signs of trauma. (Am. Compl. ¶ 98.)

Suspecting child abuse, Flushing Hospital called Det. Phelan and the NYPD Child Abuse Squad that day. (Am. Compl. ¶ 101.) Det. Phelan went to the hospital, spoke **\*593** with the hospital staff, looked at medical charts, and met with the Lis. (Am. Compl. ¶¶ 101–103.) P.O. Yam, an officer who spoke Mandarin, accompanied Det. Phelan. (Am. Compl. ¶ 101.) The Lis were taken to Det. Phelan's office at the Queens Child Abuse Squad. (Am. Compl. ¶ 104.) When they arrived at the 109th precinct, other officers and sergeants, including Defendant Manfredi, were present. (Am. Compl. ¶ 105.) Det. Heffernan also came to the Precinct that night. (Am. Compl. ¶ 105.) Dets. Phelan and Degnan interrogated Plaintiff, alone, for about an hour while P.O. Yam interpreted. (Am. Compl. ¶ 106.) They then interrogated Hang Bin Li. (Am. Compl. ¶ 106.) Afterwards, Dets. Degnan and Heffernan drove the Lis back to Flushing Hospital. (Am. Compl. ¶ 108.) At the hospital, Dets. Degnan and Heffernan had extended conversations with the hospital staff, including Dr. Kupferman. (Am. Compl. ¶ 108.)

The next day, October 24, 2007, Det. Phelan went to the Lis' house, and Plaintiff's husband gave written consent for Det. Phelan to search the home. (Am. Compl. ¶ 110.) Later, detectives from the 109th Precinct went to search the Lis' home after getting a warrant. (Am. Compl. ¶ 110.)

Subsequently, the Lis were interviewed again by numerous people, including Dets. Heffernan and Moser, officers from the Queens Homicide Squad, and medical personnel at Flushing Hospital, including Dr. Kupferman. [4] (Am. Compl. ¶¶ 112–15.) Det. Chan served as an interpreter from the afternoon of October 24, 2007, until the morning hours of October 25, 2007. (Am. Compl. ¶ 112.) During these interviews, according to Plaintiff, Dets. Heffernan and Moser and Dr. Kupferman repeatedly screamed at the Lis that they had killed their daughter and that unless the Lis told them which one of them had hurt Annie, the doctors could not help her. (Am. Compl. ¶ 115.) They also promised the Lis that they could see Annie if they admitted to hurting her. (Am. Compl. ¶ 116.) After being repeatedly told this, Hang Bin Li stated that he might have inadvertently bumped Annie's head lightly against a table while trying to resuscitate her. (Am. Compl. ¶ 117.)

4      The Amended Complaint does not indicate where these interviews occurred. (Am. Compl. ¶¶ 112–15.)

On October 25, 2007, Dr. Kupferman conducted a "forensic interview" of Plaintiff. (Am. Compl. ¶ 120.) A day later, Annie was confirmed brain dead, and was diagnosed with "Shaken Baby Syndrome" ("SBS"). [5] (Am. Compl. ¶¶ 123, 134.) That evening, the Lis were again taken to the 109th precinct, and Dets. Degnan, Heffernan, and Chan questioned the Lis separately until the next morning. (Am. Compl. ¶ 124.) Hang Bin Li also gave a written statement regarding the events that had occurred on October 22 and 23. (*Id.*) Annie was removed from life support on October *594 28. (Am. Compl. ¶ 125.) On October 29, Dets. Moser, Degnan, Heffernan, and Sgt. Cai questioned Hang Bin Li at the 109th precinct. (Am. Compl. ¶ 126.) Throughout the multiple investigations and interviews, Plaintiff denied any wrongdoing. (Am. Compl. ¶ 127.) Unidentified Defendants ordered Plaintiff to remain in and about her home from approximately October 26, 2007 up to her arrest five months later. (Am. Compl. ¶ 131.)

5      SBS is "a devastating form of child abuse caused by violently shaking a baby, resulting in traumatic brain injury, which is characterized by a constellation of injuries including subdural hematomas (i.e. bleeding in the brain), retinal hemorrhages, rib fractures and long-bone fractures." *Phelan ex rel. Phelan v. Torres*, 843 F.Supp.2d 259, 261

(E.D.N.Y. 2011) (citing, *inter alia*, Shaken Baby Syndrome, Medline Plus Medical Encyclopedia, a service of the U.S. National Library of Medicine, National Institutes of Health ("Medline Plus"), http://www.nlm.nih.gov/medlineplus/ency/article/000004.htm). However, some courts have acknowledged that there is an "emergence of a legitimate and significant dispute within the medical community as to the cause of [ ] injuries" that used to be attributed to SBS. *See State v. Edmunds*, 308 Wis.2d 374, 746 N.W.2d 590, 599 (Wis. Ct. app. 2008); *see also Cavazos v. Smith*, 565 U.S. 1, 132 S.Ct. 2, 181 L.Ed.2d 311 (2011) (Ginsburg, J., dissenting) ("What is now known about shaken baby syndrome (SBS) casts grave doubt on the charge leveled against [petitioner].")

**3 On March 11, 2008, Plaintiff and her husband were arrested for Annie's death based on the conclusion that Annie had died of SBS. (Am. Compl. ¶¶ 133–34.) Plaintiff was charged with two counts of Manslaughter in the First Degree, and one count of Endangering the Welfare of a Child. (Am. Compl. ¶¶ 146.) The grand jury indicted Plaintiff on various charges, including Manslaughter in the Second Degree. (Am. Compl. ¶ 181, 184, Ex. C.) Plaintiff pled not guilty to all charges. (Am. Compl. ¶ 179.) Plaintiff's husband was also indicted for one count of Murder in the Second Degree, two counts of Manslaughter in the Second Degree, and one count of Endangering the Welfare of a Child. (Am. Compl. ¶ 185.) Unable to make bail, Plaintiff was held at the Riker's Island correctional facility for about four years without a trial. (*See* Am. Compl. ¶¶ 180, 234.) On March 26, 2012, Plaintiff was released after her bail was reduced. (Am. Compl. ¶ 197.) On January 2, 2013, ADA Bishop moved to dismiss the criminal charges against Plaintiff. (Dkt. 63–6, Ex. F.) Hang Bin Li's trial began the next day. (Am. Compl. ¶ 199.) On February 1, 2013, he was convicted of reckless manslaughter. (Am. Compl. ¶ 200.)

## II. PROCEDURAL HISTORY

Plaintiff filed this action on March 26, 2015. (Dkt. 1.) On November 19, 2015, she filed the Amended Complaint. (Dkt. 36.) On March 7, 2016, Defendants moved to dismiss the Amended Complaint pursuant to FRCP 12(b)(6). (Dkt. 53, 58.)

## DISCUSSION [6]

Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 74 of 186
Ying Li v. City of New York, 246 F.Supp.3d 578 (2017)
2017 WL 1208422

6    As an initial matter, the Court cautions Plaintiff's counsels that their scatter-shot, kitchen-sink approach to this litigation thus far has done a great disservice to her client's case. Plaintiff's 275–paragraph Amended Complaint indiscriminately asserts eight of her ten claims against every single Defendant, even though, as discussed herein, these claims clearly should not have been brought against many of these Defendants, and many of these Defendants should not have been named at all. Despite the Court's repeated suggestions at the pre-motion conference that Plaintiff's counsel focus on developing meritorious claims and arguments, and consider pruning this action of non-viable claims, Plaintiff not only persisted with all of her claims, but doubled down on her helter-skelter approach by responding to Defendants' motions to dismiss with two separate Memoranda of Law ("MOLs") with internal editing notes left for the Court to read, place-holders for citations, and multiple grammatical errors. (*See, e.g.,* Dkt. 61 at 22 n.36; *id.* at 41; Dkt. 66 at 29). "Not only does the 'kitchen sink' approach to briefing cause distraction and confusion, it also 'consumes space that should be devoted to developing the arguments with some promise.' " *Dynegy Marketing & Trade v. Multiut Corp.*, 648 F.3d 506, 512 (7th Cir. 2011) (citation omitted). Indeed, here, the Court has had to struggle to tease out of Plaintiff's MOLs legally coherent and supported positions. While the Court has done so in order to comply with its duty *at this stage* to view the complaint in the light most favorable to Plaintiff, it will not be so forgiving as this case progresses.

## I. COURT'S CONSIDERATION OF MATERIAL EXTRANEOUS TO THE AMENDED COMPLAINT

Plaintiff and Defendants both seek to have the Court consider certain information and documents outside of the Amended Complaint. Both parties have attached to their moving papers the Queens County criminal court complaint ("criminal complaint") against Plaintiff (Dkt. 60, Ex. B; **\*595** Dkt. 63, Ex. B) and the transcript of the court conference at which ADA Bishop moved to dismiss the criminal charges against Plaintiff (Dkt. 60, Ex. C; Dkt. 63, Ex. F). The City Defendants also submitted the grand jury minutes (Dkt. 65, Ex. A) with their Reply brief. Plaintiff also has submitted a copy of the manslaughter indictment returned by the grand jury against her (Dkt. 63, Ex. C) and two press releases

from the Queens District Attorney's Office, dated March 12, 2008, and September 11, 2015 (Dkt. 63, Exs. D, E). The March 12, 2008 press release discusses the District Attorney's charging of Plaintiff and her husband. (*See* Ex. D, Dkt. 63–4, at ECF 2.)[7] The September 11, 2015 press release notes that the Queens District Attorney and the New York City Chief Medical Examiner were to host the 2015 New York City Abusive Head Trauma / Shaken Baby Syndrome Conference. (*See* Ex. E, Dkt. 63–5 at ECF 2.)

7    Citations to "ECF" refer to the pagination generated by the Court's electronic docketing system and not the document's internal pagination.

**\*\*4** In determining the adequacy of a claim under Rule 12(b)(6), courts are generally limited to the facts alleged in the complaint, documents attached to the complaint, documents incorporated by reference in the complaint, and facts that may be judicially noticed. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)); *see also Wilson v. Kellogg Co.*, 628 Fed.Appx. 59, 60 (2d Cir. 2016) (summary order) (noting that the court may consider matters of which judicial notice may be taken in deciding a Rule 12(b)(6) motion). However, even if the complaint does not expressly cite a document, the complaint is deemed to include that document if it is "integral" to the complaint. *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)); *Sira*, 380 F.3d at 67 (document not expressly cited in the complaint was "incorporated into the pleading because [it] was integral to [plaintiff's] ability to pursue" his cause of action); *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.") (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–153 (2d Cir. 2002)); Fed. R. Evid. 201 (a court may take judicial notice of "a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

[1]    [2]    By repeatedly referring to the criminal complaint, the Amended Complaint incorporates it by reference.[8] As for Plaintiff's other exhibits, *i.e.*, the indictment, the transcript of the criminal court conference, and the two press releases, the Court takes judicial notice of them, but for the limited purpose of establishing their existence and

legal effect, and determining the statements that they contain without considering the truth of those statements. **\*596** *See, e.g., Bejaoui v. City of New York*, No. 13-cv-5667, 2015 WL 1529633, at \*6 (E.D.N.Y. Mar. 31, 2015) (recognizing disagreement among district courts in the Second Circuit as to whether incident reports, arrest reports, and police complaints may be judicially noticed, but still taking notice of the plaintiff's State court indictment and criminal court order to establish their existence and legal effect); *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998))); *see, e.g., Garcia–Garcia v. City of New York*, No. 12-cv-1302, 2013 WL 3832730 (S.D.N.Y. July 22, 2013) (taking judicial notice of criminal complaints and indictments for the limited fact that plaintiff was arrested and charged with certain crimes). [9] Here, the criminal court records and the press releases relate to Plaintiff's allegations that the criminal case was terminated favorably to her and the date on which the criminal charges were dropped. [10] (Am. Compl. ¶¶ 201, 212.)

[8]     The Amended Complaint repeatedly refers to the criminal complaint in alleging Plaintiff's fabrication of evidence and malicious prosecution claims. (*See, e.g.,* Am. Compl. ¶ 145 ("Defendant DEGNAN signed the criminal court complaint ... despite his knowing that there was no truth to those allegations...."); Am. Compl. ¶ 146 (alleging that the criminal court complaint was based on fabricated information provided to the District Attorney's Office); Am. Compl. ¶ 150 (alleging that Dr. Landi made a false statement in the criminal complaint)). Plaintiff also alleges that Dr. Landi made a false statement in the criminal complaint that Annie may have been saved had Plaintiff sought medical care for Annie sooner. (Am. Compl. ¶ 150.)

[9]     *See also McLoughlin v. People's United Bank, Inc.*, 586 F.Supp.2d 70, 73 (D. Conn. 2008) ("The Court may take judicial notice of the press releases of government agencies" (citing *In re Zyprexa Products Liability Litigation*, 549 F.Supp.2d 496, 501 (E.D.N.Y. 2008))); *Mitchell v. Home*, 377 F.Supp.2d 361, 367 n.1 (S.D.N.Y. 2005)

("The press release [from the New York Attorney General] may be considered on this motion to dismiss because ... this Court may take judicial notice of it as a matter of public record[.]"); *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("If the court takes judicial notice, it does so in order to determine what statements they contained—but ... not for the truth of the matters asserted.").

[10]    Moreover, Plaintiff's counsel has also represented to the Court that she has used one of the press releases in order to identify the named Defendants (*see* 1/7/2016 Pre–Motion Conference Transcript), and the Court therefore may consider at least one of the press releases to be "integral" to the Complaint. *See Sira*, 380 F.3d at 67. The Court, however, will not consider the new factual assertions Plaintiff makes in her opposition papers. *See Green v. City of Mount Vernon*, 96 F.Supp.3d 263, 285 (S.D.N.Y. 2015) (citing, *inter alia, Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988) ("Factual allegations contained in legal briefs or memoranda are also treated as matters outside the pleading[s] for purposes of Rule 12(b).")).

**\*\*5**  **[3]**   The Court, however, declines to take judicial notice of the grand jury minutes in *People v. Hang Bin Li and Ying Li*, Indictment No. 603/08 (Dkt. 65, Ex. A), which the City Defendants have attached to their Reply brief, because the City seeks to rely on the substance and truth of the testimony set forth in those minutes, and not just the fact of the testimony being given or the date on which it was given. *See St. John's Univ., N.Y. v. Bolton*, 757 F.Supp.2d 144, 156 (E.D.N.Y. 2010) ("[T]he court may, *at its discretion*, consider matters of which judicial notice may be taken...." (emphasis added) (citation omitted)).

## II. LEGAL STANDARD

Under Rule 12(b)(6) of the FRCP, a defendant may move for dismissal on the ground that the complaint "fail[s] to state a claim upon which relief can be granted." To withstand a Rule 12(b)(6) motion, a complaint must plead sufficient facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable **\*597** inference

that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). In ruling on a 12(b)(6) motion, a court must accept the factual allegations set forth in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *See Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). However, that " 'tenet is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' " *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 668, 129 S.Ct. 1937). A complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement' " will not suffice. *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955). Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level...." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. A complaint should be dismissed where a plaintiff has not "nudged [its] claims across the line from conceivable to plausible[.]" *Id.* at 570, 127 S.Ct. 1955.

## III. PLAINTIFF'S SECTION 1983 CLAIMS

[4]  [5]  Plaintiff has brought this action pursuant to 42 U.S.C. § 1983 ("Section 1983"), which provides a cause of action for anyone subjected "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by a person acting under color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of [federal] rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). To state a claim under Section 1983, a plaintiff must plausibly allege "(1) that the defendants deprived him of a right 'secured by the Constitution or laws of the United States'; and (2) that they did so 'under color of state law.' " *Giordano v. City of New York*, 274 F.3d 740, 750 (2d Cir. 2001) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999)); *see Flynn v. James*, 513 Fed.Appx. 37, 39 (2d Cir. 2013).

### A. Liability of Medical Center Defendants as Private Actors

[6]  Plaintiff asserts her federal claims not only against the City Defendants but also against the Medical Center Defendants, who ordinarily would be considered non-State actors. *See White v. St. Joseph's Hosp.*, 369 Fed.Appx. 225, 226 (2d Cir. 2010) ("[P]rivate actors and institutions, such as

the hospitals ... are generally not proper § 1983 defendants because they do not act under color of state law.") (citing *Amer. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999)); *see also Kia P. v. McIntyre*, 235 F.3d 749, 756 (2d Cir. 2000) (finding that a hospital was not a State actor to the extent it acted in its capacity as a private provider of medical care). As a general matter, liability under Section 1983 is proper only with respect to individuals acting under "color of state law," *i.e.*, State actors, or individuals acting in concert with a State actor. *See* 42 U.S.C. § 1983; *Jones v. City of New York*, No. 12-cv-9144, 2013 WL 4028183, at *6 n.3 (S.D.N.Y. Aug. 8, 2013) ("Section 1983 addresses only those injuries caused by state actors or those acting under color of state law.") (quoting *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992)). For a private entity to be held liable under Section 1983, a plaintiff must establish that the private entity acted as a "willful participant in joint activity with the State or its agents." **\*598** *Betts v. Shearman*, 751 F.3d 78, 85 (2d Cir. 2014) (citation and quotation marks omitted).

**\*\*6**  Although the Medical Center Defendants argue that they are not State actors and therefore not subject to liability under Section 1983, they also note that this issue may be more appropriate to be decided on summary judgment. (*See* Dkt. 55 at 19 n.3.) Because the Medical Center Defendants essentially defer arguing the issue, the Court reserves consideration of the issue for summary judgment. For purposes of ruling on Defendants' motions to dismiss, the Court assumes without deciding that the Medical Center Defendants are State actors who acted "under color of state law."

### B. City Defendants' Request to Dismiss the Individual Officer Defendants for Lack of Personal Involvement

[7]  [8]  The City Defendants point out—and rightfully so —that Plaintiff has failed to allege any personal involvement by many of the named Officer Defendants. (Dkt. 59 at 6.) "An individual defendant is not liable under § 1983 absent personal involvement." *Morris v. Eversley*, 282 F.Supp.2d 196, 202 (S.D.N.Y. 2003) (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)); *Spavone v. New York State Dept. of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). Pleadings that do not differentiate which defendant was involved in the unlawful conduct are insufficient to state a claim. *See, e.g., Wright v. Orleans Cnty.*, No. 14-cv-0622A, 2015 WL 5316410, at *13 (W.D.N.Y. Sept.

10, 2015) (noting in a § 1983 case that "[g]roup pleading is insufficient for purposes of Rule 8(a)(2) [of the FRCP] which requires a short and plain statement of the claim showing that the pleader is entitled to relief." (citation and quotation marks omitted)); *Holmes v. Allstate Corp.*, No. 11–civ–1543, 2012 WL 627238, at \*7, \*22 (S.D.N.Y. Jan. 27, 2012) ("Plaintiffs' method of group pleading is incoherent or illogical" and "[FRCP] 8(a) is violated where a plaintiff, by engaging in 'group pleading,' fails to give each defendant fair notice of the claims against it."); *Pierson v. Orlando Regional Healthcare Systems, Inc.*, 619 F.Supp.2d 1260, 1273 (M.D. Fla. 2009) (dismissing complaint because group-pleading method of collectively referring to individual defendants and two physician groups as "Peer Review Defendants" throughout complaint did not satisfy [FRCP] 9(a)).

### 1. Lt. Conforti, Det. Perdoch, Sgt. Rodriguez, Lt. Hall, Det. Lee, and Sgt. Manfredi

[9] The Amended Complaint fails to allege facts from which it can be reasonably inferred that Lt. Conforti, Det. Perdoch, Sgt. Rodriguez, Lt. Hall, and Det. Lee had any involvement in Plaintiff's Queens County criminal proceedings. Though the lengthy Amended Complaint devotes six paragraphs to each of these Defendants (*see* Am. Compl. ¶¶ 19–22, 82–83 (for Lt. Conforti); Am. Compl. ¶¶ 27–30, 81–82 (for Det. Perdoch); Am. Compl. ¶¶ 39–42, 82–83 (for Sgt. Rodriguez); Am. Compl. ¶¶ 43–46, 82–83 (for Lt. Hall); Am. Compl. ¶¶ 55–58, 82–83 (for Det. Lee)), these paragraphs simply recite the same conclusory, formulaic, and non-substantive allegations as to each of these Defendants, asserting that they were "acting within the course and scope of their employment" and "under color of state law," that they are being sued in their individual and official capacities, and that they should be referred to as "CITY DEFENDANTS" or "OFFICER DEFENDANTS." In short, Plaintiff does not allege that any of these five officers had even a minimal role in arresting, investigating, or prosecuting **\*599** her. For Sgt. Manfredi, Plaintiff alleges nothing more than that he was present at the 109th Precinct when the Lis arrived with Det. Phelan. (*See* Am. Compl. ¶¶ 104–105.)[11]

---

[11] Though Plaintiff alleges a claim of failure to intervene in her arrest and prosecution, the allegation that Sgt. Manfredi simply was present at the precinct when the Lis were brought there by Det. Phelan is still not enough to plausibly allege

that Sgt. Manfredi was aware of the circumstances relating to Plaintiff's arrest or detention, such that he had a duty to intervene.

**\*\*7** [10] Based on Plaintiff's counsel's representation at the pre-motion conference, it appears that Plaintiff named some of these individual Defendants because they were listed as having supervisory roles in the Queens County District Attorney's press release (dated March 12, 2008). (*See* Ex. D, Dkt. 63–4 at ECF 3.) Even though the Court takes judicial notice of the press release, as noted, it does not take judicial notice of the press release for the truth of its contents, *i.e.*, that the identified officers were, in fact, supervisors at the time of Plaintiff's arrest and prosecution. *See Roth*, 489 F.3d at 509. Furthermore, the mere listing of these officers as supervisors in a press release is insufficient to create an inference of personal involvement absent further allegations, especially because "a defendant [may not] be held liable merely by his connection to the events through links in the chain of command." *Reynolds v. Goord*, No. 98-cv-6722, 2000 WL 235278, at \*7 (S.D.N.Y. Mar. 1, 2000); *Colon*, 58 F.3d at 873–74 ("The bare fact that [the defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain [plaintiff's] claim.").

### 2. P.O. Yam, Sgt. Cai, and Det. Chan

With respect to P.O. Yam, Sgt. Cai, and Det. Chan, the allegations in the Amended Complaint are also insufficient to show personal involvement in unlawful conduct that supports any of Plaintiff's claims. Based on the Amended Complaint, the participation of these officers was limited to serving as translators during the investigations of Plaintiff's criminal case.[12] (*See* Am. Compl. ¶¶ 35–38, 101, 104, 106 (for P.O. Yam); Am. Compl. ¶¶ 51–54, 126 (for Sgt. Cai); Am. Compl. ¶¶ 59–62, 112, 119 (for Det. Chan); Am. Compl. ¶ 82–83 (for all Defendants).) While these translating officers are alleged to have been present during the interviews of the Lis by the other City Defendants, there are no other allegations from which to infer that these three officers were involved, in any way, in the conduct that gives rise to Plaintiff's Section 1983 claims, *e.g.*, arresting Plaintiff without probable cause, initiating criminal process against her, forwarding false or fabricated evidence to the prosecution, or concealing exculpatory information from the prosecutors or the defense. The translating officers' mere presence at the Lis' interviews is simply not enough to allege their direct involvement in the *unlawful* conduct at issue in this case, as opposed to

their incidental involvement in some of the events related to Plaintiff's arrest and detention. All claims against P.O. Yam, Sgt. Cai, and Det. Chan are, therefore, dismissed.

12  Plaintiff alleges that P.O. Yam interpreted on October 23, 2007 (Am. Compl. ¶¶ 101–06), that Sgt. Cai interrogated Hang Bin Li on October 29, 2007 (Am. Compl. ¶ 126), and that Det. Chan "served as an interpreter" from the afternoon of October 24, 2007, until the morning of October 25, 2007, when Heffernan and Moser interrogated the Lis (Am. Compl. ¶ 112).

### 3. Dets. Moser, Phelan, and Heffernan

With respect to Dets. Moser, Phelan, and Heffernan, the Court finds that Plaintiff has provided sufficient allegations as to **\*600** their personal involvement in the conduct giving rise to some, but not all, of Plaintiff's claims, as discussed *infra*. (*See* Am. Compl. ¶¶ 112, 119, 126, 130 (alleging Det. Moser's involvement in the investigation of the Lis); ¶¶ 102–104, 106, 109–111 (alleging Det. Phelan's involvement to the extent that he went to the hospital, spoke to the hospital staff, examined relevant medical charts, and interrogated Ying Li); ¶¶ 112, 126, 130 (alleging Det. Heffernan's involvement to the extent that he interrogated Hang Bin Li and other witnesses).)

\* \* \*

Accordingly, Lt. Conforti, Lt. Perdoch, Sgt. Rodriguez, Lt. Hall, Det. Lee, Sgt. Manfredi, P.O. Yam, Sgt. Cai, and Det. Chan are dismissed as Defendants due to the insufficiency of allegations establishing personal involvement. *See Zurich American Ins. Co. v. Dah Sing Bank, Ltd.* No. 03–civ–7778, 2004 WL 1328215, at \*6 (S.D.N.Y. Jun. 15, 2004) (dismissing claims against one defendant bank where plaintiff did not put forth "a single factual allegation" but instead "lump[ed] the three bank defendants together and assert[ed] that they collectively processed the checks"); *Hernandez v. Goord*, 312 F.Supp.2d 537, 548 (S.D.N.Y. 2004) (dismissing individual defendants who were merely listed at the beginning of the complaint and were never connected in the complaint to any particular adverse action); *see also S.B. v. City of New York*, No. 14-cv-1021, 2016 WL 4530455, at \*13 (E.D.N.Y. Aug. 29, 2016) (dismissing claims where the complaint did "not even directly name any of the defendants or allege the particular actions they undertook" (citation omitted));

*Barber v. Ruzzo*, No. 10-cv-1198, 2011 WL 4965343, at \*2 (N.D.N.Y. Oct. 19, 2011) ("Simply stating that [defendants] were 'personally and actively involved in the continuation of criminal proceedings against [a plaintiff],' is grossly insufficient to establish personal involvement in the actual prosecution.").

## IV. FALSE ARREST

**\*\*8** **[11]** **[12]** **[13]** **[14]** A claim for false arrest under Section 1983, resting on the Fourth Amendment right to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as that under New York law. [13] *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). In analyzing Section 1983 claims for false arrest, courts "generally look[ ] to the law of the state in which the arrest occurred." *Dancy v. McGinley*, 843 F.3d 93, 107 (2d Cir. 2016) (quoting *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006)). Under New York law, a plaintiff must establish, *inter alia*, that "the defendant intentionally confined him without his consent and without justification." *Id.* at 107 (quoting *Weyant*, 101 F.3d at 852) (quotation marks omitted); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (citing *Broughton v. State of New York*, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975)).

13  Plaintiff also alleges a false imprisonment claim under Section 1983. However, the Court does not address this claim separately, because pursuant to New York law, false arrest and false imprisonment are "synonymous." *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991); *see also Singer*, 63 F.3d at 118 ("The common law tort of false arrest is a species of false imprisonment." (citing *Broughton v. State*, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975))).

### A. Plaintiff's False Arrest Claim is Barred by the Statute of Limitations

[15] The statute of limitations for Section 1983 claims filed in federal court in New York is determined by New York State's statute of limitations for personal injury actions. *See* **\*601** *Owens v. Okure*, 488 U.S. 235, 251, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989) (discussing *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), which held that courts deciding claims under Section 1983 should "borrow" the State statute of limitations for personal injury actions); *see also Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d

Cir. 2002) (citing *Owens* ). In New York State, the applicable statute of limitations for personal injuries is three years. N.Y. C.P.L.R. § 214 (McKinney). Thus, Plaintiff should have filed her false arrest claim within three years of the date on which the cause of action accrued.

[16]    [17]    While the applicable limitations period is determined by State law, the accrual date "is a question of federal law". *Wallace v. Kato*, 549 U.S. 384, 388, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007) ("[T]he accrual date of a § 1983 cause of action is a question of federal law that is *not* resolved by reference to state law." (emphasis in the original)). Under federal law, a Section 1983 false arrest claim accrues at the time that the alleged false arrest ends, *i.e.*, when the arrestee "becomes held pursuant to [legal] process —when, for example, he is bound over by a magistrate or arraigned on charges." *Wallace*, 549 U.S. at 389, 127 S.Ct. 1091; *see also Lynch v. Suffolk Cnty. Police Dep't, Inc.*, 348 Fed.Appx. 672, 675 (2d Cir. 2009) (summary order) (applying *Wallace* to find that plaintiff's § 1983 false arrest claim was time-barred).

[18]    Here, the Medical Center Defendants and the City Defendants contend that Plaintiff's false arrest claim as to all Defendants is time-barred. (Dkt. 55 at 4; Dkt. 64 at 3.) Plaintiff concedes this (Dkt. 66 at 6), and the Court agrees. Plaintiff was arrested on March 11, 2008 in connection with her daughter's death. (Am. Compl. ¶ 133.) For Plaintiff's false arrest claim to be timely, she must have made an initial appearance or been arraigned on or after March 26, 2012, *i.e.*, three years from the filing of her complaint. *See Wallace*, 549 U.S. at 389, 127 S.Ct. 1091 (false arrest claim accrues when plaintiff's false arrest ends and plaintiff becomes held pursuant to legal process). However, Plaintiff alleges that she was arrested on March 11, 2008 and that she was incarcerated as of that date until March 26, 2012. [14] Because Plaintiff did not bring her false arrest claim until March 2015, it is plainly barred by the applicable three-year statute of limitations.

14    Although Plaintiff has not alleged in her Amended Complaint when she made her initial appearance in State court or when she was arraigned on the indictment, given her March 2008 arrest and incarceration date, her arraignment clearly took place long before March 2012.

**B. Equitable Tolling**

**\*\*9** [19]    [20]    Recognizing that the statute of limitations has run, Plaintiff contends that equity demands tolling of the statute of limitations. (Dkt. 66 at 7.) Plaintiff's claim for equitable tolling is based on the notion of fraudulent concealment. [15]    *See Pearl*, 296 F.3d at 81–84 (noting that the "taxonomy of tolling, in the context of avoiding a **\*602** statute of limitations, includes at least three phrases: equitable tolling, fraudulent concealment of a cause of action, and equitable estoppel," and also recognizing that the Second Circuit equates both equitable estoppel and equitable tolling with fraudulent concealment).

15    The Court recognizes that "the application of the doctrine of equitable tolling is not limited to [fraudulent concealment]." *Valdez ex rel. Donely v. U.S.*, 518 F.3d 173, 183 (2d Cir. 2008). However, based on Plaintiff's articulation of why equitable tolling should be granted, it is clear that she is seeking equitable tolling based on fraudulent concealment. Plaintiff's MOL also mentions "equitable estoppel," which is applicable "where the plaintiff knew of the existence of the cause of action, but the defendant's conduct caused plaintiff to delay in bringing suit." (Dkt. 66 at 7 n.7 (citing, *inter alia*, *Cerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 49–50 (2d Cir. 1985)).) However, equitable estoppel is inapplicable here, because Plaintiff's theory is that she was *unaware* of her false arrest claim, not that she was aware of it, but Defendants' conduct caused her to delay bringing the claim. (*See* Am. Compl. ¶ 209; *see also* Dkt. 66 at 7 (asking the Court to toll the statute of limitations until 2013, "when Plaintiff *became aware*-that she had, in fact, been falsely arrested...." (emphasis added)).)

[21]    [22]    When a "defendant fraudulently conceals the wrong, the [statute of limitations] does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action." *Pinaud v. Cnty. of Suffolk*, 52 F.3d 1139, 1157 (2d Cir. 1995) (quoting *Keating v. Carey*, 706 F.2d 377, 382 (2d Cir. 1983)); *Pearl*, 296 F.3d at 81; *see also Halstead v. City of New York*, No. 13-cv-4874, 2015 WL 1506133, at \*4 (E.D.N.Y. Mar. 31, 2015). To benefit from this doctrine of equitable tolling based on fraudulent concealment, the "plaintiff must submit non-conclusory evidence of conspiracy or other fraudulent wrong *which precludes his possible discovery of harms that he suffered.*" *Pinaud*, 52 F.3d at 1157 (emphasis in original); *see also Govt. Employees Ins. Co. v. U.S.*, No. 13-cv-4063, 2014 WL 582164 (E.D.N.Y. Feb. 14, 2014) ("the 'burden

of demonstrating the appropriateness of equitable tolling ... lies with the plaintiff.' " (quoting *Boos v. Runyon*, 201 F.3d 178, 184–85 (2d Cir. 2000))). The Second Circuit has made clear that, "as a matter of fairness", the doctrine should only be applied "where a plaintiff has been 'prevented in some extraordinary way from exercising [her] rights' ". *Pearl*, 296 F.3d at 85 (citation and quotation marks omitted). *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (noting that courts apply equitable tolling only in "rare and exceptional circumstances" (citation and internal quotation marks omitted)).

[23]  Here, Plaintiff presents only an unsupported, conclusory statement to justify equitable tolling: "[D]efendants' fraud, misrepresentation, and deception, induced plaintiff from filing a timely action. Defendants' misconduct caused the plaintiff to delay in bringing suit and/or wrongfully deceived or misled plaintiff in order to conceal the existence of a cause of action." (Am. Compl. ¶ 209.) The Amended Complaint does not allege (a) which of the numerous Defendants committed fraud, misrepresentation, or deception, (b) what information was kept from Plaintiff, or (c) how the alleged withholding of information made it impossible for Plaintiff to discover the harms she had suffered. *See, e.g., Harrison v. Harlem Hosp.*, 364 Fed.Appx. 686, 688 (2d Cir. 2010) (summary order) ("The appellants have failed to identify any specific fact they have learned *since* the limitations period expired which, if known by them sooner, would have led them to file suit sooner." (emphasis in original)).

**10  In her opposition brief, Plaintiff claims that she became aware of her false arrest only "when Plaintiff's attorneys were told ... that there was no 'medical proof' that she could have saved her daughter," and that Plaintiff's reliance on Dr. Kupferman's assessment that earlier medical intervention could have saved Annie caused Plaintiff to delay filing her false arrest claim. (Dkt. 66 at 7.) However, as the Medical Center Defendants correctly point out, none of these factual allegations are in Plaintiff's Amended Complaint. [16]

[16]  In fact, there is a discrepancy between what Plaintiff argues in her MOL and what she alleges in the Complaint regarding the suppressed or concealed information that warrants equitable tolling. In the Complaint, Plaintiff alleges that Dr. Landi stated that Plaintiff's failure to get earlier medical care contributed to Annie's death. (Am. Compl. ¶ 150.) But in her MOL, she attributes that statement to Dr. Kupferman. (Dkt. 66 at

7 ("Plaintiff relied on false statements made by Kupferman that Annie's death was caused by Ying Li not obtaining lifesaving medical attention for Annie, and that had she come to the hospital sooner, she could have saved Annie.")).

**\*603**  Furthermore, even assuming *arguendo* that Dr. Kupferman had concealed information that might have supported Plaintiff's false arrest claim, equitable tolling is still not warranted if this alleged concealment did not sufficiently justify Plaintiff's failure to pursue her cause of action. *Paige v. Police Dept. of City of Schenectady*, 264 F.3d 197 (2d Cir. 2001). In *Paige*, the plaintiff, a minor at the time, was sexually assaulted by a police officer. *Id.* at 198. She reported the assault to the police department soon after it occurred, but the department told her that there was insufficient evidence to pursue the case. *Id.* Fifteen years later, the plaintiff found out through a newspaper article that the police department might have had an investigatory file with information identifying the assaulting officer as the suspect, but chose not to pursue the case. *Id.* at 199. In bringing a Section 1983 claim against the City, the police department, and the suspected assaulting officer, the plaintiff argued that none of her claims was time-barred because (a) they did not accrue until the publishing of the newspaper article, and, in the alternative (b) the statute of limitations should be tolled until the date the article was published under the doctrine of equitable tolling. *Id.* The Second Circuit rejected both arguments finding, *inter alia*, that the plaintiff had sufficient knowledge to timely commence her causes of action without the investigatory file. *Id.* at 200 ("Although some of the facts putatively concealed by the defendants might have strengthened [plaintiff's] case ... the absence of those facts did not sufficiently justify [plaintiff] in not pursuing her cause of action as to merit equitable tolling.")*; see also Pearl*, 296 F.3d at 78–85 (finding Section 1983 plaintiff, who alleged a brutal beating by four officers, was not entitled to equitable tolling, despite one of the officer's subsequent confession that the officers had fabricated evidence against plaintiff, explaining that plaintiff had full knowledge of his encounter with the officers and that the officer's recantation was "not newly developed awareness of a previously concealed cause of action", but simply "more persuasive evidence").

Even accepting Plaintiff's new, and improperly asserted, theory of fraudulent concealment, her case is indistinguishable from *Paige* and *Pearl*; Plaintiff "had full knowledge" of her actions relating to her child's death, including whether she knowingly delayed getting her child medical attention, and thus the purportedly

Ying Li v. City of New York, 246 F.Supp.3d 578 (2017)
Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 81 of 186
2017 WL 1208422

withheld information that earlier medical intervention might not have saved Annie's life does not lead to a "newly developed awareness of a previously concealed cause of action", but simply provides potentially persuasive evidence for that claim. Indeed, Plaintiff fails to explain how Dr. Kupferman's purported diagnosis with regard to Annie made it "impossible" for Plaintiff to learn that she had a claim for false arrest. *See Pearl*, 296 F.3d at 85 (reiterating that, with respect to application of the equitable tolling doctrine, "we made it clear that we had in mind a situation where a plaintiff 'could show that it would have been *impossible* for a reasonably prudent person to learn' about [her] cause of action." (emphasis in original)). In fact, some allegations in the Amended Complaint suggest that Plaintiff always knew or believed that she had a false arrest claim. For example, she alleges that she had "steadfastly denied wrongdoing throughout the numerous interrogations *604 conducted by Defendants," even in the early stages of the investigation of Annie's death. (*See* Am. Compl. ¶ 127; *see also* Am. Compl. ¶ 118 ("Ying Li, however was positive that she did not harm her daughter, that she never saw Hang Bin do anything but love and treasure Annie. She maintained her innocence throughout.").) Plaintiff also pleaded not guilty to all counts in the criminal complaint and indictment. (Am. Compl. ¶ 179.) Furthermore, Plaintiff also alleges in the Amended Complaint that she made diligent attempts to disprove the shaken baby syndrome diagnosis of Annie, thereby demonstrating her belief from the time of her arrest that the diagnosis was wrong and that Plaintiff had been falsely arrested and accused of causing her daughter's death, whether by SBS or failing to get her daughter prompt medical attention. (*See, e.g.,* AC ¶ 197 ("In May of 2012[,] Judge Gregory Lasak ordered further DNA testing done on [the Lis], after the OI [Osteogenesis Imperfecta] [17] gene had been detected in Hang Bin Li.").) While Plaintiff may have "diligently attempted to disprove Kupferman's ... diagnosis (Dkt. 66 at 7), in this case, it only reinforces the conclusion that Plaintiff was aware of her false arrest claim before 2013.

[17]    Osteogenesis imperfecta is "a group of genetic disorders that mainly affect the bones. The term 'osteogenesis imperfecta' means imperfect bone formation. People with this condition have bones that break easily, often from mild trauma or with no apparent cause. Multiple fractures are common, and in severe cases, can occur even before birth.... The milder forms of osteogenesis imperfecta ... are characterized by bone fractures during childhood and adolescence that often result from minor trauma.... Other types of osteogenesis imperfecta are more severe, causing frequent bone fractures that may begin before birth and result from little or no trauma.... The most severe forms of osteogenesis imperfecta ... can include an abnormally small, fragile rib cage and underdeveloped lungs. Infants with these abnormalities have life-threatening problems with breathing and often die shortly after birth." *See https://ghr.nlm.nih.gov/ condition/osteogenesis-imperfecta* (Last visited 3/25/2017.)

**11 In sum, Plaintiff's Amended Complaint provides only an unsupported, conclusory assertion regarding "fraud, misrepresentation, and deception" that is patently insufficient to support equitable tolling with respect to her false arrest claim, which is barred by the three-year statute of limitations. Furthermore, even Plaintiff's belated and improper assertion of facts regarding the withholding of information by the Medical Center Defendants fails to show that Plaintiff could not have timely brought her false arrest claim, and thus even these facts, if accepted as true, would not support the application of the equitable tolling doctrine.

Accordingly, Defendants' motions to dismiss Plaintiff false arrest claim are granted. [18]

[18]    Because Plaintiff's false arrest claim is time-barred, the Court does not address the Defendants' argument that there was probable cause to arrest Plaintiff.

## V. MALICIOUS PROSECUTION

[24]    [25]    [26]    Plaintiff asserts a federal malicious prosecution claim against all Defendants. (Am. Compl. ¶ 211–213.) To allege a Section 1983 claim for malicious prosecution, a plaintiff must allege the four elements of a malicious prosecution claim under New York law—"(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions"—as well as a violation of the plaintiff's rights under the Fourth Amendment. [19] *605 Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (citations and quotation marks omitted); *Cornejo*, 592 F.3d at 129 ("And § 1983, in recognizing a malicious prosecution claim when the prosecution depends on a violation of federal rights, adopts

the law of the forum state so far as the elements of the claim for malicious prosecution are concerned." (citation omitted)); *see also Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 116–117 (2d Cir. 1995) (relying in part on common law and New York State malicious prosecution law in analyzing § 1983 malicious prosecution claim). In establishing a violation of a Fourth Amendment right in relation to a Section 1983 malicious prosecution claim, a plaintiff must demonstrate "a sufficient post-arraignment deprivation[ ] of liberty." [20] *Singer*, 63 F.3d at 117; *see also Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000) (noting that it is insufficient for a plaintiff to assert only the four elements of New York State malicious prosecution claim alone).

[19]  The Second Circuit in *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110 (2d Cir. 1995), left open the possibility of a plaintiff bringing a malicious prosecution claim premised on some other constitutional right. *Id.* at 116 n.5 ("It is theoretically possible ... for a plaintiff to premise a malicious prosecution claim on some other constitutional right. Where that is the case, it will be the standard governing that right that will determine whether there has been a constitutional violation.")

[20]  "The Fourth Amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person —*i.e.*, the right to be free of unreasonable unwarranted restraints on personal liberty. A plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must therefore show some deprivation of liberty consistent with the concept of 'seizure.' ... To maintain a § 1983 claim for malicious prosecution under the Fourth Amendment, the deprivation of liberty— the seizure—must have been effected 'pursuant to legal process.' " *Singer*, 63 F.3d at 116–17.

**12  The Medical Center Defendants contend that Plaintiff cannot satisfy three out of the five requisite elements— specifically, favorable termination, lack of probable cause, and malice. (Dkt. 55 at 5–9.) The City Defendants argue that Plaintiff's claim must be dismissed because there was probable cause and because none of the Officer Defendants initiated the prosecution against Plaintiff. (*See* Dkt. 59 at 7–11.) For the reasons stated below, the Court finds that Plaintiff has adequately alleged a malicious prosecution claim against Det. Degnan, Dr. Landi, and also Dr. Kupferman, but not as to

all of the other Defendants. The malicious prosecution claim is dismissed as to Dets. Moser, Phelan, and Heffernan, Lt. Conforti, Lt. Perdoch, Sgt. Rodriguez, Lt. Hall, Det. Lee, Sgt. Manfredi, P.O. Yam, Sgt. Cai, and Det. Chan.

## A. Initiation of a Criminal Proceeding

[27]  [28]  [29] To initiate or continue a criminal proceeding, "a defendant must do more than report the crime or give testimony. He must play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Manganiello*, 612 F.3d at 163 (quoting *Rohman*, 215 F.3d at 217) (alteration and internal quotation marks omitted). An active role in prosecution is inferred when a defendant had the plaintiff arraigned, filled out a complaining and corroborating affidavit, or signed a felony complaint. *See Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) (noting that a police officer can initiate prosecution by filing charges or other accusatory instruments); *see also Costello v. Milano*, 20 F.Supp.3d 406, 415 (S.D.N.Y. 2014). Additionally, a defendant could have initiated a prosecution "by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor." *Costello*, 20 F.Supp.3d at 415; *see also Llerando-Phipps v. City of New York*, 390 F.Supp.2d 372, 383 (S.D.N.Y. 2005) ("[A]n arresting **606 officer may be held liable for malicious prosecution [if he] creates false information likely to influence a jury's decision and forwards that information to prosecutors." (citation and quotation marks omitted)); *Webster v. City of New York*, 333 F.Supp.2d 184, 198–99 (S.D.N.Y. 2004) (noting that police officers could be held liable for malicious prosecution if they provided false information to prosecutors).

The Medical Center Defendants do not dispute that they took part in the initiation of the criminal proceeding (*see* Dkt. 55), whereas the City Defendants contend that Plaintiff's Amended Complaint only alleges active participation in the prosecution by Det. Degnan (*see* Dkt. 59 at 9 n.10). The Court finds that the Amended Complaint contains sufficient factual allegations to support a plausible inference that not only Det. Degnan, but also Dr. Landi, initiated Li's prosecution. [21] (*See* Am. Compl. ¶ 149.)

[21]  The Court notes that Plaintiff's opposition did little to assist the Court in resolving this issue. In her response, Plaintiff directed the Court to thirty paragraphs in the Amended Complaint, many of

which did not allege facts related to whether the City Defendants initiated Plaintiff's prosecution. (*See* Dkt. 61 at 10 (citing to paragraphs 168–198 of the Amended Complaint).) For example, paragraph 179 states, "As plaintiff did not commit or aid/abet in the any of the offenses with which she was charged, she pleaded not guilty to all counts, and bail was set at $250,000." (Am. Compl. ¶ 179.) This plainly has nothing to do with whether Plaintiff has adequately alleged, for each of the City Defendants, participation in the prosecution. Plaintiff is reminded that "[w]hile the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out." *Monahan v. New York City Dep't of Corrections,* 214 F.3d 275, 292 (2d Cir. 2000) (quotations and citations omitted); *see also 24/7 Records, Inc. v. Sony Music Entertainment, Inc.,* 429 F.3d 39, 46 (2d Cir. 2005).

**\*\*13** [30] [31] Plaintiff has adequately alleged that Det. Degnan initiated the prosecution, because the Amended Complaint alleges that Det. Degnan swore to the criminal complaint. (*See* Am. Compl. ¶ 145.) Plaintiff has also alleged that Dr. Landi "swore under oath in the criminal complaint against plaintiff" and made assertions that were "false, misleading, and perjurious, and entirely unsupported and unsupportable by any medical science or clinical or forensic evidence." (Am. Compl. ¶¶ 149–150.) *See Cameron,* 598 F.3d at 63 (noting that a police officer can initiate prosecution by filing charges or other accusatory instruments). The Amended Complaint also alleges that Dr. Landi "played an active role in the prosecution of Ying Li. She provided advice and encouragement, that went well beyond her role, and into ancillary and forensic aspects of motive, culpability, and the veracity of Ying Li." (Am. Compl. ¶ 155.)

These City Defendants "cannot hide behind the decision of the DA to prosecute" when they, according to Plaintiff's allegations, provided the prosecutor with false information. *Blake v. Race,* 487 F.Supp.2d 187, 211 (E.D.N.Y. 2007) (rejecting the defendants' argument that the District Attorney, not the officers, initiated the prosecution); *Zahrey v. Coffey* ("*Coffey*"), 221 F.3d 342, 352 (2d Cir. 2000) ("[I]t is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation

of liberty.") Therefore, the Court finds that Plaintiff has adequately alleged that Det. Degnan and Dr. Landi participated in the initiation of Plaintiff's criminal proceeding.

By contrast, the Amended Complaint contains no factual allegations to support the inference that Dets. Moser, Phelan, **\*607** and Heffernan, Lt. Conforti, Lt. Perdoch, Sgt. Rodriguez, Lt. Hall, Det. Lee, Sgt. Manfredi, P.O. Yam, Sgt. Cai, and Det. Chan played an active role in initiating Plaintiff's prosecution. Therefore, as to these Defendants, the malicious prosecution claim is dismissed. *See, e.g., Jean-Laurent v. Bowman,* No. 12-cv-2954, 2014 WL 4662221, at \*6 (E.D.N.Y. Jul. 7, 2014) (finding that plaintiff failed to demonstrate that some of the defendants played an active role in commencing the criminal prosecution against plaintiff, even though plaintiff alleged that they "authorized, approved and/or participated" in plaintiff's criminal prosecution, because the defendants neither swore out a criminal complaint or corroborating affidavit, nor presented any information to the prosecutor).

**B. Favorable Termination**

The second element of a malicious prosecution claim is termination of the criminal proceeding in the plaintiff's favor. The Medical Center Defendants argue that Plaintiff's criminal proceeding did not terminate in her favor because (i) the prosecution was not terminated on its merits, (ii) Plaintiff does not set forth factual allegations to support an inference that the charges were dropped because she was innocent, and (iii) a dismissal "in the interest of justice" does not constitute a favorable termination. (*See* Dkt. 56 at 5–8.) The Court disagrees, and finds that Plaintiff has sufficiently alleged a favorable termination for purposes of her malicious prosecution claim. [22]

22     At this stage, the Court need not decide whether the termination of Plaintiff's criminal case was, in fact, a favorable one; rather, the only issue before the Court is whether Plaintiff has sufficiently *alleged* a favorable termination. *See Bacquie v. City of New York,* No. 99 CIV10951, 2000 WL 1051904, at \*3 (S.D.N.Y. Jul. 31, 2000).

[32] [33] The Court looks to New York law to determine whether Plaintiff has sufficiently alleged a favorable termination of her Queens County criminal proceeding. *Neal v. Fitzpatrick,* 250 F.Supp.2d 153, 154 (E.D.N.Y. 2003) (citing *Hygh v. Jacobs,* 961 F.2d 359, 367 (2d Cir. 1992)). "Under New York law, there are two ways to establish [a]

favorable termination: '(1) an adjudication of the merits by the tribunal in the prior action,' or (2) 'an act of withdrawal or abandonment on the part of the party prosecuting the prior action.' " *Liberty Synergistics, Inc. v. Microflo Ltd.*, 50 F.Supp.3d 267 (E.D.N.Y. 2014) (quoting *Morgan v. Nassau County*, No. 03-cv-5109, 2009 WL 2882823, at *8 (E.D.N.Y. Sept. 2, 2009) and citing *Castro v. East End Plastic, Reconstructive & Hand Surgery, P.C.*, 47 A.D.3d 608, 850 N.Y.S.2d 483, 485 (2008)); *Castro*, 850 N.Y.S.2d at 485 ("The favorable termination element must be established by evidence that 'the court passed on the merits of the charge or claim ... under circumstances as to show ... nonliability,' or evidence that the action was abandoned under circumstances 'which fairly imply the plaintiff's innocence.' ") (citation and internal quotation marks omitted). Thus, the fact that a criminal prosecution never reached the merits does not preclude a plaintiff from alleging a favorable termination. *See Castro*, 850 N.Y.S.2d at 485; *see also Norton v. Town of Brookhaven*, 47 F.Supp.3d 152, 158 (E.D.N.Y. 2014) (noting, on reconsideration, "the fact that the underlying prosecutions against the Plaintiff [were dismissed pursuant to statutes that] did not reach the merits does not, without more, render the termination of the prosecution inconsistent with innocence"); *Verboys v. Town of Ramapo*, 12 A.D.3d 665, 785 N.Y.S.2d 496, 497 (2004) (holding that favorable termination can be shown by "the formal abandonment of the proceedings").

**\*\*14** **[34]** **[35]** Furthermore, "New York law does not require a malicious prosecution **\*608** plaintiff to prove her innocence, or even that the termination of the criminal proceeding was indicative of innocence." *Rothstein v. Carriere*, 373 F.3d 275, 286 (2d Cir. 2004) (citing *Smith–Hunter v. Harvey*, 95 N.Y.2d 191, 195–96, 712 N.Y.S.2d 438, 734 N.E.2d 750 (2000)). "[A]ny final termination of a criminal proceeding in favor of the accused, such that the proceeding cannot be brought again, qualifies as a favorable termination for purposes of a malicious prosecution action," *Smith–Hunter*, 95 N.Y.2d at 195–96, 712 N.Y.S.2d 438, 734 N.E.2d 750, unless the disposition was "inconsistent with the innocence of the accused," *Cantalino v. Danner*, 96 N.Y.2d 391, 396, 729 N.Y.S.2d 405, 754 N.E.2d 164 (2001). *See Rothstein*, 373 F.3d at 275 (discussing New York Law regarding the favorable termination element and citing to both *Smith–Hunter*, 95 N.Y.2d 191, 712 N.Y.S.2d 438, 734 N.E.2d 750, and *Cantalino*, 96 N.Y.2d 391, 729 N.Y.S.2d 405, 754 N.E.2d 164); *see also Stampf v. Long Island R. Co.*, 761 F.3d 192, 201 (2d Cir. 2014) (applying *Smith–Hunter*, 95 N.Y.2d 191, 712 N.Y.S.2d 438, 734 N.E.2d 750 (2000)).

While New York and federal courts in this circuit have consistently applied the *Cantalino* "not inconsistent with innocence" standard in deciding whether a termination is favorable, there is open disagreement and divergence in this circuit on the constituent issue of whether the termination of a criminal case "in the interest of justice" is a favorable termination, *i.e.*, a termination that is not inconsistent with innocence.[23] *See Gem Financial Serv., Inc. v. City of New York*, No. 13-cv-1686, 2014 WL 1010408, at *10 n.10 (E.D.N.Y. Mar. 17, 2014) (recognizing "an apparent fissure amongst Second Circuit opinions with respect to the proper standard for assessing a favorable termination" where an "interest of justice" dismissal is involved). On the one hand, the New York Court of Appeals in 2001 held in *Cantalino* that there is no "per se rule that a dismissal in the interest of justice can never constitute a favorable termination." 96 N.Y.2d at 396, 729 N.Y.S.2d 405, 754 N.E.2d 164.[24] Nonetheless, in 2009, the Second Circuit in a summary order in *Lynch v. Suffolk County Police Dep't, Inc.* found, "as a matter of law", that a dismissal in the interest of justice could not "provide the favorable termination required as the basis for a claim of malicious prosecution", because such a dismissal was "neither an acquittal of the charges nor any determination of the merits[, and left] the question of guilt or innocence unanswered". 348 Fed.Appx. 672, 675 (2d Cir. 2009) (citing *Hygh*, 961 F.2d 359). Even after the *Lynch* decision, district courts in this circuit have continued to apply *Cantalino* to find that an "interest of justice" termination can be deemed favorable in a malicious prosecution action. *See Norton*, 47 F.Supp.3d at 160 (collecting district court cases that adopted *Cantalino* even after *Lynch* ); **\*609** *Guzman v. United States*, No. 11-CV-5834, 2013 WL 543343, at *8 (S.D.N.Y. Feb. 14, 2013) (collecting cases decided by the Southern District of New York that applied *Cantalino* even after the Second Circuit decided *Lynch* ); *see, e.g.*, *Genovese v. Cnty. of Suffolk*, 128 F.Supp.3d 661, 672 n.3 (E.D.N.Y. 2015) (declining to apply the standard set forth in *Lynch*, noting that it is a non-binding summary order failing to cite to *Cantalino*, which had already been decided at the time *Lynch* was decided). Other courts, however, have followed *Lynch* in dismissing malicious prosecution claims involving "interest of justice" dismissals. *See Norton*, 47 F.Supp.3d at 160–161 (citing *Tribie v. Parwanta*, No. 10 Civ. 6016, 2012 WL 246619, at *8 (S.D.N.Y. Jan. 26, 2012) and *Paulin v. Figlia*, 916 F.Supp.2d 524, 533 (S.D.N.Y. 2013)). However, as discussed below, notwithstanding the Medical Center Defendants' argument, the Court need not resolve this issue in order to determine whether Plaintiff has sufficiently *alleged* a favorable termination.

23    The Medical Center Defendants cite *Singer*, 63 F.3d 110, in support of their argument. (Dkt. 56 at 5.) However, as discussed below, because the New York Court of Appeals decision in *Cantalino* largely negates this aspect of *Singer*, the Court does not address *Singer*. In any event, the Medical Center Defendants need not rely on *Singer*, given the numerous federal court decisions, including one by the Second Circuit, reaching the same conclusion as *Singer*.

24    Significantly, reiterating part of its holding in *Smith–Hunter*, the Court of Appeals in *Cantolino* stated, "[t]o be sure, there are circumstances where a dismissal in the interest of justice is inconsistent with innocence because it represents 'mercy requested or accepted by the accused' ". 96 N.Y.2d at 396, 729 N.Y.S.2d 405, 754 N.E.2d 164 (quoting *Smith–Hunter*, 95 N.Y.2d at 197, 712 N.Y.S.2d 438, 734 N.E.2d 750).

**\*\*15** **[36]** The Court now turns to the Medical Center Defendants' three arguments. First, the argument that Plaintiff cannot show a favorable termination because her criminal case was not terminated on the merits is plainly unavailing. As discussed, there are "two ways to establish a favorable termination", one of which is the "act of withdrawal or abandonment" of the case by the prosecution, which is what Plaintiff alleges happened here. (Am. Comp. ¶ 201 ("Contemporaneously with the commencement of Hang Bin's trial, all charges against plaintiff were dismissed.").)

Second, the argument that Plaintiff has not sufficiently alleged malicious prosecution because she has not alleged facts from which it can be inferred that the criminal charges against her were dropped because she was innocent similarly lacks merit. As the New York Court of Appeals made clear in *Smith–Hunter*, a claim of malicious prosecution does not require that the plaintiff prove her innocence of the charges that were dropped, or even that the termination of her prosecution was indicative of innocence. 95 N.Y.2d at 195–96, 712 N.Y.S.2d 438, 734 N.E.2d 750. 25  **\*610** Rather, all that is required after *Smith–Hunter* and *Cantalino* is that the termination of Plaintiff's case was "final", *e.g.*, that the charges were dismissed with prejudice, and that the termination did not fall into one of the exceptions recognized by *Cantalino*, *e.g.*, that the disposition of Plaintiff's criminal case was "inconsistent with innocence". *Cantalino*, 96 N.Y.2d at 396, 729 N.Y.S.2d 405, 754 N.E.2d 164. Thus, the absence of any allegations

demonstrating that the termination of Plaintiff's prosecution is indicative of her innocence of the charges that were dropped does not preclude her malicious prosecution claim.

25    The Medical Center Defendants rely on decisions that define a favorable termination as one that "involves the merits and indicates the accused's innocence." *MacFawn v. Kresler*, 88 N.Y.2d 859, 644 N.Y.S.2d 486, 666 N.E.2d 1359, 1360 (1996); (*see* Dkt. 55 at 6–7) (citing *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995); *Singleton v. City of New York*, 632 F.2d 185, 193 (2d Cir. 1980), *Fulton v. Robinson*, 289 F.3d 188, 196 (2d Cir. 2002); *Hershey v. Goldstein*, 938 F.Supp.2d 491, 518 (S.D.N.Y. 2013)). However, the Court does not find this authority persuasive in light of *Smith–Hunter*, which implicitly rejected this position in favor of the principle that "a criminal proceeding is terminated favorably to the accused when 'there can be no further proceeding upon the complaint or indictment, and no further prosecution of the alleged offense' ", recognizing only a few exceptions to this rule. *Smith–Hunter*, 95 N.Y.2d at 195–96, 712 N.Y.S.2d 438, 734 N.E.2d 750 (noting as exceptions termination "inconsistent with innocence"; charges withdrawn pursuant to a voluntary compromise with the accused; and charges being dismissed out of mercy requested or accepted by the accused (citing *Robbins v. Robbins*, 133 N.Y. 597, 599, 30 N.E. 977 (1892))). Notably, *Smith–Hunter* also distinguished *MacFawn* on the basis that it involved a dismissal *without* prejudice, which also distinguishes it from the instant case. *Id.* at 197, 712 N.Y.S.2d 438, 734 N.E.2d 750 (noting that *MacFawn* was "[f]ar from controlling in the case at hand" and "simply held that a plaintiff in a malicious prosecution action must show, as a threshold matter, that the criminal proceeding was *finally* terminated.") (emphasis in original).

Though the Court did not factor this into its decision, at the status conference in which the charges against Plaintiff were dismissed, Plaintiff explicitly refused any conditions, *i.e.*, any compromise (Dkt. 63–6, Ex. F at 3:22–24; *see Smith–Hunter*, 95 N.Y.2d at 196, 712 N.Y.S.2d 438, 734 N.E.2d 750 ("noting that an action terminated by settlement cannot sustain a malicious prosecution claim").)

Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 86 of 186
Ying Li v. City of New York, 246 F.Supp.3d 578 (2017)
2017 WL 1208422

**\*\*16** Third, the Medical Center Defendants argue that the termination of Plaintiff's prosecution was an "interest of justice" dismissal and therefore does not constitute a favorable termination. However, the Court cannot make that determination at this stage, because it cannot determine the reason or reasons for the District Attorney's dismissal of the charges against Plaintiff. The Amended Complaint simply alleges that, "Defendants ... caused plaintiff to be prosecuted with malice and without probable cause—*a prosecution that terminated in plaintiff's favor*...." [26] (Am. Compl. ¶ 212 (emphasis added).) Although Plaintiff does not allege the specific disposition of the case, the Court finds she has sufficiently alleged favorable termination to survive a motion to dismiss. *See Rivers v. Towers, Perrin, Foster & Crosby Inc.*, No. 07-cv-5441, 2009 WL 817852, at \*4 (E.D.N.Y. Mar. 27, 2009) ("There is nothing implausible about a bare allegation that the prosecution terminated in plaintiff's favor and hence there is no need to amplify that allegation by pleading specific facts."); *see also Norton*, 47 F.Supp.3d at 161 (reinstating plaintiff's malicious prosecution claim on reconsideration after concluding that the court cannot conclude that the dismissal of the charges was inconsistent with plaintiff's innocence); *McLennon v. New York City*, No. 13-cv-128, 2015 WL 1475819, at \*6 n.16 (E.D.N.Y. Mar. 31, 2015); *Peros v. Castano*, No. CV-01-4457, 2002 WL 603042, at \*4 (E.D.N.Y. Mar. 22, 2002) (stating, "Although there apparently is some uncertainty as to the precise basis of the state court's dismissal of the criminal charges, I cannot say at this point that there is no set of facts on which plaintiff could satisfy the favorable termination element of his claim," when plaintiff's Complaint alleged "[t]hat after the Plaintiff was arraigned on [ ] charges [and] appeared in Court ... the case was finally disposed of by the Court granting the Motion to Dismiss." (citation omitted)); *accord Tommy Hilfiger Lic., Inc. v. Bradlees, Inc.*, No. 99-CIV-4677, 2002 WL 737477, at \*6 (S.D.N.Y. Apr. 25, 2002) (finding that the defendant sufficiently alleged favorable termination to withstand a motion to dismiss because the basis for the dismissal of the criminal action was unclear at that particular stage of litigation) (citation omitted); *Bacquie v. City of New York*, No. 99-CIV-10951, 2000 WL 1051904, at \*3 (denying defendant's motion to dismiss plaintiffs' malicious prosecution claim where the plaintiffs alleged that the charges against them were dismissed by the district attorney's **\*611** motion and where, at the early stage in the litigation, the Court could not tell why the charges had been dropped); *but see Campbell v. Giuliani*, No. 99-cv-2603, 2000 WL 194815, at \*4 (E.D.N.Y. Feb. 16, 2000) ("I find that the bare allegation of dismissal, absent any explanation of the basis on which

the case was dismissed, is insufficient to meet the favorable termination requirement."); *Weaver v. Warrington*, No. 14-cv-7097, 2015 WL 4645298, at \*5 (E.D.N.Y. Aug. 4, 2015) (directing plaintiff to amend the complaint alleging additional facts that make clear whether the dismissal was under circumstances not inconsistent with plaintiff's innocence). It is important to note that while the Court has taken judicial notice of the criminal court records submitted by Plaintiff and the City Defendants, including the transcript of the conference at which Plaintiff's case was dismissed, the Court has only considered those documents to establish the date and fact of the dismissal, but not for the truth of statements made by ADA Bishop at the conference as to why Plaintiff's case was being dismissed. *See Global Network Commc'ns, Inc.*, 458 F.3d at 157 ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.").

[26]      Even if the Court were to consider the City Defendants' Exhibit B, the dismissal hearing transcript, and draws all inferences in favor of Plaintiff—as it must at this stage—the transcript indicates that dismissal of the criminal prosecution was with prejudice. (Ex. F, Dkt. 63–6 at 7:8–9.) While the transcript also includes the prosecution's explanation for why it is dismissing the charges (*see* Ex. F, Dkt. 63–6 at 5:29–6:18), it is inappropriate for the Court to interpret articulated reasons given by the prosecutor as the real motivation for the government's dismissal of the case. *See Liang v. City of New York*, 2013 WL 5366394, at \*5; *see also Nielsen*, 746 F.3d at 62 (noting that the court must draw all reasonable inferences in favor of the plaintiff).

Accordingly, the Court finds that Plaintiff has adequately alleged a favorable termination of her criminal proceedings.

**C. Probable Cause**
The Medical Center Defendants also contend that Plaintiff's malicious prosecution claim must be dismissed because there was probable cause. (Dkt. 55 at 8.) Specifically, they assert that the Amended Complaint's factual allegations regarding Annie's condition when she arrived at FHMC and her subsequent medical test results are sufficient to establish the existence of probable cause at the time criminal proceedings were initiated against Plaintiff. (Dkt. 55 at 8) They also argue that there is a presumption of probable cause unless

the indictment was procured through improper means. (Dkt. 55 at 9.) For the reasons explained below, the Court finds that Plaintiff has rebutted the presumption of probable cause, and that the facts alleged in the Amended Complaint support a plausible inference that there was no probable cause for Plaintiff's prosecution.

[37]    [38]    [39]    As an initial matter, the Court notes that probable cause for malicious prosecution is different from probable cause for false arrest. See *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999) ("The defendants seem to conflate probable cause to arrest with probable cause to believe that [the plaintiff] could be successfully prosecuted. Only the latter kind of probable cause is at issue with respect to the malicious prosecution claim...."). For a malicious prosecution claim, probable cause to prosecute consists of "facts and circumstances [that] would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003) (citing *Colon v. City of New York*, 60 N.Y.2d 78, 82, 455 N.E.2d 1248, 468 N.Y.S.2d 453 (N.Y. 1983)). Probable cause to prosecute is evaluated "in light of the facts known or reasonably believed at the time the prosecution was initiated, as opposed to at the time of arrest." *Drummond v. Castro*, 522 F.Supp.2d 667, 677–78 (S.D.N.Y. 2007) (citations and quotation marks omitted).

**17    [40]    [41]    A grand jury indictment "gives rise to a presumption that probable cause exists" and thereby defeats a claim for malicious prosecution. *Rentas v. Ruffin*, 816 F.3d 214, 220 (2d Cir. 2016) (quoting *McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006)). "If plaintiff is to succeed in his malicious prosecution action after he has been indicted, he must establish that the **612 indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *McClellan*, 439 F.3d at 145 (quoting *Colon*, 60 N.Y.2d at 83, 468 N.Y.S.2d 453, 455 N.E.2d 1248). A plaintiff may demonstrate fraud or perjury through "evidence establishing that the [ ] witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." *Rothstein*, 373 F.3d at 283 (quoting *Colon*, 60 N.Y.2d at 82–93, 468 N.Y.S.2d 453, 455 N.E.2d 1248).

### 1. Rebutting the Presumption of Probable Cause as to the City Defendants

[42]    Plaintiff alleges that the indictment against her was procured by bad faith on the part of the City Defendants. Plaintiff alleges that "the Officer Defendants failed to obtain or disclose evidence inconsistent with plaintiff's guilt, did not document or inform the district attorney's office of exculpatory evidence, falsely reported facts in reports and search warrant affidavits, and fabricated oral statements of witnesses. Officers sought to strengthen their case against plaintiff in order to avoid acquittal, leading them to falsify and omit information in their reports and representations to the district attorney's office." (Am. Compl. ¶ 178; *see also id.* ¶ 181.) More specifically, Plaintiff alleges that "it was apparent from medical evidence that [she] was innocent." (Am. Compl. ¶ 201.) Plaintiff also alleges that Dr. Landi "enthusiastically and with commitment" sought the Lis' prosecution and conviction "despite the lack of any evidence connecting them with any crime whatsoever." (Am. Compl. ¶ 171.) The Amended Complaint further alleges that Dr. Landi misrepresented that the medical evidence conclusively showed Plaintiff's guilt. (Am. Compl. ¶ 208.)

Taking these allegations as true and given the circumstantial nature of the case against Plaintiff, which, in turn, rested almost entirely on Dr. Landi's and Dr. Kupferman's medical conclusions, the Court finds that these allegations are sufficient to rebut the presumption of probable cause created by the grand jury indictment. See *Anilao v. Spota*, 774 F.Supp.2d 457, 494 (E.D.N.Y. 2011) (denying defendant's motion to dismiss finding that plaintiff sufficiently overcame the presumption of probable cause by alleging that the grand jury indictment was based on falsified evidence and testimony in spite of defendant's knowledge of significant exculpatory evidence, and that the defendants agreed to present false evidence to the grand jury); *McLennon*, 2015 WL 1475819, at *8 (finding sufficient allegations similar to Plaintiff's allegations about Defendants procuring indictment in bad faith); *see also Brandon v. City of New York*, 705 F.Supp.2d 261, 273–74 (S.D.N.Y. 2010) (denying summary judgment to defendant with respect to malicious prosecution claim where jury could reasonably find that the indictment was secured through bad faith or perjury).

Accordingly, the Court finds that Plaintiff has sufficiently rebutted the presumption of probable cause.

Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 88 of 186
Ying Li v. City of New York, 246 F.Supp.3d 578 (2017)
2017 WL 1208422

### 2. Rebutting the Presumption of Probable Cause Against the Medical Center Defendants

Plaintiff also sufficiently alleges that the indictments were procured in bad faith by the Medical Center Defendants. For example, Plaintiff alleges that "Defendant FHMC and Kupferman made no efforts to seek a diagnosis other than SBS."[27] (Am. *613 Compl. ¶ 122.) This claim is analogous to an allegation that a police officer failed to obtain evidence inconsistent with a plaintiff's guilt, which has been considered sufficient to allege that an indictment was procured in bad faith. See *McLennon*, 2015 WL 1475819, at *8 (finding bad faith sufficiently alleged where officer defendants accused of, *inter alia*, failing to obtain or disclose evidence inconsistent with plaintiff's guilt and not informing the district attorney's office of exculpatory evidence).

[27]    The Complaint also alleges that "Dr. Kupferman testified to the forensic interrogation she conducted with Ying Li ... [and] deliberately testif[ied] falsely under oath that 'If you read any book, it is a classical case of shaken baby syndrome.' Defendant Kupferman knew that these statements were false and misleading and contrary to all valid and reliable medical evidence." (Am. Compl. ¶ 160.)

**\*\*18  [43]**  While the Court acknowledges that a grand jury witness is entitled to absolute immunity in Section 1983 actions, *Rehberg v. Paulk*, 566 U.S. 356, 132 S.Ct. 1497, 182 L.Ed.2d 593 (2012), the Second Circuit's decision in *Coggins v. Buonora*, 776 F.3d 108 (2d Cir. 2015), provides a clarification of this principle that is applicable to Plaintiff's malicious prosecution claim against Dr. Kupferman. In *Coggins*, the plaintiff was arrested and charged with various felonies based on allegations made by two officers in police paperwork and also verbally to the grand jury. 776 F.3d 108. The Second Circuit affirmed the district court's denial of absolute immunity to one of the police officers because the plaintiff's Section 1983 claims against that officer were based on alleged misconduct "prior to and independent of [the police officer's] perjurious grand jury appearance." *Id.* at 113 ("The fact that [the police officer's] grand jury testimony paralleled information he gave in other contexts does not mean that [plaintiff's] malicious prosecution claim was 'based on' [the officer's] grand jury testimony[;] ... [thus,] the district court properly found that absolute immunity is inappropriate.") Similarly, here, Plaintiff alleges that, separate

and apart from Dr. Kupferman's grand jury testimony, the Medical Center Defendants, including Dr. Kupferman, diagnosed Annie with SBS in bad faith and provided false information about the cause of Annie's death to the prosecutor. (See Am. Compl. ¶¶ 122, 150–52.)[28] Therefore, even assuming that Plaintiff cannot rebut the presumption of probable cause based on Dr. Kupferman's grand jury testimony alone, Plaintiff has done so based on other allegedly wrongful acts by Dr. Kupferman. Accordingly, the Court finds that Plaintiff has rebutted the presumption of probable cause.

[28]    In her Amended Complaint, Plaintiff alleges that despite Annie's "lab results ... consistent with metabolic bone disease[, an alternative explanation for Annie's injuries,] Dr. Kupferman made no effort to seek a diagnosis other than SBS." (Am. Compl. ¶ 122.) Plaintiff also alleges that Dr. Landi falsely "swore under oath in the criminal complaint" as to Annie's death and that her opinion was "largely based on the evidence" presented by Dr. Kupferman. (*Id.* ¶¶ 150–52.) From this, the Court can reasonably infer that Dr. Kupferman also provided false information that eventually was relayed to the prosecutor.

### 3. Amended Complaint Sufficiently Alleges Lack of Probable Cause to Prosecute

For the same reasons just discussed, the Court finds that the allegations in the Amended Complaint are sufficient to create a plausible inference that there was no probable cause to prosecute Plaintiff at the time she was indicted. The case against Plaintiff was almost entirely circumstantial and depended upon the accuracy of the Medical Center Defendants' determination that SBS and the failure to obtain prompt medical attention caused Annie's death. Plaintiff's allegations that both the Medical Center Defendants and the City Defendants *614 failed to obtain evidence that would have contradicted these findings—*i.e.*, that Annie suffered from osteogenesis imperfecta, and that Annie's brain damage was so extensive that prompter medical intervention would not have saved her life—and the resulting communication of false or incomplete information to the prosecutors support a plausible inference that there was no probable cause to prosecute when Plaintiff was indicted.

### D. Malice

[44]  [45]  To plead a malicious prosecution claim, Plaintiff must also allege malice for each of the Defendants. *Manganiello*, 612 F.3d at 160–61. "[M]alice may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff." *Id.* at 163; *see also TADCO Const. Corp. v. Dormitory Auth. of State of New York*, 700 F.Supp.2d 253, 271 (E.D.N.Y. 2010) ("Actual malice requires pleading facts that show the defendant 'commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.' " (citation and quotation marks omitted)); *Manbeck v. Micka*, 640 F.Supp.2d 351, 377 (S.D.N.Y. 2009) ("Malice in this context does not have to be actual spite or hatred." (citation, internal quotation marks, and alteration omitted)); *Newton v. City of New York*, 566 F.Supp.2d 256, 273 (S.D.N.Y. 2008) (Malice is "a wrong or improper motive[.]" (citations and quotation marks omitted)). "[A] lack of probable cause *generally* creates an inference of malice." *Manganiello*, 612 F.3d at 163 (citation and quotation marks omitted) (emphasis added); *see also Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) ("In most cases, the lack of probable cause—while not dispositive —'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause.' " (quoting *Conkey v. State*, 74 A.D.2d 998, 427 N.Y.S.2d 330, 332 (1980))).

### 1. The City Defendants' Malice

**\*\*19**  [46]  [47]  Drawing all inferences in favor of Plaintiff, the Court finds that Plaintiff has adequately pled malice only for Det. Degnan and Dr. Landi. (Am. Compl. ¶ 145 (alleging that Degnan signed the criminal complaint knowing that its content was false and fabricated); *see also* Am. Compl. ¶ 150 (alleging that Dr. Landi swore under oath in the criminal complaint and made a statement that was false, perjurious, and entirely unsupported by any medical science or clinical or forensic evidence).) Plaintiff incorrectly argues that she has "plainly alleged malice" for all Defendants and directs the Court to Paragraph 215 of the Complaint. However, that paragraph is conclusory and is one of the numerous instances where Plaintiff resorts to "group pleading" against all the Defendants. [29] While Paragraph 215 properly alleges an improper motive for her prosecution, *i.e.*, to "us[e] plaintiff as a bargaining chip to pressure Hang Bin Li to plead guilty and covering up defendants' illegal actions in **\*615** knowingly arresting plaintiff without any legal basis, justification, or

probable cause[,]" it fails to allege any facts upon which to plausibly infer that *each* of the City Defendants acted out of this improper motive, and instead categorically states that they *all* had the same improper motive. Such conclusory allegations are not enough to infer malice on the part of all City Defendants. The Court, therefore, finds that malice has been sufficiently alleged only as to Det. Degnan and Dr. Landi.

29      Paragraph 215 states, "Defendants, acting in concert and within the scope of their employment and authority, employed regularly issued process against plaintiff compelling the performance or forbearance of prescribed acts. The purpose of activating the process was intent to harm plaintiff without economic or social excuse or justification, and the defendants were seeking a collateral advantage or corresponding detriment to plaintiff which was outside the legitimate ends of the process. Such collateral objectives included, but were not limited to, using plaintiff as a bargaining chip to pressure Hang Bin Li to plead guilty and covering up defendants' illegal actions in knowingly arresting plaintiff without any legal basis, justification, or probable cause."

### 2. The Medical Center Defendants' Malice

[48]  Notwithstanding Plaintiff's failure to cite to the relevant paragraphs in the Complaint, the Court finds that Plaintiff has adequately alleged malice on the part of the Medical Center Defendants. Plaintiff alleges that Defendants "arrested and imprisoned [her] despite knowing that there was no legal justification ... in order to pressure plaintiff to testify against her husband ... or to put pressure on plaintiff's husband to plead guilty." (Am. Compl. ¶ 196.) More specifically, Plaintiff alleges that "[d]espite lab results showing high alkaline phosphatase and low calcium, consistent with metabolic bone disease," FHMC and Dr. Kupferman "made no effort to seek a diagnosis other than SBS." (Am. Compl. ¶ 122). Plaintiff also alleges, in describing "the interrogations and searches of [the Lis'] home by three separate squads ... [and] forensic interrogations by several medical personnel at Flushing Hospital," that she was treated with "suspicion and unconcealed and unrestrained racism." (Am. Compl. ¶ 114.) Drawing inferences in the light most favorable to Plaintiff, the Court finds that Plaintiff has sufficiently alleged malice on the part of the Medical Center Defendants, based on

their motives in concealing exculpatory medical evidence to enable the prosecutor's use of Plaintiff as a "bargaining chip" against Plaintiff's husband [30] and conducting racially biased "forensic interrogations" of her.

[30]    While Plaintiff may face a steep challenge in ultimately proving that the Medical Center Defendants colluded with the City Defendants to the extent of sharing the alleged goal of using Plaintiff as leverage against her husband, at this stage, the Court finds that she has sufficiently alleged facts to support a plausible inference of such a coordinated effort.

* * *

Accordingly, the Medical Defendants' motion to dismiss the malicious prosecution claim is denied in its entirety, and the City Defendants' motion to dismiss Plaintiff's malicious prosecution claim is denied as to Det. Degnan and Dr. Landi, but is granted as to all other City Defendants. [31]

[31]    The Court discusses *infra* Defendants' claims of immunity with respect to all claims. In sum, the Courts finds that: (1) ADA Bishop is entitled to absolute immunity from all claims; (2) the Officer Defendants and Dr. Landi are not entitled to qualified immunity at this juncture; and (3) Dr. Kupferman is not entitled to statutory immunity. (*See infra* at Section XIII.)

## VI. ABUSE OF PROCESS

**\*\*20** **[49]** **[50]** **[51]**   Plaintiff also asserts a claim of abuse of process under Section 1983 against the City Defendants. [32] As with malicious prosecution, the Court looks to State law for the elements of a Section 1983 abuse of process claim. *Mangino v. Incorporated Village of Patchogue*, 808 F.3d 951, 958 n.5 (2d Cir. 2015) (citing *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) and *Savino v. City of New York*, 331 F.3d 63, 76–77 (2d Cir. 2003)). Under New **\*616** York law, "a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with the intent to do harm without excuse of justification and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino*, 331 F.3d at 76 (quoting *Cook*, 41 F.3d at 80); *Hoffman v. Town of Southampton*, 523 Fed.Appx.

770, 771 (2d Cir. 2013) (summary order) (citing *Savino*, 331 F.3d 63). In the context of an abuse of process claim, "legal process means that a court issued the process, and the plaintiff will be penalized if he violates it." *Cook*, 41 F.3d at 80 (quoting *Mormon v. Baran*, 35 N.Y.S.2d 906, 909 (Sup. Ct. 1942)). So, for example, an arrest executed by the officers for a " 'collateral objective outside the legitimate ends of the process', satisfies the first element of an abuse of process claim." *Crockett v. City of New York*, No. 11-CV-4378, 2015 WL 5719737, at \*10 (E.D.N.Y. Sept. 29, 2015) (citation and quotation marks omitted); *see also Cook*, 41 F.3d at 80 (finding, with respect to abuse of process claim, that New York State Troopers who stopped and arrested plaintiff "clearly employed criminal process against [plaintiff] by having him arraigned on charges" that caused him to be held in custody). Notably, in *TADCO Const. Corp.*, the court found that allegations that defendants "improperly contributed to [plaintiff's] arrest, but not that they took any further actions in his prosecution" were sufficient to withstand a motion to dismiss an abuse of process claim. 700 F.Supp.2d at 272 (recognizing "split of opinion" on whether mere act of issuing process is sufficient for first element of malicious abuse of process claim).

[32]    Plaintiff withdrew her malicious abuse of process claim against the Medical Center Defendants. (*See* 1/7/2016 Minute Entry.)

**[52]** **[53]**   "The crux of a malicious abuse of process claim is the collateral objective element." *Kraft v. City of New York*, 696 F.Supp.2d 403, 416 (S.D.N.Y. 2010), *aff'd*, 441 Fed.Appx. 24 (2d Cir. 2011). To plead a collateral objective, a plaintiff must plausibly plead not that defendant acted with an "improper motive," but rather an "improper purpose": "[A plaintiff] must claim that [the defendant] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino*, 331 F.3d at 77.

**[54]**   The City Defendants argue that Plaintiff's abuse of process claim should be dismissed because the claim accrued at the time of Plaintiff's arrest, and therefore the three-year statute of limitations expired sometime around March 2011. (Dkt. 59 at 21.) The Court, however, finds that because Plaintiff could not have discovered one of the two collateral objectives she alleges until her prosecution was dismissed on January 12, 2013, her complaint in this action was timely filed.

**[55]**   A claim for abuse of process accrues "at such a time as the criminal process is set in motion—typically at arrest—

against the plaintiff. However, accrual cannot be appropriate before such time as plaintiff is aware, or ought to be aware, of those facts providing a basis for his claim." *Duamutef v. Morris*, 956 F.Supp. 1112, 1118 (S.D.N.Y. 1997) (Sotomayor, J.) (citing *Rose v. Bartle*, 871 F.2d 331, 350 (3d Cir. 1989) and *Singleton*, 632 F.2d at 192); *see also Hadid v. City of New York*, No. 15-cv-19, 2015 WL 7734098, at *5 (E.D.N.Y. Nov. 30, 2015) (citing *Duamutef*, 956 F.Supp. at 1118). Unlike the plaintiffs in other cases, Plaintiff in this case does not even allege in the Complaint when she learned of her abuse of process claim. *See, e.g., Duamutef*, 956 F.Supp. at 1118–19 (finding that plaintiff's abuse of process claim was not time-barred because "[a]ccording to the allegations in [plaintiff's] Complaint, plaintiff was unaware that he was being retaliated against until September 28, 1995, when he received an affidavit detailing defendants' intention to stifle his **\*617** political activities through a criminal prosecution"); *Lukowski v. Cnty. of Seneca*, No. 08-cv-6098, 2009 WL 467075, *8 (W.D.N.Y. Feb. 24, 2009) ("The Complaint alleges that plaintiffs learned of the allegedly illegal conduct of the defendants in 'late March 2007, ... after being contacted by Ontario County District Attorney Michael Tantillo[.]' ")

**\*\*21** Here, Plaintiff alleges that Defendants had two collateral objectives for prosecuting her: (1) using her as a "bargaining chip" to get her husband to plead guilty; and (2) covering up their illegal arrest of her. (*See* Am. Compl. ¶ 215). While these two objectives are sufficient to state an abuse of process claim [33], the "cover-up" objective does not provide a basis for finding this claim timely. As the Court has already found in connection with Plaintiff's false arrest claim, Plaintiff believed from the time of her arrest that her arrest was illegal, and thus Plaintiff was aware of or should have been aware of the facts providing a basis for her claim, *Duamutef*, 956 F.Supp. at 1118, that at least one purpose of her prosecution was to cover up this illegal arrest. Were Plaintiff's abuse of process claim based solely on this objective, that claim would have accrued, as the City Defendants maintain, on the date of her arrest, and therefore would be time-barred.

[33]    *See, e.g., Pinter v. City of New York*, 976 F.Supp.2d 539, 569 (S.D.N.Y. 2013) (finding that there was a collateral objective for plaintiff's arrest where the defendant "us[ed] prostitution arrests for leverage in negotiations over nuisance abatement, without any apparent interest in conviction").

However, Plaintiff also alleges that another purpose of her prosecution was to use her as leverage to get her husband

to plead guilty. As to that collateral objective, the Court finds that Plaintiff was not reasonably aware of that possible objective until the dismissal of her case, without any effort to pursue her prosecution during the four years of her pretrial incarceration and only after her husband was convicted. It was only when Plaintiff's case was dismissed, without prosecution and following her husband's conviction, did the objective of using Plaintiff as a "bargaining chip" become clear. [34] Accordingly, the Court finds that Plaintiff's abuse of process claim did not accrue until the date on which her case was dismissed, January 2, 2013, and thus her abuse of process is not time-barred. [35]

[34]    Although Plaintiff has not made this exact argument, the Court has the obligation at this stage to draw all reasonable inferences in Plaintiff's favor. *See Nielsen*, 746 F.3d at 62.

[35]    The Court also rules that, for the time being, her abuse of process claim can proceed on the basis of both collateral objectives, even though, as previously discussed, a claim based solely on the "cover-up" objective would have been time-barred. *See Bacchus v. New York City Bd. of Ed.*, 137 F.Supp.3d 214 (E.D.N.Y. 2015) (finding that "better course" was not to dismiss claim based on same evidence as surviving claims); *Thibodeaux v. Travco Ins. Co.*, 13–CV–5599, 2014 WL 354656, at *2 (E.D.N.Y. Jan. 31, 2014) ("If one of a number of integrally related causes of action have to be tried, it makes little sense to grant a motion to dismiss as to one or more of them, as it may prove necessary to hold yet another trial in the event that it is determined on appeal that the motion to dismiss was improperly granted.").
However, to the extent that Plaintiff argues in her MOL (Dkt. 61) that another "collateral motive ... [for Plaintiff's arrest was to obtain Hang Bin's confession because] such confessions are very valuable to promoting the City's agenda in promoting the truth of SBS science," Plaintiff will not be permitted to pursue this as part of her abuse of process claim, since there is nothing remotely related to this allegation in the Complaint, nor does Plaintiff cite to any paragraph in the Complaint to support this newly proffered objective.

[56]    The Court briefly addresses the City Defendants' two other grounds for **\*618** dismissing Plaintiff's abuse of

Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 92 of 186
Ying Li v. City of New York, 246 F.Supp.3d 578 (2017)
2017 WL 1208422

process claim. First, they contend that neither police officers nor medical examiners, such as Dr. Landi, have the authority to offer and/or to induce defendants to accept plea deals and that, therefore, Plaintiff's abuse of process claim against them fails "as a matter of practicality." (Dkt. 59 at 20.) However, the City Defendants do not cite any legal authority for this contention, and it is unclear to the Court why the police officers and medical examiners would not be liable if they worked with the prosecutors to pursue Plaintiff's prosecution for the purposes of getting Plaintiff's husband to plead guilty or covering up an unlawful arrest. Second, the City Defendants argue that, although "there is a split in the Second Circuit as to whether probable cause is a defense against abuse of process claims", the Court should follow the line of cases finding probable cause to be a complete defense to this claim. (Dkt. 59 at 21 n.17.) The Court declines that invitation, and instead adheres to the view that "[t]he Second Circuit has long recognized that probable cause is not a complete defense to malicious abuse of process." *Goldring v. Zumo*, No. 14–Civ–4861, 2015 WL 148451, at *5 (E.D.N.Y. Jan. 12, 2015). In any event, as the Court has already found, in connection with Plaintiff's malicious prosecution claim, the Amended Complaint contains sufficient allegations from which the absence of probable cause to prosecute Plaintiff can be reasonably inferred.

**\*\*22** **[57]** **[58]** While the Court finds that Plaintiff has sufficiently and timely pled an abuse of process claim, she has not adequately alleged that claim as to all City Defendants. Plaintiff, again, indiscriminately group pleads her abuse of process claim against *all* Defendants. (*See* Am. Compl. ¶¶ 215–217.) As with Plaintiff's malicious prosecution claim, however, her abuse of process claim is only properly pled as to Det. Degnan and Dr. Landi. These are the only City Defendants as to whom Plaintiff has adequately pled involvement in the use of legal process, *i.e.*, arresting and detaining Plaintiff on the basis of allegedly false or incomplete evidence, and thus these are the only Defendants as to whom the pursuit of one or both of the alleged collateral objectives could be plausibly inferred. Although the court in *TADCO Const. Corp.* suggested that individuals who "improperly contributed" to the plaintiff's arrest could be held liable for malicious abuse of process, there, the defendants were alleged to have directly contributed to the plaintiff's arrest. Here, while Dets. Moser, Phelan, and Heffernan are alleged to have participated in the investigation of Plaintiff's case, there is nothing in the Amended Complaint from which to infer that they participated in the actual legal process that was used against Plaintiff, *i.e.*, her arrest and detention. [36]

36    By contrast, as discussed *infra*, the involvement of these detectives in the investigation is sufficient to state a claim against them for Section 1983 conspiracy, unreasonably prolonged detention, and violating some of Plaintiff's substantive due process rights.

Accordingly, Defendants' motion to dismiss Plaintiff's abuse of process claim is denied as to Det. Degnan and Dr. Landi, and granted as to all other City Defendants.

## VII. FAILURE TO INTERVENE

**[59]** The Amended Complaint asserts, as part of Plaintiff's Section 1983 claim, that *all* Defendants failed to prevent other Defendants from violating her constitutional rights not to be subjected to false arrest, malicious prosecution, and abuse of process. Both groups of Defendants argue for dismissal of this claim on the grounds that Plaintiff's claim is based on conclusory allegations. The Court agrees. Moreover, the Court independently **\*619** finds these allegations irreconcilable with Plaintiff's theory of direct participation by each Defendant.

**[60]** **[61]** "It is widely recognized that law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official." *Anderson*, 17 F.3d at 557 (citations omitted). To establish a claim for failure to intervene, a plaintiff must show (1) the officer's failure "permitted fellow officers to violate [plaintiff's] clearly established statutory or constitutional rights," and (2) it was "objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997) (citation and quotation marks omitted). Additionally, Plaintiff must show that the officer had "a realistic opportunity to intervene to prevent the harm from occurring" but failed to do so. *See Cerbelli v. City of New York*, No. 99-CV-6846, 2008 WL 4449634, at *11 (E.D.N.Y. Oct. 1, 2008) (citation and quotation marks omitted).

Plaintiff's failure to intervene claim is dismissed as to all Defendants for two reasons.[37] First, Plaintiff's allegations are merely conclusory.[38] Second, Plaintiff resorts to conclusory generalized allegations asserting her failure to intervene claim against every single Defendant and refers to the numerous defendants collectively. Such conclusory and generalized allegations do not give any of the Defendants "fair notice of what [Plaintiff's] claim is and the grounds upon which it rests." *Jackson v. Onondaga Cnty.*, 549 F.Supp.2d 204, 212 (N.D.N.Y. 2008) (quotation marks omitted); *see* **\*620** *Bouche v. City of Mount Vernon*, No. 11–Civ–5246, 2012 WL 987592, at \*7 (S.D.N.Y. Mar. 23, 2012) (dismissing the plaintiff's failure to intervene claim because the plaintiff "only refer[red] to the defendants in the collective, never identifying which defendants were responsible for specific actions"); *see also Clay v. Cnty. of Clinton*, No. 8:10-cv-00239, 2012 WL 4485952, at \*14 (N.D.N.Y. Sep. 27, 2012) (granting motion for judgment on the pleadings as to plaintiff's failure to intervene claim because the plaintiff "fail[ed] to distinguish which ... Defendant was responsible for actually violating Plaintiff's constitutional rights and which, if any, Defendant failed to intervene to prevent such violations from occurring"). As the district court explained in *Hardy v. City of New York*, No. 12–Civ–17, 2013 WL 5231459, at \*4 (S.D.N.Y. Jul. 9, 2013), "restatement of the legal standard ... does not sufficiently allege constitutional violations in which the [defendants] might have intervened. Where were the [defendants] in relation to Plaintiff and in relation to each other? What impermissible actions did they take? Which officers observed those actions? Plaintiff does not say. Accordingly, he fails to nudge his failure to intervene claim from possible to plausible."

[37]  In addition to the deficiencies the Court discusses here, the City Defendants also argue that the failure to intervene claim is time-barred. (Dkt. 59 at 23.) Specifically, they argue that "because the alleged constitutional violations were being committed 'by other police officers,' and such conduct necessarily would have taken place during or before plaintiff's arrest in March 2008, the three-year statute of limitations has run." (*Id.*) The Court finds this argument unclear and unpersuasive. Plaintiff's Complaint alleges constitutional violations that are not limited to false arrest, and it is conceivable that her constitutional rights were violated after March 2008 since she was in prison—awaiting trial—for

over four years. (Am. Compl. ¶¶ 234, 236.) In any event, because Plaintiff's claim fails to include sufficient factual allegations, the Court cannot even determine whether the statute of limitations has expired as to virtually all of the Defendants. The Court also finds Plaintiff's response to the City Defendants' argument deficient at best. Plaintiff simply recites, in a footnote, the law that the statute of limitations for Section 1983 actions arising in New York is three years and that New York law determines the tolling of the limitations period while federal law determines when the claim accrues. (Dkt. 61 at 21 n.35.) This recitation of boilerplate law is in no way responsive or illuminating on the issue of whether Plaintiff's failure to intervene claim is time barred.

[38]  Plaintiff alleges that "[e]ach individual defendant had an affirmative duty to intervene on behalf of plaintiff, whose constitutional rights were being violated in that defendant's presence by other police officers, but failed to intervene to prevent the unlawful conduct, despite having had a realistic opportunity to do so, in violation of plaintiff's right under the First, Fourth, and Fourteenth Amendments to the United States Constitution." (Am. Compl. ¶ 219.)

**\*\*23** Such a generalized pleading, which fails to differentiate between the Defendants, is especially problematic where, as here, Plaintiff is also alleging that Defendants are all liable under a theory of direct participation.[39] *See Chepilko v. City of New York*, No. 06-CV-5491, 2012 WL 398700, at \*8 n.5 (E.D.N.Y. Feb. 6, 2012) (finding that if a defendant "may be liable under a theory of direct participation, there is no claim against [that defendant] for failure to intervene"); *see also Buchy v. City of White Plains*, No. 14-CV-1806, 2015 WL 8207492, \*3 (S.D.N.Y. Dec. 7, 2015) (same) (citation omitted). Plaintiff's failure to specify which Defendants participated directly in the unlawful conduct, as opposed to failed to intervene in it, is fatal to her claim, even at this stage.

[39]  Indeed, Plaintiff names every Defendant in all but her *Monell* and malicious abuse of process claims. (*See* Compl; *see also* Dkt. 61 at 21 ("Defendant Officers collectively caused Plaintiff's constitutional violations and each of those officers also can be found liable for failing to intervene to

prevent his fellow officers from committing those acts." (citation omitted)).)

Accordingly, Defendants' motion to dismiss with regard to Plaintiff's failure to intervene claim is granted as to all Defendants.[40]

40    Given the deficient pleading of Plaintiff's failure to intervene claim, the Court need not address the Medical Center Defendants' argument that, as a non-governmental hospital and a medical expert who provided testimony and information to the prosecuting authority, they had no affirmative duty to intervene to prevent the alleged false arrest, malicious prosecution, or abuse of process. (*See* Dkt. 55 at 10.)

## VIII. CONSPIRACY

[62]    [63]    [64]    Plaintiff asserts a Section 1983 conspiracy claim against all Defendants. (Am. Compl. ¶¶ 221–223.) "[T]o survive a motion to dismiss on [a plaintiff's] § 1983 conspiracy claim, [the plaintiff] must allege (1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002). "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Id.* (quoting ***621** *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993)). To state a Section 1983 conspiracy claim against a private entity, "the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act."[41] *Id.* at 324 (quoting *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992)). For the reasons stated below, the Court finds that Plaintiff has sufficiently pled a claim of conspiracy against specific City Defendants and the Medical Center Defendants.

41    Given that the parties have not, at this stage, delved into the issue of whether the Medical Center Defendants can be considered "joint actors" that can be held liable under Section 1983, the Court's finding that Plaintiff has adequately pled her conspiracy claim is limited to whether Plaintiff's claim overcomes a 12(b)(6) motion.

[65]    While Plaintiff's pleading of her conspiracy claim is hardly robust, drawing all reasonable inferences in her favor, the Court finds that Plaintiff has adequately pled this claim as to Dets. Degnan, Moser, Heffernan, and Phelan, Dr. Landi, and Dr. Kupferman. The Complaint provides factual allegations that these Defendants acted jointly. For example, Plaintiff alleges that Det. Degnan was present at the autopsy of Annie that Dr. Landi performed (Am. Compl. ¶ 129) and that "Defendant Degnan and Heffernan engaged in lengthy communications with FHMC staff, including Defendant Kupferman" (Am. Compl. ¶ 108). Plaintiff also alleged that Dr. Kupferman joined Dets. Heffernan and Moser in screaming at her during an investigation (Am. Compl. ¶ 115) and that Dr. Landi "made her determination largely based on the evidence presented to her by" Dr. Kupferman and other City Defendants (Am. Compl. ¶ 152). Moreover, Plaintiff alleges that Det. Phelan and Det. Degnan together interrogated the Lis, and participated in the early stages of investigating Plaintiff's criminal case. (*See, e.g.,* Am. Compl. ¶¶ 102–104, 106, 110.)

**\*\*24** Pointing to Plaintiff's allegations in paragraphs 157 and 158 that Dr. Kupferman acted "as a deputy of the NYPD and the Queens County D.A.'s office," the Medical Center Defendants argue that they are "legally incapable of conspiring" with the City Defendants under the intra-corporate conspiracy doctrine. (*See* Dkt. 55 at 11–12.) Plaintiff responds that she has adequately pled facts to support this claim[42] and that "[j]ust because one is alleged to be [sic] State Actor, does not make them members of the NYPD, or break intro-corporate [sic] conspiracy." (*See* Dkt. 66 at 16–17.) In their reply, the Medical Center Defendants clarify that Plaintiff's counsel misconstrues the argument: "[T]he doctrine applies [not simply because Plaintiff alleged that Dr. Kupferman was a state actor but] because plaintiff alleged that Kupferman 'acted as a deputy of the NYPD and the Queen County D.A.'s office[.]' " (Dkt. 56 at ECF 15.)

42    Though making this argument, Plaintiff does not, in fact, provide adequate citation to the Amended Complaint. For example, Plaintiff argues in her MOL that "Dr. Kupferman did not begin her extensive investigation notes imbedded in the medical records until October 25, 2007, two days after police were first notified of possible child abuse." (Dkt. 66 at 16.) However, she fails to provide relevant citation to the Amended Complaint to support this statement.

2017 WL 1208422

**[66]** Under the intra-corporate conspiracy doctrine, "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978) (citation omitted). While the Court must accept the factual allegations **\*622** set forth in the complaint as true, it must also draw all reasonable inferences *in favor* of the plaintiff. *See Nielsen*, 746 F.3d at 62. Here, the Court infers from paragraphs 157 and 158 that Plaintiff is alleging—albeit in exaggerated language —that Dr. Kupferman acted in concert with or "acted as a part of the team" that is the NYPD and the Queens County D.A.'s Office, not that Dr. Kupferman was an actual "employee" of the NYPD or District Attorney's Office. Indeed, any inference that Dr. Kupferman actually worked for those offices is belied by the Amended Complaint's allegations that Dr. Kupferman worked for FMHC. (Am. Compl. ¶ 108.) In *Herrmann*, the case on which the Medical Center Defendants rely, there was no question that all defendants accused of conspiracy belonged to a single corporation. *See* 576 F.2d 453, 459 ("Every one of the defendants ... was either a trustee or faculty member of the Brooklyn Law School[.]") Therefore, at this stage of the proceedings, the Court does not find it appropriate to dismiss Plaintiff's conspiracy claim against Dr. Kupferman based on the intra-corporate conspiracy doctrine.

\* \* \*

Accordingly, the City Defendants' motion to dismiss Plaintiff's conspiracy claim is denied as to Dets. Degnan, Moser, Heffernan, and Phelan, and Dr. Landi, but granted as to all other City Defendants; the Medical Center Defendants' motion to dismiss Plaintiff's Section 1983 conspiracy claim is denied. [43]

[43] Furthermore, to the extent that Dr. Kupferman is alleged to have acted as an agent of FHMC, the hospital is also liable for the Section 1983 conspiracy. *See Niemann v. Whalen*, 911 F.Supp. 656, 664 (S.D.N.Y. 1996) (where bank employees who allegedly violated plaintiff's constitutional rights were acting as agents of defendant bank, plaintiff could bring § 1983 action against bank).

## IX. UNREASONABLY PROLONGED DETENTION

Plaintiff also asserts a Section 1983 claim for unreasonably prolonged detention in violation of her Fourth Amendment rights. (Am. Compl. ¶¶ 225–229.) Specifically, Plaintiff alleges that Defendants' mishandling, concealing, and suppressing of exculpatory evidence, and their intimidation and coercion of witnesses, caused her unreasonably prolonged detention. (*Id.* (citing *Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007).).)

**\*\*25 [67]    [68]** Unreasonably prolonged pretrial detention where exculpatory evidence is readily available can form the basis of a Section 1983 claim against police officers as a violation of the Fourth Amendment's protection against unreasonable seizures. *Russo*, 479 F.3d at 208–09. To state such a claim, Plaintiff must allege that (1) she has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) the actions of the officers violated that right, and (3) the officers' conduct "shocks the conscience." *Russo*, 479 F.3d at 205 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). In *Russo*, the Second Circuit considered the following three factors in determining whether the plaintiff's detention was excessive in violation of the Fourth Amendment: (1) the length of time the plaintiff was incarcerated; (2) the ease with which the exculpatory evidence in the officers' possession could have been checked; and (3) the alleged intentionality of the defendants' behavior. *Id.* at 209.

Applying these standards, the Court finds that Plaintiff has adequately alleged an unreasonably prolonged detention claim against some of the City Defendants, but **\*623** not against the Medical Center Defendants.

### A. The City Defendants

**[69]** The City Defendants argue that this claim should be dismissed because (1) Plaintiff only recites the elements of the cause of action, and (2) Plaintiff cannot allege the third element, *i.e.*, that the alleged conduct "shocks the conscience", because the exculpatory evidence at issue is not equivalent to the exculpatory evidence in *Russo*.

First, the Court disagrees with the City Defendants' contention that Plaintiff only recites the elements of unreasonably prolonged detention and nothing more. In the Amended Complaint, Plaintiff alleges that she was held at Riker's Island Jail for about four years (Am. Compl. ¶¶ 180, 234), and that Defendants "disregarded plainly exculpatory evidence" (Am.

Compl. ¶ 173), "failed to ... disclose evidence inconsistent with plaintiff's guilt" (Am. Compl. ¶ 182), and mishandled and suppressed "exculpatory ... evidence" (Am. Compl. ¶ 225). Had Plaintiff only alleged this, her claim would have been conclusory. However, Plaintiff provides specifics regarding these broad allegations. For example, she alleges that Defendants mishandled evidence that "Annie's injuries could have been caused by osteogenesis imperfecta or other natural causes" (Am. Compl. ¶ 137), and that Dr. Landi's statement was "entirely ... unsupportable by any medical science" (*see* Am. Compl. ¶ 150). She also alleges that Dr. Landi withheld exculpatory evidence (Am. Compl. ¶ 154), falsely "swore under oath in the criminal complaint" that the Lis could have prevented Annie's death by getting her prompt medical attention the night she died (Am. Compl. ¶ 150), and "ignored signs of rib anterior flaring, and [the need for] any kind of thorough eye [sic] exam for eyes, or bones." (Am. Compl. ¶ 152.) To the extent that Dets. Degnan, Moser, Phelan, and Heffernan took an active role in investigating the Lis, the Court can infer that any exculpatory evidence concealed by Dr. Landi was also known by these Officer Defendants. From these allegations, the Court can plausibly infer that these City Defendants failed to disclose medical evidence that would have contradicted Dr. Landi's diagnosis and thus suppressed evidence that would have exculpated Plaintiff sooner.

[70] Second, the Court disagrees with the City Defendants' contention that the exculpatory evidence in this case—*i.e.*, that Annie could not have been saved even if medical care was sought out sooner or that she died due to a condition other than SBS—is not equivalent to the definitive and conclusive exculpatory evidence contemplated by the Second Circuit in *Russo*. (Dkt. 59 at 25.) The failure to obtain or disclose evidence that is only arguably exculpatory does not shock the conscience. *See, e.g., Wilson v. City of New York*, 480 Fed.Appx. 592, 595 (2d Cir. 2012) (summary order) (distinguishing *Russo* because the evidence in *Wilson* was conflicting and some of the testimonial evidence at issue identified the defendant as an accomplice to the charged crime). In *Russo*, the exculpatory evidence at issue was a video surveillance tape that showed the perpetrator of the robbery in question without tattoos on his arms; Russo, who was arrested for the robbery, had distinctive tattoos covering his arms and repeatedly alerted the defendant-officers that the surveillance video would establish his innocence. *Id.* at 200. Here, the exculpatory evidence that Plaintiff alleges was concealed is the *absence* of any medical support for the charge that she caused Annie's death by SBS. (*Id.* ¶¶ 150, 135

(asserting that charge of SBS was "*entirely* ... unsupportable by *any* medical science," that the "there was *no* evidence, and *no reasonable basis* to believe, that plaintiff had any time *624 engaged in any conduct which could have caused or contributed to Annie's injuries and death," and that "there was *no* clinical or diagnostic medical evidence to support a finding of SBS [based on Annie's condition]." (emphasis added)).) Although the Amended Complaint is not a model of clarity, the Court infers that Plaintiff's unreasonably prolonged detention claim is based on the allegation that the City Defendants knew from conversations with, or information provided by, the Medical Center Defendants that there was no medical support for the conclusion that Annie died from SBS or that earlier medical intervention could have prevented her death—conclusions that were central to the case against Plaintiff—and that the City Defendants concealed this information for over four years while Plaintiff remained in prison. At this stage of the litigation, the Court takes these allegations as true—*i.e.*, that there was definitive and conclusive exculpatory evidence—and finds that Plaintiff has adequately pled the third element of her unreasonably prolonged detention claim. [44]

[44]      While the City Defendants cite to a string of cases in support of their argument that Plaintiff has failed to adequately plead a claim of unreasonable detention (*see* Dkt. 59 at 26), the courts in those cases dismissed the claim either at the stage of summary judgment or after a trial was conducted. *See Nzegwu v. Friedman*, No. 10-CV-02994, 2014 WL 1311428 (E.D.N.Y. Mar. 31, 2014); *Harewood v. Braithwaite*, 64 F.Supp.3d 384 (E.D.N.Y. 2014); *Thompson v. City of New York*, 603 F.Supp.2d 650 (S.D.N.Y. 2009); *Jackson v. City of New York*, 29 F.Supp.3d 161 (E.D.N.Y. 2014). Citations to such cases are not persuasive.

**26 Accordingly, the City Defendants' motion to dismiss Plaintiff's unreasonably prolonged detention claim is denied as to Dets. Degnan, Moser, Phelan, and Heffernan, and Dr. Landi, but granted as to all other City Defendants.

### B. The Medical Center Defendants
The Medical Center Defendants contend that Plaintiff cannot state a claim for unreasonably prolonged detention against Dr. Kupferman because that claim can only be brought against law enforcement officers. (Dkt. 55 at 12.) Plaintiff, citing no legal authority, argues that the Second Circuit's holding in *Russo* should be extended to non-law-enforcement officials.

(Dkt. 66 at 19.) Plaintiff also argues that as long as the defendant acted under color of state law, that defendant is subject to an unreasonably prolonged detention claim recognized by the court in *Russo.* The Court disagrees with Plaintiff's overly expansive and unsupported reading of *Russo*.

In *Russo*, the Second Circuit specifically stated that a plaintiff has a right to be free from prolonged detention "stemming from *law enforcement officials'* mishandling or suppression of exculpatory evidence...." *See Russo*, 479 F.3d at 205 (emphasis added). Indeed, all three prongs of the test for determining whether an unreasonably prolonged detention has occurred expressly references conduct by a law enforcement officer. *See id.* There is nothing in *Russo* or any case applying *Russo* that suggests that non-State individuals or entities can be held liable for unreasonably prolonged detention. *See, e.g., Jackson v. City of New York*, 29 F.Supp.3d 161, 178 (E.D.N.Y. 2014) ("*Russo* has been narrowly construed to involve situations where a law enforcement official has mishandled or suppressed readily available exculpatory evidence...."); *Harewood v. Braithwaite*, 64 F.Supp.3d 384, 401–03 (E.D.N.Y. 2014); *Thompson v. City of New York*, 603 F.Supp.2d 650, 656 (S.D.N.Y. 2009); *Wilson v. City of New York*, 480 Fed.Appx. 592, 594–95 (2d Cir. 2012) (summary order); *Nelson v. Hernandez*, 524 F.Supp.2d 212, 224–25 (E.D.N.Y. 2007). Nor does Plaintiff cite any such case law.

**\*625** Accordingly, the Medical Center Defendants' motion to dismiss Plaintiff's unreasonably prolonged detention claim as to them is granted in its entirety.

## X. DUE PROCESS

[71] Under the Due Process Clause of the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. This prohibition applies to municipalities. *See Horvath v. Westport Library Ass'n*, 362 F.3d 147, 151 (2d Cir. 2004) (stating that the Fourteenth Amendment due process right applies only to government entities whose action may be fairly attributed to the State).

[72]   [73]   [74]   [75] The Due Process Clause was "intended to secure the individual from the arbitrary exercise of the powers of government." *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (quoting *Hurtado v. California*, 110 U.S. 516, 527, 4 S.Ct. 292, 28 L.Ed. 232 (1884)). Procedural due process requires that

government action depriving an individual of substantial interest in life, liberty, or property "be implemented in a fair manner." *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Substantive due process, as recognized by the Supreme Court, bars "certain government actions regardless of the fairness of the procedures used to implement them," in order to "prevent governmental power from being used for purposes of oppression." *Daniels*, 474 U.S. at 331, 106 S.Ct. 662 (citation and quotations marks omitted); *McClary v. O'Hare*, 786 F.2d 83, 88 (2d Cir. 1986). "In other words, while a procedural due process claim challenges the procedure by which [deprivation of liberty] is effected, a substantive due process claim challenges the 'fact of the [deprivation'] itself." *See Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2012) (alteration in original omitted) (differentiating a procedural due process claim from a substantive due process claim); *see also Kerry v. Din*, ──── U.S. ────, 135 S.Ct. 2128, 192 L.Ed.2d 183 (2015) ("[T]here are two categories of implied rights protected by the Due Process Clause: really fundamental rights, which cannot be taken away at all absent a compelling state interest; and not-so-fundamental rights, which can be taken away so long as procedural due process is observed.").

**\*\*27** The Court interprets Plaintiff's due process claim, set forth in her seventh cause of action, to be based on the alleged (1) concealment of exculpatory evidence, *i.e.*, a *Brady* violation (Am. Compl. ¶¶ 232–233), (2) fabrication of evidence (*id.*), (3) failure to investigate (Am. Compl. ¶ 235), (4) violation of the right to a speedy trial (Am. Compl. ¶ 234), and (5) violation of the right to be treated with dignity during her pretrial detention (¶ 236). While Plaintiff does not clearly articulate which due process claims are procedural and which are substantive, the Court interprets the first two claims, regarding the mishandling of evidence, to be procedural [45], and the others to be substantive.

[45]

> "The Supreme Court has never definitively held whether *Brady* is based on substantive or procedural due process. Nevertheless, it seems clear that it is a procedural due process aspect of the criminal defendant's right to a fair trial." Martin A. Schwartz, *The Supreme Court's Unfortunate Narrowing of the Section 1983 Remedy for Brady Violations*, Champion, May 2013 at 58, 59. As for Plaintiff's fabrication of evidence claim, it is unclear whether Plaintiff characterizes it as a procedural or substantive due process claim.

(*See* Dkt. 66 at 20 ("Dr. Kupferman's actions [of fabricating evidence, *inter alia*,] deprived Plaintiff of the right to a fair trial under the doctrine of *procedural* due process." (emphasis added)); *but see* Dkt. 61 at 24–25 (first laying out the law of substantive due process and then immediately following it with a discussion of Plaintiff's claim of fabrication of evidence, among other claims).) Regardless, courts in this Circuit have characterized the right to be protected against the deprivation of liberty based on fabricated evidence as a procedural due process issue. *See Coffey*, 221 F.3d at 348–49 (the use of fabricated evidence amounts to a deprivation of liberty without due process); *see also Jean–Laurent v. Bowman*, No. 12-cv-2954, 2014 WL 4662221, at *12 (E.D.N.Y. Jul. 7, 2014); *Zachary v. City of Newburgh*, 13–cv–5737, 2014 WL 1508705, at *4–5 (S.D.N.Y. Apr. 1, 2014) (dismissing plaintiff's substantive due process claim but finding that plaintiff alleged a procedural due process claim based on fabricated evidence); *Maldonado v. City of New York*, No. 11-cv-3514, 2014 WL 787814, at *12 (S.D.N.Y. Feb. 26, 2014) (dismissing plaintiff's substantive due process claim but noting that plaintiff's fabrication of evidence claims may proceed "via the Fourth Amendment and the procedural component of the Fourteenth Amendment's Due Process Clause"); *Pinter v. City of New York*, 976 F.Supp.2d 539, 576 (S.D.N.Y. 2013) (recognizing a separate "fabrication-based due process claim").

**\*626 A. Procedural Due Process**

[76]     [77]   A procedural due process violation occurs when the government deprives a person of a protected life, liberty, or property interest without first providing notice and an opportunity to be heard. *See B.D. v. DeBuono*, 130 F.Supp.2d 401, 432–33 (S.D.N.Y. 2000). "To determine whether a Section 1983 due process claim is plausibly alleged, the Court evaluates the sufficiency of the allegations with respect to the liberty or property interest alleged and the process due before deprivation of that interest." *Norton v. Town of Islip*, 97 F.Supp.3d 241, 266 (E.D.N.Y. 2015); *see also Ciambriello*, 292 F.3d at 313.

[78]     [79]     [80]   Here, Plaintiff has asserted Section 1983 due process claims that are often referred to as fair trial claims. "A fair trial claim is a civil claim for violations of a criminal defendant's Fourteenth Amendment due process

rights." *Fappiano v. City of New York*, 640 Fed.Appx. 115, 118 (2d Cir. 2016) (citing *Ramchair v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010)). A defendant's right to a fair trial is violated when exculpatory evidence is withheld, *i.e.*, when a *Brady* violation occurs (*see Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)), and also when an officer forwards fabricated evidence to prosecutors, *Ricciuti*, 124 F.3d at 130. "A plaintiff need not have gone to a full trial on the merits in order to have an actionable Section 1983 claim based on the denial of a fair trial." *Marom v. City of New York*, No. 15-CV-2017, 2016 WL 916424, at *9 (S.D.N.Y. Mar. 7, 2016); *see Ricciuti*, 124 F.3d at 127 (plaintiffs who brought a Section 1983 claim for right to a fair trial had their criminal charges dismissed pretrial).

**\*\*28**  The Court finds that Plaintiff has adequately alleged fair trial claims against Dets. Degnan, Moser, Phelan, and Heffernan, Dr. Landi, and the Medical Center Defendants.

### 1. *Brady* violation claim

[81]     [82]   The Supreme Court held that a prosecutor violates a criminal defendant's due process right when the prosecutor fails to disclose favorable material to the defendant, "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. 1194; *see also Poventud v. City of New York*, 750 F.3d 121, 155 (2d Cir. 2014) ("[T]he constitutional right defined by *Brady* ... is the criminal defendant's procedural due process right to the disclosure of 'evidence that is material to his guilt or punishment.' ") (quoting *Cone v. Bell*, 556 U.S. 449, 469, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009)). Police officers also "can be held liable for *Brady* due process violations under § 1983 if they withhold exculpatory evidence from prosecutors." *Bermudez v. City of New York*, 790 F.3d 368, 376 n.4 (2d Cir. 2015). **\*627**  Once a police officer turns over exculpatory evidence to the prosecutor, that officer satisfies his obligations under *Brady*. *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992) ("It is appropriate that the prosecutors, who possess the requisite legal acumen, be charged with the task of determining which evidence constitutes *Brady* material that must be disclosed to the defense."); *see also Blake v. Race*, 487 F.Supp.2d 187, 215–16 (E.D.N.Y. 2007) (noting that the Second Circuit had extended the *Brady* obligations to police officers in that they are required to turn exculpatory evidence over to the prosecutors).

[83]    [84] "A classic *Brady* violation contains three elements: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' " *Fappiano v. City of New York*, 640 Fed.Appx. 115, 118 (2d Cir. 2016) (summary order) (quoting *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004)). "To establish prejudice, a plaintiff must show the evidence was material; i.e., whether the 'evidentiary suppression undermines confidence in the outcomes of the trial.' " *Id.* at 118 (quoting *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001)).

 [85]    Here, Plaintiff has sufficiently pled her *Brady* violation claim against Dets. Degnan, Moser, Phelan, and Heffernan, Dr. Landi, and Dr. Kupferman. [46] The Amended Complaint states that "the Officer Defendants failed to ... disclose evidence inconsistent with plaintiff's guilt, *did not document or inform the district attorney's office of exculpatory evidence*, [and] falsely reported facts in reports and search warrant affidavits." (Am. Compl. ¶ 178 (emphasis added).) Plaintiff also alleges that Defendants "*maliciously* concealed *material* exculpatory evidence" (Am. Compl. ¶ 233 (emphasis added)), and that prejudice ensued because it resulted in her arrest (Am. Compl. ¶ 238). In addition, as previously discussed, the Amended Complaint describes the nature of this exculpatory evidence as relating to the false conclusions of Dr. Landi and/or Dr. Kupferman regarding the causes of Annie's death, which implicated Plaintiff and her husband in their daughter's death. (*Id.* ¶¶ 150, 152, 164.)

[46]    Plaintiff's due process claim under *Brady* is distinct from her malicious prosecution claim. *See Fappiano*, 640 Fed.Appx. at 120–21 (differentiating plaintiff's malicious prosecution claim from his "fair trial" claim stemming from defendants alleged *Brady* violation); *Alexander v. McKinney*, 692 F.3d 553, 556–57 (7th Cir. 2012) (listing the elements of a malicious prosecution claim and the elements of a due process claim under *Brady*, and identifying lack of probable cause as a requirement only of the former).

### 2. Fabrication of Evidence claim

 **29    [86]    Separate from her malicious prosecution claim, Plaintiff alleges a procedural due process violation based on

Defendants' alleged fabrication of evidence. (*See* Am. Compl. ¶ 233.) [47] The claim of denial of the right to a fair trial due to fabricated evidence stems from the Sixth Amendment and the Due Process clauses of the Fifth, Sixth, Fourteenth Amendments of the U.S. Constitution. *See Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986); *Zahrey v. City of New York*, No. 98-4546, 2009 WL 1024261, at *16 (S.D.N.Y. Apr. 15, 2009) (characterizing plaintiff's right to a fair trial claim as an action for violation of his right to procedural **\*628** due process rooted in the Fifth, Sixth, and Fourteenth Amendments). Fabrication of evidence constitutes a violation of this right to a fair trial. *Coffey*, 221 F.3d at 344 ("[T]here is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity, at least where the officer foresees that he himself will use the evidence with a resulting deprivation of liberty."); *Brandon v. City of New York*, 705 F.Supp.2d 261, 276 (S.D.N.Y. 2010) (noting that the Second Circuit has permitted "claims for both malicious prosecution and a denial of his right to trial based on the same alleged fabrication of evidence") (citing *Ricciuti*, 124 F.3d at 130–31); *see also Zahrey*, 2009 WL 1024261, at *8 n.14 (S.D.N.Y. Apr. 15, 2009) ("Because evidence fabrication serves to both improperly charge and/or arrest a plaintiff as well as unfairly try him, the *Coffey* violation, in its essence, involves aspects of both the Fourth Amendment and procedural due process."); *Myers v. Cnty. of Nassau*, 825 F.Supp.2d 359, 367 (E.D.N.Y. 2011) (noting that when a police officer turned over fabricated evidence to the prosecutor, such conduct can be redressed, not as a *Brady* violation, but as a deprivation of liberty on the basis of false and fabricated evidence).

[47]    Specifically, Plaintiff alleges that Defendants "created and fabricated evidence to create the appearance of probable cause to believe that plaintiff had abused her daughter[,] ... [and] developed and cultivated witnesses to testify falsely...." (Am. Compl. ¶ 233.)

 [87]    To state a claim of fabrication of evidence, a plaintiff must allege that "an (1) investigating official (2) fabricat[ed] information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 280 (2d Cir. 2016).

### a) The City Defendants

[88]  The City Defendants assert that Plaintiff's fabrication of evidence claims should be dismissed for three reasons: (1) none of the City Defendants could have possibly fabricated the SBS medical evidence, and the Complaint does not credibly allege that Dr. Landi "fabricated" evidence of SBS; (2) ADA Bishop is absolutely immune from the claims; and (3) the claims are time-barred, because Plaintiff was always aware of her theory that Annie died from a genetic disorder and not from any action taken by Plaintiff or her husband. (Dkt. 59 at 27–28.) Plaintiff provides a somewhat haphazard analysis in response and argues, "[Det.] Degnan states 'that he was informed by Dr. Landi that earlier medical attention for the complainant could have resulted in the complainant's survival, and that the lack of immediate medical attention contributed to the complainant's death' .... Whether such a statement was fabricated is discoverable." (Dkt. 61 at 25 (citing Plaintiff's Exhibit B, Criminal Court Complaint in *People v. Ying Li* )). Notwithstanding Plaintiff's cursory response to the City Defendants' arguments, the Court finds that Plaintiff has adequately alleged a plausible claim of fabrication of evidence against Dets. Degnan, Moser, Heffernan, and Phelan, and Dr. Landi.

Although Plaintiff fails to identify the relevant paragraphs of the Amended Complaint, except for Paragraph 233, the Amended Complaint does contain allegations of fact that support her fabrication of evidence claim with regard to these City Defendants. (*See* Am. Compl. ¶¶ 145, 146, 150, 160, 178.) Specifically, Plaintiff alleges that Det. Degnan signed the criminal court complaint in spite of his knowing that its content was not true (Am. Compl. ¶ 145), that Plaintiff was arraigned based on the fabricated information Defendants forwarded to the District Attorney's Office (Am. Compl. ¶ 146), and that Defendants "falsely reported facts in reports and search warrant affidavits, and fabricated oral statements of witnesses." (Am. Compl. **\*629** ¶ 178.)[48] Plaintiff also alleges that Dr. Landi swore under oath in the criminal complaint that had Annie received medical care sooner, she could have survived—a fact that was, according to the Complaint, "false, misleading, and perjurious, and entirely unsupported ... by any medical science...." (Am. Compl. ¶ 150.) At this stage of the litigation, the Court takes these allegations as true—*i.e.*, that the content of the criminal complaint, reports, and search warrant affidavits contained false information that certain City Defendants knowingly provided and/or swore to—and finds that Plaintiff

has adequately pled her fabrication of evidence claim against Dets. Degnan, Moser, Heffernan, and Phelan, and Dr. Landi.

[48]  As previously discussed, because the Amended Complaint does not allege direct involvement by all Defendants in the investigation of Plaintiff's case, these group pleadings are insufficient in themselves to state a fabrication of evidence claim as to those City Defendants as to whom there are no specific allegations of involvement.

### b) The Medical Center Defendants

**\*\*30**  [89]  As previously discussed (*see supra* Sections X.A.1), Plaintiff has alleged that Dr. Kupferman ignored evidence suggesting that Annie's death was not caused by SBS and provided false information to Dr. Landi, who based her conclusions on that false information.

Although the Medical Center Defendants argue that "the [Amended] Complaint does not contain an allegation regarding violation of plaintiff's right to a fair trial" (*see* Dkt. 56 at 10), the Court disagrees, given the numerous allegations of fabrication of evidence and Dr. Kupferman's alleged failure to consider Annie's lab results that were consistent with metabolic bone disease. (*See* Am. Compl. ¶¶ 122, 145, 146, 150, 178, 232, 233.) Even though, as the Medical Center Defendants point out, the Amended Complaint does not specifically mention the Fifth Amendment, the Court finds that the factual allegations in the complaint have given the Medical Center Defendants sufficient notice of this claim.[49]

[49]  The Medical Center Defendants also assert that even assuming that Dr. Kupferman diagnosed Annie with SBS and that she failed to consider alternative causes for Annie's death, Dr. Kupferman cannot be liable for violating Plaintiff's right to a fair trial because Plaintiff's indictment was based on her failure to seek timely medical attention and not based on Dr. Kupferman's opinions on the cause of Annie's death. (Dkt. 56 at 10.) The Court this argument unpersuasive as it is plausible that Dr. Kupferman's conclusion that Annie died of SBS proximately caused Plaintiff's indictment for failure to seek medical attention sooner.

Case 5:24-cv-00522-BKS-TWD   Document 15   Filed 10/25/24   Page 101 of 186
Ying Li v. City of New York, 246 F.Supp.3d 578 (2017)
2017 WL 1208422

3. Statute of Limitations With Respect to Fair Trial Claims

Having found that Plaintiff adequately pled both her *Brady* violation and fabrication of evidence claim against the City Defendants and the Medical Center Defendants, the Court turns to those Defendants' argument that these claims are time-barred (*see* Dkt. 59 at 28). The City Defendants contend that Plaintiff's fair trial claim accrued at the time of her arrest because "she was always aware of her theory that her baby died from a genetic disorder and not any action taken by plaintiff or her husband." (*Id.*) In response to this argument, Plaintiff simply states, without citing any legal authority, that her procedural due process claim is not time barred because "Federal equitable tolling standards should apply." (Dkt. 61 at 25.) Plaintiff makes no other argument. Notwithstanding Plaintiff's inadequate response, the Court finds the City Defendants' argument unpersuasive.

 **[90]** **[91]** Fabrication of evidence claims accrue "when the plaintiff learns that evidence was fabricated and an injury was **\*630** caused by the fabrication." *Carr v. City of New York*, No. 11–Civ–6982, 2013 WL 1732343, at *6 (S.D.N.Y. Apr. 19, 2013) ("[P]laintiff arguably learned of the alleged fabrication as soon as the criminal complaint was filed and certainly no later than when [the defendant] took the stand at [ ] trial...."); *see also Garnett v. Undercover Officer C0039*, No. 13-cv-7083, 2015 WL 1539044, at *4 (S.D.N.Y. Apr. 6, 2015) ("[A fabrication of evidence] claim accrues when the officer forwards the false information to the prosecutors."). Because the statute of limitations is an affirmative defense, "[t]he burden is on the defendant to establish when a federal claim accrues." *Gonzalez v. Hasty*, 651 F.3d 318, 322 (2d Cir. 2011).

 **\*\*31** **[92]** Here, the Court finds that the City Defendants have not established that Plaintiff knew all along that she had *Brady* violation and fabrication of evidence claims simply because she believed in her innocence; the City Defendants' contrary assertion is too sweeping. At a January 2, 2013 status conference, Plaintiff learned that ADA Bishop moved to dismiss the criminal charges against Plaintiff because Dr. Kupferman informed ADA Bishop that Annie's brain injuries were so severe that immediate medical intervention would likely not have saved her. (*See* Dkt. 63 at Ex. F at ECF 6.) Therefore, it is plausible to infer that in January 2013 Plaintiff specifically learned that she might have a fabrication of evidence claim against the City Defendants based on Dr. Landi's earlier contrary assessment of how Plaintiff was

responsible for Annie's death, in part, because Plaintiff failed to get medical attention for her daughter quickly enough. *See Mitchell v. Home*, 377 F.Supp.2d 361, 373 (S.D.N.Y. 2005) ("[A] fair trial claim premised on fabrication of evidence accrues when the plaintiff learns or should have learned that the evidence was fabricated and such conduct causes the claimant some injury[.]") (citing *Veal v. Geraci*, 23 F.3d 722, 724–25 (2d Cir. 1994)); *see also Bailey v. City of New York*, 79 F.Supp.3d 424, 444 (E.D.N.Y. 2015) (same). [50]

[50]       This conclusion is not inconsistent with the Court's finding that the fact that Plaintiff might not have known until long after her arrest that there was evidence that could have supported her claim of innocence—such as Dr. Kupferman's contrary conclusion about the preventability of Annie's death—did not warrant equitable tolling. *See supra* at Section IV.B. In analyzing specifically the accrual of a fabrication of evidence claim, when Plaintiff learned of the alleged fabricated evidence *is* the triggering date, but not so for a claim of false arrest or malicious prosecution.

As for Plaintiff's *Brady* violation claim, the Court cannot assess when it was that the claim could have plausibly accrued because Plaintiff does not specifically allege what exculpatory evidence the City Defendants concealed. However, because the City Defendants have the burden of establishing that the statute of limitations has expired, and in light of the cursory argument put forth by the City Defendants, the Court denies the City Defendants' motion to dismiss Plaintiff's fair trials claims on statute of limitations grounds with respect to Dets. Degnan, Moser, Phelan, Heffernan, and Dr. Landi. For the reasons previously discussed, the Medical Center Defendants' motion to dismiss Plaintiff's fair trials claims against them is also denied.

**B. Substantive Due Process**
 **[93]** **[94]** **[95]** **[96]** "[D]ue process protection in the substantive sense limits what the government may do in both its legislative, and its executive capacities...." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (citing *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) and **\*631** *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)). "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 273, 114

S.Ct. 807, 127 L.Ed.2d 114 (1994). "[C]riteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue." *Cnty. of Sacramento*, 523 U.S. at 845, 118 S.Ct. 1708. "[F]or executive action to violate substantive due process, it must be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Bolmer v. Oliveira*, 594 F.3d 134, 142 (2d Cir. 2010) (citation and quotations marks omitted). "It is not enough that the government act [was] 'incorrect or ill-advised[.]' " *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011) (quoting *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995)). "Only the most egregious official conduct can be said to be arbitrary in the constitutional sense and therefore unconstitutional." *Id.* (citation and quotation marks omitted).

### 1. Failure to Investigate

Against the Medical Center Defendants and Dr. Landi, Plaintiff asserts a claim best characterized as a claim of failure to investigate, in violation of Plaintiff's substantive due process rights. (*See* Am. Compl. ¶ 235; *see also* Dkt. 66 at 20.) [51] More specifically, this claim is based on the argument that the Medical Center Defendants and Dr. Landi failed to "exhaust all possibilities" before rendering an SBS diagnosis, and therefore violated Plaintiff's liberty. (*See* Dkt. 66 at 20–21; Am. Compl. ¶ 238 ("Defendants' conduct precipitated and caused the sequence of events that ultimately resulted in the deprivation of plaintiff's liberty....").)

[51]    The City Defendants interpret Paragraph 235 of the Amended Complaint as stating a claim of professional malpractice, and argues that "such a claim is not cognizable under § 1983." (Dkt. 59 at 28–29; *id.* at 26 ("For good measure, [Plaintiff] appears to include a professional malpractice claim of sorts against defendants Landi, Kupferman and FHMC....").) This is a misunderstanding of Plaintiff's allegation. A more suitable reading of Plaintiff's allegation in Paragraph 235 would be that it is touching on the "professional judgment" standard that is discussed in the context of substantive due process claims. The Supreme Court has articulated this "professional judgment" standard in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). The Supreme Court held in *Youngberg* that State officials

are liable for treatment decisions concerning involuntarily committed mental health patients only if the officials' decisions were "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323, 102 S.Ct. 2452 (citation and quotation marks omitted).

**\*\*32** Both groups of Defendants contend that all of Plaintiff's substantive due process claims are solely based on Plaintiff's Fourth Amendment claims of false arrest, malicious abuse of process, and conspiracy, and thus are duplicative of her Fourth Amendment claims and should be dismissed. (*See* Dkt. 55 at 14; Dkt. 56 at 10; Dkt. 59 at 26.) Plaintiff responds that "the Fourth Amendment does not 'cover a cause of action for government abuse of process in the investigation or pursuit of a suspect', and that she therefore has a separate, standalone substantive due process claim against certain Defendants for failing to investigate other explanations for Annie's death before concluding that she died from SBS. (Dkt. 66 at 20 (citing *Russo v. City of Hartford*, 184 F.Supp.2d 169, 184 (D. Conn. 2002)).)

[97]    [98]    "The right [to be free from arbitrary government action,] to the extent it exists, is the right to be free of arbitrary **\*632** government action *that infringes a protected right.*" *O'Connor v. Pierson*, 426 F.3d 187, 200 n. 6 (2d Cir. 2005). Here, Plaintiff does not provide adequate legal support for her assertion of a substantive due process right to have investigating officials "exhaust all possibilities" that could have explained the cause of Annie's death before concluding that it was SBS. (*See* Dkt. 66 at 20–21.) [52] Moreover, even though Plaintiff attempts to distinguish her substantive due process claim from her Fourth Amendment claims, Plaintiff's failure to investigate claim, at the end of the day, is based on her substantive due process right to be free of prosecution and arrest *without probable cause.* [53] *Cf. Campbell*, 2000 WL 194815, at \*3 ("allegations of an officer's failure to investigate are considered under the rubric of false imprisonment, false arrest, or malicious prosecution."). This is evidenced by Plaintiff's own brief and the Amended Complaint, which both state that Defendants' failure to investigate "effectuated Plaintiff's arrest." [54] (Dkt. 66 at 22.)

[52]    In her MOL, Plaintiff argues that, "Plaintiff properly pleads that [the Medical Center] Defendants failed to exhaust all possibilities before rendering an SBS diagnosis and adopted

an improper burden shifting presumption that presumes subdural hemorrhaging is caused by abuse. (FAC ¶¶ 122, 160, 208, 235, 257)…. Kupferman's actions shocked the conscious [sic] because Plaintiff had the right to liberty protected under the Fifth Amendment and Kupferman and FHMC acted 'so outrageous [sic], that it may fairly be said to shock the contemporary conscience.' " (Dkt. 66 at 20–21 (citation omitted).) Plaintiff cites to one Middle District of Pennsylvania case, *Isbell v. Bellino*, 983 F.Supp.2d 492 (M.D.P.A. 2012), but does not discuss the case. Setting aside the fact that this case is not Second Circuit law, *Isbell* does not even support a finding that the protection of substantive due process creates an obligation for a government official to follow alternative investigatory paths. Indeed, the court in *Isbell* concluded that where the plaintiff went "to the emergency room with an infant suffering from subdural hematomas, retinal hemorrhaging, reinoschisis, and rib fractures ... [and] the injuries were later revealed to have been caused by a Vitamin D deficiency and congenital rickets," the defendant's child abuse diagnosis *did not* shock the conscience. *Id.* at 500. The *Isbell* court also explained that "mere negligence or deliberate indifference on the part of the Defendants [under Third Circuit law] was] insufficient to support a substantive due process claim." *Id.* at 499–500.

53

The Court is not persuaded by Plaintiff's reliance on *Russo v. City of Hartford*, 184 F.Supp.2d 169 (D. Conn. 2002) in attempting to distinguish her substantive due process failure-to-investigate claim from her Fourth Amendment claims. In *Russo*, the court stated, "[W]hile claims arising from a plaintiff's arrest and prosecution would fall within the scope of the Fourth Amendment, that Amendment would not cover a cause of action for government abuse of process in the investigation or pursuit of a suspect." *Id.* at 184. However, the plaintiff in *Russo* specifically argued that "allegations of a conspiracy to discredit him, jeering *after* his arrest, and continued harassment state a claim for substantive due process." *Id.* It also appears that the plaintiff in *Russo* alleged injury besides his arrest and prosecution that was caused by the defendant's violation of his substantive due process rights. *Id.* ("Supporting his substantive due process cause of action, Russo

claims that the [defendants] conspired to ruin Russo's credibility…."). In contrast, the sole injury Plaintiff alleges here relating to her substantive due process violation claim is deprivation of liberty, *i.e.*, her arrest and incarceration. (*See* Am. Compl. ¶ 238.)

54

The overlap between Plaintiff's substantive due process failure to investigate and her Fourth Amendment claims is further evidenced by the Due Process section of the Amended Complaint, which begins with a paragraph stating, "By the conduct and actions described above, defendants ... violat[ed] rights secured to plaintiff by the Constitution of the United States ... including, but not limited to, Plaintiff's Fourth and Fourteenth Amendment rights." (Am. Compl. ¶¶ 231, 238) and closes with, *inter alia*, a paragraph that states, "Defendants' conduct precipitated and caused the sequence of events that *ultimately resulted in the deprivation of plaintiff's liberty*...." (Am. Compl. ¶ 238.)

**\*\*33   \*633** "As a general matter, [the U.S. Supreme Court] has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Albright*, 510 U.S. at 271–72, 114 S.Ct. 807 (citing *Collins v. Harker Heights*, 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). The Supreme Court has instructed that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process,' must be the guide for analyzing these claims." *Id.* at 273, 114 S.Ct. 807 (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) and holding that substantive due process cannot afford plaintiff relief when the plaintiff "ask[ed] [the Supreme Court] to recognize a substantive right under the Due Process Clause of the Fourteenth Amendment to be free from criminal prosecution except upon probable cause"). In light of this guidance and given the plain overlap between Plaintiff's substantive due process claim alleging a failure to investigate and her Fourth Amendment claims, the Court finds that, to the extent Plaintiff has a viable failure to investigate claim [55], it falls under the Fourth Amendment rubric. Here, Plaintiff's claim of failure to investigate, as a practical matter, will be subsumed by all of her other Section 1983 claims.

55     Whether the alleged failure to investigate gives rise to a constitutional claim is far from clear. Courts have explained that failure to pursue a particular investigative path does not give rise to an independent due process claim apart from claims of false arrest, malicious prosecution, or violation of right to a fair trial. *See, e.g.*, *Blake v. Race*, 487 F.Supp.2d 187, 212 n.18 (E.D.N.Y. 2007) (rejecting an independent due process claim of failure to investigate and finding the allegations of failure to investigate should be regarded as part of plaintiff's false arrest and malicious prosecution claims); *Stokes v. City of New York*, No. 5-CV-0007, 2007 WL 1300983, at *6 (E.D.N.Y. May 3, 2007) ("[I]t is well-settled that there is no independent claim for a police officer's purported failure to investigate; rather, such allegations are considered, to the extent they are relevant, within the framework of claims for false arrest, false imprisonment, or malicious prosecution."); *Newton v. City of New York*, 566 F.Supp.2d 256, 278 (S.D.N.Y. 2008) ("[T]here is no constitutional right to an adequate investigation. Accepting [plaintiff's] allegations as true, his rights were violated as a result of the malicious prosecution, not the failure to investigate."); *McCaffrey v. City of New York*, No. 11-cv-1636, 2013 WL 494025, at *5 (S.D.N.Y. Feb. 7, 2013) ("[A] 'failure to investigate' is not independently cognizable as a stand-alone claim.").

Accordingly, both the City Defendants' and the Medical Center Defendants' motions to dismiss Plaintiff's substantive due process claim based on a failure to investigate are granted.

## 2. Speedy Trial

[99]  Plaintiff also alleges that she was denied a speedy trial, in violation of her right under the speedy trial clause of the Sixth Amendment. (*See* Am. Compl. ¶ 234.) The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. Specifically, Plaintiff alleges that she was held for more than four years in pretrial detention and that all Defendants encouraged this for the purpose of using Plaintiff's confinement as a bargaining chip to pressure her husband to plead guilty. (Am. Compl. ¶ 234.)

The Medical Center Defendants argue that Plaintiff failed to allege, other than in conclusory fashion, the causation element of this claim with respect to the Medical Center Defendants. (*See* Dkt. 55 at 14.) The Court agrees.

**634**  [100]     [101]  A Section 1983 action, "like its state tort analogs, employs the principle of proximate causation." *Townes v. City of New York*, 176 F.3d 138, 146 (2d Cir. 1999); *see also Higazy v. Templeton*, 505 F.3d 161, 181 (2d Cir. 2007) (Jacobs, C.J., concurring) ("Our cases affirm that traditional tort law principles apply equally to a Section 1983 plaintiff and require him to show the causal link from the original police misconduct up to the point of injury in order to proceed on his claim."). "It is well settled that the chain of causation between a police officer's unlawful arrest and a subsequent conviction and incarceration is broken by the intervening exercise of independent judgment." *Townes*, 176 F.3d at 147. Here, Plaintiff fails to allege any facts to support a causal link between the Medical Center's alleged conduct and the unreasonable delay in Plaintiff criminal case being resolved.

**34**  [102]  The City Defendants do not discuss Plaintiff's speedy trial claim in their briefing. In any event, the Court finds that Plaintiff's allegations that Defendants sought to use her as a "bargaining chip" to obtain a guilty plea from her husband, coupled with the four-year delay in her case being resolved and her case being dismissed shortly after her husband's conviction, is sufficient to state a speedy trial claim as to the City Defendants who were involved in her prosecution.

Accordingly, the Court denies the City Defendants' motion to dismiss Plaintiff's speedy trial claim as to Dets. Degnan, Moser, Phelan, Heffernan, and Dr. Landi, but grants the Medical Center Defendants' motion to dismiss this claim as to them.

## 3. Unconstitutional Conditions of Confinement

[103]  Plaintiff also alleges that certain conditions of confinement violated her substantive and procedural due process rights. (Am. Compl. ¶ 236.) [56] "A pretrial detainee's claim of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment." *Darnell v. City of New York*, 849 F.3d 17, 29 (2d Cir. 2017) (citing, *inter alia*, *Benjamin v. Fraser*, 343 F.3d 35, 49 (2d Cir. 2003)).

56    Specifically, Plaintiff alleges that every Defendant violated her due process right during her detention by (1) refusing to tell Plaintiff where her daughter's body was buried, (2) refusing the usual and customary medical services, including OB–GYN care, (3) forcing Plaintiff to give birth to her second daughter while handcuffed and shackled, (4) refusing Plaintiff the opportunity to breastfeed or bond with her infant daughter after childbirth, and (5) taking away Plaintiff's infant daughter two-and-a-half days after delivery. (Am. Compl. ¶ 236.) While Plaintiff argues that these deprivations constitute both a substantive and procedural due process violation (Am. Compl. ¶ 237), the Court need not decide whether these claims allege substantive or procedural due process violations because they must be dismissed due to the lack of connection to any Defendant in this case.

Only the Medical Center Defendants discuss this claim; they assert that their conduct did not proximately cause Plaintiff's condition of detention. (*See* Dkt. 55 at 14.) Not only does Plaintiff fail to respond to this argument, she does not discuss this claim at all, and therefore abandons it. *See deVere Grp. GmbH v. Op. Corp.*, 877 F.Supp.2d 67, 70 n.3 (E.D.N.Y. 2012) ("Because plaintiff did not address defendants' motion to dismiss with regard to this claim, it is deemed abandoned and is hereby dismissed.") (quoting *Hanig v. Yorktown Cent. Sch. Dist.*, 384 F.Supp.2d 710, 723 (S.D.N.Y. 2005)); *Harley v. City of New York*, 14–CV–5452, 2016 WL 552477, at \*7 (E.D.N.Y. Feb. 10, 2016) (finding plaintiff's claims abandoned where plaintiff's response to motion to dismiss "did not dispute, and in fact wholly ignore[d], **\*635** defendants' argument" (citing *Jackson v. Federal Exps.*, 766 F.3d 189 (2d Cir. 2014))); *Moccio v. Cornell Univ.*, No. 09–Civ–3601, 2009 WL 2176626, at \*4 (S.D.N.Y. Jul. 21, 2009) ("Whatever the merit of [the defendants'] argument [for dismissal], plaintiff has abandoned the ... claim, as her motion papers fail to contest or otherwise respond to defendants' contention."), *aff'd*, 526 Fed.Appx. 124 (2d Cir. 2013); *see also Simon v. City of New York*, No. 14-CV-8391, 2015 WL 4092389, at \*2 (S.D.N.Y. Jul. 6, 2015) (collecting cases).

 **\*\*35**  **[104]**  In any event, the Medical Center Defendants are correct. Plaintiff's claim of unconstitutional conditions of confinement must be dismissed as to all Defendants because the Amended Complaint does not allege any facts establishing the personal involvement of any Defendant

with respect to those conditions. *See Spavone*, 719 F.3d at 135; *Johnson v. Barney*, 360 Fed.Appx. 199, 201 (2d Cir. 2010) (summary order) (finding that plaintiff's claim failed "as a matter of law" where plaintiff failed to allege sufficient personal involvement on the part of the prison superintendent); *Scott v. Fischer*, 616 F.3d 100, 110 (2d Cir. 2010) (dismissing claim against Department of Correctional Services ("DOCS"), where plaintiff had argued that DOCS violated her constitutional rights by arresting her for non-compliance with her post-release supervision ("PRS"), since "the practice of re-incarcerating persons who violated their administratively-imposed PRS was a practice of the Division of Parole, and not of [DOCS]"). 57

57    To the extent Plaintiff has a viable claim based on the conditions of her confinement in a State correctional facility, that claim should have been brought against the State, the correctional facility, or the prison officials, not the prosecutor or police officers who handled Plaintiff's criminal case. *See, e.g., Women Prisoners of District of Columbia Dep't of Corrections v. District of Columbia*, 877 F.Supp. 634 (D.D.C. 1994), *modified in part on other grounds*, 899 F.Supp. 659 (D.D.C. 1995), *vacated in part and remanded on other grounds*, 93 F.3d 910 (D.C. Cir. 1996); *Nelson v. Correctional Medical Services*, 583 F.3d 522 (8th Cir. 2009) (en banc); *Brawley v. Washington*, 712 F.Supp.2d 1208 (W.D. Wash. 2010); *Zaborowski v. Dart*, No. 08–cv–6946, 2011 WL 6660999 (N.D. Ill. Dec. 20, 2011); *Villegas v. Metropolitan Govt. of Nashville*, 709 F.3d 563 (6th Cir. 2013).

Accordingly, the Court grants the Medical Center Defendants' motion to dismiss Plaintiff's conditions of confinement claim as to them. The Court also dismisses that claim *sua sponte* as to the City Defendants since there are no factual allegations in the Amended Complaint that support such a claim as to these Defendants. *See, e.g., Barreto v. Suffolk Cnty.*, No. 10-CV-0028, 2010 WL 301949, at \*2 (E.D.N.Y. Jan. 20, 2010) ("When a complaint fails to comply with the requirements of Rule 8, district courts have the authority to dismiss the complaint *sua sponte*." (citing *Salahuddin v. Cuomo*, 861 F.2d 40, 41 (2d Cir. 1988))); *LeBarron v. Warren Cnty. Sheriff's Office*, No. 1:13-CV-1572, 2015 WL 2248749 (N.D.N.Y. May 13, 2015) (*sua sponte* dismissing plaintiff's claim where the claim failed to allege facts plausibly suggesting personal involvement of individual defendants even though the defendants did not raise a lack-

of-personal-involvement challenge to the claim); *Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (recognizing that district courts have power to *sua sponte* dismiss complaints "in order to preserve scarce judicial resources").

## XI. *MONELL* CLAIMS

### A. Against the City

[105] Plaintiff asserts a *Monell* claim against the City based on her Section 1983 claims for false arrest, malicious prosecution, and violation of right to a fair trial, alleging a theory of "deliberate indifference" *636 to provide adequate training for its officers who work on SBS cases or to properly instruct Defendants of "applicable provisions of [New York] State Penal Law ... federal and state constitutional limitations...." (*See* Am. Compl. ¶ 243, 244, 248.) The Court finds Plaintiff's allegations of municipal liability adequate to state a *Monell* claim against the City.

[106]  [107]  [108] A municipality may be liable under Section 1983 if a municipal "policy or custom" causes "deprivation of rights protected by the Constitution." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see also Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012). For a *Monell* claim to survive a motion to dismiss, a plaintiff must allege "sufficient factual detail" and not mere "boilerplate allegations" that the violation of the plaintiff's constitutional rights resulted from the municipality's custom or official policy. *Plair v. City of New York*, 789 F.Supp.2d 459, 469 (S.D.N.Y. 2011) (collecting cases). "A policy or custom may be established by any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised 'deliberate indifference' to the rights of the plaintiff." *Moran v. Cnty. of Suffolk*, No. 11 Civ.3704, 2015 WL 1321685 (E.D.N.Y. Mar. 24, 2015) (citing *Parker v. City of Long Beach*, 563 Fed.Appx. 39 (2d Cir. 2014), *as amended*, (Apr. 21, 2014) (failure to train); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014) (widespread and persistent practice); *Hines v. Albany Police Dep't*, 520 Fed.Appx. 5, 7 (2d Cir. 2013) (actions of policymakers); *Schnitter v. City of Rochester*, 556 Fed.Appx. 5, 8 (2d Cir. 2014) (failure to train or supervise); *Missel v. Cnty. of*

*Monroe*, 351 Fed.Appx. 543, 545 (2d Cir. 2009) (formal policy and act of a person with policymaking authority for the municipality)).

**36 Here, Plaintiff advances two theories of municipal liability. First, Plaintiff asserts that the City has a custom of zealously promoting "debated science", here, the diagnosis of SBS. (Dkt. 61 at 26–27.) Second, Plaintiff asserts that the City failed to train its employees, especially child abuse detectives, regarding SBS cases. (Dkt. 61 at 29, 30).[58] The City contends that Plaintiff's *Monell* claim must be dismissed because the claims against individual City Defendants are without merit (Dkt. 59 at 29) and because Plaintiff has not identified any municipal policy that could serve as the basis of a *Monell* claim (*id.* at 31).[59] The Court disagrees.

[58]     It appears that Plaintiff is also arguing that the City's failure to train its employees as to SBS is consistent with the custom of zealously promoting a diagnosis of SBS. (*See* Dkt. 61 at 28 ("Instead of training its Detectives on diligently and cautiously investigating SBS cases to avoid constitutional violations[,] ... the District Attorney's Office, in conjunction with the Office for the Chief Medical Examiner puts on yearly conferences advocating for the continued finding of SBS.").)

[59]     The City also denies Plaintiff's allegation that the police abdicated their investigatory obligations to medical professionals when arresting Plaintiff, and her allegation that Defendants were deliberately indifferent. (*Id.* at 31.)

Plaintiff has alleged that "the NYPD and their precinct(s) and/or the OCME [Office of Chief Medical Examiner of the City of New York] ... [r]outinely conclude[ed] that Shaken Baby Syndrome is responsible for many infant fatalities despite the absence of evidence necessary to make such a finding." (Am. Compl. ¶ 243a.) *637 Additionally, Plaintiff alleges, *inter alia*, that the NYPD and the OCME routinely ignored the existence of debate and doubt in the medical community concerning SBS diagnoses (*id.* ¶ 243b), and routinely failed to perform tests to rule out SBS or consider evidence that contradicts an SBS diagnosis (*id.* ¶ 243c-d).[60] Plaintiff also alleges that the City "with deliberate indifference failed to provide adequate training and standards and policies and practices for its police officers in SBS related cases." (*id.* ¶ 243.) The Court finds these allegations sufficient to overcome a 12(b)(6) motion.

60
The Amended Complaint includes many more allegations in support of Plaintiff's *Monell* claim that are generally conclusory, insufficient, or irrelevant. For example, she alleges that, "[t]he foregoing customs, policies, practices ... include, but are not limited to, making arrests without probable cause, initiating and continuing prosecutions without probable cause, and committing perjury." (Am. Compl. ¶ 243). She also alleges that the City failed to properly instruct Defendants on the "proper and prudent use of force" (*id.* ¶ 248).

### B. "*Monell*-type" claim against FHMC

[109] Plaintiff brings a "*Monell*-type" claim [61] against FHMC based on multiple theories: (1) FHMC has a policy pursuant to which its employees, such as Dr. Kupferman, conduct forensic and factual investigation of SBS cases "for non-medical purposes, in order to reach non-medical conclusions, and with knowledge that law enforcement will rely on these investigative conclusions in directing the course of an arrest and prosecution" (Am. Compl. ¶ 257); (2) FHMC "perpetuated this policy [of having its staff conduct investigations for 'non-medical purposes'] in order to see those accused of SBS arrested, prosecuted, and convicted, despite the lack of any evidence connecting them with any crime whatsoever" (Am. Compl. ¶ 259); (3) FHMC failed to train its staff on advances in the field of Child Abuse Diagnosis and Investigation, including SBS (Am. Compl. ¶ 260); (4) FHMC was aware that its employees, including Dr. Kupferman, had a tendency to jump to conclusions and to diagnose SBS without supporting evidence (Am. Compl. ¶ 264); (5) FHMC failed to supervise its employees (Am. Compl. ¶¶ 265–266); and (6) FHMC failed to adequately screen and hire its employees "to respect the constitutional rights of those individuals with whom FHMC comes in contact" (Am. Compl. ¶ 266).

61
In *Rojas v. Alexander's Dept. Store, Inc.*, 924 F.2d 406 (2d Cir. 1990), the Second Circuit explicitly extended *Monell* to Section 1983 suits against private entities. *Id.* at 408–09 ("Private employers are not liable under § 1983 for the constitutional torts of their employees, unless the plaintiff proves that 'action pursuant to official ... *policy* of some nature caused a constitutional tort.' Although *Monell* dealt with municipal

employers, its rationale has been extended to private businesses." (quoting *Monell* )).

**37 While Plaintiff's pleading of a *Monell*-type claim against FHMC is largely based on conclusory allegations, [62] Plaintiff does *638 specifically allege that Dr. Kupferman had a history of overzealously diagnosing SBS of which FHMC was aware, and that Dr. Kupferman was a "final policymaker" [63] with respect to these diagnoses, which resulted in no confirmation being sought with respect to her conclusion that "Annie's death was due to SBS." (Am. Compl. ¶ 164.) [64] Taking Plaintiff's allegations as true, the Court finds that she has nudged her *Monell* claim against FHMC across the line from merely "conceivable to plausible." *See Iqbal,* 556 U.S. at 680, 129 S.Ct. 1937.

62
FHMC argues that Plaintiff's *Monell* claim is deficient because: (1) Plaintiff fails to allege the existence of a policy or custom; (2) Plaintiff puts forth an implausible allegation that "a private hospital dedicated to the well-being of its patients had a policy and procedure for its staff 'to reach non-medical conclusions' 'in order to see those accused of SBS [ ] arrested, prosecuted, and convicted, despite the lack of any evidence connecting them with any crime whatsoever' "; (3) Plaintiff fails to sufficiently allege a *Monell* claim based upon failure to train; (4) co-Defendants' actions were an intervening cause; (5) "by requesting discovery to determine whether FHMC 'even had a policy in place' for diagnosing and investigating child abuse and SBS cases," Plaintiff has acknowledged that she has no basis to support a *Monell* claim against the hospital; (6) Plaintiff has not alleged facts that Dr. Kupferman was a policymaker; and (7) Plaintiff has not alleged well-settled "custom or usage" to imply the acquiescence of policymaking officials at FHMC because she has not alleged that anyone other than Dr. Kupferman at FHMC engaged in allegedly unconstitutional actions. (*See* Dkt. 56 at 12–15.) The Court explicitly addresses some of these arguments, but has considered FHMC's other arguments and deemed them meritless or irrelevant at this stage.

63
Although Plaintiff argues that Dr. Kupferman was a policymaker with final authority because she was a Child Abuse Specialist and "was

the Director of Continuity Clinics" at FHMC with "responsibility to overview patient care and training of residents" (Dkt. 66 at 26), none of this is alleged in the Complaint. It is thus improper for the Court to consider such factual allegations in deciding the motion to dismiss. *See Green v. City of Mount Vernon*, 96 F.Supp.3d 263 (S.D.N.Y. 2015) (collecting cases in which the court declines to consider additional facts set forth in plaintiff's opposition papers that are not in the complaint).

64    FHMC asserts that because Plaintiff only alleges facts as to Dr. Kupferman's unconstitutional actions pertaining to this particular case, there could be no policy or custom inferred on the part of FHMC. (Dkt. 56 at 13.) However, at this stage, given Plaintiff's allegation that Dr. Kupferman, on multiple occasions, overzealously diagnosed SBS and ignored contradictory evidence, the Court finds that the claim survives the Medical Center Defendants' 12(b)(6) motion.

Accordingly, FHMC's motion to dismiss Plaintiff's *Monell* claim against it is denied.

### C. Liability Based on *Respondeat Superior*

[110]    [111]    Plaintiff also argues that FHMC should be held liable under the doctrine of *respondeat superior* and therefore Plaintiff need not show that a violation of Plaintiff's constitutional rights by FHMC's employees was due to a policy or custom. (Dkt. 66 at 21–22.) However, the doctrine of *respondeat superior* is not available to render a supervisor liable under Section 1983 for the unconstitutional conduct of his subordinates. *Connick v. Thompson*, 563 U.S. 51, 60, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) ("[U]nder § 1983, local governments are responsible only for 'their *own* illegal acts.' ... They are not vicariously liable under § 1983 for their employee's actions."). In *Connick*, the Supreme Court unequivocally stated that *respondeat superior* cannot be applied either to superiors or to local government entities. *See id.*; *Monell*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (holding that Section 1983's language demands a causal relationship between the conduct of the defendant and the plaintiff's constitutional deprivation, and that this relationship is absent when liability is imposed solely on the basis of *respondeat superior* ). In *Rojas*, the Second Circuit extended *Monell* to Section 1983 suits against private entities. 924 F.2d 406. And just as a municipal entity cannot be held liable under *respondeat superior*, a private corporation cannot

be held liable under *respondeat superior* for the allegedly unconstitutional conduct of its employee. *Green v. City of New* York, 465 F.3d 65 (2d Cir. 2006) (citing *Rojas*, 924 F.2d at 408); *see also Feder v. Sposato*, No. 11-CV-193, 2014 WL 1801137, at *10 (E.D.N.Y. May 7, 2014) (noting that under *Rojas* a plaintiff must prove an official policy that caused a constitutional tort rather than relying on *respondeat superior* theory). [65]

65    Notably, Plaintiff does not even acknowledge *Rojas* and instead "respectfully requests this Court to line with the 7th Circuit [ ] and find FHC liable under the theory of *respondeat superior.*" (Dkt. 66 at 22.)

**\*\*38    \*639** Accordingly, the Medical Center Defendants' motion to dismiss Plaintiff's claim against FHMC based on the doctrine of *respondeat superior* is granted.

### XII. STATE CONSTITUTIONAL CLAIM

Plaintiff's tenth claim against all Defendants alleges violation of Plaintiff's rights under the New York State Constitution to be free of unreasonable and unlawful searches and seizures under Article I, Section 12 and to be free of deprivation of liberty and property without due process of law under Article I, Section 6. (Am. Compl. ¶¶ 270–275.)

[112]    Plaintiff's State constitution claims must be dismissed because "[d]istrict courts in this circuit have consistently held that there is no private right of action under the New York State Constitution where, as here, remedies are available under § 1983." *Campbell v. City of N.Y.*, No. 09-CV-3306, 2011 WL 6329456, at *5 (E.D.N.Y. Dec. 15, 2011) (citation and quotation marks omitted); *see also Biswas v. City of New York*, 973 F.Supp.2d 504, 522 (S.D.N.Y. 2013) (dismissing plaintiff's State constitutional tort claims of unlawful seizures and arrest because the plaintiff had a remedy at common law for false arrest/false imprisonment and a § 1983 claim based on the same grounds and stating that "the state constitutional tort is usually available only in cases in which a plaintiff ... has no alternative remedy."); *see also Wahad v. F.B.I.*, 994 F.Supp. 237, 240 n.4 (S.D.N.Y. 1998) ("Section 1983 need not provide the exact same standard of relief in order to provide an adequate remedy").

Here, Plaintiff has a remedy based on Section 1983. Furthermore, Plaintiff has asserted the same due process claim under Section 1983, making Plaintiff's State constitutional claim duplicative. Accordingly, Defendants'

motion to dismiss Plaintiff's State constitutional claim is granted.

## XIII. IMMUNITY

### A. Absolute Immunity of ADA Bishop

[113] District courts "are encouraged to determine the availability of an absolute immunity defense at the earliest appropriate stage." *Norton v. Town of Brookhaven*, 33 F.Supp.3d 215, 229 (E.D.N.Y. 2014) (citation and quotation marks omitted), *reconsidered on other grounds*, 47 F.Supp.3d 152 (E.D.N.Y. 2014). ADA Bishop claims absolute immunity from liability for her prosecutorial actions (Dkt. 59 at 15). *See Giraldo v. Kessler*, 694 F.3d 161, 165 (2d Cir. 2012) (defendant claiming absolute immunity bears burden of showing that immunity doctrine applies).

[114]     [115] Prosecutors performing core prosecutorial functions are entitled to absolute immunity. *See Warney v. Monroe Cnty.*, 587 F.3d 113, 120 (2d Cir. 2009) (citing *Imbler v. Pachtman*, 424 U.S. 409, 430–31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)). They are entitled to absolute immunity "because their prosecutorial activities are 'intimately associated with the judicial phase of the criminal process, and thus [are] functions to which the reasons for absolute immunity apply with full force.' " *Cornejo*, 592 F.3d at 127 (quoting *Imbler*, 424 U.S. at 430, 96 S.Ct. 984) (modification in the original). Prosecutorial functions protected by absolute immunity include conduct "preliminary to the initiation of a prosecution," such as "whether to present a case to a grand jury ... whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present." **\*640** *Giraldo*, 694 F.3d at 165. The Supreme Court has "made clear that absolute immunity may not apply when a prosecutor is not acting as 'an officer of the court,' but is instead engaged in other tasks, say, investigative or administrative tasks." *Van de Kamp v. Goldstein*, 555 U.S. 335, 342, 129 S.Ct. 855, 172 L.Ed.2d 706 (2009) (citing *Imbler*, 424 U.S. at 431 n.33, 96 S.Ct. 984). A prosecutor who engages in such activities is protected only by qualified immunity. *Sclafani v. Spitzer*, 734 F.Supp.2d 288, 296 (E.D.N.Y. 2010) (citing *Van de Kamp*, 555 U.S. 335, 129 S.Ct. 855).

**\*\*39** [116] Plaintiff argues that ADA Bishop's conduct was administrative and investigatory in nature. (*See* Dkt. 61 at 15–17.) In support of this argument, Plaintiff notes that ADA Bishop "was an initial point of contact for the hospital, and had been in communications with its staff [and] had

investigators ... from the DA's Office involved...." (*Id.* at 16.) However, none of this is alleged in the Complaint, and Plaintiff does not direct the Court to any relevant portion of the Complaint in support of these assertions. Moreover, because information from FHMC staff was crucial to the prosecution of the Lis, ADA Bishop's communications with them are considered part of the prosecutorial process. *See, e.g., Schnitter v. City of Rochester*, 556 Fed.Appx. 5 (2d Cir. 2014) (summary order) (finding ADA's interview of crucial witness to be a core part of the prosecutorial process).

[117] Plaintiff's other allegations regarding ADA Bishop also relate to prosecutorial functions. Plaintiff alleges that ADA Bishop "failed to examine the medical reports and ask relevant questions as to [Annie's medical] history" (Am. Compl. ¶ 169), and also "ignored evidence ... and [the] absence of witnesses" (Am. Compl. ¶ 174). However, these allegations "amount[ ] to the claim that [ADA Bishop] sought an indictment based on insufficient or unpersuasive evidence[,] ... [thus challenging] an essential prosecutorial decision." *Schnitter*, 556 Fed.Appx. at 7. Moreover, a prosecutor is entitled to absolute immunity even in the face of allegations of "deliberate withholding of exculpatory information" or "his knowing use of perjured testimony." *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005) (citing *Imbler*, 424 U.S. at 431 n.34, 96 S.Ct. 984); *see also Warney v. Monroe Cnty.*, 587 F.3d 113, 125 (2d Cir. 2009) ("[I]f the prosecutors had tested all the evidence, and then sat on the exculpatory results for at least 72 days, they may well have violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); but they would be absolutely immune from personal liability"). Thus, absolute immunity applies even though Plaintiff alleges that ADA Bishop "concealed evidence" (Am. Compl. ¶ 175) and "misrepresented facts" (Am. Compl. ¶ 208). [66]

[66]     Furthermore, the Court does not find that Plaintiff's allegation that ADA Bishop "encouraged and, in effect, deputized Drs. LANDI and KUPFERMAN to forensically and factually investigate the case against the [Lis]" (Am. Compl. ¶ 170) creates a plausible inference that ADA Bishop acted in an investigative or administrative capacity. Plaintiff provides no factual or legal support for her "deputization" theory. This allegation is simply too conclusory to pierce the grant of absolute immunity here.

**[118]**  To the extent that Plaintiff's claims are asserted against ADA Bishop in her official capacity, they are barred because Bishop acted on behalf of New York State, which is immune under the Eleventh Amendment. *See Caldwell v. James*, 14–CV–5384, 2015 WL 427980, at *3 (E.D.N.Y. Jan. 30, 2015) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against **\*641** the State itself." (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989))); *see, also Caldwell*, 2015 WL 427980 at *3 (collecting cases where courts dismissed claims against State officials on Eleventh Amendment grounds); *Reid v. Schuman*, 83 Fed.Appx. 376, 377 (2d Cir. 2003) (summary order) ("We have held that when a District Attorney is prosecuting a criminal matter, she represents the State, not the municipality." (citing *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993)).

Accordingly, Plaintiff's claims against ADA Bishop are dismissed with prejudice.

**B. City Defendants**

**\*\*40**  The City Defendants also contend that the Officer Defendants are entitled to qualified immunity as to Plaintiff's Fourth Amendment claims of false arrest and malicious prosecution.[67] However, for the reasons explained below, the Court cannot find qualified immunity at this stage of the litigation.

[67]    Although the City Defendants do not specify which claims they direct their qualified immunity defense against, to the extent they assert the defense based on the existence of probable cause, the defense goes to Plaintiff's claims of false arrest and malicious prosecution. (*See* Dkt. 59 at 12–27.)

**[119]**  **[120]**  "Qualified immunity shields law enforcement officers from § 1983 claims for money damages provided that their conduct does not violate clearly established constitutional rights of which a reasonable person would have been aware." *Barboza v. D'Agata*, 676 Fed.Appx. 9, 12, 2017 WL 214563, at *2 (summary order) (2d Cir. 2017) (citing *Ashcroft v. al–Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013)). It is an affirmative defense as to which the defendant officers or

officials bear the burden of proof. *Harlow*, 457 U.S. at 815, 102 S.Ct. 2727.

**[121]**    **[122]**  In analyzing the applicability of qualified immunity, courts conduct a two-step analysis: "First, do the facts show that the officer's conduct violated plaintiff's constitutional rights? Second, if there was a constitutional violation, was the right clearly established at the time of the officer's actions?" *Barboza*, 676 Fed.Appx. at 12, 2017 WL 214563, at *2 (citation omitted); *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). In short, "[e]ven if the right at issue was clearly established in certain respects, ... an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue *in its particular factual context*." *Barboza*, 676 Fed.Appx. at 12, 2017 WL 214563, at *2 (emphasis in original) (quoting *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007)). Moreover, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236, 129 S.Ct. 808.

At this juncture, the Court cannot find that the Officer Defendants are entitled to qualified immunity, especially where Plaintiff's theory of liability is based on the alleged fabrication of evidence and suppression of exculpatory evidence. (*See, e.g.,* Am. Compl. ¶ 145 (with respect to malicious prosecution claim, stating that a criminal complaint containing false information was signed with knowledge that there was no legal basis to prosecute Plaintiff); Am. Compl. ¶ 222 (with respect **\*642** to Section 1983 conspiracy claim, noting that Defendants conspired to accuse Plaintiff of a crime she did not commit); Am. Compl. ¶ 225 (with respect to unreasonably prolonged detention claim, noting that Defendants mishandled exculpatory evidence); Am. Compl. ¶ 234 (noting that Plaintiff was in pretrial detention because of Defendants' collateral motive).)

Based on these allegations, Plaintiff has sufficiently demonstrated potential violations of her constitutional right to be free from prosecution based on fabricated or suppressed exculpatory evidence. Those rights were clearly established at the time of her prosecution and pretrial detention, such that no reasonable officer could believe that fabricating evidence or suppressing exculpatory evidence is constitutional. *See Coggins v. Cnty. of Nassau*, 988 F.Supp.2d 231, 245, n.8 (E.D.N.Y. 2013) ("It is beyond cavil that [ ] conspiring to and actually falsifying police records, evidence, and testimony

Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 111 of 186
Ying Li v. City of New York, 246 F.Supp.3d 578 (2017)
2017 WL 1208422

violates clearly established rights.... and [ ] no public official would think it was objectively reasonable to violate those rights."); *see also Coggins*, 776 F.3d 108 (affirming the district court's conclusion that qualified immunity was inappropriate); *Blake v. Race*, 487 F.Supp.2d 187, 214 (E.D.N.Y. 2007) ("The [Second Circuit] found qualified immunity unavailable because conspiring to fabricate and forward to prosecutors a known false confession 'violates an accused's clearly established constitutional right, and no reasonably competent police officer could believe otherwise.' ") (quoting *Ricciuti*, 124 F.3d at 130); *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) ("The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right.").

**\*\*41** **[123]** The City Defendants assert that the Officer Defendants are entitled to qualified immunity because a police officer who signs a supporting deposition under penalty of perjury can be entitled to qualified immunity from a malicious prosecution claim if he reasonably relied on the statement of a witness. *See, e.g., Jean–Laurent v. Bowman*, 2014 WL 4662221, at \*4 (citing *Loria v. Gorman*, 306 F.3d 1271, 1289–90 (2d Cir. 2002)). However, because Plaintiff contends that Dr. Kupferman's and Dr. Landi's diagnoses of Annie's condition and the cause of her death were "entirely unsupported and unsupportable by any medical science or clinical or forensic evidence" (*see* Am. Compl. ¶¶ 150, 160), the Court cannot determine at this point whether it was reasonable for the officers—some of whom are members of the NYPD Child Abuse Squad—to rely on the statements of witnesses, such as Dr. Kupferman or Dr. Landi. Moreover, Plaintiff alleges that the Officer Defendants (and Dr. Kupferman) ignored her claims of innocence out of "unconcealed and unrestrained racism" (Am. Compl. ¶ 114), and that this led to her arrest and prosecution. No reasonable officer would believe seeking arrest and prosecution based on such improper motives was constitutional.

Additionally, in support of their argument, the City Defendants cite to *V.S. v. Muhammad*, 595 F.3d 426 (2d Cir. 2010). Although *V.S.* may seem similar to the instant case, the two are distinguishable in that the "reasonably objective" decision made by the defendants in *V.S.* was in a very different circumstance from the challenged conduct of the Officer Defendants here. In *V.S.*, the Second Circuit held that a caseworker at the New York City Administration of Child Services was entitled to qualified immunity because she sought a court order permitting the removal of a child from the parent. *Id.* at 431. On summary judgment, the

district court found that qualified immunity could not be granted given the plaintiff's allegation that the caseworker had relied on a diagnosis **\*643** by a doctor who was known to have repeatedly misdiagnosed children's injuries as evidence of child abuse. *Id.* at 431 (district court reasoned that "reliability of [the doctor's] diagnosis ... is an issue of material fact that goes directly to the objective reasonableness of the caseworker in seizing and removing the child from his mother"). The Second Circuit reversed the district court's decision on qualified immunity, holding that "to impose on [a] caseworker the obligation in such circumstances of assessing the reliability of a qualified doctor's past and present diagnoses would impose a wholly unreasonable burden of the very kind qualified immunity is designed to remove." *Id.* However, in *V.S.*, the caseworker was making a time-sensitive decision to remove a child from a potentially dangerous and abusive environment. *See V.S. ex rel. T.S. v. Muhammad*, 581 F.Supp.2d 365, 388 (E.D.N.Y. 2008) (noting defendants' argument that "in light of [the doctor's diagnosis of injury caused by child abuse], the caseworker's belief in the imminent danger to the child was reasonable and their removal of [the child] into protective custody was justified"); *see also Cornejo*, 592 F.3d at 128–29 (recognizing that the caseworker defendants were forced to "choose between difficult alternatives" and were reasonable to believe that "immediate temporary removal" of the children from a potentially abusive environment was justified).

Here, in determining whether the officers reasonably believed that there was probable cause to prosecute Plaintiff, the Court notes that the decision to prosecute was not made under the same threat of imminent harm or time-sensitivity; there was no child to be protected from a potentially abusive parent, as the Lis' only child had already died. Nor was the decision to prosecute a temporary one. Moreover, in *V.S.*, the Second Circuit found that the caseworker's actions were reasonable because the doctor had diagnosed the child with SBS "*in the absence of any plausible alternative.*" *V.S.*, 595 F.3d at 431 (emphasis added). By contrast, Plaintiff alleges that there were several plausible alternative explanations to SBS as the cause of death, including a genetic disorder and the child's prior medical history, that the Officer Defendants chose to ignore. (Am. Compl. ¶ 173.) Plaintiff also alleges that at some point, the Officer Defendants became aware of information that cast doubt on the medical opinions, including the SBS diagnosis, upon which the investigation was premised, but the officers failed to disclose that information to the prosecution or consider it before deciding to prosecute Plaintiff or continue that prosecution. (*See, e.g.,* Am. Compl. ¶ 178.) At

this stage, the Court must accept these allegations as true, and thus *V.S.* does not dictate that the Officers are entitled to qualified immunity.

**\*\*42** Accordingly, the Court does not find that the Officer Defendants are entitled to qualified immunity as to Plaintiff's false arrest and malicious prosecution claims.

### C. Dr. Landi

The City Defendants contend that Dr. Landi is entitled to absolute and qualified immunity. (Dkt. 59 at 17.) Again, at this stage of the litigation, the Court finds it inappropriate to dismiss claims against Dr. Landi based on immunity.

### I. Absolute Immunity

In determining whether Dr. Landi's acitivity was investigative or prosecutorial, the Court applies a "functional approach" and looks to the function being performed rather than to the office or identity of the defendant. *See Cornejo*, 592 F.3d at 127 (citing *Briscoe v. LaHue*, 460 U.S. 325, 342, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983)); *see also Warney v. Monroe Cnty.*, 587 F.3d 113, 121 (2d Cir. 2009) (identifying prosecutorial immunity "not by the identity of **\*644** the actor but by reference to the 'function' performed"); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 530 (2d Cir. 1993) (noting that immunity attaches to the "function performed, not [ ] the office itself").

In arguing that Dr. Landi is entitled to absolute immunity, the City Defendants rely heavily on *Newton v. City of New York*, 738 F.Supp.2d 397 (S.D.N.Y. 2010). However, the Court does not find *Newton* to be applicable here. In *Newton*, the plaintiff, who had been convicted of rape, brought a civil rights action against a forensic scientist, employed by the Office of the Chief Medical Examiner of the City of New York, for allegedly failing to conduct proper DNA testing that would have exonerated the plaintiff. *Id.* at 400–03. The forensic scientist had conducted a DNA test three years after the plaintiff was convicted for a court-ordered adversarial post-conviction proceeding. The district court held that the scientist was entitled to absolute and qualified immunity. *Id.* at 411, 416. However, in granting absolute immunity, the court stated that "the protection of absolute immunity may not be appropriate in a pre-conviction context where the jury's determination of guilt may result from a faulty scientific process, and where the laboratory scientist's role is

primarily an investigative one." *Id.* at 411. That distinction is critical here, given that Dr. Landi, unlike the forensic scientist in *Newton*, was involved in Plaintiff's criminal case in a *pre*-conviction context and is alleged to have provided false statements and analyses in support of the criminal complaint and the NYPD's investigation.

**[124]** Based on the allegations in the Complaint, the Court cannot find, as a matter of law, that Dr. Landi was acting in a prosecutorial role rather than an investigatory one. *See Hill v. City of New York*, 45 F.3d 653 (2d Cir. 1995) ("[W]hen it may not be gleaned from the complaint whether the conduct objected to was performed ... in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss."); *see also Wilkins v. Herky*, No. 11-cv-6104, 2013 WL 2385065, at \*7 (W.D.N.Y. May 29, 2013) ("[I]t is appropriate to address absolute immunity in a 12(b)(6) context *if the complaint clearly indicates the nature of the function for which the defendant is being sued*...." (emphasis added)); *also compare Newton*, 738 F.Supp.2d at 408, 412 (noting that the defendant-scientist was entitled to absolute immunity because the scientists' role in the plaintiff's criminal case was in an advocacy capacity and *not* for the purpose of identifying potential suspects) *with Cornejo*, 592 F.3d at 128 (finding that the district court was incorrect to find that a caseworker was entitled to absolute immunity because the caseworker's initiation of the child's removal from his mother's custody was functionally equivalent to police officers making arrests in criminal cases).

### 2. Qualified Immunity

**\*\*43** The City Defendants also argue that Dr. Landi is entitled to qualified immunity because she did not violate Plaintiff's Fourth Amendment rights. (Dkt. 59 at 19.) The City Defendants contend that Dr. Landi could not have falsely arrested or maliciously prosecuted Plaintiff and thus there was no violation of Plaintiff's clearly established constitutional right. (*Id.*) However, the Court has ruled that Plaintiff's malicious prosecution claim will, in fact, proceed against Dr. Landi and several Officer Defendants. Furthermore, Plaintiff's claims against Dr. Landi are not limited to false arrest and malicious prosecution. For example, as previously discussed, Plaintiff also asserts fair trial claims, based on alleged fabrication of evidence and concealment of exculpatory evidence, against Dr. **\*645** Landi. Accordingly,

the Court cannot find, at this time, that Dr. Landi is entitled to qualified immunity.

### D. Dr. Kupferman Is Not Entitled to Statutory Immunity

[125] The Medical Center Defendants assert that Dr. Kupferman is entitled to statutory immunity under the New York Child Protective Services Act. (Dkt. 55 at 2–3.)

Section 413 of the Child Protective Services Act requires physicians, such as Dr. Kupferman and FHMC's staff, to report suspected child abuse if they have "reasonable cause" to believe that a child has been abused. *See* N.Y. Soc. Serv. Law § 413(1)(a) (McKinney). Failure to report a case of suspected child abuse is a class A misdemeanor. N.Y. Soc. Serv. Law § 420 (McKinney). Section 419 of the Child Protective Services Act provides good faith immunity from any liability to individuals who report suspected cases of child abuse. That section states in pertinent part:

> Any person, official or institution participating in good faith in ... the making of a report [of suspected child abuse] ... pursuant to this title shall have immunity from any liability, civil or criminal, that might otherwise result by reason of such actions. For the purpose of any proceeding, civil or criminal, the good faith of any such person, official or institution required to report cases of child abuse or maltreatment ... shall be presumed....

Contrary to the Medical Center Defendants' assertion, the Court does not find *Thomas v. Beth Israel Hospital Inc.*, 710 F.Supp. 935 (S.D.N.Y. 1989) to be particularly relevant. In *Thomas*, the court held that the defendant-physician who examined an infant and reported suspected child abuse had immunity under Section 419 of the Child Protective Services Act because the physician had "reasonable cause" to suspect abuse when the examination revealed multiple abrasions and black and blue marks. *Id.* at 941–42. In contrast to *Thomas*, however, Plaintiff alleges that Dr. Kupferman's role went beyond simply reporting suspected child abuse. Plaintiff alleges that Dr. Kupferman took on an active role in investigating the Lis. (*See* Am. Compl. ¶ 115 (Kupferman

"repeatedly screamed at [the Lis] that they killed their daughter...."); Am. Compl. ¶ 120 ("Kupferman conducted a 'forensic interview' of plaintiff.")).

Similarly, the Court is not convinced by the Medical Center Defendants' reliance on *Storck v. Suffolk County Dep't of Social Servs.*, 62 F.Supp.2d 927, 946 (E.D.N.Y. 1999) because, there, the court "clearly" found that the defendant doctors were acting "in the discharge of their duties and within the scope of their employment." Here, Plaintiff's allegations, accepted as true, suggest that Dr. Kupferman's conduct may have exceeded the scope of her employment with FHMC, (*See, e.g.,* Am. Compl. ¶ 157 (Kupferman "acted as a deputy of the *NYPD* and the *Queens County D.A.'s Office*" (emphasis in original)); Am. Compl. ¶ 161 (Kupferman "played an active role in the prosecution of Ying Li ... that went well beyond her role, and into ancillary and forensic aspects of determining motive, culpability, and the veracity of Ying Li.").) Moreover, Plaintiff alleges that Dr. Kupferman's determination that Annie died of SBS was "such a substantial departure from accepted professional judgment, practice, or standards" (Am. Compl. ¶ 235), and that Dr. Kupferman failed to consider other pertinent information that might have suggested alternative causes for Annie's death (*see, e.g.,* Am. Compl. ¶ 122). Taking these allegations as true, such alleged acts "go beyond mere error and amount to willful misconduct," and thus Dr. Kupferman would not be entitled to statutory immunity based on the lack of **\*646** "good faith". *See* Section 419 of the Child Protective Services Act; *see also Estiverne v. Esernio–Jenssen*, 581 F.Supp.2d 335, 347 (E.D.N.Y. 2008) (allowing plaintiffs to proceed with discovery to prove their allegations of bad faith on the part of the Medical Center Defendants and denying statutory immunity, given that plaintiff alleged that the defendant-doctor's "diagnosis of child abuse was not supported by *any* medical evidence ... [and] that she disregarded the medical assessment of a colleague.").

**\*\*44** Accordingly, because the Court cannot determine at this time whether Dr. Kupferman enjoys immunity under the Child Protective Services Act, the Court denies the Medical Center Defendants' motion to dismiss the claims against Dr. Kupferman on the ground that she is statutorily immune.

### XIV. LEAVE TO AMEND

Plaintiff has requested leave to amend her complaint in the event any of her claims are dismissed. For the reasons discussed below, the Court denies that request in its entirety.

**[126]    [127]** Federal Rules of Civil Procedure 15(a) provides that a court "should freely give leave [to amend] when justice so requires." "Although 'it is the usual practice upon granting a motion to dismiss to allow leave to replead, such leave should be denied where the proposed amendment would be futile.' " *S.B. v. City of New York*, No. 14-CV-1021, 2016 WL 4530455, at *18 (E.D.N.Y. Aug. 29, 2016) (citation and quotation marks omitted); *see also Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011). An amendment to a pleading is considered futile if the claim is time-barred due to the expiration of the applicable statute of limitations period. *See, e.g., Kwon v. Santander Consumer U.S.A.*, No. 15-CV-3352, 2016 WL 6518578, at *6 (E.D.N.Y. Oct. 6, 2016) (dismissing with prejudice claims that are time-barred while allowing the plaintiff to replead his other claims); *Johnson v. New York City Police Dept.*, 651 Fed.Appx. 58 (2d Cir. 2016) (summary order) (affirming district court's dismissal of the plaintiff's Section 1983 claims "without granting him an opportunity to amend or discussing whether leave to amend would be appropriate" because the three-year statute of limitations expired).

**[128]** First, the Court denies, as futile, leave to amend any time-barred claims and all claims against ADA Bishop, whom the Court has found is entitled to absolute immunity. *See, e.g., Harrison v. Cnty. of Nassau*, No. 15-cv-2712, 2016 WL 4083381, at *6 (E.D.N.Y. Aug. 1, 2016) (denying leave to replead claims against ADAs "because it is clear that all of plaintiff's allegations relate to their involvement in [plaintiff's] prosecution and are therefore protected by absolute immunity"); *Johnson*, 651 Fed.Appx. at 61 (finding leave to amend would be futile where the district court found the prosecutor was entitled to absolute immunity); *Contreras v. Perimenis*, 562 Fed.Appx. 50 (Summary Order) (2d Cir. 2014) (same).

Second, the Court exercises its discretion to deny Plaintiff leave to amend as to the other claims that the Court has dismissed. *Avent v. Doe*, No. 2008 WL 877176, at *14 (N.D.N.Y. Mar. 31, 2008) ("Plaintiff has already filed one amended complaint in this action, and this court has found that the complaint does not state a claim[.]"). The Court already permitted Plaintiff the opportunity to amend the complaint, and, in fact, at the pre-motion conference held in connection with Defendants' motions to dismiss, urged Plaintiff to correct the deficiencies identified in Defendants' pre-motion conference requests and at the conference, and to pare down her claims to only viable ones. However, as noted throughout this decision, Plaintiff **\*647** did not heed the

Court's advice, nor make good use of that opportunity to prune her complaint of invalid claims or to add useful or relevant factual allegations or particularity to her complaint, which is currently 275 paragraphs. To allow Plaintiff to attempt to amend her complaint again would be an act of futility and a waste of resources. The Court therefore denies Plaintiff leave to amend her complaint a second time.

**\*\*45** In summary, the following claims are dismissed:

- Count 1 (False Arrest and Imprisonment)—as to all Defendants;

- Count 2 (Malicious Prosecution)—as to all Defendants, except Defendants Degnan and Landi, and the Medical Center Defendants;

- Count 3 (Malicious Abuse of Process)—as to all Defendants, except Defendants Degnan and Landi;

- Count 4 (Failure to Intervene)—as to all Defendants;

- Count 5 (Section 1983 Conspiracy)—as to all Defendants, except Defendants Degnan, Moser, Phelan, Heffernan, and Landi, and the Medical Center Defendants;

- Count 6 (Unreasonably Prolonged Detention)—as to all Defendants, except Defendants Degnan, Moser, Phelan, Heffernan, and Landi;

- Count 7 (Due Process)—as to all Defendants, except Defendants Degnan, Moser, Phelan, Heffernan, Landi, and Medical Center Defendants. However, the speedy trial aspects of Plaintiff's due process claim is dismissed as to the Medical Center Defendants. Moreover, Plaintiff's due process claim of failure to investigate and conditions of confinement are dismissed as to all Defendants.

- Count 10 (State Constitution)—as to all Defendants.

## CONCLUSION

For the reasons stated above, the City Defendants' motion to dismiss is GRANTED in part and DENIED in part. The Medical Center Defendants' motion to dismiss is GRANTED in part and DENIED in part. Plaintiff shall proceed on the following claims:

- Malicious Prosecution against Defendants Degnan, Landi, and the Medical Center Defendants;

- Malicious Abuse of Process against Defendants Degnan and Landi;

- Section 1983 Conspiracy against Defendants Degnan, Moser, Phelan, Heffernan, Landi, and the Medical Center Defendants;

- Unreasonably Prolonged Detention against Defendants Degnan, Moser, Phelan, Heffernan, and Landi;

- Due Process (*Brady* violation and fabrication of evidence) against Defendants Degnan, Moser, Phelan, Heffernan, and Landi, and the Medical Center Defendants;

- Due Process (speedy trial) against Defendants Degnan, Moser, Phelan, Heffernan, and Landi;

- *Monell* claims against the City and FHMC.

Given that several Defendants as to whom claims are proceeding are not yet represented (*see supra* footnote 1), Plaintiff shall by April 14, 2017 advise the Court in writing how she intends to proceed with respect to these Defendants.

SO ORDERED.

**All Citations**

246 F.Supp.3d 578, 2017 WL 1208422

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-00522-BKS-TWD Document 15 Filed 10/25/24 Page 116 of 186
Wright v. Orleans County, Not Reported in F.Supp.3d (2015)
2015 WL 5316410

2015 WL 5316410
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

David WRIGHT and Sarah Harris, Plaintiffs,

v.

ORLEANS COUNTY, Orleans County Sheriff, County
of Orleans Major Crime Task Force, Albion Police
Department, Village of Albion, Town of Albion, New
York State Office of Fire Prevention and Control,
Niagara County Sheriff, Albion Fire Department,
Rocco Sidari, both individually and in his capacity as
Albion Fire Chief, Jeremy Grahm, both individually
and in his capacity as an employee of Albion Fire
Department, Jeffrey Gifaldi, both individually and in
his capacity as Investigator for the Village of Albion
Police Department, Joseph Fuller, both individually
and in his capacity as a police officer for the Village of
Albion Police Department, John Doyle, both individually
and in his capacity as police officer for the Village
of Albion Police Department, Karol L. Hughes, both
individually and in his capacity as police officer for
the Village of Albion Police Department, Erik Holter,
both individually and in his capacity as Investigator
with the New York State Office of Fire Prevention
and Control, Donald Clawson, Michael Jutrowski,
Adriean Ann Park, Paul E. Savage, Randi Shadic,
Steven M. Nassivera, Nicholas Long, The Hartford,
and Sentinel Insurance Company, Ltd., Defendants.

No. 14–CV–00622A(F).
|
Signed Sept. 10, 2015.

**Attorneys and Law Firms**

Elliott, Stern & Calabrese, LLP David S. Stern, of Counsel,
Rochester, NY, for Plaintiffs.

Webster Szanyi, LLP, Michael P. McClaren, Andrew
Dylan, and Florina Altshiler, of Counsel, Buffalo, NY,
for Defendants Orleans County, Orleans County Sheriff,
County of Orleans Major Crime Task Force, Albion Police
Department, Village of Albion, Town of Albion, Niagara
County Sheriff, Jeffrey Gifaldi, Joseph Fuller, John Doyle,
and Karol L. Hughes.

Eric T. Schneiderman, New York State Attorney General,
STephanie Joy Calhoun, Assistant Attorney General, of
Counsel, Buffalo, NY, for Defendants New York State Office
of Fire Prevention and Control, Eric Holter, and Randi Shadic.

Gennet Kallman Antin & Robinson, P.C. Mark Leigh Antin,
and Michael Scott Leavy, of Counsel New York, NY, for
Defendant Paul E. Savage.

Leclair Korona Giordano Cole LLP, Laurie A. Giordano,
and Michael E. Nicholson, of Counsel, Rochester, NY, for
Steven M. Nassivera, The Hartford, and Sentinel Insurance
Company, Limited.

Walsh, Roberts & Grace, Buffalo, NY, for Albion Fire
Department, Rocco Sidari, and Jeremy Grahm.

REPORT and RECOMMENDATION

DECISION and ORDER

LESLIE G. FOSCHIO, United States Magistrate Judge.

***JURISDICTION***

**\*1** This action was referred to the undersigned by Honorable
Richard J. Arcara on October 16, 2014, for all pretrial
matters including preparation of a report and recommendation
on dispositive motions. The matter is presently before the
court on motions to dismiss filed on October 15, 2014,
by Defendants Orleans County, Orleans County Sheriff,
County of Orleans Major Crime Task Force, Albion Police
Department, Village of Albion, Town of Albion, Niagara
County Sheriff, Jeffrey Gifaldi, Joseph Fuller, John Doyle,
and Karol L. Hughes (Doc. No. 22), on November 3, 2014 by
Defendants Steven M. Nassivera, The Hartford, and Sentinel
Insurance Company, Limited (Doc. No. 28), on November 7,
2014, by Defendant Paul E. Savage (Doc. No. 30), and on
November 17, 2014, by Defendants New York State Office of
Fire Prevention and Control, Eric Holter, and Randi Shadic
(Doc. No. 33), as well as Plaintiffs' motion for leave to file an
amended complaint, filed December 8, 2014 (Doc. No. 36). [1]

1

> Although Defendants' motions to dismiss are
> dispositive, while Plaintiffs' motion to amend
> is nondispositive, the undersigned addresses
> all pending motions in this combined Report

and Recommendation/Decision and Order in the interest of judicial economy.

### *BACKGROUND*

Plaintiffs Sarah Harris ("Harris"), and David Wright ("Wright") (together, "Plaintiffs"), commenced this civil rights action on August 1, 2014, alleging Defendants violated their constitutional rights in connection with the investigation of a fire that destroyed Harris's business, and subsequent indictment, arrest, and prosecution of Plaintiffs for arson and criminal mischief in connection with the fire. Defendants to this action include Orleans County ("Orleans County"), Orleans County Sheriff ("Orleans County Sheriff"), County of Orleans Major Crime Task Force ("the Crime Task Force"), Albion Police Department ("Albion Police"), Village of Albion ("the Village"), Town of Albion ("the Town"), New York State Office of Fire Prevention and Control ("Fire Prevention Office"), Niagara County Sheriff ("Niagara County Sheriff"), Albion Fire Department ("Fire Department"), Rocco Sidari ("Sidari"), Jeremy Grahm ("Grahm"), Jeffrey Gifaldi ("Gifaldi"), Joseph Fuller (Fuller"), John Doyle ("Doyle"), Karol L. Hughes ("Hughes"), Erik Holter ("Holter"), Donald Clawson ("Clawson"), Michael Jutrowski ("Jutrowski"), Adriean Ann Park ("Park"), Paul E. Savage ("Savage"), Randi Shadic ("Shadic"), Steven M. Nassivera ("Nassivera"), Nicholas Long ("Long"), The Hartford ("Hartford"), and Sentinel Insurance Company, LTD ("Sentinel") (together, "Defendants"). Plaintiffs assert four claims for relief including (1) false arrest, Complaint ¶¶ 43–52 ("false arrest claim"); (2) malicious prosecution, Complaint ¶¶ 53–61 ("malicious prosecution claim"); (3) negligent hiring, supervision and retention, Complaint ¶¶ 62–69 ("supervisory liability claim"); and (4) false arrest, malicious prosecution, and deprivation of a fair trial in violation of Plaintiffs' civil rights under 42 U.S.C. § 1983 (" § 1983"), and the New York State Constitution, Complaint ¶¶ 70–75 ("civil rights claim"). On September 26, 2014, Defendants Fire Department, Grahm, and Sidari ("Fire Department Defendants"), filed an Answer (Doc. No. 12).

**\*2** On October 15, 2014, Defendants Orleans County, Orleans County Sheriff, the Crime Task Force, Albion Police, the Village, the Town, Niagara County Sheriff, Gifaldi, Fuller, Doyle, and Hughes ("Prosecuting Defendants") filed a motion to dismiss (Doc. No. 22) ("Prosecuting Defendants' Motion"), supported by the attached Declaration of Andrew Dylan, Esq. (Doc. No. 22–1) ("Dylan Declaration"), and

the Memorandum of Law in Support of Motion to Dismiss (Doc. No. 22–2) ("Prosecuting Defendants' Memorandum"). On November 3, 2014, Defendants Hartford, Sentinel and Nassivera ("Insurance Defendants"), filed a motion to dismiss (Doc. No. 28) ("Insurance Defendants' Motion"), attaching the Memorandum of Law in Support of Motion to Dismiss (Doc. No. 28–1) ("Insurance Defendants' Memorandum"). On November 7, 2014, Defendant Savage filed a motion to dismiss or, alternatively, for summary judgment (Doc. No. 30) ("Savage's Motion"), attaching in support the Memorandum of Law of Defendant Paul E. Savage (Doc. No. 30–1) ("Savage's Memorandum"), a Statement of Facts in Support of Motion for Summary Judgment (Doc. No. 30–2) ("Savage's Statement of Facts"), the Affidavit of Paul E. Savage in Support of Motion to Dismiss or for Summary Judgment (Doc. No. 30–3) ("Savage's Affidavit"), and the Declaration of Michael S. Leavy, Esq., in Support of Motion to Dismiss or for Summary Judgment (Doc. No. 30–4) ("Leavy Declaration"), with exhibits 1 through 4, and 5 (Docs. Nos. 30–5 through 30–10, and exhibit 3 (Doc. No. 31) ("Savage's Exh(s). ___"). On November 17, 2014, Defendants Fire Prevention Office, Holter, and Shadic ("Fire Prevention Defendants"), filed a motion to dismiss (Doc. No. 33) ("Fire Prevention Defendants' Motion"), attaching Defendants' New York State Office of Fire Prevention and Control, Erik Holter, and Randi Shadic Memorandum of Law in Support of Motion to Dismiss for Failure to State a Claim Pursuant to F.R.C.P. 12(b)(6) (Doc. No. 33–1) ("Fire Prevention Defendants' Memorandum").

In opposition to the motions to dismiss, Plaintiffs filed on December 8, 2014, the Cross–Notice of Motion [*sic* ] (Doc. No. 36) ("Plaintiff's Motion"), seeking leave to file an amended complaint, attaching the Declaration of David S. Stern, Esq. ("Stern Declaration"), the Memorandum in Support of Plaintiff [*sic* ] Opposition to Defendants' Motions to Dismiss Complaint and in Support of Cross Motion Permitting Plaintiffs to Amend Their Complaint ("Plaintiffs' Memorandum"), with a copy of the proposed amended complaint attached as Exh. A ("Proposed Amended Complaint"). Plaintiffs' Memorandum contains legal argument in support of Plaintiffs' Motion seeking leave to file an amended complaint but does not respond to the various arguments made by the Defendants moving to dismiss.

On December 23, 2014, Prosecuting Defendants filed in further support of dismissal the Reply Declaration of Florina Altshiler, Esq. (Doc. No. 38) ("Altshiler Reply Declaration"),

attaching exhibits A and B ("Prosecuting Defendants' Reply Exh(s). ___"). On January 12, 2015, Savage filed the Reply Memorandum of Law of Defendant Paul E. Savage in Further Support of Motion to Dismiss Complaint Pursuant to Fed.R.Civ.P. 12(b)(6), or, Alternatively, for Summary Judgment Pursuant to Fed.R.Civ.P. 56(a) (Doc. No. 41) ("Savage Reply"). On January 14, 2015, the Insurance Defendants filed the Attorney Declaration of Laurie A. Giordano, Esq. (Doc. No. 42) ("Giordano Reply Declaration"), attaching the Memorandum in Reply to Plaintiffs' Opposition to Motion to Dismiss and in Opposition to Plaintiffs' Motion to Amend the Complaint (Doc. No. 42–1) (Insurance Defendants' Reply"), the Fire Prevention Defendants filed the Declaration of Assistant Attorney General Stephanie Joy Calhoun (Doc. No. 43) ("Calhoun Reply Declaration"), and the Prosecuting Defendants filed the Amended Reply Declaration of Florina Altshiler, Esq. (Doc. No. 44) ("Amended Altshiler Reply Declaration"), attaching exhibits A and B ("Prosecuting Defendants' Exh(s). ___"). Oral argument was deemed unnecessary.

**\*3** Based on the following, the Prosecuting Defendants' Motion should be GRANTED in part and DENIED in part; the Insurance Defendants' Motion should be GRANTED; Savage's Motion should be GRANTED insofar as it seeks to dismiss the Complaint for failure to state a claim and is DISMISSED as moot as to the alternative request for summary judgment; and the Fire Prevention Defendants' Motion should be GRANTED; Plaintiffs' Motion is GRANTED in part and DENIED in part.

### FACTS

Because the motions pending before the court include motions by various Defendants to dismiss for failure to state a claim, and Plaintiffs' crossmotion for leave to file an amended complaint alleging additional facts so as to avoid dismissal of the action, the court, in the interest of completeness and clarity, separately considers the facts of both the Complaint and the Proposed Amended Complaint, as well as facts found in a report prepared by an insurance investigator incorporated by reference into the Proposed Amended Complaint.

**The Complaint**
The facts as pleaded in the Complaint, although sparse, assert that on August 13, 2012, "Defendants began an arson investigation of the Plaintiffs herein arising from a fire loss

that occurred on or about that date located at 158 Hamilton Street, Albion, New York." Complaint ¶ 32. Defendants appeared before an Orleans County grand jury ("the Grand Jury")[2] and presented evidence resulting in an indictment on March 15, 2013 ("the Indictment"),[3] charging Plaintiffs with violations of New York Penal Law ("N.Y. Penal Law") § 150.10(1) (Arson in the Third Degree) ("the arson charge"), and § 145.00(1) (Criminal Mischief in the Fourth Degree) ("the criminal mischief charge") (together, "the criminal charges"). After the Indictment was returned, Plaintiffs were arrested on the charges and tried in Orleans County Court, before County Court Judge James P. Punch ("Judge Punch") ("the trial"). The trial commenced on November 12, 2013, and continued through November 22, 2013, when Judge Punch dismissed both charges against Harris[4] and the jury returned a verdict acquitting Wright on both charges. Plaintiffs maintain that the investigation and prosecution damaged their personal and social reputations, as well as their business reputation and standing in the business community and that those involved in investigating the fire failed to thoroughly discern whether the fire was electrical in nature and not an arson.

2    Plaintiffs do not specify which Defendants appeared before the Grand Jury.

3    Exh. A.

4    Why the criminal charges were dismissed against Harris is not stated in the record.

**The Proposed Amended Complaint**
The Proposed Amended Complaint Plaintiffs seek leave to file provides more facts including that on March 13, 2012, Plaintiff Harris opened her own business, a novelty/smoke shop and second-hand clothing store ("the shop"), located at 158 Hamilton Street, in Albion, New York. Proposed Amended Complaint ¶¶ 33–34. The building in which the shop was located had recently been purchased and extensively renovated by Harris and her boyfriend, Plaintiff Wright, and Plaintiffs, in addition to their hard work and labor, invested $ 18,000 in the premises, $ 45,000 in inventory, $ 10,000 in display cases, and $ 35,000 in "tattoo flash"[5] and artwork. *Id.* ¶¶ 35–37. On August 12, 2012, a fire ("the fire") heavily damaged the shop and resulted in a total loss of its inventory and contents. *Id.* ¶¶ 38, 40. Harris was notified of the fire by a customer, one Amber M. Mesita ("Mesita"), who telephoned Plaintiff in the early morning of August 12, 2012. Harris and

Wright then "rushed" to the shop and were told by Mesita that she informed Defendant Ablion Police Officer John Doyle ("Doyle"), who was the first police officer to arrive at the scene of the fire, that Mesita smelled what she recognized as the odor of an electrical fire. *Id.* ¶ 45. Doyle interviewed both Harris and Wright, preparing written statements for their signatures, *id.* ¶ 46, but never recorded Mesita's observation regarding the odor of an electrical fire. *Id.* ¶ 47. On August 13, 2012, Defendants commenced an arson investigation of the fire ("the investigation"). Plaintiffs cooperated with the investigation, including consenting to further interviews by insurance investigators Defendants Paul Savage ("Savage") and Steve Nassivera ("Nassivera"), and insurance adjuster Jennifer Holler ("Holler"),[6] as well as Defendants Albion Police Officer Jeffrey Gifaldi ("Gifaldi") and Sergeant Joseph Fuller ("Fuller"). Proposed Amended Complaint ¶¶ 48–50. Defendant Donald Clawson ("Clawson"), who was known in the community to have a psychiatric and criminal history, contacted the Albion Police, the Orleans County Sheriff, and Defendant Hartford Insurance Company ("Hartford"), reporting that Wright burned down the shop, hoping to receive reward money for reporting the arson. *Id.* ¶¶ 51–53. According to Plaintiffs, "the investigators in this case were overcome by their eagerness and zeal of convicting Plaintiffs demonstrated by their conduct in selectively choosing evidence and ignoring blunt holes in their case." *Id.* ¶ 54. Plaintiffs assert that Clawson reported Wright started the fire in a red plastic bucket, despite Savage and Holter's conclusion that if the fire originated in the red plastic bucket, it would have been burnt beyond recognition. *Id.* ¶ 55. Plaintiffs allege Defendant Albion Fire Department Chief Rocco Sidari ("Sidari"), failed to hire an arson investigator to conduct a proper investigation of the fire and coached witnesses, including Albion Fire Department employee Jeremy Grahm ("Grahm"), and another, unidentified firefighter, to testify that "the fire appeared as if it were from an incendiary origin...." *Id.* ¶¶ 57–59. Plaintiffs similarly assert Defendant police investigator Gifaldi, despite knowing Clawson's reputation, "cajoled" witnesses, including Defendants Adrian Park ("Park"), and Michael Jutrowski ("Jutrowski"), into testifying at trial against Plaintiffs with threats of jail. *Id.* ¶¶ 60–62. Plaintiffs' describe Park's trial testimony as informing the jury Gifaldi had forced her to testify against Plaintiffs, while Jutrowski testified Wright started the fire "by flipping a cigarette above the inflammable ceiling tiles," *id.* ¶¶ 63, which conflicted with Prosecuting Defendants' own investigation. *Id.* ¶ 64.

5    "Tattoo flash" refers to "common designs, usually drawn on paper or cardboard and displayed prominently on the walls or in binders in tattoo shops." What is Tattoo Flash?, available at http://tattoo.about.com/od/tattoosartandphotoss/fl/What-is-Tattoo-Flash.htm, last visited September 9, 2015.

6    Holler is not named as a Defendant in either the Complaint or in the Proposed Amended Complaint.

**\*4** Harris's insurance company, Defendant Hartford, retained fire origin and cause investigation firm PT & C Forensic Consulting Services, P.A. ("PT & C"),[7] based in Atlanta, Georgia, to conduct a forensic investigation of the fire's origin and caused, which was conducted on August 15, 2012, by Savage, PT & C's Senior Fire & Explosion Consultant. Proposed Amended Complaint ¶ 65. In his report ("Investigative Report"), dated September 10, 2012, Savage, based on his investigation including three fire debris samples for which laboratory analysis revealed no accelerants present, concluded the fire originated along the rear wall of the shop's office, that the ignition source, the first material ignited, and ignition sequence were all unknown, and the fire's "cause classification" was "undetermined with incendiary not eliminated." *Id.* ¶¶ 65–66. Although Gifaldi subsequently provided Savage with Defendant Niagara County Sheriff's Office Forensic Laboratory report ("Niagara County Forensic Laboratory Report"), indicating accelerants were present in one of two fire debris samples, consistent with a "medium petroleum distillate," such as mineral spirits, paint thinners, and charcoal starters, such findings did not change Savage's conclusion in the Investigative Report. *Id.* ¶ 67. Plaintiffs assert Gifaldi agreed with Savage's conclusion that the fire originated in the shop's rear office wall near Harris's desk, *id.* ¶ 68, yet Defendant Albion Police employees, including Doyle, Fuller, Gifaldi, and Hughes, failed to secure video footage from a security digital video recorder ("DVR"), which Plaintiffs maintain would have established Plaintiffs did not set the fire. *Id.* ¶ 71.

7    PT & C is not named as a defendant to this action.

Plaintiffs assert Defendant Erik Holter ("Holter"), an investigator with Defendant Fire Prevention Office, failed to conduct a proper fire investigation to determine whether an electrical short caused the fire, and instead simply rubber-stamped Gifaldi's investigation despite its obvious short-comings. Proposed Amended Complaint ¶ 72. According to Plaintiffs, Nassivera intentionally misused tape recorded

Wright v. Orleans County, Not Reported in F.Supp.3d (2015)
Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 120 of 186
2015 WL 5316410

statements of Plaintiffs when testifying at the trial, interpreting inaudible portions of the audio recordings so as to slant the meaning against Plaintiffs. *Id.* ¶ 73. Gifaldi allegedly "interviewed witnesses of known doubtfulness," and provided false Grand Jury testimony to secure the Indictment, including stating the shop's security system and DVR were not operating at the time of the fire, and that Plaintiffs had purposefully shut off a fire alarm system which Plaintiffs maintain was abandoned by the shop's former tenant. *Id.* ¶ 74. Gifaldi allegedly embellished his job title at the trial, claiming to be a "Level II" arson investigator when no such designation exists, and also falsely testified that he failed to take any contemporaneous hand written notes which were contradicted by witnesses who reported observing Gifaldi taking notes.

**Fire Investigative Reports**

**\*5** The Proposed Amended Complaint refers to both the Investigative Report prepared by Savage and a supplement to the Investigative Report ("Supplemental Report"), prepared by Savage regarding the Niagara County Forensic Laboratory Report. In particular, Savage reported that Defendant Albion Police Department ("Albion Police"), initially listed the fire's cause as "undetermined pending further investigation." Investigative Report at 2. According to Savage, although there was smoke and heat damage throughout the shop, most of the shop's fire damage occurred in the shop's office, particularly at the rear wall near Harris's desk and a large sofa. *Id.* at 3. Wright's desk, located at the office's doorway, had less damage but the remains of a medium sized red plastic trash can with "fire/melt damage" and which had "melted into itself," was found in front of Wright's desk instead of in its regular location between Harris's desk and the large sofa. *Id.* The caption to photo 52 accompanying the Investigative Report ("Photo 52")[8] depicting the red plastic trash can states "[t]he red trash can did not burn here, there is no corresponding fire damage to [Wright's][9] wood desk. This may have been moved/kicked around by fire department personal [*sic*] during suppression. It should have been at the rear wall next to [Harris's] desk."

8    Savage's Exh. 2–b (Doc. No. 30–7) at 26.

9    Unless otherwise indicated, all bracketed material has been added.

Savage reported that close examination of the shop's rear entry door revealed a "very loose" striker plate that "was not loose from pry damage, but would have to [have] been

loosened by unscrewing the two large metal/steel screws that hold it in place against the jamb." Investigative Report at 3. Because the loosened strike plate moved, the rear door hardware "plunger was not able to seat properly in the striker plate and could move easily." *Id.* Savage essentially ruled out the fire's cause as electrical as "[e]xamination of structural electrical conductors and receptacles showed no arc damage or any indication of being related to the cause of the fire." *Id.* A power strip on the floor near Harris's desk "sustained total fire damage" although Harris "stated it was not plugged in or being used." *Id.*

Savage reported that in an on-scene interview Harris stated that on Sunday, March 11, 2012, she was in the shop's office at 11:00 P.M ., reviewing bills and invoices while she waited for Wright to drive her home. Investigative Report at 4. Wright arrived around midnight and drove Harris to her home where they later received a telephone call notifying them the shop was on fire. *Id.* The fire had been extinguished by the time Plaintiffs returned to the shop, but the fire trucks remained on the scene. Harris stated that "things were not too good with bills." *Id.*

Savage also interviewed Wright who described helping Harris with the shop, receiving from his realtor ex-father-in-law household items and clothing from 'house clean outs' to be sold second-hand in the shop. Savage Report at 4. Wright stated he had received from a friend with a recent financial settlement two loans for the shop, the first for $ 20,000 and the second for $ 50,000. *Id.* Wright admitted the shop was behind on its bills. *Id.* Wright further stated he picked up Harris the night of the fire, setting the alarm system and turning on a DVD recorder for outside cameras before leaving with Harris at midnight, taking their laptop computers with them. *Id.* Wright and Harris went to Harris's home where they fell asleep and were awoken by a telephone call informing them of the fire at the shop. *Id.* Wright stated they "had to find a ride so they could get back to the shop taking about 30 to 40 minutes." *Id.* Both Harris and Wright denied having a key to the shop's rear door, stating "it could be secured with a slam slam shut." *Id.*

**\*6** Savage concluded the fire originated along the rear wall of the store's office, that the fire's cause was "undetermined with incendiary not eliminated," and noting that no accelerants had been detected on any fire debris samples collected at the scene of the fire. Investigative Report at 4. In his report, Savage also commented that

This fire is still being investigated by the Albion Police. Several pieces of interview information are not clear. Although the lab report is negative for ignitable/flammable liquids in the samples collected, this does not remove the possibility of manual open flame to paper or other combustibles. There are other issues with regards to the structure and with the insured's ability to drive away from the shop at closing yet needing to "find a ride" back to the scene.

*Id.* at 5.

In a supplemental letter report issued on November 7, 2012 ("Supplemental Report"), [10] Savage indicated Defendant Albion Police Detective Jeff Gifaldi ("Gifaldi") had advised of the discovery in the fire debris of an accelerant consistent with a medium petroleum distillate such as mineral oil, but that the discovery did not change Savage's conclusion and the fire's cause remained undetermined "with incendiary still not eliminated." Supplemental Report at 1.

[10]    Savage's Exh. 5 (Doc. No. 31).

### DISCUSSION

Pending before the court are motions to dismiss filed by Prosecuting Defendants, Insurance Defendants, Defendant Savage, and Fire Prevention Defendants ("moving Defendants"). The other named Defendants to this action, including the Albion Fire Department, Rocco Sidari, Jeremy Grahm, Donald Clawson, Michael Jutrowski, Adrieian Ann Park, and Nicholas Long (the non-moving Defendants"), have not moved to dismiss. In opposition to the motions to dismiss, Plaintiffs have moved for leave to file an amended complaint, but have not otherwise responded in opposition to the moving Defendants' arguments in support of dismissal.

### 1. Insufficient Service of Process
Defendant Crime Task Force moves to dismiss the Complaint for insufficient service of Process based on Plaintiffs'

failure to file the affidavit required under Fed.R.Civ.P. 4(l) (1) indicating service was made. Prosecuting Defendants' Memorandum at 4. A review of the docket, however, establishes an Affidavit of Process Server was filed on October 3, 2014 (Doc. No. 21–2), stating that on August 27, 2014, one Eric Harling, an Investigator with the Crime Task Force, was personally served with a copy of the summons and verified Complaint. Accordingly, Prosecuting Defendants' Motion should be DENIED insofar as they seek dismissal of the action as against the Crime Task Force for insufficient service of process. [11]

[11]    Inasmuch as the Crime Task Force is not a suable entity, *see* Discussion, *infra,* at 17–18, the action should be dismissed as to this Defendant, and the issue of service on the Crime Task Force, the manner of which Prosecuting Defendants do not challenge, is academic.

### 2. Motion to Dismiss
Pending before the court are four motions to dismiss the Complaint filed by the Prosecuting Defendants, the Insurance Defendants, Savage, and the Fire Prevention Defendants. On a motion to dismiss under Fed.R.Civ.P. 12(b)(6) ( "Rule 12(b) (6)"), the court looks to the four corners of the complaint and is required to accept the plaintiff's allegations as true and to construe those allegations in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Goldstein v. Pataki,* 516 F.3d 50, 56 (2d Cir.2008) (court is required to liberally construe the complaint, accept as true all factual allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor). The Supreme Court requires application of "a 'plausibility standard,' which is guided by '[t]wo working principles.' " *Harris v. Mills,* 572 F.3d 66, 71–72 (2d Cir.2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). "First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' " *Harris,* 572 F.3d at 72 (quoting *Iqbal,* 556 U.S. at 678). " 'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss,' and '[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court

Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 122 of 186
Wright v. Orleans County, Not Reported in F.Supp.3d (2015)
2015 WL 5316410

to draw on its judicial experience and common sense.' " *Id.*
(quoting *Iqbal,* 556 U.S. at 679).

**\*7** "To survive a motion to dismiss, a complaint must
contain sufficient factual matter, accepted as true, to 'state a
claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at
678 (quoting *Twombly,* 550 U.S. at 570). "A claim will have
'facial plausibility when the plaintiff pleads factual content
that allows the court to draw the reasonable inference that
the defendant is liable for the misconduct alleged.' " *Sykes v.
Bank of America,* 723 F.3d 399, 403 (2d Cir.2013) (quoting
*Ashcroft,* 556 U.S. at 678); *see Twombly,* 550 U.S. at 570
(the complaint must plead "enough facts to state a claim to
relief that is plausible on its face"). The factual allegations
of the complaint "must be enough to raise a right to relief
above the speculative level on the assumption that all the
allegations in the complaint are true." *Twombly,* 550 U.S.
at 570. " 'In adjudicating a motion to dismiss, a court may
consider only the complaint, any written instrument attached,
and any document upon which the complaint heavily relies.'
" *ASARCO LLC v. Goodwin,* 756 F.3d 191, 198 (2d Cir.2014)
(quoting *In re Thelen LLP,* 736 F.3d 213, 219 (2d Cir.2013)).

In the instant case, a thorough review of the Complaint
establishes it fails to state any viable claim against
Prosecuting Defendants, Insurance Defendants, Savage, and
Fire Prevention Defendants.

### A. Capacity to be Sued
Preliminarily, the court addresses the Prosecuting Defendants'
argument, Prosecuting Defendants' Memorandum at 2–4, that
the Orleans County Sheriff, the Crime Task Force, the Albion
Police, and the Niagara County Sheriff lack the capacity to be
sued, requiring dismissal of the Complaint as against them.
Plaintiffs have not responded in opposition to this argument,
nor have Prosecuting Defendants argued in further support of
the argument.

The "[c]apacity to sue or be sued is determined ... by the
law of the state where the court is located," Fed.R.Civ.P.
17(b), here, the law of New York which, as relevant, provides
that a "municipal corporation" may sue or be sued. N.Y.
General Municipal Law ("N.Y.Gen.Mun.Law") § 50. Further,
a "municipal corporation," as defined, "includes only a
county, town, city and village." N.Y. Gen. Mun. Law § 2.

An administrative arm of a municipal corporation, however,
does not exist separate and apart from the municipality
and does not have its own legal identity. *Laboy v. Ontario*

*County, N.Y.* —— F.Supp.3d ——; 2015 WL 1977251, at
\* 6 (W.D.N.Y. May 4, 2015). In the instant case, the
Orleans County Sheriff and the Crime Task Force are
administrative arms of Orleans County, the Albion Police
is an administrative arm of the Village of Albion, and the
Niagara County Sheriff is an administrative arm of the County
of Niagara. *See Phillips v. Cortland City Police,* 2013 WL
5462951, at \* 2 (N.D.N.Y. Sept.30, 2013) ("Because the
Defendant Police Department is an administrative arm of
the City of Cortland, it lacks the capacity to be sued.");
*McKenzie v. County of Erie,* 2013 WL 5348084, at \* 2
(W.D.N.Y. Sept.23, 2013) (dismissing claims against various
Erie County departments, including the Erie County Sheriff's
Department, the Erie County Holding Center, the Erie County
Department of Health, and the Erie County Department
of Mental Health, as each such department "is merely an
administrative arm of the County, and they therefore lack the
capacity to be sued."). As such, the Orleans County Sheriff,
the Crime Task Force, the Albion Police, and the Niagara
County Sheriff cannot sue or be sued. *Id.* Accordingly, the
Prosecuting Defendants' Motion should be GRANTED as
to all claims set forth in the Complaint against the Orleans
County Sheriff, the Crime Task Force, the Albion Police, and
the Niagara County Sheriff. [12]

12      Fire Prevention Defendants did not similarly argue
        in support of dismissal that the Fire Prevention
        Office also, as an administrative arm of the state,
        similarly lacks the capacity to be sued.

### B. Niagara County Sheriff
**\*8** Prosecuting Defendants also seeks dismissal of the
malicious prosecution and negligence claims against Niagara
County Sheriff for failing to plead any facts indicating
the Niagara County Sheriff was involved in the criminal
prosecution against Plaintiffs, which occurred in Orleans
County. Prosecuting Defendants' Memorandum at 10–11.
Plaintiffs have not responded in opposition to this argument.

A thorough reading of the Complaint reveals no factual
allegations against Niagara County Sheriff. Further, the
Complaint indicates that the criminal prosecution of which
Plaintiffs complain occurred in Orleans County where the
shop is located. The Complaint thus fails to state any viable
claim against Niagara County Sheriff.

Prosecuting Defendants' Motion should thus be GRANTED
as to Niagara County Sheriff.

## C. Civil Rights Claims

The Prosecuting Defendants are alleged in the fourth claim pursuant to § 1983 to have violated Plaintiffs' civil rights. Complaint ¶¶ 70–75. An individual may seek damages against any person who, under color of state law, subjects such individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States. 42 U.S.C. § 1983. Under § 1983 an action is permitted "against a 'person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.' " *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 225 (2d Cir.2004) (quoting 42 U.S.C. § 1983). Section § 1983, however, " 'is not itself a source of substantive rights.' " *Id.* (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Rather, § 1983 "merely provides 'a method for vindicating federal rights elsewhere conferred....' " *Id.* The elements of a § 1983 claim include (1) the deprivation of a federal constitutional or statutory right, (2) by a person acting under color of state law. *Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005). Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* (citing *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); and *Baker,* 443 U .S. at 140).

In the instant case, Plaintiffs allege Prosecuting Defendants subjected them to unlawful arrest, malicious prosecution, and denial of a fair trial in violation of their Fourth, Fifth, Sixth and Fourteenth Amendment rights.

## D. False Arrest and Malicious Prosecution Claims

Plaintiffs assert claims for false arrest and malicious prosecution under both New York common law and § 1983. Complaint ¶¶ 43–52 (New York common law false arrest); 53–61 (New York common law malicious prosecution); and 70–75 (§ 1983 false arrest and malicious prosecution). The common law false arrest claim and the civil rights claim are asserted only against some of the Prosecuting Defendants, including the Orleans County Sheriff, the Crime Task Force, and the Albion Police Department, whereas the common law malicious prosecution claim is asserted against all Prosecuting Defendants, Defendant Savage, the Insurance Defendants, and the Fire Prevention Defendants, as well as against the non-moving Defendants. As discussed below, the existence of probable cause, as evidenced by the Indictment, requires the dismissal of these claims.

**\*9** Plaintiffs' first claim is a New York tort claim for false arrest. Complaint ¶¶ 43–52. "Under New York law, a plaintiff claiming false arrest must show, *inter alia,* that the defendant intentionally confined him without his consent and without justification." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (citing *Broughton v. State,* 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310, 313–14 (N.Y.), *cert. denied,* 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975)). The elements of a false arrest claim under New York law include that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged. *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994) (citing *Benjamin v. United States,* 554 F.Supp. 82, 85 (E.D.N.Y.1982)).

Plaintiffs' second claim is for malicious prosecution in violation of New York common law. Complaint ¶¶ 53–61. "To establish a malicious prosecution claim under New York Law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against the plaintiff; (2) the termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello v. City of New York,* 612 F.3d 149, 161 (2d Cir.2010) (internal quotation marks and citations omitted).

The fourth claim alleges both false arrest and malicious prosecution in violation of § 1983. Complaint ¶¶ 70–75. The same false arrest and malicious prosecution claims Plaintiffs bring under New York common law may be brought under § 1983 because such claims invoke the Fourth Amendment's protection of an individual's liberty interest with respect to criminal prosecutions. *See Singer v. Fulton County Sheriff,* 63 F.3d 110, 115–16 (2d Cir.1995) (Fourth Amendment is the source of § 1983 claims for malicious prosecution and false arrest).

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law. *Weyant,* 101 F.3d at 852. "In analyzing § 1983 claims for unconstitutional false arrest, we have generally looked to the law of the state in which the arrest occurred." *Jaegly v. Couch,* 439 F.3d 149, 151 (2d Cir.2006) (internal quotation marks omitted). Similarly, "[a] § 1983 claim for malicious prosecution looks to the relevant state

common law." *Gonzalez v. City of Schenectady,* 728 F.3d 149, 162 (2d Cir.2013) (citing *Janetka v. Dabe,* 892 F.2d 187, 189 (2d Cir.1989)). Under New York law, a plaintiff must show that the underlying proceeding was terminated in his favor to make out a malicious prosecution claim. *Id.* " 'Where the prosecution did not result in an acquittal, it is deemed to have ended in favor of the accused, for these purposes, only when its final disposition is such as to indicate the innocence of the accused.' " *Id.* (quoting *Murphy v. Lynn,* 118 F.3d 938, 948 (2d Cir.1997)).

**\*10** As stated, Background, *supra,* at 4, Plaintiffs allege New York common law claims for false arrest and malicious prosecution, as well as § 1983 claims based on false arrest, malicious prosecution, and denial of a fair trial. The existence of probable cause for the arrest and malicious prosecution of Plaintiffs, however, is a complete defense to Plaintiffs' common law false arrest and malicious prosecution claims, as well as Plaintiffs' § 1983 false arrest and malicious prosecution claims. *See Manganiello v. City of New York,* 612 F.3d 149, 161–62 (2d Cir.2010) (probable cause is complete defense to malicious prosecution claim in violation of New York common law and § 1983); *Jaegly v. Couch,* 439 F.3d 149, 152 (2d Cir.2006) ("Under New York law, the existence of probable cause is an absolute defense to a false arrest claim."); (*Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995) (probable cause is complete defense to false arrest in violation of civil rights claim).

Further, an indictment by a grand jury establishes a rebuttable presumption of probable cause.[13] *Manganiello,* 612 F.3d at 162 (citing *Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir.2003)). The presumption of probable cause "may be rebutted only 'by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." " *Manganiello,* 612 F.3d at 162 (quoting *Savino,* 331 F.3d at 72 (quoting *Colon v. City of New York,* 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248, 1251 (N.Y.1983))). Where there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have 'lied in order to secure an indictment,' and 'a jury could reasonably find that the indictment was secured through bad faith or perjury,' the presumption of probable cause created by the indictment may be overcome." *Id.* (quoting *Boyd v. City of New York,* 336 F.3d 72, 77 (2d Cir.2003)). " 'Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-

seeking function of the trial process." " *Id.* (quoting *Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123, 130 (2d Cir.1997) (quoting *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976))).

13      Although an indictment subsequent to an arrest does not give rise to a presumption of probable cause to defeat a false arrest claim, *Broughton v. State,* 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310, 313 (N.Y.1975) (holding arraignment and subsequent indictment of defendant did not generate presumption of probable cause to support arrest), in the instant case, according to the Complaint, Plaintiffs were indicted prior to the arrest. Complaint ¶ 39 ("as a result of said indictment the Plaintiffs were both arrested and deprived of their liberty ...."). An arrest is privileged if based on probable cause in accord with the fourth element under New York law. *See Bernard,* 25 F.3d at 102 (affirming district court's grant of summary judgment in favor of government on plaintiff's false arrest claim where the only element in dispute, *i.e.,* that the confinement was privileged, was established by the existence of probable cause to support the arrest).

Nevertheless, "probable cause can exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994) (citing *Colon v. City of New York,* 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (N.Y.1983). Further, "that plaintiff was ultimately acquitted after trial does not negate the existence of probable cause [rebutting the presumption of probable cause afforded by the indictment]." *Nadal v. City of New York,* 105 A.D.3d 598, 964 N.Y.S.2d 100, 101 (1st Dept.2013) (citing *Jenkins v. City of New York,* 2 A.D.3d 291, 770 N.Y.S.2d 22, 24 (1st Dept.2003) ("Despite plaintiff's subsequent acquittal, there was nonetheless probable cause for the arresting officers' actions.")).

**\*11** In the instant case, the Indictment returned by the Orleans County Grand Jury on March 15, 2013, establishes the requisite probable cause to extinguish Plaintiffs' common law false arrest and malicious prosecution claims, as well as Plaintiffs' § 1983 claims based on false arrest and malicious prosecution. Significantly, Plaintiffs do not allege in the Complaint any facts which, if true, would establish that the Indictment was secured through bad faith or perjury by persons acting under color of state law, such as law

Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 125 of 186
Wright v. Orleans County, Not Reported in F.Supp.3d (2015)
2015 WL 5316410

enforcement officers, so as to rebut the presumption of probable cause supporting the Indictment, and a plain reading of the Complaint reveals no allegations to that effect.

Accordingly, Plaintiffs' New York common law claims for false arrest and malicious prosecution, as well as the § 1983 claim for false arrest and malicious prosecution fail to state a claim for which relief could be granted and the motions to dismiss should be GRANTED as to these claims.

**E. Fair Trial**

Insofar as Plaintiffs' civil rights claim can be construed as alleging a violation of their right to a fair trial, *see* Complaint ¶ 33 (alleging unspecified Defendants appeared before the Grand Jury and intentionally or negligently misrepresented and falsified facts and evidence); ¶ 34 (alleging unspecified Defendants presented false, fraudulent and perjured testimony to the Grand Jury and at trial); and ¶ 73 (alleging violations of, *inter alia,* Plaintiffs' Fifth, Sixth, and Fourteenth Amendments), the Complaint may be liberally construed as asserting a denial of the fundamental right to a fair trial which must be dismissed for failure to state a claim. *See Bertuglia v. City of New York,* 839 F.Supp.2d 703, 723 (S.D.N.Y.2012) (" 'Pursuant to § 1983 and prevailing case law, denial of a right to a fair trial is a separate and distinct cause of action.' " (quoting *Nibbs v. City of New York,* 800 F.Supp.2d 574, 575 (S.D.N.Y.2011))).

"The Constitution guarantees a fair trial through the Due Process Clauses [of the Fifth and Fourteenth Amendments], but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment .... " *Strickland v. Washington,* 466 U.S. 668, 684–85, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (analyzing habeas petition asserting denial of fair trial based on violation of right to counsel under Sixth Amendment). Specifically, "the due process analysis is basically the same under both the Fifth and Fourteenth Amendments." *Chew v. Dietrich,* 143 F.3d 24, 28 n. 4 (2d Cir.1998). "[T]he [Supreme] Court has held that the due process clause of the Fifth Amendment prohibits federal action if the same action taken by a state would be proscribed under the Fourteenth Amendment." *United States Postal Service v. Brennan,* 574 F.2d 712, 717 n. 10 (2d Cir.1978) (citing *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954)). Here, however, Plaintiffs challenge only actions allegedly taken by Defendants under New York law and, as such, Plaintiffs allege only a violation of the Fourteenth Amendment, rather than the Fifth Amendment.

The Complaint thus fails to state any § 1983 claim based on a violation of the Fifth Amendment.

**\*12** Although a due process violation, including denial of the right to a fair trial, can be established by demonstrating that state action deprived Plaintiffs of a property or liberty interest protected by the Fourteenth Amendment, *Velez,* 401 F.3d at 85, the Fourteenth Amendment is relevant to Plaintiffs' fair trial claim only insofar as the Fourteenth Amendment's Due Process Clause make the Sixth Amendment applicable to Defendants as state actors. *See Tennesee v. Lane,* 541 U.S. 509, 523, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) (recognizing the Sixth Amendment applies to the states via the Fourteenth Amendment). Further, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). Accordingly, because the Sixth Amendment provides the "explicit source of constitutional behavior" for Plaintiffs' fair trial claim, the claim cannot be analyzed under the Fourteenth Amendment.

The Sixth Amendment provides

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

U.S. Const. Amend. 6.

Further, that the government must prove the elements of the charged crime beyond a reasonable doubt "is a requirement

Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 126 of 186

and a safeguard of due process of law in the historic, procedural content of 'due process.' " *In re Winship,* 397 U.S. 358, 362, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (quoting *Leland v. Oregon,* 343 U.S. 790, 802–03, 72 S.Ct. 1002, 96 L.Ed. 1302) (1952) (Frankfurter, J., dissenting)).

"It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of the false evidence fabricated by a government officer." *Zahrey v. Coffey,* 221 F.3d 342, 355 (2d Cir.2000). "Such a claim based on fabrication of evidence may be properly pled where a plaintiff alleges that defendants fabricated evidence, which was likely to influence a jury's decision, and forwarded it to prosecutors." *McHenry v. Bell,* 2015 WL 2354438, at *8 (N.D.N.Y. May 15, 2015) (citing *Bertuglia,* 839 F.Supp.2d at 724; and *Ricciuti,* 124 F.3d at 130). " 'The constitutional right in question is the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity ... provided that the deprivation of liberty ... can be shown to be the result of the [officer's] fabrication of evidence." *Id.* (internal quotation marks and citations omitted). "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial...." *Ricciuti,* 124 F.3d at 130. Further, "[i]t has long been established that a prosecutor who knowingly uses false evidence at trial to obtain a conviction acts unconstitutionally." *Zahrey,* 221 F.3d at 355.

**\*13** In the instant case, although Plaintiffs allege unidentified Defendants presented falsified information to the Grand Jury as well as at trial, the failure to specify what constituted the allegedly falsified information is fatal to Plaintiffs' fair trial claim. Nor does Plaintiffs' assertion, Complaint ¶ 35, that exculpatory evidence was withheld from the Grand Jury require a different result because the prosecutor is not required to disclose to the grand jury "substantial exculpatory evidence" in its possession. *United States v. Williams,* 504 U.S. 36, 51–55, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) ("requiring the prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body."). Here, none of the individual moving Defendants are alleged by Plaintiffs to have acted in a manner by which Plaintiffs' trial was unfairly compromised.

Accordingly, the motions to dismiss should be GRANTED insofar as Plaintiffs' claim they were denied a fair trial by any named Defendant.

### F. Personal Involvement

Prosecuting Defendants and Insurance Defendants argue in support of dismissal that Plaintiffs' have failed to allege the requisite personal involvement of individual Defendants in the asserted claims, relying instead on "group pleading" allegations which are insufficient to put the Defendants on notice as to the claims asserted against them and thus fail to comport with Fed.R.Civ.P. 8 ("Rule 8"). Prosecuting Defendants' Memorandum at 6–8; Insurance Defendants' Memorandum at 5–6. Fire Prevention Defendants argue the Complaint fails to allege any of the Fire Prevention Defendants were personally involved in the asserted unlawful conduct. Fire Prevention Defendants' Memorandum at 5–6.

" 'It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Spavone v. New York State Dept. of Correctional Services,* 719 F.3d 127, 135 (2d Cir.2013) (quoting *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Pleadings that fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim. *See, e.g., Holmes v. Allstate Corp.,* 2012 WL 627238, at ——7 and 22 (S.D.N.Y. Jan.27, 2012) (commenting that "[p]laintiffs' method of group pleading is incoherent or illogical" and "Rule 8(a) is violated where a plaintiff, by engaging in 'group pleading,' fails to give each defendant fair notice of the claims against it." (citing *Pierson v. Orlando Regional Healthcare Systems, Inc.,* 619 F.Supp.2d 1260, 1273 (M.D.Fla.2009) (dismissing complaint because group-pleading method of collectively referring to individual defendants and two physician groups as "Peer Review Defendants" throughout complaint did not satisfy the "fair notice" requirement of Rule 8))); *Zurich American Ins. Co. v. Dah Sing Bank, Ltd.,* 2004 WL 1328215, at *6 (S.D.N.Y. June 15, 2004) (dismissing complaint as against one defendant bank against whom not "a single factual allegation" was made but, rather, "lumps the three bank defendants together and asserts that they collectively processed the checks."). Such "group pleading" is insufficient for purposes of Rule 8(a) (2) which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *See Iqbal,* 566 U.S. at 678 ("the pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." (citations and quotation marks omitted)).

Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 127 of 186
Wright v. Orleans County, Not Reported in F.Supp.3d (2015)
2015 WL 5316410

**\*14** Here, Plaintiffs' failure to specify against which moving Defendants their claims are asserted requires dismissal of Plaintiffs' claims as to those Defendants.

### G. Supervisory Liability

Plaintiffs' third claim alleges supervisory liability under § 1983 and New York law against Defendants Orleans County, the Town, the Village, the Orleans County Sheriff, the Crime Task Force, the Fire Prevention Office, the Niagara County Sheriff, Hartford, and Sentinel for negligent hiring, supervision, and retention. Complaint ¶¶ 62–69.

#### 1. § 1983

Supervisory liability under § 1983

> can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)).

There can be no supervisory liability for gross negligence of a subordinate, however, unless the subordinate has actually violated a plaintiff's constitutional rights. *Raspardo v. Carlone,* 770 F.3d 97, 123 (2d Cir.2014) (citing *Poe v. Leonard,* 282 F.3d 123, 134 (2d Cir.2002) (holding a supervisor may not be held liable under § 1983 for acts of a subordinate unless both the subordinate's violation of the plaintiff's rights and the supervisory liability doctrine under which the plaintiff wishes to hold the supervisor liable are clearly established). *See also Blyden v. Mancusi,* 186 F.3d 252, 265 (2d Cir.1999) ("Of course, for a supervisor

to be liable under Section 1983, there must have been an underlying constitutional deprivation."); *Elek v. Inc. Village of Monroe,* 815 F.Supp.2d 801, 808 (S.D.N.Y.2011) (where the plaintiff "has not established any underlying constitutional violation, [the plaintiff] cannot state a claim for § 1983 supervisory liability."). In the instant case, because Plaintiff has failed to state any constitutional deprivation claim against any individual Defendant, there is no basis for any claim for supervisory liability as against Defendants Orleans County, Orleans County Sheriff, the Village, the Town, and Niagara County Sheriff.

Alternatively, assuming, *arguendo,* Plaintiff had stated an underlying § 1983 claim against an individual Defendant, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior.*" *Hernandez,* 341 F.3d at 144 (citing *Al–Jundi v. Estate of Rockfeller,* 885 F.2d 1060, 1065 (2d Cir.1989)). " 'Absent some personal involvement by [the supervisory official] in the allegedly unlawful conduct of his subordinates,' he cannot be liable under section 1983.' " *Id.* at 144–45 (quoting *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987)). Even an imperfect investigation, without more, does not give rise to a constitutional violation. *Friedman v. New York City Admin. for Children's Services,* 502 Fed.Appx. 23, 27 (2d Cir. Nov.6, 2012) (citing *Wilkinson v. Russell,* 182 F.3d 89, 106 (2d Cir.1999)).

**\*15** A plaintiff, however, " 'cannot base liability solely on [a defendant's] supervisory capacity or the fact that he held the highest position of authority' within the relevant governmental agency or department." *Houghton v. Cardone,* 295 F.Supp.2d 268, 276 (W.D.N.Y.2003) (quoting *Burgess v. Morse,* 259 F.Supp.2d 240, 248 (W.D.N.Y.2003)). Simply put, "the conclusory assertion that a supervisory official was personally involved in the deprivation of constitutional rights, without support factual allegations, is not sufficient to state a claim under § 1983." *Roberites v. Huff,* 2012 WL 1113479, at * 6 (W.D.N.Y. Mar.30, 2012).

Here, Plaintiffs merely allege that Defendants Orleans County, the Town, the Village, the Orleans County Sheriff, the Crime Task Force, the Fire Prevention Office, the Niagara County Sheriff, Hartford, and Sentinel "were grossly negligent in training and supervising the individual [*sic* ] named defendant officers who arrested the Plaintiff and fabricated false charges against them with malice, with respect to the proper exercise of their police powers in a manner consistent with the Fourth and Fourteenth

Amendments to the Constitution of the United States, and with the relevant provisions of the Constitution of the State of New York," Complaint ¶ 66, that "the negligence of the defendants in the aforesaid respects was so gross as to constitute indifference to the rights of the Plaintiff[s], *id.* ¶ 67, and that such Defendants "are vicariously liable to the Plaintiff for the actions of their employees .... " *Id.* ¶ 68. There are, however, no facts alleged to support these conclusory allegations. *See Otis–Wisher v. Medtronic, Inc.,* —— Fed.Appx. ——, 2015 WL 3557011, at * 2 (2d Cir. June 9, 2015) (conclusory allegations do not satisfy plausibility requirement under *Iqbal* ). As such, the Complaint fails to state a claim for supervisory liability as against Defendants Orleans County, the Town, the Village, the Orleans County Sheriff, the Crime Task Force, the Fire Prevention Office, the Niagara County Sheriff, Hartford, and Sentinel.

### 2. New York Common Law

Plaintiffs' negligent hiring, supervision and retention claim is also alleged under New York Law against Orleans County, the Town, the Village, Albion Police Department, Orleans County Sheriff, the Crime Task Force, the Fire Prevention Office, Niagara County Sheriff, Hartford, and Sentinel. Complaint ¶ 66. "Under New York law, a claim for negligent hiring, supervision or retention, 'in addition to the standard elements of negligence,' requires 'a plaintiff [to] show: (1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." " *Bouchard v. New York Archdiocese,* 719 F.Supp.2d 255, 261 (S.D.N.Y.2010) (quoting *Ehrens v. Lutheran Church,* 385 F.3d 232, 235 (2d Cir.2004) (quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn,* 229 A.D.2d 159, 654 N.Y.S.2d 791, 792 (2d Dept.1997)). Here, Plaintiffs have failed to plead any of these elements.

*16 With regard to the first element, Plaintiffs have failed to allege that any of the individually named moving Defendants were in an employee-employer relationship with any of the other moving Defendants in a supervisory capacity. For example, none of the individually sued police officers, *i.e.,* Doyle, Fuller, Gifaldi, or Hughes, is alleged to be an employee of any of the sued municipal Defendants. Nor, have Plaintiffs alleged any facts establishing any supervisory Defendant knew or should have known that any employee named as a Defendant had a propensity for the alleged unlawful

conduct. Finally, there is no allegation that any tort was committed on any supervisory Defendant's property or with such Defendant's chattels. Accordingly, Plaintiffs' have failed to allege a claim for negligent hiring, supervision or retention under New York law.

The Motions to Dismiss should be GRANTED as to Plaintiffs' Third Claim alleging supervisory liability.

### H. Municipal Liability

With regard to the claims against Orleans County, the Town, and the Village, it is settled that municipalities may not be held liable under § 1983 solely on the basis of *respondeat superior* unless the alleged "deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven,* 691 F.3d 72, 80 (2d Cir.2012) (citing *Monell v. Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a respondeat superior basis for the tort of its employee." *Id.* "[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Board of Commissioners of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). As such, municipal liability may be found "when the execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible for under § 1983." *Monell,* 436 U.S. at 691.

Here, Plaintiffs have not alleged that the Town, Village, or Orleans County maintained any policy pursuant to which Plaintiffs allegedly were subjected to false arrest and malicious prosecution or denial of a fair trial. Nor do Plaintiffs claim such moving Defendants routinely disregard any applicable policy in making arrests or conducting criminal prosecutions. Accordingly, insofar as Plaintiffs assert claims based on *respondeat superior* against the Town, Village and County, such claims must be dismissed.

### I. Statutory Immunity

The Insurance Defendants assert statutory immunity insofar as Plaintiffs' claims are based on the release of information relative to the fire investigation. Insurance Defendants' Memorandum at 8. As relevant, New York Insurance Law ("N.Y.Ins.Law") § 319 (" § 319"), provides that

**\*17** Each insurer authorized to issue policies covering losses incurred to personal or real property through fire shall contact the appropriate law enforcement agency and release information in its possession resulting from an investigation conducted by it pertaining to any such fire loss, should the insurer be of the opinion that the fire was caused by other than accidental means.

N.Y. Ins. Law § 319(b).

Significantly, insurance providers are granted immunity for all conduct under § 319 pursuant to N.Y. Ins. Law § 3432 (" § 3432"), which provides

In the absence of fraud or bad faith, there shall be no liability on the part of, and no cause of action of any nature shall arise against, an insurer ... or any person acting on their behalf with respect to obligations and duties performed pursuant to the sections referred to in subsection (b) hereof.

N.Y. Ins. Law § 3432(a).

As relevant, such civil or criminal "immunity shall apply to * * * information, reports, assistance in investigations, notification, made in the absence of fraud or bad faith, to any authorized law enforcement agency" pursuant to § 319. N.Y. Ins. Law § 3432(b)(4). Significantly, the Complaint is devoid of any allegation that any of the Insurance Defendants engaged in any fraud or bad faith so as to render the statutory immunity inapplicable. The Complaint thus fails to state a claim against the Insurance Defendants.

**J. Defendant Savage**

Savage is a defendant only to Plaintiffs' New York common law malicious prosecution claim. Complaint ¶ 54. As discussed, Discussion, *supra*, at 22–23 (citing caselaw),

the existence of probable cause, a required element of a malicious prosecution claim under New York law for which the Indictment creates a rebuttable presumption, is fatal to this claim. Furthermore, the Complaint is devoid of any factual allegations pertaining to Savage and, as such, falls far short of pleading the requisite malice for a malicious prosecution claim. The Complaint thus fails to state any claim against Savage whose motion to dismiss should be GRANTED.

**K. Non–Moving Defendants**

As stated, Discussion, *supra*, at 15, the other named Defendants to this action, including the Albion Fire Department, Rocco Sidari, Jeremy Grahm, Donald Clawson, Michael Jutrowski, Adriean Ann Park, and Nicholas Long, have not moved to dismiss the Complaint for failure to state a claim, and the court therefore expresses no opinion as to whether the claims asserted against the non-moving Defendants are viable. *See Grant v. County of Erie*, 542 Fed.Appx. 21, 24 (2d Cir. Oct.17, 2013) (reversing district court's *sua sponte* dismissal of action for failure to state a claim based on failure to provide plaintiff with notice of the grounds for dismissal and an opportunity to be heard).

**L. Dismissal with Prejudice**

The moving Defendants seek dismissal of the Complaint with prejudice. *See* Insurance Defendants' Motion at 2 (seeking as relief "an order dismissing the action in its entirety as to [Insurance Defendants]"); Fire Prevention Defendants' Memorandum at 7; Altshiler Reply Declaration ¶¶ 5–6 (asserting probable cause requires dismissal of claims in their entirety); and Savage Reply at 2 (requesting dismissal with prejudice). Generally, the court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir.1991). Nevertheless, where further amendment of the complaint would be futile, dismissal of the complaint with prejudice to filing an amended complaint is not an abuse of discretion. *See Van Buskirk v. the New York Times Co.*, 325 F.3d 87, 92 (2d Cir.2003) (affirming district court's dismissal of complaint with prejudice for failure to state a claim where amendment of complaint would have been futile).

**\*18** In the instant case, the futility of permitting Plaintiffs to file an Amended Complaint is discussed below. Discussion, *infra*, at 37–49. Accordingly, based on that analysis, the Motions to Dismiss for failure to state a claim should be GRANTED as to Prosecuting Defendants, the Insurance

Defendants, Savage, and the Fire Prevention Defendants against whom the Complaint should be DISMISSED with prejudice.

### 3. Motion to Amend

In opposing moving Defendants motions to dismiss, Plaintiffs move for leave to file an amended complaint which Plaintiffs assert should be granted because the "more detailed description of the Defendants [*sic* ] culpable conduct is provided in the [Proposed] Amended Complaint apprising each defendant of its specific acts and omissions presented in this litigation and will provide judicial economy for the Court and litigants." Plaintiffs' Memorandum at 11. Plaintiffs further argue that should leave to amend be granted, Defendants will not suffer any substantial prejudice, nor is Plaintiff's Motion brought for undue delay, in bad faith, or for any dilatory motive. *Id.* at 11–12. Moving Defendants argue in opposition that Plaintiffs' Proposed Amended Complaint fails to cure the deficiencies in the Complaint such that Plaintiffs' Motion is futile and should be denied. In particular, Prosecuting Defendants argue that the Proposed Amended Complaint fails to allege facts rebutting the presumption of probable cause attributed to the Indictment and truncating the false arrest and malicious prosecution claims against the Prosecuting Defendants, and also fails to allege facts supporting any claim for negligent hiring, supervision or retention, Altshiler Reply Declaration ¶¶ 4–6; Amended Altshiler Reply Declaration ¶¶ 8–10, and that insofar as Plaintiffs seek to allege Defendant Gifaldi "testified falsely" and "vaguely allege that 'defendants [*sic* ] own investigation proved their testimony would be false,' " Amended Altshiler Reply Declaration ¶ 4, witnesses, including law enforcement officials, are absolutely immune from liability for testimony, even if such testimony is perjured. *Id.* ¶¶ 5–6. Defendant Savage argues in opposition to Plaintiffs' Motion that the Proposed Amended Complaint is devoid of any allegation of wrongdoing against Savage and contains only an admission that Savage committed no tort. Savage Reply at 3–4. In opposition to Plaintiffs' Motion, Insurance Defendants argue the Proposed Amended Complaint fails to cure any of the group-pleading and vagueness deficiencies of the Complaint, Insurance Defendants' Reply at 3–4, also fails to address Insurance Defendants' statutory immunity under New York law, *id.* at 4, and thus is futile. *Id.* at 4– 7. The Fire Prevention Defendants argue in opposition to Plaintiffs' Motion that the Proposed Amended Complaint fails to allege any involvement by Defendant Shadic with the fire investigation and subsequent prosecution, Calhoun Reply Declaration ¶¶ 6–8, alleges only that Defendant Holter

was involved in the fire investigation, *id.* ¶ 9, and did not conduct a proper arson investigation but instead "rubber-stamped" Gifaldi's investigation which fails to allege the malice required for a malicious prosecution. *Id.* ¶ 10. Fire Prevention Defendants further argue that Proposed Amended Complaint's lack of any allegation that Shadic or Holter was involved in any constitutional deprivation against Plaintiffs also precludes any supervisory liability claim against Defendant Fire Prevention Office.

**\*19** Under Fed.R.Civ.P. 15(a), leave to amend "shall be freely given when justice so requires." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Burns v. Imagine Films Entertainment, Inc.,* 165 F.R.D. 381, 384 (W.D.N.Y.1996) (quoting Fed.R.Civ.P. 15(a)). Therefore, "an amended pleading may be filed pursuant to Rule 15(a) where the new allegations do not unduly prejudice an opponent, are not the result of undue delay or bad faith, and are not futile." *Warren v. Goord,* 2006 WL 1582385, at * 7 (W.D.N.Y. May 26, 2006). Further, "[a]n amendment to a pleading is futile if it could not withstand a motion to dismiss under Rule 12(b)(6)." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 88 (2d Cir.2002). In ruling on a motion under Rule 12(b)(6), and, thus, in considering the plausibility of a proposed amended pleading, the court may consider only "the fact as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated into the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007). Here, Defendant Savage filed in support of his motion to dismiss [14] exhibits, including copies of the Investigative Report and its accompanying photographs, as well as the Supplementary Report, both of which the court may consider because Plaintiffs have referenced them in their Proposed Amended Complaint. *See Avon Pension Fund v. GlaxoSmithKline PLC,* 343 Fed .Appx. 671, * 3 n. 2 (2d Cir. Aug.24, 2009) (considering, on motion seeking leave to file amended complaint filed in opposition to motion to dismiss complaint, the transcript of physician's testimony not attached to proposed amended complaint but incorporated by reference).

14    Savage moved, in the alternative, for summary judgment. Based on the court's recommendation that the Complaint be dismissed as to Savage, Savage's alternative motion for summary judgment is DISMISSED as moot.

In the instant case, moving Defendants do not argue that permitting Plaintiffs to file an amended complaint will result in any undue prejudice, undue delay, or bad faith; rather, moving Defendants maintain that Plaintiffs' Motion should be denied on the ground of futility because the Proposed Amended Complaint, like the Complaint, fails to state a claim for which relief can be granted. Here, a thorough reading of the Proposed Amended Complaint establishes that it fails to cure the defects of the Complaint, such that Plaintiffs' Motion should be denied as to the Prosecuting Defendants, the Insurance Defendants, Defendant Savage, and the Fire Prevention Defendants that have opposed Plaintiffs' Motion.

### 1. Prosecuting Defendants

The Proposed Amended Complaint asserts against the Prosecuting Defendants claims for common law false arrest, malicious prosecution, negligent hiring, and supervision, and retention, as well as § 1983 violations for false arrest, malicious prosecution and denial of a fair trial. The Proposed Amended Complaint, as discussed in connection with the Complaint, Discussion, *supra*, at 17–18, fails to establish any basis upon which Defendants Orleans County Sheriff, the Crime Task Force, the Albion Police, and the Niagara County Sheriff may be sued given that such Defendants, as administrative arms of municipal corporations, do not exist separate and apart from the municipality and thus do not have their own legal identity. *Laboy*, ––– F.Supp.3d at ––––; 2015 WL 1977251, at * 6 (W.D.N.Y. May 4, 2015).

**\*20** With regard to Defendants Orleans County, the Town, the Village, Doyle, Fuller, Gifaldi, and Hughes, as discussed, Discussion, *supra*, at 22–24, the Indictment creates a rebuttable presumption of probable cause that defeats the common law and § 1983 false arrest and malicious prosecution claims. Significantly, Plaintiffs do not describe what was put before the Grand Jury that Plaintiffs maintain was false or fraudulent and the Proposed Amended Complaint is devoid of any factual allegations that any Defendant cajoled or importuned any witness to appear to testify untruthfully before the Grand Jury so as to obtain the Indictment. *See Rohman v. New York City Transit Authority (N.Y.CTA)*, 215 F.3d 208, 217 (2d Cir.2000) (defendant to malicious prosecution claim must be shown to have knowingly provided false or fabricated evidence or importuned authorities to act). The Proposed Amended Complaint also lacks reasonable clarity as to whether Plaintiffs assert any moving Defendant was responsible for submitting the Investigative Reports to the Grand Jury as evidence on which the Grand Jury could indict Plaintiffs. Nevertheless, that Plaintiffs sue Savage, whose only participation in the events leading to Plaintiffs' arrest and prosecution is the preparation of the Investigative Reports, strongly implies Plaintiffs' believe the Investigative Reports were presented to the Grand Jury.

Nor is the Investigative Report inconsistent with a finding of probable cause, the absence of which is a necessary element of the false arrest and malicious prosecution claims. In particular, the Investigative Report states the Albion Police initially listed the fire's cause as "undetermined pending further investigation." Investigative Report at 2. Savage determined the fire's origin was located near the rear wall of the shop's office near Harris's desk and a large sofa where most of the fire damage had occurred. *Id.* at 3. Although the remains of a medium sized red plastic trash can with "fire/melt damage" and which had "melted into itself," was found in front of Wright's desk instead of in its regular location between Harris's desk and the large sofa, *id.*, the caption to Photo 52 depicting the red plastic trash can indicates the trash can may have been kicked by fire department personnel while extinguishing the fire. An electrical cause of the fire, as Plaintiffs urge, Proposed Amended Complaint ¶¶ 45–47, is inconsistent with Savage's determination that "[e]xamination of structural electrical conductors and receptacles showed no arc damage or any indication of being related to the cause of the fire," Investigative Report at 3, and that a power strip on the floor near Harris's desk "sustained total fire damage" although Harris "stated it was not plugged in or being used." *Id.*

Further, the Investigative Report contains a motive for arson. In particular, when interviewed by Savage, both Harris and Wright reported the shop was having financial difficulties and Wright further stated he had personally borrowed $ 70,000 for the shop. Investigative Report at 4. It is noted in the Investigative Report that Plaintiffs' inability after being notified of the fire to return to the shop for 30 to 40 minutes because Plaintiffs "had to find a ride" was inconsistent with Plaintiffs' statements to Savage that Wright drove Plaintiff to her home where they both remained until learning of the fire. *Id.* at 5. The statement given by both Harris and Wright that the shop's rear door "could be secured with a good slam shut," *id.* at 4, is inconsistent with the finding that the door's striker plate was "very loose" such that "[t]he plunger was not able to seat properly in the striker plate and could easily move. *Id.* at 3. Moreover, although the Investigative Report does not contain a conclusive determination of the cause of the fire, the Investigative Report states that "incendiary was not eliminated," *id.* at 4, and the Supplemental Report states

that "incendiary still not eliminated." Supplemental Report at 1. It is significant that Plaintiffs do not challenge the accuracy of the Investigative or Supplemental Reports, nor do Plaintiffs attribute any part of the reports to fraud or bad faith. The Investigative Report and the Supplemental Report thus are not inconsistent with probable cause supporting both the Indictment and the subsequent arrest and prosecution of Plaintiffs. Thus, the Proposed Amended Complaint does not plausibly allege that any of the Prosecuting Defendants was responsible for the malicious prosecution of Plaintiffs as Plaintiffs allege, and is therefore futile.

**\*21** With regard to Defendant Doyle, the Proposed Amended Complaint alleges only that Doyle failed to report Mesita's observation that she perceived an electrical fire odor at the scene of the fire. Proposed Amended Complaint ¶¶ 45–47. Such allegations, however, assert a claim of negligent investigation which is not recognized under New York law, see *McCray v. City of New York*, 2007 WL 4352748, at \* 29 (S.D.N.Y. Dec.11, 2007) (citing *Jenkins v. City of New York*, 1992 WL 147647 at \* 8 (S.D.N.Y. June 15, 1992) (citing *Pandolfo v. U.A. Cable Systems*, 171 A.D.2d 1013, 568 N.Y.S.2d 981, 982 (4th Dept.1991))), nor is negligent investigation a basis for § 1983 liability in the absence of some special relationship creating an affirmative duty. See, e.g., *Daniels v. Williams*, 474 U.S. 327, 332–33 (1986) (negligent inaction will not suffice to establish a constitutional violation because Due Process clause is not implicated by a state official's negligent act causing unintended loss or injury to life, liberty, or property). *See also Daniels*, 474 U.S. at 332–33.

The Proposed Amended Complaint fails to set forth any allegation of unlawful conduct undertaken by Defendants Fuller and Hughes. Rather, Fuller is alleged to have conducted interviews of Harris and Wright at the Albion Police Station, Proposed Amended Complaint ¶ 49, which interview of Wright was subsequently lost by unidentified Albion Police, Proposed Amended Complaint ¶ 49, and both Fuller and Hughes are alleged to have informed Harris that the shop's security "DVR was sent out for testing to obtain the images captured on it during [ ] the evening in question," but "the Albion Police Department and its investigators failed to safeguard this important piece of exculpatory evidence." *Id.* ¶ 72. Both of these allegations assert, at most, the Fuller was negligent in investigating the fire which, as discussed, Discussion, *supra*, at 43–44, is not a ground for liability under either state law or § 1983.

Defendant Gifaldi is named as a Defendant in the Proposed Amended Complaint's common law and § 1983 false arrest and malicious prosecution claims. As discussed, Discussion, *supra*, at 22–24, the Indictment creates a presumption of probable cause that is a complete defense to these claims, and none of the proposed factual allegations against Gifaldi rebuts the presumption. Specifically, Gifaldi is alleged to have failed to secure video footage from a security DVR which would have established Plaintiffs did not set the fire, Proposed Amended Complaint ¶ 71, but such failure, if true, constitutes investigatory negligence which is insufficient to sustain liability for false arrest and malicious prosecution under New York law or § 1983. See *Daniels*, 474 U.S. at 332–33 (negligent inaction not actionable under § 1983); *McCray*, 2007 WL 4352748, at \* 29 (negligent investigation not recognized under New York law). Gifaldi is also alleged to have "interviewed witnesses of known doubtfulness," and provided false Grand Jury testimony to secure the Indictment, Proposed Amended Complaint ¶ 74, embellished his job title at the trial, claiming to be a "Level II" arson investigator when no such designation exists, *id.* ¶ 75, and also falsely testified at trial that he failed to take any contemporaneous hand written notes which was contradicted by witnesses who reported observing Gifaldi taking notes. *Id.* ¶ 76. A law enforcement officer is absolutely immune from under § 1983 based on perjurious testimony either before the Grand Jury or given at trial. *Coggins v. Buonora*, 776 F.3d 108, 112 (2d Cir.2015) (citing *Rehberg v. Paulk*, ––U.S. ––, 132 S.Ct. 1497, 1506, 182 L.Ed.2d 593 (2012)). Further, Plaintiffs' assertions that Gifaldi coerced Defendants Adrian Parks ("Parks"), and Michael Jutrowski ("Jutrowski"), into falsely testifying against Plaintiffs, Proposed Amended Complaint ¶¶ 61–63, is negated by the assertion that "Defendants' own investigation provided [the testimony of Parks and Jutrowski] would be false and conflicted with the statements given by these witnesses." *Id.* ¶ 64. The Proposed Amended Complaint thus fails to state a claim against Gifaldi.

**\*22** Accordingly, Plaintiffs' motion is DENIED as to the Prosecuting Defendants.

### 2. Insurance Defendants

Insurance Defendants are listed as Defendants in the Proposed Amended Complaint's state common law malicious prosecution claim and negligent hiring, supervision and retention claims. Insurance Defendants are correct, Insurance Defendants' Reply at 3–4, that the Proposed Amended Complaint fails to cure any of the group-pleading and vagueness deficiencies of the Complaint. *See* Discussion,

*supra,* at 28–29. In particular, the Proposed Amended Complaint's allegations against the Insurance Defendants assert only that the Insurance Defendants never determined the fire's cause, Proposed Amended Complaint ¶ 39 ("the cause of the fire was never determined."), but that someone else alerted law enforcement that Plaintiffs intentionally started the fire. *Id.* ¶ 51 ("defendant Donald Clawson tipped off police Wright committed arson and burned down Harris's shop. Records indicate Clawson contacted Crime Stoppers and was seeking reward money for his lead."), and ¶ 52 ("Clawson contacted the Albion Police Department and/ or Orleans County Sheriff and/or Hartford Insurance Co. and told these agencies and the insurance company David Wright committed arson and burned down Harris's shop."). No liability for malicious prosecution can be attributed to the Insurance Defendants based on the failure to determine the cause of the fire.

Nor is there any allegation that the Insurance Defendants improperly importuned or cajoled any law enforcement officers or the prosecutor to charge Plaintiffs. *Rohman,* 215 F.3d at 217 (defendant must have played an " 'active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act). Although the Proposed Amended Complaint asserts Nassivera, when testifying at trial, "intentionally misused tape recorded statements of the Plaintiffs," which "contained many inaudible portions and Nassivera filled in the blanks during his testimony with slanted interpretations" because Nassivera, as Hartford's agent "was motivated to sabotage Plaintiff Harris'[s] fire claim in any manner he could," Proposed Amended Complaint ¶ 73, Nassivera's trial testimony, even if perjured, is entitled to absolute immunity. *Coggins,* 776 F.3d at 112 (citing *Rehberg,* 132 S.Ct. at 1506).

Moreover, the Proposed Amended Complaint fails to avoid the Insurance Defendants' statutory immunity pursuant to § 3432(a) and (b)(4). Significantly, Plaintiffs failed to allege any fraud or bad faith on the part of the Insurance Defendants as to the "information, reports, assistance in investigations, [and] notifications" as required to avoid the applicable immunity. Even if the Insurance Defendants relied in some way on a source, Clawson, as a person of dubious credibility, such reliance is insufficient to support a malicious prosecution claim. *See Husbands v. City of New York,* 2007 WL 2454106, at * 8 (S.D.N.Y. Aug.16, 2007) (holding with regard to false arrest and malicious prosecution claims that questionable credibility of witness's testimony "does not vitiate the basis for probable cause").

**\*23** Accordingly, Plaintiffs' Motion is DENIED on the basis of futility as to Insurance Defendants against whom the Proposed Amended Complaint fails to state a claim.

### 3. Defendant Savage

Savage is named in the Proposed Amended Complaint as a Defendant only to the malicious prosecution claim under New York common law. Proposed Amended Complaint ¶ 103. The Proposed Amended Complaint asserts only that Savage, working on contract with Hartford, performed a forensic investigation of the fire to determine the fire's origin and cause and prepared a report regarding the investigation in which Savage concluded the fire's origin was along the shop's office's rear wall, that the ignition source, the first material ignited, and the ignition sequence were "unknown," such that the fire's "cause classification" was "undetermined with incendiary not eliminated." Proposed Amended Complaint ¶ 65. Even upon being provided additional fire debris samples one of which, upon laboratory analysis, was positive for fire accelerant "consistent with a 'medium petroleum distillate' such as mineral spirits, some paint thinners, and some charcoal starters," Savage did not consider the findings sufficiently significant to support altering her original conclusion that the fire's cause was undetermined. *Id.* ¶ 67. Nothing within these allegations plausibly implies that Savage engaged in any fraud or bad faith so as to subject Savage to any liability in connection with Plaintiffs' arrest and criminal prosecution for the fire. *See Otis–Wisher,* 2015 WL 255701, at *1 (to withstand dismissal allegation must plausibly establish defendant's liability). Even assuming, *arguendo,* the New York and § 1983 claims for false arrest and malicious prosecution could be brought against Savage, a private actor, *see Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005) (§ 1983 liability requires defendant act under color of state law), Savage's conclusion in the Investigative Report and the fire's cause was "undetermined with incendiary not eliminated," a conclusion favorable to Plaintiffs, simply cannot be the basis for any such claims.

Plaintiffs' Motion thus is DENIED as to Savage.

### 4. Fire Prevention Defendants

The Proposed Amended Complaint's malicious prosecution claim is asserted against all Fire Prevention Defendants, Proposed Amended Complaint ¶ 103 (Holter and Shadic), and ¶ 109 (Fire Prevention Office), and the negligent hiring, supervision and retention claim is asserted against

Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 134 of 186
Wright v. Orleans County, Not Reported in F.Supp.3d (2015)
2015 WL 5316410

Fire Prevention Office. *Id.* ¶¶ 112, 115, and 117. Insofar as the Proposed Amended Complaint fails to allege any involvement by Defendant Shadic with the fire investigation and subsequent prosecution, it fails to state a claim as against Shadic and is therefore futile. The Proposed Amended Complaint's allegation that Defendant Holter was involved in the fire investigation, *id.* ¶ 9, and did not conduct a proper arson investigation but instead "rubber-stamped" Gifaldi's investigation, *id.* ¶ 10, fails to plead the requisite element of malice for a malicious prosecution claim because it, at most, asserts a claim for negligent investigation which, as discussed, Discussion, *supra,* at 43–44, does not support a false arrest or malicious prosecution claim. Further, absent any claim stated against either Shadic or Holter, there is no basis for finding Shadic or Holter was personally involved in either the alleged malicious prosecution of Plaintiffs, such that the Fire Prevention Office cannot be held liable for negligent hiring, supervision or retention of these individual Defendants. *See Bouchard,* 719 F.Supp.2d at 261 ("A cause of action for negligent hiring or retention requires allegations that the employer ... failed to investigate a prospective employee notwithstanding knowledge of 'facts that would lead a reasonably prudent person to investigate that prospective employee.' " (quoting *Richardson v. City of New York,* 2006 WL 3771115, at *3 (S.D.N.Y. Dec.21, 2006))).

**\*24** Plaintiffs' Motion is DENIED as to the Fire Prevention Defendants.

**5. Non-moving Defendants**

Although Plaintiffs' Motion is DENIED with regard to the Prosecuting Defendants, the Insurance Defendants, Defendant Savage, and the Fire Prevention Defendants and, assuming the District Judge agrees with the undersigned's recommendation that the action be dismissed as against the moving Defendants for failure to state a claim, the non-moving Defendants have not opposed Plaintiffs' Motion seeking leave to file the Proposed Amended Complaint which, despite failing to cure the deficiencies of the Complaint, does provide additional facts which are helpful to understand Plaintiffs' claims. Accordingly, insofar as Plaintiffs' Motion is unopposed by the non-moving Defendants, Plaintiffs' Motion is GRANTED as to these non-moving Defendants. Plaintiffs are directed to file **within ten (10) days** the Amended Complaint only asserting claims against the non-moving Defendants, but should not attempt to re-plead the claims that for which dismissal with prejudice

is recommended as to the moving Defendants. Nothing in the foregoing Report and Recommendation and Decision and Order is intended to indicate how the court may rule on any possible motions by nonmoving Defendants addressed to the Amended Complaint.

### *CONCLUSION*

Based on the foregoing, the Prosecuting Defendants' Motion (Doc. No. 22) should be GRANTED in part and DENIED in part; the Insurance Defendants' Motion (Doc. No. 28) should be GRANTED; Savage's Motion (Doc. No. 30) should be GRANTED insofar as it seeks to dismiss the Complaint for failure to state a claim and is DISMISSED as moot as to the alternative request for summary judgment; and the Fire Prevention Defendants' Motion (Doc. No. 36) should be GRANTED; Plaintiffs' Motion is GRANTED in part and DENIED in part.

SO ORDERED as to Plaintiff's Motion to Amend and Savage's Motion for Summary Judgment.

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiffs and the Defendants.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5316410

**Wright v. Orleans County, Not Reported in F.Supp.3d (2015)**

2015 WL 5316410

---

**End of Document**                                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 627238

KeyCite Yellow Flag - Negative Treatment
Distinguished by   Kolbe & Kolbe Millwork, Co., Inc. v. Manson Ins.
Agency, Inc.,  W.D.Wis.,  October 25, 2013

2012 WL 627238
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Tyrone HOLMES and Samuel's Temple
Church of God in Christ, Inc., Plaintiffs,

v.

The ALLSTATE CORPORATION, Bryan M. Harris,
a.k.a. Bryan Michael Harris, Bluebox Entertainment,
Inc., Harris Financial Inc., Harris Financial Insurance
Inc., Associate Management LLC, B.M. Harris Inc.,
First One Distributors, Inc., I Am Global Ent. LLC,
Harris Financial Insurance Services, Defendants.

No. 11 Civ. 1543(LTS)(DF).
|
Jan. 27, 2012.

## REPORT AND RECOMMENDATION

DEBRA FREEMAN, United States Magistrate Judge.

**\*1 TO THE HONORABLE LAURA T. SWAIN,
U.S.D.J.:**

In this diversity action, plaintiffs Tyrone Holmes ("Holmes")
and the church of which he has claimed to be the
Executive Pastor, Samuel's Temple Church of God in Christ,
Inc. (the "Church" or "Samuel's Temple") (collectively,
"Plaintiffs") have asserted a variety of state-law claims
against defendants the Allstate Corporation ("Allstate"),
Bryan M. Harris ("Harris"), and a number of corporate
entities of which Harris is purportedly the principal (the
"Harris Entities"[1]) (collectively, "Defendants"), essentially
alleging that Defendants mismanaged or stole more than half
a million dollars that Plaintiffs had entrusted to Defendants
for investment or other purposes.

[1]    The  Harris  Entities  include:  Bluebox
      Entertainment, Inc. ("Bluebox"), Harris Financial,
      Inc. ("HF"), Harris Financial Insurance, Inc.
      ("HFI"), B.M. Harris, Inc. ("BMH"), First One

Distributors, Inc. ("First"), Associate Management
LLC ("Associate"), I Am Global Ent. LLC, a/
k/a Attracknaphobia, LLC ("IAGE"), and Harris
Financial Insurance Services, Inc. ("HFIS").

Currently pending before the Court for a report and
recommendation are five separate motions:

(1) a motion by Allstate to dismiss Plaintiffs' Amended
Complaint, as against Allstate (Dkt.18);

(2) a cross-motion by Plaintiffs for leave to file a Second
Amended Complaint (Dkt.33);

(3) a motion by Allstate against Plaintiffs for Rule
11 sanctions for bringing a frivolous lawsuit against
Allstate (Dkt.27);

(4) a motion by Plaintiffs against Allstate for Rule 11
sanctions, for making purportedly false and unsupported
statements to the Court in motion papers (Dkt.51); and

(5) a motion by Harris and the Harris Entities (collectively,
the "Harris Defendants") to dismiss Plaintiffs' Amended
Complaint as against them (see Dkt. 55).[2]

[2]      The Harris Defendants never actually filed a
        "motion" to dismiss the Amended Complaint;
        rather, they only filed a memorandum, with two
        attached declarations, in support of such a motion.
        The Court's Docket Clerk advised counsel that
        a memorandum and declarations in support of a
        motion should not be filed until a formal "motion"
        had been filed (see Docket entries following Dkt.
        56), but it does not appear that counsel ever
        complied with the Court's rules. Nonetheless,
        given the nature of the arguments raised by
        the Harris Defendants in their submission, which
        relate to the adequacy of Plaintiffs' pleading, this
        Court has determined that it would be in the
        interest of effective case management to deem that
        submission a motion and to consider it as such.

For the reasons set forth below, I respectfully recommend
that Allstate's motion to dismiss (Dkt.18) be granted and
that Plaintiffs' claims against Allstate be dismissed with
prejudice. I further recommend that Plaintiffs' cross-motion
to amend (Dkt.33) be denied, as nothing in Plaintiffs'
proposed amended pleading would cure the defects in the
Amended Complaint. As for the pending sanctions motions, I
recommend that Allstate's motion against Plaintiffs (Dkt.27)

Holmes v. Allstate Corp., Not Reported in F.Supp.2d (2012)
Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 137 of 186
2012 WL 627238

be granted and that Plaintiffs' motion against Allstate (Dkt 51) be denied, as Plaintiffs' claims against Allstate are patently frivolous and Plaintiffs' sanctions motion against Allstate is procedurally defective and meritless. On these motions, I recommend that Plaintiffs' counsel be ordered to pay to Allstate certain costs it has incurred, as set forth below. Finally, I recommend that the motion by the Harris Defendants to dismiss Plaintiffs' claims against them (Dkt.55) be granted, without prejudice to Plaintiffs' filing a Second Amended Complaint that satisfies the requirements of Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure, with respect to Plaintiffs' claims against these defendants.

## BACKGROUND

### A. *The Amended Complaint*

Initially proceeding *pro se,* Holmes filed the initial Complaint in this matter on his own behalf. (*See* Complaint, dated Mar. 7, 2011 (Dkt.1).) Holmes then retained as counsel Eric Suffin, Esq. ("Suffin"), of the Law Firm of Eric Andrew Suffin, and, on June 1, 2011, Suffin filed an Amended Complaint, on behalf of both Holmes and the Church. (*See* Amended Complaint, dated May 17, 2011 ("Am.Compl") (Dkt.17).)

### 1. *Factual Allegations*

**\*2**  At its core, the Amended Complaint alleges that Holmes and the Church entrusted Harris with more than half a million dollars, that Harris promised to make certain investments and purchases with the funds and also promised certain benefits to Holmes and his family, and that Harris broke these various promises. The Amended Complaint alleges the following facts, which are accepted as true for purposes of the motions to dismiss:

Plaintiff Samuel's Temple is a non-profit religious organization that formerly owned a church in East Harlem, New York. (*Id.* at ¶¶ 6, 7.) According to the Amended Complaint, Holmes is the Executive Pastor and Music Director of Samuel's Temple. (*Id.* at ¶ 3.) Defendant Harris is an Allstate agent and franchisee (*id.* at ¶ 10), who also operates defendant HFIS (*id.* at ¶ 13). The Amended Complaint does not describe the nature of HFIS or the other Harris Entities, other than to allege that they are all "alter egos" of one another. (*Id.* at ¶¶ 15–22.)

In 2006, Plaintiffs received $1 million from a developer (*id.* at ¶ 27), and Defendants suggested that Plaintiffs' capital

be invested with them (*id.* at ¶ 32). [3]  Defendants promised Plaintiffs at least a 15–20% profit within two years of their investment. (*Id.* at ¶ 33.) Harris was to serve as Plaintiffs' investment advisor and business manager for their capital investments, and Defendants proposed investments in real estate, insurance, an entertainment company (defendant Bluebox), and various securities and derivatives. (*Id.* at ¶¶ 34, 37, 49.) In connection with their proposal, Defendants also allegedly promised many personal benefits for Holmes, including housing for him and his family in Georgia, insurance for him and his family, and appointments to several executive positions at Bluebox. (*Id.* at ¶¶ 38, 47, 49.)

[3]      The Amended Complaint predominately refers to "plaintiffs," without distinguishing between Samuel's Temple and Holmes. (*See generally* Am. Compl.) Similarly, throughout the Amended Complaint, Plaintiffs refer generally to actions of the "defendants," without differentiating among Allstate, Harris, or any of the Harris Entities. (*See generally id.*)

On the basis of these representations, Plaintiffs allegedly invested approximately $513,000. [4] (*Id.* at ¶ 53.) More specifically, Plaintiffs made a series of wire transfers to Bluebox, from August 2006 through February 2007, in amounts that totaled approximately $500,000. [5]  (*Id.* at ¶¶ 56–58, 60.) Plaintiffs also invested approximately $15,000 in cash with Defendants, and made a $28,000 down payment for a piece of real estate. (*Id.* at ¶¶ 55, 61.) Defendants sent Plaintiffs promissory notes regarding amounts of $320,000 and $50,000, promising repayment of these principal amounts, together with interest, at a rate of 8.5% per annum on the unpaid balance, and promising balloon payments in the form of cashier's checks. (*Id.* at ¶ 59.) Despite demand, Plaintiffs allege that they have not received any money back from their investments with Defendants, nor have they received an accounting regarding their investments. (*Id.* at ¶¶ 69–72.) As described more specifically below, Plaintiffs also allege that Defendants did not follow through on their various alleged promises.

[4]      Plaintiffs generally allege that they invested approximately $513,000 with Defendants (*id.* at 53), but the more specific allegations concerning Plaintiffs' investments suggest a total of $543,000 (*see id.* at ¶¶ 56–58, 60 (alleging various wire transfers to Bluebox in amounts totaling $500,000);

¶ 61 (alleging cash investment of $15,000); ¶ 55 (alleging downpayment of $28,000 for real estate)).

5   On or about August 17, 2006, Plaintiffs transferred approximately $80,000 to Bluebox; on or about August 21, 2006, Plaintiffs transferred approximately $50,000 to Bluebox; on or about September 12, 2006, plaintiffs transferred approximately $320,000 to Bluebox; and on or about February 3, 2007, Plaintiffs transferred approximately $50,000 to Bluebox. (*See id.* at ¶¶ 56–58, 60.)

### a. *Blue Box*

**\*3**  Holmes alleges that, as part of the alleged investment deal, he was promised stock and a number of positions at the entertainment company Bluebox. (*Id.* at ¶ 47.) Holmes was allegedly to become the Chief Executive Officer of Bluebox, as well as its Director of Music Production and Video Production. (*Id.*) Holmes was also to be appointed as Musician, Webmaster, Digital Music Engineer, and Songwriter for Bluebox. (*Id.*) Holmes and Samuel's Temple, together, were to become 51% stockholders of Bluebox. (*Id.*) Harris agreed to reduce his own stock holdings in Bluebox to only 49%, although he promised to serve as Bluebox's Chief Financial Officer and Business Manager. (*Id.* at ¶ 48.) Finally, Defendants promised to file "any required annual tax documents relating to Bluebox, and plaintiff Holmes's personal income taxes as a salaried corporate officer and employee of Bluebox ." (*Id.* at ¶ 44.)

According to the Amended Complaint, Defendants have admitted to omitting Plaintiffs' names from documents regarding control of Bluebox. (*Id.* at ¶ 76.)

### b. *Real Estate*

#### i. *921 Moreland Avenue*
According to Plaintiffs, part of their money was supposed to be used to buy a house that, at the time, belonged to Harris, and Holmes and his family were to live in it. (*Id.* at ¶¶ 47, 55 .) Under the agreement, Samuel's Temple would become the titleholder of the property, which was located at 921 Moreland Avenue, in Atlanta, Georgia. (*Id.* at ¶¶ 47, 55.) Defendants allegedly represented that they would secure a purchase mortgage for Plaintiffs and make mortgage payments with Plaintiffs' capital investment. (*Id.* at ¶ 77.) Plaintiffs allege that on or around March 16, 2006, Plaintiffs

gave Defendants $28,000 as a down payment on this house. (*Id.* at ¶ 55.)

On or around December 28, 2007, Harris sent Plaintiffs an email indicating that the Moreland Avenue property, which Holmes and his family were by then occupying, was in danger of being foreclosed. (*Id.* at ¶ 79.)

Then, at some point in 2008, while Holmes was in New York, Harris allegedly entered the Moreland Avenue property, which Holmes was still using as a residence, and removed personal property belonging to Holmes, including a rifle, hard drives, two speakers, video footage, sound tools, documents, video masters, and music masters. (*Id.* at ¶ 80.) A person believed to be an agent of the City of Atlanta Police Department allegedly stood outside of the Moreland Avenue property while Harris entered the home and left with Holmes' personal property. (*Id.* at ¶ 80.)

At a later point in 2008, the house at 921 Moreland Avenue was foreclosed and Plaintiffs were evicted. (*Id.* at ¶ 81.) Plaintiffs allege that, despite the representations made by Defendants, Defendants never obtained a purchase mortgage for Plaintiffs for the Moreland Avenue property, and Defendants failed to use Plaintiffs' capital investment to make mortgage payments on that property. (*Id.* at ¶ 77.)

#### ii. *Other Allegations Regarding Real Estate*
**\*4**  HFIS and Harris, as an agent of Allstate, had an office at 1133 Forest Parkway, in Forest Park, Georgia. (*Id.* at ¶ 14.) In April of 2007, Defendants told Plaintiffs that Defendants had sold the mall that contained this office. (*Id.* at ¶ 67.) The Court is unclear as to whether Plaintiffs are claiming any interest in this mall.

Plaintiffs also allege that "[i]n or about 2008, defendants represented to plaintiffs that defendants bought a parcel and properties for the benefit of plaintiffs and lost the parcel and properties." (*Id.* at ¶ 68.) It is not clear to the Court whether this allegation refers to the property at 921 Moreland Avenue, discussed above, or to another piece of property.

#### c. *Insurance*
Plaintiffs allege that Defendants said that they would purchase and maintain life insurance for Holmes and his family. (*Id.* at ¶¶ 49, 39.) Although Defendants later represented that they had purchased a $5,000 life insurance policy, this policy allegedly lapsed in November of 2010. (*Id.* at ¶¶ 62, 63, 82.)

Case 5:24-cv-00522-BKS-TWD   Document 15   Filed 10/25/24   Page 139 of 186
Holmes v. Allstate Corp., Not Reported in F.Supp.2d (2012)
2012 WL 627238

According to Plaintiffs, Defendants also represented that they had purchased "business insurance policies" for the benefit of Plaintiffs (*id.* at ¶ 62), but the Amended Complaint does not indicate whether Defendants actually made such purchases, or, if so, whether these insurance policies also lapsed.

#### d. *Loans to an Elected Representative*

Plaintiffs allege that Defendants loaned $20,000 to Ron Sailor Jr. (identified in the Amended Complaint as a Georgia Congressman)[6] from Plaintiffs' capital investment. (*Id.* at ¶ 64.) Plaintiffs do not indicate whether this loan was authorized by Plaintiffs or whether the loan was repaid.

6     The Court takes judicial notice of the fact that Walter Ronnie Sailor, Jr., was a Georgia state assemblyman (not a member of the U.S. Congress), who left office after pleading guilty to federal wire fraud and money laundering charges. *See* http://www.justice . gov/usao/gan/press/2008/06– 17–08.pdf

#### e. *Documents*

At some point, Defendants allegedly sent Plaintiffs a large collection of Allstate documents containing personal information of thousands of Allstate policyholders and other policyholders. (*Id.* at ¶ 29.) Plaintiffs assert that they stored these documents for nine years, without compensation, incurring approximately $10,080 in storage costs. (*Id.* at ¶ 30.)[7]

7     At the initial case conference before this Court on July 26, 2011, the parties informed the Court that Holmes was in possession of certain Allstate documents, which contained confidential information related to Allstate's current or former policyholders (the "Allstate Documents"). According to Holmes' counsel, these documents had been given to Holmes, years ago, by Harris. (*See* July 26, 2011 Rule 16 Conference Transcript, at 12, Ex. D to Declaration of Elizabeth D. Schrero in Opposition to Plaintiffs' Motion for Sanctions Under Rule 11, dated Oct. 17, 2011 ("10/17/11 Schrero Decl.") (Dkt.57).) The Court directed Holmes to transfer the Allstate Documents to Allstate's counsel, and directed Allstate to maintain these documents in its possession and to preserve them for use as potential evidence in this case. (*See*

Scheduling Order, dated Aug. 4, 2011 (Dkt.30).) At the following case conference on November 1, 2011, the document transfer having been made, Allstate's counsel informed the Court that, among the transferred documents were certain documents in which Allstate claimed no interest, and which appeared, on their face, to be documents, such as ledgers, related to the operations of Harris's business(es). This Court directed Allstate to return that subset of the transferred documents (the "Harris Documents") to counsel for Holmes, and directed counsel for Holmes to maintain the Harris Documents as "Attorneys Eyes Only." This Court further directed counsel for Holmes either to deliver copies of the Harris Documents to counsel for Harris or to make the documents available to Harris's counsel for inspection and copying. (*See* Scheduling Order, dated Nov. 4, 2011 (Dkt.61).)

#### 2. *Legal Claims and Alleged Damages*

Plaintiffs assert nine claims against Defendants. One of these claims—for *prima facie* tort—is asserted solely against Harris. The eight remaining claims are brought against all Defendants. These claims include: (1) conversion; (2) fraud; (3) violation of New York Debtor and Creditor Law § 276; (4) negligent misrepresentation; (5) promissory estoppel; (6) unjust enrichment; (7) breach of contract; and (8) negligent infliction of emotional distress.

Plaintiffs demand $10 million in damages for the death of a Samuel's Temple member (whose death was allegedly "[d]irectly related to the conduct of defendants"), loss of business opportunities, loss of the ability to operate a school, harm to reputation, financial distress, harm to familial relations, and loss of employment at Bluebox. (Am. Compl. at ¶¶ 15, 86, 87, 88, 89, 94.)

#### B. *Motions before the Court*

#### 1. *Allstate's Motions To Dismiss and for Sanctions*

**\*5** On June 28, 2011, Allstate moved to dismiss the Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (*See* Notice of Motion To Dismiss Plaintiffs' Amended Complaint as Against Defendant the Allstate Corporation ("Allstate Mtn. To Dismiss"), dated June 28, 2011 (Dkt.18).) Allstate seeks dismissal on the grounds that the Amended Complaint consists of improper "group" allegations against "defendants," that it alleges no direct action by Allstate and no conduct by Allstate that could make

it liable for the actions of any of the other defendants, and that each individual claim fails for additional and independent reasons. (*See generally* Allstate Mtn. To Dismiss.)

Allstate has also filed a motion for sanctions against Plaintiffs, as well as their counsel, under Rule 11 of the Federal Rules of Civil Procedure and based on the Court's inherent authority. (*See* Notice of Motion For Sanctions Under Rule 11 ("Allstate's Sanctions Mtn."), dated July 29, 2011 (Dkt.27).) In its sanctions motion, Allstate contends that, as against Allstate, the Amended Complaint is frivolous and without any factual or legal basis. (*Id.*)

### 2. *Plaintiffs' Motions for Leave To Amend and for Sanctions*

On August 5, 2011, Plaintiffs opposed Allstate's motion to dismiss and filed a cross-motion for leave to file a Second Amended Complaint. (Notice of Cross–Motion, dated Aug. 5, 2011 (Dkt.33).) Plaintiffs argue that, because Harris was an agent and franchisee of Allstate, Allstate is liable for the acts alleged in the Amended Complaint. (Plaintiff's Memorandum of Law in Opposition to Defendant the Allstate Corporation's Motion To Dismiss Plaintiff's Amended Complaint and in Support of Plaintiff's Cross–Motion for Leave To File a Second Amended Complaint ("Pl. Opp. Mem. to Allstate Mtn."), dated Aug. 5 (Dkt.34[8]), at 4.) Primarily on this basis, Plaintiffs contend that each of their eight claims against Allstate is well-founded. (*Id.* at 6–11.) Nonetheless, Plaintiffs also request leave of Court to file the proposed Second Amended Complaint that they submit with their cross-motion. (*Id.* at 11.)

[8]    Through an apparent filing error, Plaintiffs' opposition memorandum was filed, in various parts, as Docket entries 34, 36 and 38.

On September 30, 2011, Plaintiffs filed a motion for sanctions against Allstate. (Notice of Motion, dated Sept. 30, 2011 (Dkt.51) .) Plaintiffs allege that certain statements contained in Allstate's memoranda in support of its two motions, and in a Declaration supporting Allstate's motion to dismiss and opposing Plaintiffs' cross-motion for leave to amend, are without evidentiary support. (Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Rule 11 Sanctions, dated Sept. 30, 2011 ("Pl. Sanctions Mem.") (Dkt.53), at 2.)

### 3. *Motions of the Harris Defendants*

On October 11, 2011, the Harris Defendants filed their own motion to dismiss the Amended Complaint. (*See* Memorandum of Law in Support of the Motion of Defendants, Bryan M. Harris a/k/a Bryan Michael Harris, Bluebox Entertainment, Inc., Harris Financial Insurance Services, Inc., Harris Financial, Inc., Harris Financial Insurance, In, Associate Management LLC, B.M. Harris Inc., First One Distributors, Inc., I Am Global Ent. LLC a/k/a Attracknaphobia, LLC To Dismiss The Amended Complaint ("Harris Mtn. To Dismiss"), dated Oct. 9, 2011 (Dkt.55).) The Harris Defendants contend that Plaintiffs have no standing to bring their claims; that, as a general matter, the Amended Complaint is inadequately pleaded; and that the nine claims also fail for independent reasons. (*See id.*)

*\*6* In opposition to the Harris Defendants' motion, Plaintiffs argue that each of their claims against these defendants is sufficient as pleaded, and Plaintiffs also submit additional documents related to the issue of standing and ask for leave to file an "Alternative Second Amended Complaint," which they submit with their opposition papers. (*See* Plaintiffs' Memorandum of Law in Opposition to Harris Defendants' Motion To Dismiss ("Pl. Opp. Mem. to Harris Mtn."), dated Nov. 10, 2011 (Dkt.64); *see also* Affidavit of Tyrone Holmes, dated Nov. 7, 2011 (Dkt.65); *see also* Declaration of Eric Andrew Suffin in Opposition to Harris Defendants' Motion To Dismiss, dated Nov. 10, 2011 ("11/10/11 Suffin Decl.") (Dkt.66).)

### *DISCUSSION*

### I. *ALLSTATE'S MOTION TO DISMISS AND PLAINTIFFS' CROSS–MOTION TO AMEND*

### A. *Applicable Legal Standards*

### 1. *Rule 12(b)(6)*

A case is subject to dismissal under Rule 12(b)(6) where the complaint is not legally sufficient to state a claim upon which relief can be granted. *See Kopec v. Coughlin,* 922 F.2d 152, 155 (2d Cir.1991). In deciding a Rule 12(b)(6) motion, the Court "accept[s] as true all factual statements alleged in the complaint and draw[s] all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007) (citation omitted); *accord Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). A court should grant dismissal where, after considering the plaintiff's allegations in this generous light, "it appears beyond doubt that the plaintiff can prove no set of

Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 141 of 186
Holmes v. Allstate Corp., Not Reported in F.Supp.2d (2012)
2012 WL 627238

facts in support of his claim which would entitle him to relief." *Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir.1992), *cert. denied,* 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993). At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP,* 464 F.3d 328, 337 (2d Cir.2006) (citation omitted). Rather, in order to withstand a motion to dismiss, a complaint must plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) ("[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

### 2. *Rule 15(a)*

Rule 15(a) of the Federal Rules of Civil Procedure governs the amendment of complaints and provides that the court "should freely give leave when justice so requires." Fed.R.Civ.P. 15(a). A motion to amend should be denied, however, "if there is an 'apparent or declared reason—such as undue delay, bad faith or dilatory motive ... repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of an amendment, [or] futility of amendment.' " *Dluhos v. Floating and Abandoned Vessel Known as "New York,"* 162 F.3d 63, 69 (2d Cir.1998) (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

**\*7** An amendment is considered futile when the proposed new claim would not withstand a motion to dismiss, either for failure to state a cause of action, or on another ground. *See Milanese v. Rust-oleum Corp.,* 244 F.3d 104, 110 (2d Cir.2001). Thus, if a proposed amendment would be subject to "immediate dismissal" on some ground, the Court will not permit the amendment. *See Jones v. NY. State Div. of Military & Naval Affairs,* 166 F.3d 45, 55 (2d Cir.1999). If, on the other hand, the party seeking to amend "has at least colorable grounds for relief, justice ... require[s]" that its motion be granted. *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 783 (2d Cir.1984) (citation omitted).

### B. *Adequacy of Plaintiffs' Allegations Against Allstate*

Allstate makes a number of arguments for dismissing the claims against it. As an initial matter, Allstate argues that

in order to state a claim against it, Plaintiffs would have to proceed under a theory that Harris had apparent authority to act on Allstate's behalf, but that Plaintiffs have not pleaded any facts sufficient to support the conclusion that Harris had such authority. Allstate also argues that the Amended Complaint fails to satisfy Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure. Finally, Allstate advances arguments for dismissing each of the eight individual claims against it on independent grounds. As this Court agrees that Plaintiffs have not pleaded facts sufficient to support any claim based on apparent authority, on which all of Plaintiffs' claims necessarily rest, I recommend that Allstate's motion to dismiss be granted on that ground, without regard to Allstate's other arguments.

### 1. *Lack of Allegations of Apparent Authority*

The Amended Complaint contains few allegations that relate, in particular, to Allstate. Instead, as noted above (*see* n. 3, *supra* ), Plaintiffs claim that "defendants" made and broke a range of promises. At best, Plaintiffs' use of the term "defendants" throughout the Amended Complaint is vague. At other times, Plaintiffs' method of group pleading is incoherent or illogical. [9] Given that Plaintiffs do not allege that Allstate itself engaged in any activity that would give rise to independent liability, Allstate argues that Plaintiff's theory of liability must be premised on Harris's actions and the doctrine of apparent authority. Under this doctrine, as explained by the New York Court of Appeals, [10] liability against a principal may arise if the principal's affirmative conduct causes a third party reasonably to believe that an agent has authority to act on behalf of the principal:

9

> For example, the Amended Complaint alleges that "Plaintiffs and defendants agreed that plaintiff Holmes would be Chief Executive Officer, Director of Music Production and Video Production, Musician, Webmaster, Digital Music Engineer and Songwriter, of, for and with defendant Bluebox, while living in real estate purchased with plaintiffs' capital ... plaintiff Church to benefit from potential profits of defendant Bluebox, plaintiffs to be 51% stockholders of defendant Bluebox." (*Id.* at ¶ 47.) It is difficult to understand how defendant Allstate could have made such promises. As another example, Plaintiffs allege that "[i]n or about April, 2007 defendants told plaintiffs that defendants sold the mall that defendants' Forest Park, Georgia office was located in ." (*Id.* at ¶ 67.) Construing

the term "defendants" to include all of the Harris Entities, as well as Allstate, would make little sense in this instance because defendants Bluebox, HF, HFI, BMH, First, Associate, and IAGE are not alleged to have had any connection to an office in Forest Park, Georgia, nor does it seem likely that these defendants or Allstate would have been involved in the alleged sale of the mall that contained this office. (*See id.* ¶¶ 12–14.)

10   In this diversity action, plaintiff Holmes alleges that he is a New York resident, and Samuel's Temple also appears to be located in New York. (*See* Am. Compl. at ¶¶ 2, 6, 7.) Defendant Harris is alleged to be a resident of Georgia, and the Harris Entities allegedly have principal places of business, or are incorporated, in Georgia. (*See id.* at ¶¶ 11, 12, 14, 23.) Defendant Allstate is alleged to have its principal place of business in Illinois. (*See id.* at ¶ 9.) The subject matter of the alleged contract(s) at issue was located in Georgia, and the alleged promises seem to have been made while Harris was in his Georgia office. (*See id.* at ¶¶ 37, 38, 54, 79.) Although this could potentially raise choice of law issues, the parties' submissions all cite New York case law. Such "implied consent ... is sufficient to establish choice of law." *Khubani v. Ionic White, Inc.,* No. 05 Civ. 3706(DC), 2008 U.S. Dist. LEXIS 30610, at \*3 (S.D.N.Y. Apr. 3, 2008) (citing *In re Tehran–Berkeley Civil & Environmental Engineers,* 888 F.2d 239, 242 (2d Cir.1989)); *see also Global Switching Inc. v. Kasper,* No. CV–06–412 (CPS), 2006 U.S. Dist. LEXIS 44450, at \*32 n. 10 (E.D.N.Y. June 29, 2006) ("In any event, where, as here, the parties are silent about the choice of law question, the Court may apply the law of the forum .") (citing *Michele Pommier Models v. Men Women N.Y. Model Mgmt.,* 14 F.Supp.2d 331, 336 (S.D.N.Y.1998)).

Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction. The agent cannot by his own acts imbue himself with apparent authority. Rather, the existence of 'apparent authority' depends upon a factual showing that the third party relied upon the misrepresentation of the agent because of some misleading conduct on the part of the principal-not the

agent. Moreover, a third party with whom the agent deals may rely on an appearance of authority only to the extent that such reliance is reasonable.

**\*8** *Hallock v. State of New York,* 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 474 N.E.2d 1178 (1984) (internal quotations and citations omitted); *see also Ford v. Unity Hospital,* 32 N.Y.2d 464, 472–73, 346 N.Y.S.2d 238, 299 N.E.2d 659 (1973) ("The apparent authority for which the principal may be held liable must be traceable to him; it cannot be established by the unauthorized acts, representations or conduct of the agent"). Here, Allstate argues that Plaintiffs have not sufficiently alleged any facts that could support a finding that Harris was authorized by Allstate to make the promises or engage in the transactions that form the basis of Plaintiffs' claims.

Plaintiffs do not deny that they are proceeding against Allstate on a theory of apparent authority (*see* Pl. Opp. Mem. to Allstate Mtn. at 4), but they maintain that their allegations are sufficient to implicate Allstate under that theory. Specifically, the Amended Complaint contains the following allegations regarding the nature of Allstate's business, its relationship with Harris, and the role that Plaintiffs were supposedly led to believe that Allstate would take with respect to Plaintiffs' money and investments:

- Allstate "is purportedly an insurance, retirement, investment, and banking company, purporting to offer Asset Protection, Wealth Transfer, Family Protection Insurance, Financial Products, Asset Management and Accumulation, and Asset Management Short-term Financial Objectives." (Am. Compl. at ¶ 8.)

- Harris "was and is an Agent and Franchisee with, of and for defendant Allstate." (*Id.* at ¶ 10, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

- "[A]s an Agent of defendant Allstate[,] defendant Harris offered Allstate financial services, while simultaneously operating under the corporate name of defendant Harris Financial Insurance Services, Inc." (*Id.* at ¶ 13, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

- "At the time the plaintiffs received one million dollars in or about 2006 plaintiff Holmes believed that defendant Harris operated the most successful Allstate operation/ business in the southeast region of the United States of America for the previous ten years, pursuant to representations to that effect by defendants." (*Id.* at ¶ 31, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

- "Defendants represented to plaintiffs that capital invested by plaintiffs with defendants would be invested with defendant Allstate in the name of plaintiff Church." (*Id.* at ¶ 36, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

- "Defendants Harris, HFIS, Bluebox, HF, HFI, BMH, First, Associate, and IAGE used the Allstate name and logo to convince plaintiffs to invest with defendants, assuring plaintiffs that the investments were to be with Allstate."(*Id.* at ¶ 46, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

- "Defendants represented that plaintiffs' capital investment would be maintained and supervised by Allstate." (*Id.* at ¶ 52, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

- "On the basis of the representations made to plaintiffs by defendants, and relying upon defendants' advice and representation that Allstate was exercising certain controls and safeguards upon defendant Harris, plaintiffs invested approximately five hundred and thirteen thousand dollars with defendants." (*Id.* at ¶ 53, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

**\*9** • Harris "openly conducted plaintiffs' business and discussed plaintiffs' financial transactions during business hours while in Allstate offices, acting as an Agent of Allstate." (*Id.* at ¶ 54, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

- "Defendants represented to plaintiffs that defendant Allstate was the entity that sold certain securities and derivatives, life insurance policies and business insurance policies to plaintiffs." (*Id.* at ¶ 65, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

Plaintiffs also generally allege that each defendant is an "alter ego" of the other defendants. (*Id.* at ¶¶ 15–22, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

Yet, while these allegations may suggest that Harris, holding himself out as an Allstate agent, made certain representations to Plaintiffs regarding Allstate's involvement in the planned investment transactions, missing from the Amended Complaint is any allegation that Allstate *itself* engaged in any affirmative conduct that could have caused Plaintiffs reasonably to believe that Harris had the authority to bind Allstate to promises regarding how Plaintiffs' money would be spent or invested. *See Imburgio v. Toby,* 82 A.D.3d 653, 920 N.Y.S.2d 43, 43 (1st Dep't 2011) (granting

motion to dismiss where plaintiffs failed to allege facts that would impute liability to defendant, holding that, "[w]hile plaintiffs asserted that defendant's employee was vested with apparent authority based upon the employee's representations concerning the transactions at issue, such authority may arise only from the conduct of the principal, not the agent").

Despite its repeated references to actions undertaken by "defendants," the Amended Complaint implies that Harris made the promises and engaged or failed to engage in the conduct that underlies this action. (*See* Am. Compl. at ¶ 54 ("Defendant Harris openly conducted plaintiffs' business and discussed plaintiffs' financial transactions during business hours while in Allstate offices, acting as an Agent of Allstate.").) Indeed, even Plaintiffs' allegations that refer generally to the conduct of "defendants" suggest, in context, that Harris was the actor. For example, when Plaintiffs allege that they made wire transfers to Bluebox, a Harris company, "relying upon defendants' advice and representation that Allstate was exercising certain controls and safeguards" (*id.* at ¶¶ 56–58), Plaintiffs identify no action or words *by Allstate* regarding its involvement with Bluebox, much less any action or words by Allstate that could have led Plaintiffs to have the reasonable belief that Allstate was indeed exercising any such "controls and safeguards." In short, the Amended Complaint contains no allegations that Allstate did anything to make Plaintiffs believe that Harris had the authority to bind Allstate to any promises or that Harris's promises were being made on Allstate's behalf. In fact, neither the Amended Complaint nor common sense suggest any basis on which a reasonable person could have believed that Harris had the authority to bind Allstate to the types of promises alleged. [11]

[11]   For example, it is nearly inconceivable that Allstate would have authorized the transfer to Holmes of a large volume of Allstate documents containing confidential information of other policyholders, or that Allstate would—or even could—have authorized the loan of Plaintiffs' funds to a state legislator or the promise of Holmes' employment with Harris's entertainment company.

**\*10** In opposition to Allstate's motion to dismiss, Plaintiffs rely on *Kirschner v. KPMG LLC,* 15 N.Y.3d 446, 912 N.Y.S.2d 508, 938 N.E.2d 941 (2010), for the proposition that "[a] corporation must ... be responsible for the acts of its authorized agents even if particular acts were unauthorized." *Id.* at 465, 912 N.Y.S.2d 508, 938 N.E.2d 941 (cited in Pl. Opp. Mem., at 4.) Plaintiffs' reliance on *Kirschner* is

Holmes v. Allstate Corp., Not Reported in F.Supp.2d (2012)
Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 144 of 186

2012 WL 627238

misplaced, as, even assuming that Plaintiffs have adequately pleaded, or can plead, that Harris was an authorized Allstate *insurance agent*, "[t]he mere creation of an agency for some purpose does not automatically invest the agent with 'apparent authority' to bind the principal without limitation." *Ford v. Unity Hospital*, 32 N.Y.2d 464, 472–73, 346 N.Y.S.2d 238, 299 N.E.2d 659 (1973). Rather,

> [a]n agent's power to bind his principal is coextensive with the principal's grant of authority. One who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority. Upon failure to properly determine the scope of authority, and in the face of damages resulting from an agent's misrepresentations, 'apparent authority' is not automatically available to the injured third party to bind the principal ... The very basis of the doctrine of apparent authority indicates that the principal can be held liable under the doctrine only where he was responsible for the appearance of authority in the agent to conduct *the transaction in question.*

*Id.* (internal citations and quotations omitted) (emphasis added). Here, other than stating, in general terms, that Allstate, as a company, offers a number of financial services (Am. Compl. at ¶ 8), Plaintiffs have made no factual allegations to support their claim that Allstate ever authorized Harris to act as its agent for any purpose other than, perhaps, the placement of insurance. Plaintiffs' bare allegation that Harris was an "agent" of Allstate is simply insufficient to plead liability by Allstate, under the doctrine of apparent authority, for the wide variety of claims Plaintiffs assert.

Finally, although Plaintiffs allege that Harris was supposed to provide insurance policies for them through Allstate, the Amended Complaint does not allege any failure by Allstate to provide insurance [12] or to honor any insurance obligations. Nor do Plaintiffs allege that Allstate made any false statements regarding the terms of any policy issued to them or regarding whether such a policy had been renewed. Rather, to the extent any insurance policy is even implicated

in the Amended Complaint, Plaintiffs merely appear to complain that Harris failed to use Plaintiffs' funds to make regular payments of policy premiums, after promising that he would. Again, this does not suggest any culpable conduct by Allstate.

[12]    The Amended Complaint alleges, in fact, that a life insurance policy for Holmes and his children was issued (*id.* at ¶ 82), although Plaintiffs do not make clear whether this policy was issued by Allstate or by another carrier.

In sum, the Amended Complaint fails to allege *any* factual basis for Plaintiffs' position that Harris had apparent authority to bind Allstate with respect to any of the many investment schemes alleged in this case. It also fails to allege *any* conduct, whatsoever, by Allstate that could have induced reliance on the part of Plaintiffs. While Plaintiffs allege that "defendants" failed to keep numerous promises, Plaintiffs do not specify that a single promise was ever made or sanctioned by Allstate. For these reasons, Plaintiffs' claims against Allstate cannot stand, and the Amended Complaint should be dismissed, as against Allstate, under Rule 12(b) (6), for failure to state a claim. [13]

[13]    As the Amended Complaint is defective for the reasons stated herein, the Court need not address Allstate's alternative arguments for dismissal.

### 2. *Futility of Plaintiffs' Proposed Second Amended Complaint*

**\*11** In response to Allstate's motion to dismiss, Plaintiffs seek leave to file a Second Amended Complaint, presumably in an attempt to cure any pleading defect. Plaintiffs, however, have actually submitted three different versions of a proposed Second Amended Complaint to the Court. Through what the Court assumes was attorney error, Plaintiffs filed one version of a proposed amended pleading on the Court's Electronic Case Filing ("ECF") system, but apparently served on Allstate (and submitted to this Court as a "courtesy copy") a nonconforming version. (*See* Second Amended Complaint ("2d Am. Compl."), Ex. A to Declaration of Eric Andrew Suffin, dated Aug. 5, 2011 ("8/5/11 Suffin Decl.") (Dkt.35); *see also* Service Copy of Second Amended Complaint ("Served 2d Am. Compl."), Ex. A to 8/5/11 Suffin Decl.) Then, later, in response to the Harris Defendants' separate motion to dismiss, Plaintiffs filed yet a third version, styled as an "Alternative Second Amended Complaint." (*See* Alternative Second Amended Complaint

("Alt.2d Am.Compl."), Ex. A to 11/10/11 Suffin Decl.) With regard to allegations concerning Allstate, all three versions differ only slightly from the Amended Complaint, and none of the versions cure the defects discussed above, as none allege facts sufficient to show that Harris had apparent authority to bind Allstate to any of the alleged promises.

In their proposed amended pleadings, Plaintiffs first add an allegation that, outside Harris's Forest Park office, there were signs that displayed (1) the Allstate logo, (2) a telephone number for "Forest Park Allstate," and (3) the names of both Harris and defendant HFIS. (*See* 2d Am. Compl. at ¶ 51; Alt.2d Am. Compl. at ¶ 59; *see also* Served 2d Am. Compl. at ¶ 48.) Plaintiffs also add a number of allegations about information available on Allstate's corporate website, as follows:

- "Defendant Allstate maintains and at other relevant times maintained an internet website address accessible to the public @ www.allstate.com." (2d Am. Compl. at ¶ 10; Alt.2d Am. Compl. at ¶ 16; *see also* Served 2d Am. Compl. at ¶ 10.)

- "At defendant Allstate's website and at other websites advertising defendant Allstate[,] defendant Allstate represents to the public that defendant Allstate offers 'financial' 'products' or 'services.' " (2d Am. Compl. at ¶ 52; Alt.2d Am. Compl. at ¶ 60; *see also* Served 2d Am. Compl. at ¶ 49 (same, except for omission of reference to "services").)

- "Initially in 2004 or 2005, in 2006 and in 2007 before investing with defendants plaintiffs visited www.allstate.com and observed that defendant Allstate does stocks and investor relations." (2d Am. Compl. at ¶ 59; Alt.2d Am. Compl. at ¶ 67; *see also* Served 2d Am. Compl. at ¶ 56 (same except for omission of reference to dates).)

- "Between 2005 and 2011 plaintiffs have visited the www.allstate.com website many times since first observing that defendant Allstate does stocks and investor relations." (2d Am. Compl. at ¶ 60; Alt.2d Am. Compl. at ¶ 68; *see also* Served 2d Am. Compl. at ¶ 57 (same except for omission of reference to dates).)

**\*12** Lastly, Plaintiffs add an allegation that their claims "may be supported by documents, including but not limited to documents attached as Exhibits A, B, C and D." (2d Am. Compl. at ¶ 121; Alt.2d Am. Compl. at ¶ 129; *see also* Served

2d Am. Compl. at ¶ 118.) The four referenced exhibits are attached to all three versions of Plaintiffs' proposed Second Amended Complaint. Exhibit A is a photograph of a block of signs. There is a sign for Allstate at the top of the block, and underneath the Allstate sign is a sign that reads "Harris Financial Insurance Services, Inc.," with a phone number. (Ex. A to 2d Am. Compl., Alt.2d Am. Compl.; Served 2d Am. Compl.) At the lower right of the block, another sign reads "Allstate Bryan Harris." (*Id.*)

Exhibit B appears to be a series of screen prints of web pages. (Ex. B to 2d Am. Compl., Alt.2d Am. Compl., Served 2d Am. Compl.) The first page, which appears to have been taken from an Allstate website, lists services offered by Allstate. (*Id.*) The next two pages seem to be results from some type of Internet search involving Harris and Allstate. (*See id.*) None of the listed search results are Allstate websites. (*Id.*) The next several pages include, *inter alia,* a screen print apparently taken from another Allstate web page, referring to Harris and stating, in part: "Bryan Harris is licensed to sell Allstate insurance products only in the state(s) of Georgia. If you do not reside in the state(s) of Georgia or you're not insuring property located in the state(s) of Georgia, please go to the *Find an Agent* section on allstate.com to search for another agent." (*Id.*) Also included are a number of web pages taken from non-Allstate websites, such as superpages.com, insiderpages.com, and citysearch.com, which refer in some way to Allstate or Harris. (*Id.*) The exhibit also includes what appears to be a screen print of a webpage from a Bluebox Entertainment website, listing Harris as the CEO and Director of Operations. (*Id.*) The last page of the exhibit appears to be a screen print of an Allstate web page that refers to an individual named Sam Noah, identified on the page as a Personal Financial Representative in New York; this individual is nowhere mentioned in Plaintiffs' Amended Complaint or memoranda. (*See id.*)

Exhibit C is comprised of several email messages, together with two unsigned promissory notes and certain other documents, which seem to have been email attachments. (*See* Ex. C to 2d Am. Compl ., Alt.2d Am. Compl., Served 2d Am. Compl.) The promissory notes, which are the first documents appearing in this exhibit, do not bear Allstate's name or logo, and, while they identify "Samuel's Temple" as the lender, they do not identify the borrower or the guarantor. (*See id.*) At least some of the emails contained in the exhibit seem to be correspondence between Holmes and Harris, and relate to a variety of topics, including "Blue Box Wiring Information," "Life Insurance," "Bishop Long," and "Tax ID Info." (*See id.*)

In certain of the emails, Harris is identified as "Director of Operations" of Bluebox. (*See id.*) The entire exhibit seems disjointed, as the pages do not appear to be in any sort of order, and the pages are variously forwards, backwards, right-side-up, and upside-down. (*See id.*) The meaning of the emails themselves is far from clear, [14] and is not explained anywhere by Plaintiffs. [15]

[14]  For example, an email dated October 18, 2006, from Shane Moody, of Clayton Signs Inc., to "Ty" (presumably Holmes), states, in part, "Here is the contract for the Allstate location." (*Id.*) Yet Plaintiffs do not identify Clayton Signs Inc., attach the referenced contract, or explain what it is. Another email, dated January 16, 2007, from Harris to "Ty Maximus" (presumably Holmes), states, "U are spending it before we make it you just have to stop taking 25 to 30,000 a month out of the account and you can keep your inheritance! [Y]ou need to stop and think! I will send over the reports!" (*Id.*) Yet another email, from "Ty Maximus," to Harris, which is embedded in an email dated June 12, 2008, states, "Hey Bryan, We are days away from ending this nightmare ... We now have Jews involved in the purchase of the 125 st property ... Br[y]a[ ]n, I need $150.00 to get my Son back home. They are stuck in Columbia SC, with my over due serviced benz ..." (*Id.*)

[15]  The Court also notes that some of the documents in both Exhibits C and D appear to contain personal identifying information, including financial account numbers and at least one taxpayer identification number. It thus appears that Plaintiffs' counsel has violated Rule 5.2(a) of the Federal Rules of Civil Procedure by filing these exhibits publicly, without appropriate redaction. By separate Order of January 23, 2011, this Court has directed that these exhibits be placed under seal, pending their appropriate re-submission by Plaintiffs, in accordance with the requirements of Rule 5.2.

**\*13**  Exhibit D contains an assortment of unrelated documents. It includes a copy of a fund transfer application and some documents related to a wire transfer. (Ex. C to 2d Am. Compl., Alt.2d Am. Compl., Served 2d Am. Compl.) None of these documents bear Allstate's name or logo. (*Id.*) Also included in Exhibit D is a single document that appears to be from Allstate, but nearly all of the identifying information is redacted. (*See id.*) This document may be an example of the type of documents regarding other Allstate policyholders that Harris allegedly transferred to Holmes and that Holmes then stored (*see id., see also supra* at 8 and n. 7), as the document does not appear to relate to Holmes or to any member of his family. Also included in Exhibit D are documents related to a criminal case against former Georgia state representative Walter Ronnie Sailor, Jr. (*Id.; see also supra* at 8, and nn. 6, 11.) Exhibit D also includes documents that appear to have been printed from the Georgia Secretary of State's website and contain corporate information regarding the Harris Defendants. (*Id.*) Finally, Exhibit D contains what appears to be a screen print of a page from a Bluebox website. (*Id.*)

Finally, the version of the proposed Second Amended Complaint that Plaintiffs served, but did not file, contains an Exhibit E, which is comprised of a series of photographs, the subjects of which are barely discernable and are not identified in any way. (Ex. E to Served 2d Am. Compl.)

Nothing contained in any of Plaintiffs' proposed new allegations, or in any of the above-described proposed exhibits, can render Plaintiffs' claims against Allstate viable. If anything, the new allegations detract from, rather than support, Plaintiffs' arguments regarding the potential liability of Allstate in this case. Citing general statements on Allstate's website regarding the nature of its financial services business cannot substitute for pleading affirmative conduct by Allstate that could have led Plaintiffs to believe that Allstate had authorized *Harris* to act as an investment counselor or to plan investments for clients. In fact, to the extent Plaintiffs' proposed exhibits suggest that Allstate, on its website, ever made any mention of Harris, those exhibits suggest only that Harris was licensed by Allstate to sell insurance in the State of Georgia, not to engage in any other business in Allstate's name or on its behalf. Nor can the necessary authority be reasonably inferred from the fact that Harris, who is claimed to have been an Allstate insurance agent, had an "Allstate" sign outside his office. Nor do Plaintiffs' jumbled array of email messages aid them, as none appear to have been sent from any Allstate account; in fact, all of the emails authored by Harris appear to have been sent from his private email accounts, where he identified himself solely as the Director of Operations of Bluebox.

As nothing contained in any version of Plaintiffs' proposed Second Amended Complaint would cure the defects in

Plaintiffs' claims against Allstate, I recommend that Plaintiffs' cross-motion for leave to amend, as against Allstate, [16] be denied as futile. Further, as Plaintiffs are apparently unable to plead any factual foundation, whatsoever, for their claim that Harris had apparent authority to act for Allstate, I recommend that Plaintiffs' claims against Allstate be dismissed with prejudice.

[16]    To the extent Plaintiffs seek to amend their claims against the Harris Defendants, Plaintiffs' application is addressed below.

## II. *ALLSTATE'S AND PLAINTIFFS' SANCTIONS MOTIONS*

### A. *Applicable Legal Standards*

#### 1. *Rule 11*

**\*14** Under Rule 11 of the Federal Rules of Civil Procedure, when an attorney files a complaint, motion, or other written paper, he or she is representing to the Court that, "to the best of [his or her] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, it is not being presented for any improper purpose," Fed.R.Civ.P. 11(b)(1), and that the claims, defenses, and other legal contentions therein "are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law," Fed.R.Civ.P. 11(b)(2). Further, in signing the submission, the attorney is representing that, after reasonable inquiry, he or she believes that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P. 11(b)(3).

A party that believes Rule 11 has been violated may move for sanctions. Fed.R.Civ.P. 11(c)(2). Rule 11, however, provides a "safe harbor": the sanctions motion may not be filed with the Court if, within 21 days of service of the motion, the offending party withdraws the challenged claim or appropriately corrects it. *Id.* Thus, the motion—which "must describe the specific conduct" that allegedly violates the Rule—must be served, but not filed until at least 21 days after service. *Id.* It has been noted that this provision of the Rule, which, in "plain language[,] ... expressly requir[es] the serving of a formal motion," exists for "good reason," *Lancaster v. Zufle,* 170 F.R.D. 7, 7 (S.D.N.Y.1996), as it places the movant's adversary on notice of the motion it will face if the matter is not remedied, *see id.* The Rule 11

"safe harbor" requirement is "strictly construed," *Banfield v. UHS Home Attendants, Inc.,* No. 96 Civ. 4850, 1997 WL 342422, at \*2 (S.D.N.Y. June 23, 1997) (JFK) (citing *Hadges v. Yonkers Racing Corp.,* 48 F.3d 1320, 1328 (2d Cir.1995)), and has even been described as "jurisdictional in nature," *R.B. Ventures, Ltd. v. Shane,* No. 91 Civ. 5678(CSH), 2000 WL 1010400, at \*2 (S.D.N.Y. July 20, 2000); *see also ESI, Inc. v. Coastal Corp. .,* 61 F.Supp.2d 35, 68 (S.D.N.Y.1999) (where movant had not complied with mandatory "safe harbor" requirement, sanctions motion "must be denied without a discussion of the merits of the motion"). It is an abuse of a court's discretion to impose sanctions under Rule 11, where the Rule's "safe harbor" requirement has not been met. *See Hadges,* 48 F.3d at 1328.

In determining whether a plaintiff has engaged in conduct violating Rule 11's requirements, courts apply an objective standard of reasonableness, and look to see whether the attorney's conduct was objectively reasonable at the time the pleading was signed. *See Morley v. Ciba–Geigy Corp.,* 66 F.3d 21, 25 (2d Cir.1995); *Greenberg v. Chrust,* 297 F.Supp.2d 699, 703 (S.D.N.Y.2004). Where a court finds that claims or defenses have been asserted for the sake or harassment or some other improper purpose, or that they lack any evidentiary support, a court has the discretionary authority under Rule 11(c) to impose monetary sanctions on either the offending party or its counsel, or both. *Morley v. Ciba–Geigy Corp.,* 66 F.3d 21, 24 (2nd Cir.1995). Where the violation is the assertion of an unwarranted legal claim or defense, however, a court may only impose monetary sanctions against counsel, not the represented party. Fed.R.Civ.P. 11(c)(5)(A). A court may also "award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion," Fed.R.Civ.P. 11(c) (2); such an award may be made against either a party or its counsel, *see*Fed.R.Civ.P. 11(c)(5); *see also Calloway v. Marvel Entertainment Group,* 854 F.2d 1452, 1474 (2d Cir.1988) (holding that Rule 11 sanctions may be imposed upon a represented party when the party "had actual knowledge that filing the paper constituted wrongful conduct, *e.g.* the paper made false statements or was filed for an improper purpose."), *rev 'd on other grounds by Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989).

**\*15** The 1993 Advisory Committee Note to Rule 11 sets forth certain factors that may be considered by the court when deciding whether to impose sanctions or what sanctions are appropriate in the given circumstances. Those factors include: (1) "[w]hether the improper conduct was willful,

or negligent"; (2) "whether it was part of a pattern or activity, or an isolated event"; (3) "whether it infected the entire pleading, or only one particular count or defense"; (4) "whether the person has engaged in similar conduct in other litigation"; (5) "whether it was intended to injure"; (6) "what effect it had on the litigation process in time or expense"; (7) "whether the responsible person is trained in the law"; (7) what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case"; and (8) "what amount is needed to deter similar activity by other litigants." Fed.R.Civ.P. 11 advisory committee note to 1993 amendments; *see also, e.g., Kochisarli v. Tenoso,* No. 02 Civ. 4320, 2006 WL 721509, at \*8 (E.D.N.Y. Mar.21, 2006) (applying factors, and citing *Simpson v. Putnam County Nat. Bank of Carmel,* 112 F.Supp.2d 284, 291–92 (S.D.N.Y.2000)).

**2. *The Court's Inherent Authority***

A court's inherent authority to award attorneys' fees and costs derives from "a court's need to manage its affairs so as to achieve an orderly and expeditious resolution of cases." *Bowler v. U.S. Immigration and Naturalization Service,* 901 F.Supp. 597, 605 (S.D.N.Y.1995). Attorneys' fees may be imposed if a party has continued an action "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* (internal citations omitted). The Second Circuit has reasoned that sanctions under the court's inherent authority should be based on findings that the offending party has asserted colorless claims and has acted in bad faith. See *Eisemann v. Green,* 204 F.3d at 396. [17]

[17] "To ensure ... that fear of an award of attorneys' fees against them will not deter persons with colorable claims from pursuing those claims, we have declined to uphold awards under the bad-faith exception absent both clear evidence that the challenged actions are entirely without color, and are taken for reasons of harassment or delay or for other improper purposes and a high degree of specificity in the factual findings of the lower courts." *Eisemann v. Green,* 204 F.3d at 396 (quoting *Dow Chem. Pacific Ltd. v. Rascator Maritime S.A.,* 782 F.2d 329, 344 (2d Cir.1986) (emphasis added) (internal citations, quotation marks, and brackets omitted).

**B. *Allstate's Motion for Sanctions***

Allstate's motion for Rule 11 sanctions against Plaintiffs and their counsel, Suffin, was properly made and demonstrates that sanctions are warranted, as against Suffin.

**1. *Plaintiffs' Failure To Take Advantage of Rule 11's "Safe Harbor"***

As a preliminary matter, Allstate complied with the procedural requirements of Rule 11(a). On June 14, 2011, Allstate sent Suffin a letter, which outlined Plaintiffs' pleading deficiencies in detail, and requested that Plaintiffs voluntarily withdraw the Amended Complaint. (Letter from Allstate to Suffin, dated June 14, 2011, Ex. C to Declaration of Elizabeth D. Schrero in Support of Motion of Defendant the Allstate Corporation for Sanctions Under Rule 11, dated July 29, 2011 ("2/29/11 Schrero Decl.") (Dkt.28).) Counsel for Allstate and Suffin then participated in a telephone conference on June 16, 2011, during which Allstate's counsel reiterated her request for Plaintiffs to withdraw the Amended Complaint. (*See* Memorandum of Law in Support of the Motion of Defendant the Allstate Corporation for Sanctions under Rule 11, dated July 29, 2011 ("Allstate's Sanctions Mem."), (Dkt.29) at 3.) In response, Suffin apparently requested that Allstate consent to an amendment of Plaintiffs' pleadings. (*Id.*) Counsel for Allstate refused to consent without first being presented with any evidence that supported Plaintiffs' claims against Allstate, but told Suffin that, before proceeding with motion practice, she would consider any evidence he could show her that could support Plaintiffs' claims. As AUstate's counsel describes their conversation, she asked Suffin to "come forward with *any* support/evidence of a factual basis for an allegation that Allstate made representations to Plaintiffs concerning Harris' scope of authority in connection with the funds Plaintiffs allegedly sent to Harris and Harris' alleged investment schemes." (*Id.*) (emphasis in original.) AUstate's counsel also sent Suffin a letter memorializing their June 16, 2011 telephone conference. (*Id.* at 4.)

\***16** When Plaintiffs neither withdrew the Amended Complaint nor came forward with any support for their allegations against Allstate, Allstate filed its motion to dismiss on June 28, 2011. (*Id.*) Allstate also prepared a motion for sanctions, which, in accordance with Rule 11(c)(1)(A), it served on Plaintiffs on July 6, 2011 (together with a "safe harbor" letter), but did not file. (*See* Letter from Allstate to Holmes, dated July 6, 2011, Ex. F to July 29 Schrero Decl.) When Plaintiffs did not withdraw their claims within 21 days, Allstate proceeded to file its sanctions motion with the Court. (*See* Allstate's Sanctions Motion.) Accordingly, Allstate's sanctions motion is properly before the Court, and

Holmes v. Allstate Corp., Not Reported in F.Supp.2d (2012)
Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 149 of 186
2012 WL 627238

the Court must now determine whether sanctions are justified, and, if so, whether sanctions should be imposed against Plaintiffs, Suffin, or both.

## 2. *The Relevant Factors Weigh in Favor of Sanctioning Plaintiffs' Counsel.*

On balance, the relevant factors suggest that the imposition of sanctions against Suffin (although not Plaintiffs) would be appropriate in this case. In this regard, the Court notes that the core deficiency in the Amended Complaint is the assertion of claims against Allstate that are not warranted based on the law, a matter that falls under Rule 11(b)(2). Under this section, as noted above, Rule 11 sanctions against a party may not be imposed; such sanctions, where warranted, may only be imposed on counsel. *See Morley,* 66 F.3d at 24.

This case actually began with the filing of a *pro se* Complaint by Holmes. When Suffin then appeared on behalf of Holmes and the Church, Suffin proceeded to file an Amended Complaint. Instead of substantively revising Holmes' pleading, though, Suffin signed and filed an amended pleading that adopted the same flawed theory as Holmes' original *pro se* pleading, as to the claimed liability of Allstate. In other words, in his role as counsel, Suffin appears to have done nothing to disabuse Holmes of the notion that he had viable claims against Allstate for, *inter alia,* conversion and fraud, based solely on Harris's conduct and alleged representations; rather Suffin simply filed a revamped version of the same flawed allegations against Allstate. In fact, the Amended Complaint increased the damages originally claimed by Holmes from $3 million to $10 million (sought "jointly and severally" from each defendant), with an unspecified part of that sum purportedly representing damages for the death of a Church member. (Am. Compl. at ¶ 94.) Nowhere does the Amended Complaint explain how Holmes and the Church could have standing to seek damages for a congregant's death, much less how Allstate could possibly be responsible for that death.

While this Court cannot conclude that Suffin filed the Amended Complaint in bad faith, *i.e.,* with the deliberate intent to harass Allstate or to cause it harm, it appears that, at a minimum, he failed to give adequate counsel to his clients. Further, even if not "willful," Suffin's decision to adhere to his client's former position (and even to expand it) in the face of Allstate's repeated efforts to point out the obvious legal flaws in those claims was at least reckless. While this litigation is still in an early stage, it is also worth emphasizing that Suffin not only filed an Amended Complaint

that contained no allegations capable of supporting Plaintiffs' claims against Allstate, but also submitted three versions of a proposed Second Amended Complaint that are equally deficient. As discussed below, Suffin also met Allstate's sanctions motion by filing a procedurally defective and utterly baseless sanctions motion of his own, against Allstate. (*See* discussion *infra,* at 34–39.) This is sufficient to show a pattern of frivolous filings. *See Kochisarli v. Tenoso,* No. 02 Civ. 4320(DRH)(MLO), 2006 WL 721509, at *8 (E.D.N.Y. Mar. 21, 2006) (imposing sanctions under Rule 11 for, *inter alia,* "submitting essentially the same indecipherable set of counterclaims for a third time").

**\*17** Moreover, this is not the first time that Suffin has been criticized by the Court for filing a frivolous pleading. In *Bibb v. New York City Housing Authority,* 09 Civ. 9956(NRB), 2010 WL 3958646 (S.D.N.Y. Sept. 30, 2010), as Allstate points out (*see* Allstate's Sanctions Mtn. at n. 5.), Suffin received a warning from the Honorable Naomi Reice Buchwald, U.S.D.J., for filing a complaint that the Court found "wholly lacking in merit, even if every fact in the complaint and supporting affidavit [were] accepted as true." (*Id.* at *6.) Judge Buchwald acknowledged that the defendant's Rule 11 motion—brought against Suffin, his law firm, and plaintiff for filing "baseless and frivolous" claims— was "not unwarranted," but "given Suffin's recent admission to the bar," she "hope[d] a word of caution [would] be sufficient to encourage him to be more circumspect before commencing other actions." (*Id.* at *6–7.) She cautioned:

> We wish to stress to Suffin that it is part of his function as an attorney, when appropriate, to explain to his client that she does not have a legitimate legal claim. Such action may assist the client in appreciating the situation in which she finds herself ... We are hopeful that Suffin will use better judgment in the future.

(*Id.* at *7.) [18] It does not appear that Suffin took the Court's "word of caution" to heart, in this case. Further, while Judge Buchwald noted, in her 2010 opinion, that Suffin was "recently admitted to the bar," he now holds himself out as having been in practice for four years and as having handled matters in a wide range of practice areas. [19] At this point,

there is less reason to be forgiving of Suffin's unwillingness or inability to educate and guide his clients when they lack a legitimate claim.

18    Allstate also points out the Court has previously sanctioned Suffin for violating its rules. *See Dvorkin v. New York–Presbyterian Hospital,* 10 Civ. 3680(GBD)(AJP), 2011 WL 280801, at *4 (S.D.N.Y. Jan. 19, 2011) (affirming, although modifying, sanction imposed by magistrate judge for counsel's failure to bring his client to a settlement conference, as directed by the Court) (cited in Allstate Mem., at n. 5).

19    *See* http://lawyers .law.cornell.edu/lawyer/eric–andrew–suffin–1327035.

In addition, the pleading defect at issue here—the lack of any allegations capable of supporting a legal claim against Allstate—infected Plaintiffs' entire pleading, as to Allstate. Suffin's filing of a deficient pleading, and equally deficient proposed amended pleadings has also slowed the litigation and necessitated the expenditure of both time and money by Allstate to move against Plaintiffs' claims and to oppose his futile cross-motion to amend.

All of these factors suggest that, while (in the absence of a showing of bad faith) the Court should not exercise its inherent authority to sanction Suffin, at least some Rule 11 sanction would be warranted here. The Court notes, however, that Suffin is a solo practitioner, who may not have significant resources to pay a substantial sanctions award. It is difficult for the Court to determine, without additional information, the amount of a sanctions award that would be needed to deter Suffin from further Rule 11 violations, or, by extension, to deter similar activity by others. This Court will return to this question after first addressing the merits of Plaintiffs' sanctions motion against Allstate, given that Allstate is not only seeking sanctions on its own motion, but is also seeking sanctions for having to oppose Plaintiffs' motion.

## C. *Plaintiffs' Sanctions Motion Against Allstate*

**\*18**    After Allstate moved for Rule 11 sanctions against Plaintiffs and their counsel, Plaintiffs filed a Rule 11 motion against Allstate. Unlike Allstate's motion, however, Plaintiffs' motion was not properly made, and should not be considered by the Court because of its procedural defects. In any event, even if the Court were to consider the motion, it should be

denied as wholly lacking in merit. Indeed, Plaintiffs' sanctions motion is itself frivolous.

### 1. *Plaintiffs' Failure To Satisfy the Procedural Requirements of Rule 11*

On August 22, 2011, Plaintiffs sent a letter to Jay Cho, Esq. ("Cho"), counsel for Allstate, stating that Allstate had violated Rule 11(b)(b)(3). (*See* Letter from Suffin to Cho, dated Aug. 22, 2011 ("8/22/11 Suffin Ltr."), Ex. A to Declaration of Eric Andrew Suffin in Support of Plaintiffs' Motion for Rule 11 Sanctions, dated Sept. 30, 2011 ("9/30/11 Suffin Decl.") (Dkt.52) .) This is the provision of Rule 11 under which an attorney is supposed to certify to his or her reasonable, informed belief that "the factual contentions [made in a pleading or other written submission] have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P. 11(b)(3). Here, Suffin's August 22 letter listed certain statements from submissions made by Allstate and, without any elaboration or explanation, merely claimed that the statements were false and without evidentiary support. The letter only stated that, "[p]ursuant to Fed.R.Civ.P. 11(c) and for the specific reasons described below, we request that the parts of the memos and Declaration in violation of Fed.R.Civ.P. 11(b)(3) be withdrawn or appropriately corrected within 21 days or within some other time set by the court." (8/22/11 Suffin Ltr., at 1–2.) The letter did not explicitly state that Plaintiffs were going to file a sanctions motion, and it did not enclose a copy of any sanctions motion.

On August 30, 2011, Suffin wrote another letter to Cho. (Letter from Suffin to Cho, dated Aug. 30, 2011 ("8/30/11 Suffin Ltr."), Ex. B to 11/30/11 Suffin Decl.) The language of the August 30 letter mirrored the language of the August 22 letter, but also complained of additional statements by Allstate. (*See* 8/30/11 Suffin Ltr., at 2.) Like the earlier letter, the August 30 letter did not explicitly state that Plaintiffs were going to file a sanctions motion and it did not include a copy of the sanctions motion that was eventually filed by Plaintiffs. (*Id.*) As explanation for the request to withdraw the listed statements, Suffin merely wrote that they did "not have evidentiary support as required by Fed.R.Civ.P. 11(b)(3) and were false." (*Id.*)

Plaintiffs then went ahead and filed their Rule 11 motion on September 30, 2011, in disregard of the "safe harbor" procedural requirements set out in the Rule. Although Plaintiffs now ask the Court to "treat the August 22, 2011 and

Case 5:24-cv-00522-BKS-TWD   Document 15   Filed 10/25/24   Page 151 of 186
Holmes v. Allstate Corp., Not Reported in F.Supp.2d (2012)

2012 WL 627238

August 30, 2011 letters ... as fulfilling Plaintiffs' requirement to serve the Rule 11 Motion twenty one (21) days before presenting it to the Court" (Plaintiffs' Memorandum of Law in Further Support of Plaintiff's Motion for Rule 11 Sanctions, dated Oct. 24, 2011 ("Pl. Reply to Pl. Sanctions Mtn.") (Dkt.59), at 2), this Court has repeatedly refused to impose sanctions based on mere warning letters, even where the challenged conduct was sanctionable. *See Gamla Enterprises North America, Inc. v. Lunor–Brillen Design U. Vertriebs GMBH,* No. 98 Civ. 992, 2000 WL 193120, at *3 (S.D.N.Y. Feb.17, 2000) (denying meritorious Rule 11 motion where warning to offending party was given by letter alone, even where warning letter "conformed to the spirit of the rule"); *see also Diamonds.net LLC v. Idex Online, Ltd.,* 254 F.R.D. 475, 476–77 (S.D.N.Y.2008) (finding that a warning letter does not satisfy the Rule 11 requirement of serving a formal motion); *Weeks Stevedoring Co. Inc. v. Raymond Int'l Buildiers, Inc.,* 174 F.R.D. 301, 305 (S.D.N.Y.1997 (same); *Bellistri v. US,* No. 94 Civ, 3768(KMW), 1997 WL 115545, at *3 (S.D.N.Y. Mar.14, 1997) (same); *Gal v. Viacom International, Inc.,* 403 F.Supp.2d 294, 309 (S.D.N.Y.2005) (same); *Schweizer v. Mulvehill,* 93 F.Supp.2d 376, 413 (S.D.N.Y.2000) (same). [20]

[20]   *But see Jeffreys v. Rossi,* 275 F.Supp.2d 463, 480 (S.D.N.Y.2003) (finding that movant substantially complied with Rule 11 procedural requirements by serving a "detailed letter," with attached evidentiary support).

 **\*19** Accordingly, based on the express language of Rule 11 and this Court's precedent, Plaintiffs' sanctions motion should be denied as procedurally defective.

### 2. *Plaintiffs' Motion Is Also Meritless*

In any event, even if Rule 11's procedural requirements could be deemed satisfied by the service of Suffin's warning letters, Plaintiffs' sanctions motion would completely fail on its merits, as it does nothing more than catalog five statements made at various points, by Allstate or its counsel, and assert—without any explanation-that these statements lack evidentiary support. (Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Rule 11 Sanctions, dated Sept. 30, 2011, ("Pl. Sanctions Mem.") (Dkt.53), at 2.) The challenged Allstate statements are as follows:

(1) "... Holmes is claiming to be in wrongful possession of confidential documents belonging to Allstate (which, if true, would have been taken without Allstate's authorization), the reference to those documents can have no purpose other than to attempt to prompt a settlement offer from Allstate." (Memorandum of Law in Support of the Motion of Defendant the Allstate Corporation To Dismiss the Amended Complaint as Against the Allstate Corporation, dated June 28, 2011 ("Allstate Mtn.–To–Dismiss Mem.") (Dkt.20), at 22, n. 7.)

(2) "... where, as here, the Plaintiff's attorney: (1) has advanced meritless factual allegations that have no evidentiary support; and (2) has failed to investigate the law before bringing an action and filing and serving a complaint that fails woefully to comply with the well established pleading requirements of the FRCP, Allstate must turn to Rule 11 for legal recourse." (Allstate Sanctions Mem. at 1.)

(3) "... there is no good faith basis for Plaintiffs to proceed with the instant action against Allstate." (*Id.*)

(4) "The obvious frivolity of the Complaint ..." (*Id.*)

(5) "A copy of a black-lined version of the Proposed Second Amended Complaint showing a comparison against the Complaint, dated August 3, 2011, is attached hereto as Exhibit 'A.' " (Declaration of Elizabeth D. Schrero in Further Support of Motion of Defendant the Allstate Corporation To Dismiss the Amended Complaint and in Opposition to Plaintiffs' Cross–Motion for Leave To Amend Their Amended Complaint, dated Aug. 19, 2011 (Dkt.45), ¶ 2.)

(*Id.* at 2–3.)

Most of these statements-including statements that Plaintiffs' counsel failed to comply with pleading requirements, lacked good faith in proceeding with unsupported claims against Allstate, and filed an obviously frivolous pleading—are in the nature of arguments advanced on Allstate's motions to dismiss and for sanctions. As they are not "factual contentions," these statements are not even not covered by the provision of Rule 11 on which Plaintiffs rely for their sanctions motion. (*See* Plaintiffs' Sanctions Mem. at 2 (citing Fed.R.Civ.P. 11(b) (3).) Moreover, for the reasons discussed above, this Court generally agrees that Plaintiffs' claims against Allstate *were* unsupported and frivolous.

 **\*20** To the extent Plaintiffs complain about Allstate's supposition that Plaintiffs may have been attempting to exact a settlement from Allstate by referring to Holmes' cache of confidential Allstate documents, this Court also agrees

that this is how Plaintiffs' conduct appeared; indeed, on this subject, Plaintiffs' counsel himself made statements to the Court that lend credence to Allstate's stated concerns. During a case management conference on July 26, 2011, Allstate's counsel told the Court that she had spoken with Suffin about the confidential documents, and that Suffin had demanded $30,000 for the transfer of the documents to Allstate. (July 26, 2011 Rule 16 Conference Transcript, at 10, Ex. D to 10/17/11 Schrero Decl.) Suffin said that counsel had misunderstood his statements, and that he had only "discussed that there may be a dollar amount that would be involved in the transfer." (*Id.* at 12.) Nonetheless, Suffin did not deny that he had mentioned the $30,000 figure to Allstate's counsel in their conversation (*see id.* at 13), and when asked by the Court why Holmes even had possession of Allstate documents bearing confidential, personal information of policyholders, Suffin repeatedly expressed his understanding that Holmes believed the documents were "collateral" for his investments. (*See id.* at 12, 13, 14.) Under the circumstances, Allstate's suggestion that Holmes may have been trying to "prompt a settlement offer" is hardly unsupported.

Finally, the Court could not even discern what Plaintiffs were complaining about, with regard to Allstate's proffered black-lined version of the proposed Second Amended Complaint until Plaintiffs argued, on reply, that Allstate's black-lining did not incorporate the exhibits attached to the proposed amended pleading. (*See* Pl. Reply to Pl. Sanctions Mtn. at 5.) Plaintiffs' contention on this point is patently frivolous. A black-lined document is intended to track changes made in the text of a document, and Plaintiffs apparently have no quarrel with whether Allstate accurately tracked any proposed modifications to their original allegations. Moreover, Allstate's black-lined document, submitted for the convenience of the Court, shows that exhibits were added to the proposed Second Amended Complaint. (*See* Ex. A to 8/19/11 Schrero Decl., ¶¶ 48 (highlighting addition of reference to Ex. A), 118 (highlighting addition of allegation that "Plaintiff's causes of action may be supported by documents, including but not limited to documents attached as Exhibits A, B, C and D").)

As Plaintiffs have not demonstrated that a single statement made by Allstate was, in fact, either false or unsupported, Plaintiffs' sanctions motion cannot succeed, even apart from its procedural flaws. To the contrary, it is a plainly meritless motion, and Allstate legitimately asks that Plaintiffs or their counsel be made to bear Allstate's fees and costs in having to respond to it. (*See* Defendant The Allstate Corporation's

Memorandum of Law in Opposition to Plaintiffs' Motion For Sanctions Under Rule 11, dated Oct. 17, 2011 (Dkt.58), at 16; *see also* Fed.R.Civ.P. 11(c) (2) (allowing a court to award the fees and costs of a sanctions motion to the prevailing party).)

### D. *Appropriate Sanctions Award in This Case*

**\*21** Based on the flaws in Plaintiffs' pleaded claims against Allstate, the fact that Plaintiffs, through counsel, insisted on proceeding with these defective claims despite notice of the defects, and the fact that Allstate has, as a result, incurred fees and costs in what should have been unnecessary motion practice, I recommend that sanctions be awarded in Allstate's favor, and that the award be made against Suffin, as counsel.

As noted above, however, the Court is not currently in a position to determine the appropriate amount of a monetary sanction, given that it lacks information regarding Suffin's financial circumstances. Accordingly, I recommend that Allstate be directed to submit to the Court an itemized statement of the attorneys' fees and costs it incurred on its motion to dismiss, as well as on both of the sanctions motions, and that Suffin be directed to submit a sworn affidavit or declaration made under penalty of perjury, setting out the net income earned by his law practice over the past 12 months. I further recommend that Suffin be required, under Rule 11(c), to pay to Plaintiffs the reasonable fees and expenses incurred in filing or opposing the referenced motions, up to a cap of 10 percent of the annual net income received from his law practice, as reflected in his financial affidavit or declaration. *See Weinraub v. Glen Rauch Securities, Inc.,* 419 F.Supp.2d 507, 520 (S.D.N.Y.2005) (noting that under Rule 11, a court must consider the financial circumstances of the sanctioned party); *see also Association of Holocaust Victims for Restitution of Artwork and Masterpieces v. Bank Austria Creditanstalt AG,* No. 04 Civ. 3600(SWK), 2005 WL 3099592, at \*8 (S.D.N.Y. Nov.17, 2005) ("As a final matter of the [Rule 11] sanctions determination, courts must take into account the financial circumstances of the sanctioned party." (citing *Sassower v. Field,* 973 F.2d 75, 81 (2d Cir.1992)); *Anschutz Petroleum Marketing Corp. v. E.W. Saybolt & Co., Inc.,* 112 F.R.D. 355, 357 (S.D.N.Y.1986) (finding that "adequate deterrence may permissibly fall short of full compensation," and that the court has the discretion to fashion a Rule 11 sanction for purposes of deterrence which awards part, but not all, of the opposing party's attorney's fees); *Becker v. Dunkin' Donuts of America, Inc.,* 665 F.Supp. 211, 217–18 (S.D.N.Y.1987) (taking into consideration offending litigant's ability to pay, even though sanctions were fully warranted).

Holmes v. Allstate Corp., Not Reported in F.Supp.2d (2012)

2012 WL 627238

## III. *THE HARRIS DEFENDANTS' MOTION TO DISMISS*

As noted above (*see* n. 2, *supra* ), the Harris Defendants never properly filed their motion to dismiss on the Court's ECF system, and the Court would be entitled to reject the motion on that basis. I do not recommend this, however, as some of the pleading issues raised by the motion are significant, and, for the sake of efficient case management, it would be preferable to resolve those issues as early as possible. For this reason, this Court has considered the merits of the Harris Defendants' motion.

### A. *Applicable Legal Standards*

 **\*22** The standards governing motions to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure are set forth in connection with this Court's discussion of Allstate's motion to dismiss. (*See supra,* at 12.) Additionally relevant to the Harris Defendants' motion are Rules 8(a) and 9(b), which address the question of how specific a plaintiff's allegations must be.

Rule 8(a) states that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Under this Rule, a pleading "does not have to set out in detail the facts on which the claim for relief is based, but must give the court and the defendant fair notice of what [the] plaintiffs claim is and the grounds upon which it rests." *Owens v. Suter,* 02 Civ. 8198(SHS), 2003 WL 942554, at \*1 (S.D.N.Y. Mar. 7, 2003) (internal citations and quotations omitted); *see Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("The statement should be plain because the principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted."). Rule 8(a) is violated where a plaintiff, by engaging in "group pleading," fails to give each defendant fair notice of the claims against it. *Pierson v. Orlando Regional Healthcare Systems, Inc.,* 619 F.Supp.2d 1260, 1273 (M.D.Fla.2009) (dismissing complaint because group-pleading method of collectively referring to individual defendants and two physician groups as "Peer Review Defendants" throughout complaint did not satisfy the "fair notice" requirement of Rule 8).

Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). To state a claim for fraud under New York law, a party must plead that: (1) the defendant(s) made a material false representation or omission, (2) the defendant(s) intended to

defraud the plaintiff(s) thereby, (3) the plaintiff(s) reasonably relied upon the representation, and (4) the plaintiff(s) suffered damage as a result of this reliance. *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995) (relying on New York law) (citations omitted). To satisfy the Rule 9(b) pleading requirements, a complaint alleging fraud must: "(1) specify the statement [or omissions] that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements [or omissions] were made, and (4) explain why the statements [or omissions] were fraudulent. *Scantek Medical, Inc. v. Sabella,* 583 F.Supp.2d 477, 493 (S.D.N.Y.2008) (internal quotations and citations omitted).

In addition, a fraud complaint must also "allege facts that give rise to a strong inference of fraudulent intent," which may be accomplished "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* Motive involves "concrete benefits that could be realized by one or more of the false statements ... alleged" and opportunity is shown by "the means and likely prospect of achieving concrete benefits by the means alleged." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994). To allege conscious misbehavior or recklessness, "the Complaint must link the misleading statement with facts that give rise to an inference that the speaker had a basis for knowing it was false." *Shahzad v. H.J. Meyers & Co.,* 923 F.Supp. 57, 60 (S.D.N.Y.1996) (citations omitted).

 **\*23** Rule 9(b) also requires plaintiffs to "connect the allegations of fraud to each individual defendant." *Trustees of Plumbers and Pipefitters Nat. Pension Fund v. De–Con Mechanical Contractors, Inc.,* 896 F.Supp. 342, 347 (S.D.N.Y.1995); *see also Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.' "). Plaintiffs alleging fraud "may not rely on sweeping references to acts by all or some of the defendants because each named defendant is entitled to be apprised of the facts surrounding the alleged fraud." *Trustees of Plumbers and Pipefitters Nat. Pension Fund,* 896 F.Supp. at 347. Further, the allegations must demonstrate that "each [d]efendant had a specific intent to defraud either by devising, participating in, or aiding and abetting the scheme." *Id.*

The pleading requirements of Rule 9(b) apply both to fraud claims and to "other claims that are premised on fraud."

Holmes v. Allstate Corp., Not Reported in F.Supp.2d (2012)

2012 WL 627238

*Daly v. Castro Llanes,* 30 F.Supp.2d 407, 414 (S.D.N.Y.1998) (citing *O'Brien v. Nat'l Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991)). The particularity requirements of Rule 9(b) also apply to negligent misrepresentation claims. *In re Marsh & McLennan Cos. Sec. Litig.,* 501 F.Supp.2d 452, 495 (S.D.N.Y.2006) ("Negligent misrepresentation claims must be pleaded with particularity pursuant to Rule 9(b)."). Accordingly, Plaintiffs' claims of fraud, negligent misrepresentation, and violation of New York York Debtor and Creditor Law § 276 are all subject to Rule 9(b)'s pleading requirements. *See also In re Sharp Intern. Corp.* 403 F.3d 43, 54 (2d Cir.2005) (noting that New York Debtor and Creditor Law § 276 must be pleaded with specificity, under Rule 9(b)).

### B. *Adequacy of Plaintiffs' Allegations Against the Harris Defendants*

In their motion to dismiss, the Harris Defendants argue, first, that Holmes does not have authority to speak for Samuel's Temple and thus lacks "standing" to assert claims on the Church's behalf. Second, the Harris Defendants argue that Plaintiffs' claims as to them fail under Rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure. While their asserted "standing" argument appears misplaced, the Harris Defendants' arguments for dismissal of the Amended Complaint on the basis of pleading deficiencies are persuasive.

### 1. *Propriety of Naming Samuel's Temple as a Plaintiff*

As an initial matter, the Harris Defendants contend that Samuel's Temple is not controlled by Holmes and that the Church itself never assented to bringing this action. (*See* Harris Defs. Mem., at 6; *see also id.,* at 8 (stating that Holmes "has no authority whatsoever to bring this lawsuit on behalf of the Church").) Rather, the Harris Defendants assert that the person with authority to act for the Church is Shirley Holmes Sulton ("Sulton"), Senior Pastor (and purportedly the only pastor) of Samuel's Temple and Harris's mother, who, they contend, has not authorized this lawsuit. (*Id.*) In support of their position on this point, the Harris Defendants attach a declaration of Sulton, in which she states:

> **\*24** My son Tyrone is not the pastor, nor has he ever been the pastor of Samuel's Temple. Furthermore, he has no executory or signatory powers associated with the church. I maintain and control all financial

matters concerned with the church. Neither the church nor I have instituted any lawsuit or proceedings against Mr. Bryan Michael [Harris]. Any monies that I have sent to Mr. Bryan Michael Harris, whom I consider a loyal and committed son, are personal matters between Mr. Harris and me. I am not, nor will I become a party to the current lawsuit fostered by my son against Mr. Harris. Samuel's Temple COGIC is also not a party to the suit. My son, Tyrone, does not possess the signatory powers of the church to institute a suit against Mr. Harris.

(Declaration of Frank Wheaton in Support of Defendants' Motion to Dismiss the Amended Complaint of Plaintiffs, dated Oct. 10, 2011 ("Wheaton Decl.") (Dkt.56), at Ex. C (Declaration of Shirley Holmes–Sulton, dated Aug. 12, 2011 ("Sulton Decl."), at 1.) The Harris Defendants also appear to contend that the funds at issue in this case are *Church* funds, and that Holmes has no personal standing to assert claims for recovery of those funds. (*See* Harris Defs. Mem., at 8–9.)

In response to these arguments, Plaintiffs submit certain documents purporting to show the Church's authorization for the suit. (*See* 11/10/11 Suffin Decl., at Ex. C (email from Sulton to Holmes, dated Oct. 18, 2011, and attachment), Ex. D (Resolution and Minutes of Special Meeting of the Samuel Temple Church of God in Christ, Inc.).) Plaintiffs also submit their proposed "Alternative Second Amended Complaint" in response to the Harris Defendants' arguments. (Alt.2d Am.Compl.)

Given that Samuel's Temple has itself been named as a plaintiff in this case and is asserting claims on its own behalf, it is evident that the Harris Defendants' argument regarding the Church is not appropriately styled as a "standing" argument. Certainly, the Church would be a real party in interest to a dispute over the disposition of Church funds. What the Harris Defendants actually argue, with respect to the Samuel's Temple, is that whoever purported to act on its behalf in authorizing this lawsuit was without power to do so. As shown by the parties' competing submissions, this raises an issue of fact that cannot be resolved without a more complete record.

2012 WL 627238

As for the Harris Defendants' seeming argument that Holmes has no standing to challenge the alleged conversion of funds belonging to the Church, it is unclear whether Holmes may be claiming any personal interest in the money, or, alternatively, whether he may be seeking to proceed as a third-party beneficiary to agreements allegedly made between the Church and any of the Harris Defendants regarding the use of the funds in question. For example, while Holmes may have never had a right to direct Harris to purchase a home for him with Church money, if this was something that Harris promised to Samuel's Temple, and Holmes stood to benefit from the purchase, then he may have standing to assert claims against Harris in his own right, for breach of that promise. Moreover, several of the allegations in the Amended Complaint, while confusing because they draw no clear distinction between the two plaintiffs, appear to relate to personal claims by Holmes. For instance, Holmes seems to claim that Harris promised him employment at Bluebox, and then reneged on that promise. Regardless of the viability of such claims, there seems to be little question that Holmes would have a personal stake in their outcome.

*25 For these reasons, the Harris Defendants' challenge to Plaintiffs' "standing" should be rejected at this time, without prejudice to raise the issue again at a later juncture, on a clearer pleading and a more complete record, should the case proceed.

### 2. Sufficiency of Pleading Under Rules 8(a) and 9(b)
The Harris Defendants are more persuasive in their argument that the Amended Complaint fails to satisfy the pleading requirements of Rules 8(a) and 9(b). The most glaring defect, under both rules, is Plaintiffs' pervasive "group pleading," both with respect to (a) the injuries sustained by "plaintiffs" (referred to collectively) and (b) the alleged misconduct of "defendants" (also referred to collectively). As to the former, as noted above, the Amended Complaint fails to specify whether Holmes entrusted any of his own money to any defendant, and, if not, the nature of the consideration he may have provided for any promises made to him personally. As to the latter, it appears that Plaintiffs or their counsel may have simply conducted an online search for companies of which Harris was an officer (see Ex. D to proposed 2d Am. Compl.), and then named those companies as additional defendants without any knowledge or information as to what role, if any, each of them may have played in the transactions alleged.

Plaintiffs' failure to differentiate among the Harris Entities, so as to allege the nature of each particular defendant's misconduct, has resulted in a failure by Plaintiffs to give each defendant "fair notice" of Plaintiffs' claims and "the grounds upon which [they] rest[ ]," as required by Rule 8(a). Owens, 2003 WL 942554, at *1 (internal citations and quotations omitted). For essentially the same reason, and as the Amended Complaint also wholly fails to particularize any statements by Defendants that were allegedly false or misleading, Plaintiffs have grossly violated Rule 9(b), as well. See Trustees of Plumbers and Pipefitters Nat. Pension Fund, 896 F.Supp. at 347.

As to the Harris Defendants' arguments regarding the independent insufficiency of each of Plaintiffs' claims under Rule 12(b) (6),[21] the vagueness of much of the Amended Complaint makes it difficult for the Court even to consider those arguments. It is impossible to determine, for example, whether Plaintiffs' conversion claim necessarily duplicates their breach-of-contract claim, as the Harris Defendants argue (see Harris Defs. Mem., at 15 (citing Salem v. Software Guidance and Assistance, Inc., No. 96 Civ. 8437(AGS), 1997 WL 777402, at *5 (S.D.N.Y. Dec.16, 1997))), when the particular contract(s) at issue are not well identified and when the subject of Plaintiffs' claim of conversion may be money, but may also be tangible goods. (See, e.g., Am. Compl. at ¶ 84 (alleging that Defendants "comingled and fraudulently converted plaintiffs' investment capital for defendant Harris's pecuniary gain"); ¶ 80 (alleging conversion of "various personal property owned by plaintiff Holmes, including a rifle, hard drives, two (2) Mackie speakers, video footage, and sound tools essential to plaintiff Holmes's music and television production, documents, video masters, and music masters").)

21      The Court notes that the arguments advanced by the Harris Defendants, with respect to whether Plaintiffs have adequately pleaded the elements of their individual claims, appear to have been copied nearly verbatim from Allstate's memorandum in support of its motion to dismiss. Compare Allstate Mtn.–To–Dismiss Mem. at 4–7; 11–22, e.g., with Harris Defs. Mem., at 12–14; 14–23.

*26 Similarly, the Court cannot discern whether, as the Harris Defendants argue, Plaintiffs' conversion claim is barred by the applicable three-year statute of limitations (see Harris Defs. Mem., at 15), given that the Amended Complaint alleges that Harris converted the physical property

Case 5:24-cv-00522-BKS-TWD   Document 15   Filed 10/25/24   Page 156 of 186
Holmes v. Allstate Corp., Not Reported in F.Supp.2d (2012)

2012 WL 627238

of Holmes "[a]t some point in 2008" (Am. Compl. at ¶ 80), but does not specify when in 2008 the alleged conversion occurred. Further, to the extent Plaintiffs are claiming the conversion of money, *see, e.g., Ehrlich v. Howe,* 848 F.Supp. 482, 492 (S.D.N.Y.1994) (noting that an action for conversion of money may lie if the pleading alleges that "the money converted was in specific tangible funds of which the claimant was the owner and entitled to immediate possession"), the Amended Complaint only alleges when certain funds were transferred to the Harris Defendants (*see* Am. Compl. at ¶¶ 55–58, 60), not when any particular acts of conversion occurred.

Because of the significant pleading defects present in the Amended Complaint against the Harris Defendants—defects that are not remedied by any version of Plaintiffs' proposed Second Amended Complaint—I recommend that the Harris Defendants' motion to dismiss be granted under Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure. In this instance, though, I recommend that the dismissal be without prejudice to filing an amended pleading that actually addresses the defects identified herein, as Plaintiffs may have viable claims against Harris and/or one or more of the Harris Entities, for, *inter alia,* misappropriating a large sum of money allegedly entrusted to them. *See* Fed.R.Civ.P. 15(a) (stating that courts "should freely give leave [to amend] when justice so requires"); *Rich v. Maidstone Fin., Inc.,* No. 98 Civ. 2569(DAB), 2001 WL 286757, at *12 (S.D.N.Y. Mar.23, 2001) (holding that leave to amend should be given when the court "cannot determine that the plaintiff could not, under any circumstances, sufficiently allege its claims" (internal quotation marks and citation omitted)).

Finally, given the defects that have, to date, been manifest in each of Plaintiffs' pleadings or proposed pleadings, I further recommend that Plaintiffs and their counsel be strongly cautioned by the Court that, if they choose to proceed with a further amendment, (1) they take care to plead the claims of the Church and of Holmes individually, with allegations that show a basis for each claim, as to the plaintiff asserting it, (2) they not name as a defendant any corporate entity without a good faith basis for believing that the particular entity engaged in any activity that constituted an actionable wrong, and they provide each such defendant with notice of its specific alleged wrongdoing, and (3) they plead all claims falling within the ambit of Rule 9(b) with the particularity necessary to satisfy that Rule's requirements, as described herein.

## CONCLUSION

For all of the foregoing reasons, I respectfully recommend that the Court:

**\*27** (1) grant Allstate's motion to dismiss the Amended Complaint (Dkt.18), with prejudice;

(2) deny Plaintiffs' cross-motion for leave to amend as against Allstate (Dkt.33);

(3) grant Allstate's sanctions motion to the extent it seeks Rule 11 sanctions against Plaintiffs' counsel, and otherwise deny the motion (Dkt.27);

(4) deny Plaintiffs' motion for sanctions against Allstate (Dkt.51);

(5) impose Rule 11 sanctions on Plaintiffs' counsel in the manner set forth *supra* at 39–41;

(6) grant the Harris Defendants' motion to dismiss the Amended Complaint (*see* Dkt. 55), without prejudice; and

(7) afford Plaintiffs 30 days to file a Second Amended Complaint that cures the pleading defects against the Harris Defendants, as discussed herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Laura T. Swain, United States Courthouse, 500 Pearl Street, Room 755, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Swain. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

**Holmes v. Allstate Corp., Not Reported in F.Supp.2d (2012)**

2012 WL 627238

---

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 627238

---

End of Document                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 5185047
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

David J. CASH, Plaintiff,
v.
BERNSTEIN, MD, Defendant.

No. 09 Civ.1922(BSJ)(HBP).
|
Oct. 26, 2010.

*REPORT AND RECOMMENDATION* [1]

At the time the action was originally filed,
the Honorable Leonard B. Sand, United States
District Judge, granted plaintiff's application for *in
forma pauperis* status based on plaintiff's *ex parte*
submission (Docket Item 1). Although the present
application seeking to revoke plaintiff's *in forma
pauperis* status is non-dispositive, I address it by
way of a report and recommendation to eliminate
any appearance of a conflict between the decision
of a district judge and that of a magistrate judge.

PITMAN, United States Magistrate Judge.

**\*1** TO THE HONORABLE BARBARA S. JONES, United
States District Judge,

I. *Introduction*

By notice of motion dated March 4, 2010 (Docket Item 11),
defendant moves pursuant to 28 U.S.C. § 1915(g) to revoke
plaintiff's *in forma pauperis* ("IFP") status on the ground that
plaintiff has previously had at least three Section 1983 actions
dismissed as frivolous, malicious or failing to state a claim
upon which relief could be granted, and has not shown that he
is in imminent danger of serious physical injury. Defendant
further seeks an order directing that the action be dismissed
unless plaintiff pays the full filing fee within thirty (30) days.
For the reasons set forth below, I respectfully recommend that
defendant's motion be granted.

II. *Facts*

Plaintiff, a sentenced inmate in the custody of the New
York State Department of Correctional Services, commenced
this action on or about January 12, 2009 by submitting his
complaint to the Court's Pro Se office. Plaintiff alleges, in
pertinent part, that he has "a non-healing ulcer that is gane
green [*sic* ]" and that defendant Bernstein "did not want
to treat the ulcer right" (Complaint, dated March 3, 3009
(Docket Item 2) ("Compl."), at 3).

The action was originally commenced against two defendants
—Dr. Bernstein and Dr. Finkelstein. The action was dismissed
as to Dr. Finkelstein because the complaint contained no
allegations whatsoever concerning Dr. Finkelstein (Order
dated February 18, 2010 (Docket Item 9)).

On March 4, 2010, the sole remaining defendant—Dr.
Bernstein—filed the current motion. Plaintiff failed to submit
a response. Accordingly, on August 20, 2010, I issued an
Order advising plaintiff that if he wished to oppose the
motion, he must submit his opposition by September 15, 2010
and that after that date I would consider the motion fully
submitted and ripe for decision (Order dated August 20, 2010
(Docket Item 15)). The only submission plaintiff has made
in response to my Order is a multi-part form issued by the
New York State Department of Correctional Services entitled
"Disbursement or Refund Request." [2] By this form, plaintiff
appears to request that the New York State Department of
Correctional Services pay the filing fee for this action. The
form is marked "Denied."

2       Plaintiff sent this form directly to my chambers,
        and it has not been docketed by the Clerk of the
        Court. The form will be docketed at the time this
        Report and Recommendation is issued.

III. *Analysis*

28 U.S.C. § 1915 permits an indigent litigant to commence
an action in a federal court without prepayment of the filing
fee that would ordinarily be charged. Although an indigent,
incarcerated individual need not prepay the filing fee at the
time at the time of filing, he must subsequently pay the fee,
to the extent he is able to do so, through periodic withdrawals
from his inmate accounts. 28 U.S.C. § 1915(b); *Harris v.
City of New York*, 607 F.3d 18, 21 (2d Cir.2010). To prevent
abuse of the judicial system by inmates, paragraph (g) of
this provision denies incarcerated individuals the right to
proceed without prepayment of the filing fee if they have
repeatedly filed meritless actions, unless such an individual
shows that he or she is in imminent danger of serious

physical injury. See *Ortiz v. McBride,* 380 F.3d 649, 658 (2d Cir.2004) ("[T]he purpose of the PLRA ... was plainly to curtail what Congress perceived to be inmate abuses of the judicial process."); *Nicholas v. Tucker,* 114 F.3d 17, 19 (2d Cir.1997). Specifically, paragraph (g) provides:

> **\*2** In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

If an inmate plaintiff seeks to avoid prepayment of the filing fee by alleging imminent danger of serious physical injury, there must be a nexus between the serious physical injury asserted and the claims alleged. *Pettus v. Morgenthau,* 554 F.3d 293, 298 (2d Cir.2009).

Section 1915(g) clearly prevents plaintiff from proceeding in this action without prepayment of the filing fee. The memorandum submitted by defendant establishes that plaintiff has had his IFP status revoked on at least four prior occasions as a result of his repeatedly filing meritless actions.

- In 2005, plaintiff commenced an action in the United States District Court for the Northern District of New York seeking to have his infected leg amputated. *Nelson[3] v. Lee,* No. 9:05–CV–1096 (NAM)(DEP), 2007 WL 4333776 (N.D.N.Y. Dec. 5, 2007). In that matter, the Honorable Norman A. Mordue, Chief United States District Judge, accepted and adopted the Report and Recommendation of the Honorable David E. Peebles, United States Magistrate Judge, that plaintiff had brought three or more prior actions that had been dismissed for failure to state a claim and that plaintiff's IFP status should, therefore, be revoked. 2007 WL 4333776 at *1–*2.

3
It appears that plaintiff uses the names David J. Cash and Dennis Nelson interchangeably. In his complaint in this matter, plaintiff states that the Departmental Identification Number, or DIN, assigned to him by the New York State Department of Correctional Services ("DOCS") is 94–B–0694 (Compl. at 7). DOCS inmate account records submitted by plaintiff in connection with his application for IFP status indicate that DIN 94–B–0694 is assigned to Dennis Nelson. In addition, the DOCS form described in footnote two bears the docket number of this action, but is signed in the name of Dennis Nelson and was sent in an envelope identifying the sender as Dennis Nelson. A subsequent action has been filed in this Court in which the plaintiff identifies himself as Dennis Nelson but lists his DIN as 94–B–0694, the same DIN used by plaintiff here. Finally, plaintiff has submitted nothing to controvert the assertion in defendant's papers that David Cash and Dennis Nelson are the same person. In light of all these facts, I conclude that David Cash and Dennis Nelson are both names used by plaintiff.

- In *Nelson v. Nesmith,* No. 9:06–CV–1177 (TJM)(DEP), 2008 WL 3836387 (N.D.N.Y. Aug. 13, 2008), plaintiff again filed an action concerning the medical care he was receiving for his left leg. The Honorable Thomas J. McAvoy, United States District Judge, accepted the Report and Recommendation of Magistrate Judge Peebles, and revoked plaintiff's IFP status and dismissed the action on the ground that plaintiff had previously commenced at least three actions that had been dismissed on the merits. 2008 WL 3836387 at *1, *7.

  - In *Nelson v. Spitzer,* No. 9:07–CV–1241 (TJM) (RFT), 2008 WL 268215 (N.D.N.Y. Jan. 29, 2008), Judge McAvoy again revoked plaintiff's IFP status on the ground that plaintiff had commenced three or more actions that constituted "strikes" under Section 1915(g) and had not shown an imminent threat of serious physical injury. 2008 WL 268215 at *1–*2.

  - Finally, in *Nelson v. Chang,* No. 08–CV–1261 (KAM)(LB), 2009 WL 367576 (E.D.N.Y. Feb. 10, 2009), the Honorable Kiyo A. Matsumoto, United

Case 5:24-cv-00522-BKS-TWD    Document 15    Filed 10/25/24    Page 160 of 186
Cash v. Bernstein, Not Reported in F.Supp.2d (2010)
2010 WL 5185047

States District Judge, also found, based on the cases discussed above, that plaintiff had exhausted the three strikes permitted by Section 1915(g) and could not proceed IFP in the absence of a demonstration of an imminent threat of serious physical injury. 2009 WL 367576 at *2–*3.

**\*3** As defendant candidly admits, there is one case in which plaintiff's leg infection was found to support a finding of an imminent threat of serious physical injury sufficient to come within the exception to Section 1915(g). Nelson v. Scoggy, No. 9:06–CV–1146 (NAM)(DRH), 2008 WL 4401874 at *2 (N.D.N.Y. Sept. 24, 2008). Nevertheless, summary judgment was subsequently granted for defendants in that case, and the complaint was dismissed. Judge Mordue concluded that there was no genuine issue of fact that plaintiff had received adequate medical care for his leg wound and that the failure of the leg to heal was the result of plaintiff's own acts of self-mutilation and interference with the treatment provided. Nelson v. Scoggy, No. 9:06–CV–1146 (NAM)(DRH), 2009 WL 5216955 at *3–*4 (N.D.N.Y. Dec. 30, 2009).[4]

[4]    Although the form complaint utilized by plaintiff expressly asks about prior actions involving the same facts, plaintiff disclosed only the Scoggy action and expressly denied the existence of any other actions relating to his imprisonment (Compl. at 6).

In light of the foregoing, there can be no reasonable dispute that plaintiff has exceeded the three "strikes" allowed by Section 1915(g) and that he cannot, therefore, proceed here without prepaying the filing fee unless he demonstrates an imminent threat of serious physical injury. Plaintiff has declined to attempt to make this showing in response to defendant's motion, and the only suggestion in the record of serious physical injury is the bare statement in the complaint that plaintiff "need[s] to go back to a wound speci [a]list before the gane green [sic ] kills [him]" (Compl. at 5). "However, unsupported, vague, self-serving, conclusory speculation is not sufficient to show that Plaintiff is, in fact, in imminent danger of serious physical harm." Merriweather v. Reynolds, 586 F.Supp.2d 548, 552 (D.S.C.2008), citing Ciarpaglini v. Saini, 352 F.3d 328, 330 (7th Cir.2003) and White v. Colorado, 157 F.3d 1226, 1231–32 (10th Cir.1998); see also Martin v. Shelton, 319 F.3d 1048, 1050 (8th Cir.2003) (imminent danger exception to Section 1915(g) requires "specific fact allegations of ongoing serious physical injury, or of a pattern of misconduct evidencing the likelihood of imminent serious physical injury"). Given the plaintiff's

history, as set forth in the cases described above, I conclude that this vague statement is insufficient to support a finding that plaintiff is in imminent danger of serious physical injury.[5]

[5]

Plaintiff has sent me several letters describing his wound and its symptoms in detail, and I have no doubt that the wound is serious. However, in granting summary judgment dismissing an action last year based on the same allegations, Judge Mordue of the Northern District found that there was no genuine issue of fact that plaintiff's own conduct was responsible for the ineffectiveness of the treatment he was provided:

Furthermore, to the extent that Nelson's medical treatment was delayed, much of the delay was due to his own refusal to cooperate with medical staff and his self-mutilations. Nelson's actions to thwart the medical treatment of his wound cannot be construed as interference or indifference by anyone else.... [T]he medical treatment Nelson received complied with constitutional guarantees as it was appropriate, timely, and delayed only by Nelson's own actions.

Nelson v. Scoggy, supra, 2009 WL 5216955 at *4. Given plaintiff's total failure to respond to the pending motion and his failure to even deny that he is actively thwarting treatment of his wound, it would be sheer speculation for me to conclude that he is in imminent danger of a serious injury as a result of defendant's conduct.

### IV. Conclusion

Accordingly, for all the foregoing reasons, I find that plaintiff has had three or more prior actions dismissed as being frivolous, malicious or failing to state a claim and that plaintiff's in forma pauperis status should, therfore, be revoked. If your Honor accepts this recommendation, I further recommend that the action be dismissed unless plaintiff pays the filing fee in full within thirty (30) days of your Honor's final resolution of this motion.

### V. OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections. See also Fed.R.Civ.P. 6(a). Such objections (and

2010 WL 5185047

responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Barbara S. Jones, United States District Judge, 500 Pearl Street, Room 1920, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Jones. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS *WILL* RESULT IN A WAIVER OF OBJECTIONS AND *WILL* PRECLUDE APPELLATE REVIEW. *Thomas v. Arn,* 474 U.S. 140, 155 (1985); *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

## All Citations

Not Reported in F.Supp.2d, 2010 WL 5185047

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 3858398
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Shariff ABBAS, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 10–CV–0141S.
|
Signed Aug. 1, 2014.

**Attorneys and Law Firms**

Shariff Abbas, Flushing, NY, pro se.

## DECISION and ORDER

WILLIAM M. SKRETNY, Chief Judge.

### *INTRODUCTION*

**\*1** Plaintiff Shariff Abbas commenced this *pro se* action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 et seq., and other federal laws, alleging violation of his rights while detained at the Buffalo Federal Detention Facility ("BFDF") in Batavia, the Albany County Jail and the Perry County Correctional Center ("PCCC") in Uniontown, Alabama. Currently before the Court for review pursuant to 28 U.S.C. § 1915(e)(2)(B) is plaintiff's amended complaint [1], submitted in response to the Court's Order filed on August 16, 2013 ("August 16 Order") (Docket No. 6), which reviewed plaintiff's original complaint (Docket No. 4), dismissed several of the claims asserted therein, and granted plaintiff leave to file an amended complaint. For the reasons set forth below, plaintiff's FTCA claims against the United States related to his treatment at the BFDF may proceed and his remaining claims will be dismissed.

[1]    Plaintiff's amended complaint is accompanied by two voluminous bound volumes of exhibits captioned "Exhibit's [sic] Part 1", containing a Table of Contents and exhibits 1–18 and "Exhibit Part 2", containing a Table of Contents and exhibits 19–40. Given the voluminous nature of the exhibits, numbering hundreds of pages, and

the manner in which they are bound, which would make scanning them very difficult, the Court has not required the Clerk's Office to scan them into the court's electronic filing system. They will instead be maintained in paper form in a separate file in the Clerk's Office. *See* note to Docket No. 6.

### *DISCUSSION*

#### A. *Bivens Claims*

The August 16 Order directed, *inter alia,* that plaintiff's FTCA claims stemming from his detention at the Albany County Jail and the PCCC be dismissed; that plaintiff be granted leave to file an amended complaint adding *Bivens* [2] or other federal claims against individual deportation officers and other personnel at BFDF who he alleges violated his rights; and that in the even he failed to timely file an amended complaint as directed, the Court would issue an Order directing service of the complaint upon the United States as the sole defendant to his medical malpractice claims brought under the FTCA. (Docket No. 5).

[2]    *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

The August 16 Order noted that in addition to his FTCA claims, plaintiff's original complaint asserted a variety of violations of his constitutional rights by individual deportation officers and other personnel during his periods of detention at BFDF and that these claims would be actionable against individual defendants under the *Bivens* doctrine, which allows a plaintiff to pursue constitutional claims against federal officials in their individual capacities for actions taken under color of federal law. *See Lombardi v. Whitman,* 485 F.3d 73, 78 (2d Cir.2007) ("[W]here an individual 'has been deprived of a constitutional right by a federal agent acting under color of federal authority,' the individual may bring a so-called *Bivens* action for damages against that federal agent in an individual capacity, provided that Congress has not forbidden such an action and that the situation presents 'no special factors counseling hesitation in the absence of affirmative action by Congress.' ") (internal citations omitted) (*quoting Thomas v. Ashcroft,* 470 F.3d 491, 496 (2d Cir.2006). The Court determined, however, that the *Bivens* claims could not proceed because of plaintiff's failure to name the individual custody officers and other officials who are alleged to have violated his rights as defendants in

the caption of the complaint, as required by Rule 10(a) of the Federal Rules of Civil Procedure:

> **\*2** The Court cannot allow such *Bivens* claims to proceed, however, because of plaintiff's failure to name the individual custody officers and other officials who are alleged to have violated his rights as defendants in the caption of the complaint. Rule 10 of the Federal Rules of Civil Procedure provides that "[t]he title of the complaint must name all the parties" Fed.R.Civ.P. 10(a). Therefore, a party that is not named in the caption of a complaint or amended complaint is not a party to the action.

(August 16 Order at 16) (citations omitted). The Court proceeded to note that plaintiff's failure to name in the caption of the complaint the individual defendants against whom he wished to assert *Bivens* claims would make it infeasible for the Court to determine which of the individual custody officers mentioned in the body of the complaint should be deemed to be defendants to such claims, given the often ambiguous nature of his reference to such individuals. (*Id.* at 16–17). The Court therefore concluded that "[t]he way to remedy plaintiff's failure to name as defendants in the caption of his complaint those individuals against whom he may seek to assert *Bivens* claims, as suggested by the allegations set forth in the body of the complaint, is to afford him leave to file an amended complaint which conforms to the requirements of Rule 10(a)." (*Id.* at 17) (citations omitted). "Accordingly, plaintiff will be afforded the opportunity to file, as directed below, an amended complaint in which he shall name in the caption of the complaint, each of the individuals against whom he intends to assert a *Bivens* claim or claims, in a manner that conforms to the requirements of Rules 8(a) and 10(a) of the Federal Rules of Civil Procedure." (*Id.*).

The Court accordingly directed, in the Conclusion of the August 16 Order, that plaintiff be given leave to file an amended complaint conforming to the requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure, and the Court again explicitly advised plaintiff of his duty to list all defendants in the caption of the complaint:

> Plaintiff is reminded, as explained above, that if he wishes to assert *Bivens* or other claims against defendants other than the United States in the amended complaint, *he must name those individuals in the caption of the amended complaint* and set forth

specific allegations with respect to how those individuals violated his rights.

(*Id.* at 21). (emphasis added).

While plaintiff's amended complaint contains allegations that would support *Bivens* claims (*see* Amended Complaint, ¶¶ 17–42 *passim* ),[3] it does not name in the caption of the complaint any individuals against whom plaintiff is seeking to assert *Bivens* clams, nor does the section of the complaint captioned "PARTIES" list any individual defendants. While plaintiff does, in the section of the amended complaint captioned "CONCLUSION", set forth a list of "Federal Employees from (BFDF) Health Division" (Amended Complaint ¶ 57), which includes individuals mentioned elsewhere in the amended complaint in connection with plaintiff's allegations that would be relevant to *Bivens* claims, the individuals named therein are not listed as defendants in the caption of the amended complaint or in plaintiff's recital of the parties to this action at the beginning of the amended complaint; as noted *supra,* plaintiff lists only one defendant-the United States-in the complaint caption and in his recital of the parties. Moreover, plaintiff's statement of relief sought at the end of the amended complaint (captioned "PRAYER") demands judgment "against *the defendant.*" (*Id.* at p. 16) (emphasis added).[4]

3      Plaintiff divides his claims into two sections of the amended complaint, namely "Medical Malpractice" (Amended Complaint, p. 3–5, ¶¶ 8–16), which contains allegations supportive of his FTCA claims, and "U.S. D.H.S.-ICE Federal Agency and Custody Officers Abuses" (*Id.* at p. 5–14, ¶¶ 17–56), which contains allegations supportive of his *Bivens* constitutional claims. The Court notes, however, that a number of the allegations set forth in the "Federal Agency and Custody Officers Abuses" section of the complaint are relevant to his FTCA malpractice claims. *See, e.g.,* Amended Complaint, ¶ 21.

4      Plaintiff's failure to include in the caption of the amended complaint the names of any defendants against whom he is asserting *Bivens* claims is not the only instance of his disregard of the Court's directives regarding the form and content of his

amended complaint. The August 16 Order noted that many of the *Bivens* claims that plaintiff's allegations would support against individuals identified in the body of the complaint appeared to be barred by the statute of limitations. August 16 Order at 18. The Court accordingly directed as follows:

> In the amended complaint that plaintiff will be given leave to file, as provided below, in which he must demonstrate either that his *Bivens* claims stemming from his incarceration at BFDF are timely or, if any such Bivens claims are untimely, he must allege facts demonstrating why equitable tolling should be applied to the statute of limitations periods for such claims.

(August 16 Order at 19). As noted *supra,* the August 16 Order provided that plaintiff would be given leave to file an amended complaint with respect to his *Bivens* claims, and plaintiff was further advised, in this regard, "that he should address the timeliness of any *Bivens* claims that he asserts in the amended complaint and any argument as to why the limitations period applicable to such claims should be equitably tolled." (August 16 Order at 21). However, plaintiff's amended complaint does not address the timeliness issue or offer any basis for equitable tolling of the limitations period. Given the Court's dismissal herein of the *Bivens* claims based upon plaintiff's failure to identify the defendants against whom he seeks to assert such claims, the Court need not further address the timeliness issue.

Plaintiff further disregarded the August 16 Order to the extent that he reasserts claims stemming from his detention at the Albany County Jail from February 21, 2006–March 21, 2006, and the Perry County Correctional Center ("PCCC") in Uniontown Alabama from August 5, 2006–February 9, 2007. (Amended Complaint at ¶¶ 14, 15, 28–40). The August 16 Order dismissed the claims stemming from plaintiff's incarceration at those facilities pursuant to 28 U.S.C. § 1406(a) for improper venue. (August 16 Order at 13–14). Those claims remain dismissed.

**\*3** The Court's duty to construe liberally the pleadings of *pro se* litigants does not absolve *pro se* litigants from the duty to comply with the requirements of the Federal Rules

of Civil Procedure and court orders issued pursuant to those rules. *See, e .g., Caidor v. Onondaga County,* 517 F.3d 601, 605 (2d Cir.2008) (noting that *pro se* litigants are required to familiarize themselves with procedural rules and comply with such rules); *McDonald v. Head Criminal Court Supervisor Officer,* 850 F.2d 121, 124 (2d Cir.1988) ("[W]hile *pro se* litigants may in general deserve more lenient treatment than those represented by counsel, all litigants, including *pro ses,* have an obligation to comply with court orders. When they flout that obligation they, like all litigants, must suffer the consequences of their actions.")). As discussed *supra,* this Court's previous order explained to plaintiff the requirement of Rule 10(a) that all defendants to an action be named and identified as such in the caption to the complaint, and the Court afforded him the opportunity to cure the defect in his initial complaint by filing an amended complaint naming all defendants. Plaintiff has inexplicably failed to comply with the Court's order and the requirement of Rule 10(a). Accordingly, to the extent that plaintiff seeks to bring *Bivens* claims against individual Custody Officers and other BFDF officials, *see* Amended Complaint, ¶ 58 ("Plaintiff want [sic] this Court to bring Justice against Federal Agency Employees who Violate constitutional law against Plaintiff's rights"), such claims must be dismissed in light of his failure to name those individuals as defendants in the caption of the amended complaint. *See, e.g., Ferdik v. Bonzelet,* 963 F.2d 1258, 1262–63 (9th Cir.1992) (dismissing action for refusal to comply with court orders to name defendants in the caption as required by Rule 10(a)).

Moreover, as explained in the August 16 Order (pp. 14–15), constitutional claims under *Bivens* cannot be brought against the only defendant named in the complaint, the United States. *See Robinson v. United States Bur. Of Prisons,* 244 F.Supp.2d 57, 66 (N.D.N.Y.2003) ("[A] *Bivens* action may not be maintained against the United States.") (citing *Washington v. DEA,* 183 F.3d 868, 872 n. 8 (8th Cir.1999). Nor can constitutional claims be asserted against the United States under the FTCA. *See Washington,* 183 F.3d at 873; *Russ v. United States,* 62 F.3d 201, 204 (7th Cir.1995) ("[C]onstitutional wrongs cannot be remedied through the FTCA,") (citing *FDIC v. Meyer,* 510 U.S. 471, 476, 114 S.Ct. 996, 1001–02, 127 L.Ed.2d 308(1994)).

Plaintiff having thus having failed to name a proper defendant to his *Bivens* claims, the Court concludes that his *Bivens* claims must be dismissed pursuant to 28 U.S.C. § 1915(e)(2) (B) for failure to state a claim on which relief can be granted.

### B. *Treaty Claims*

The Conclusion section of the amended complaint invokes, as a basis for relief against defendant United States not raised in plaintiffs original complaint, treaties to which the United States is a signatory. Specifically, the amended complaint states "At such time and places the United States violates International Laws as A[sic] result the United States are not in compliance with Refugee Convention Requirements or The United Nations Convention against Torture Prohibitions." (Amended Complaint, § 57). It is well established that the United Nations Convention Against Torture and Other Cruel, Inhumane or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, 23 I.L.M. 1027, ("CAT") does not give rise to a private right of action. *Renkel v. United States,* 456 F.3d 640, 644 (6th Cir.2006) ("As the Articles [of CAT] are not self-executing, they do not create private rights of action; therefore, any private lawsuit seeking to enforce the United States' obligations under the Convention must be based on domestic law."); *Wolinski v. Junious,* 2012 U.S. Dist. LEXIS 65889, at *18–19,2012 WL 1657576 (E.D.Cal. May 10, 2012) ("The CAT does not give rise to a private right of action because it is not self-executing.) (citing *Akhtar v. Reno,* 123 F.Supp.2d 191, 196 (S.D.N.Y.2000),

**\*4** The United Nations Convention Relating to the Status of Refugees, adopted July 28, 1951, art. 26, 19 U.S.T. 6259, 6576, 189 U.N.T.S. 150, 172 ("Refugee Convention") likewise does not create a private right of action. *United States v. Casaran–Rivas,* 311 Fed. Appx. 269, 272 (11th Cir.2009) (unpublished) ("[A]rgument that the indictment violated the refugee Convention and CAT Treaty is without merit, as the Refuge[e] Convention and CAT Treaty are not self-executing, or subject to relevant legislation, and, therefore, do not confer upon aliens a private right of action to allege a violation of their terms."); *Reyes–Sanchez v. Ashcroft,* 261 F.Supp.2d 276, 288–89 (S.D.N.Y.2003) ("Because the Refugee Convention is not self-executing, it does not create individual rights.").

Accordingly, plaintiff's claims against the United States under CAT and Refugee Convention are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim on which relief may be granted.

### C. *FTCA Claims*

The medical malpractice-related claims under the FTCA asserted by plaintiff in the amended complaint and stemming from his detention at BFDF may go forward against defendant United States. [5]

> [5]   As explained in the August 16 Order, plaintiff's allegations of medical malpractice and the failure to properly treat his serious medical condition are clearly cognizable under the FTCA when asserted against the United States. (August 16 Order at 6).

### *ORDER*

IT IS HEREBY ORDERED, that plaintiff's *Bivens* claims are dismissed with prejudice;

FURTHER, that plaintiff's claims under CAT and the Refugee Convention are dismissed with prejudice;

FURTHER, that the Clerk of the Court is directed to complete, on plaintiff's behalf, and to issue, a summons for service of process on defendant United States of America;

FURTHER, the Clerk of the Court is directed to send copies of the Summons, Amended Complaint, [6] and this Order by certified mail to the following, pursuant to Rule 4(i) of the Federal Rules of Civil Procedure:

> [6]   As explained in n. 1, *supra,* plaintiff's voluminous exhibits to the amended complaint are maintained in paper form in a separate file folder in the Clerk's Office.

• Attorney General of the United States, Main Justice Building, 10th and Constitution Avenues N.W., Washington, DC 20530;

• Civil Process Clerk, United States Attorney for the Western District of New York, United States Attorney's Office, USAO/WDNY, 138 Delaware Avenue, Buffalo, New York 14202.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 3858398

---

                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2931863

669 F.Supp.3d 96
United States District Court, N.D. New York.

Vladimir JEANTY, Plaintiff,

v.

Melissa SCIORTINO, Utica City Clerk/Records
Access Officer, William Borrill, Esq., Corporation
Counsel, Zachary Oren, Esq., First Assistant Corporation
Counsel, David Bagley, Esq., City of Utica, Charles
N. Brown, Esq., Asst. Corp. Counsel, Sgt. Anthony
Martino, Sgt. Edin Selimovic, John/Jane Doe One, and
John/Jane Doe Two, in their individual and official
capacities as employees of the City of Utica, Defendants.

6:22-cv-319 (BKS/TWD)
|
Signed April 13, 2023

**Synopsis**

**Background:** Requester, proceeding pro se, brought § 1983
action against city clerk, city corporation counsel, police
officers, private attorney, unnamed city employees, and city
for violation of the Equal Protection Clause of the Fourteenth
Amendment, denial of access to courts and retaliation in
violation of the First Amendment, civil conspiracy, and
fraud on the court, alleging that defendants failed to provide
photographs sought in New York Freedom of Information
Law (FOIL) request made in connection with criminal case
against him. Defendants moved to dismiss for failure to state
a claim.

**Holdings:** The District Court, Brenda K. Sannes, Chief
Judge, held that:

[1] sergeant and first assistant corporation counsel were not
entitled to absolute immunity from requester's § 1983 claims;

[2] corporation counsel and first assistant corporation counsel
were entitled to absolute immunity from requester's § 1983
claims;

[3] requester was not entitled to equitable tolling of three-year
limitations period for his § 1983;

[4] requester failed to § 1983 state claim against city and
corporation counsel, police officers, and city records access
officer in their official capacities;

[5] requester adequately alleged that private attorney acted
under color of state law;

[6] requester failed to state § 1983 claim against private
attorney for violation of the Equal Protection Clause based on
theory of selective treatment;

[7] requester failed to state § 1983 claim against private
attorney for violation of First Amendment right to access to
courts; and

[8] requester could not state § 1983 and § 1985 claims against
attorney for civil conspiracy.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss for Failure to
State a Claim.

West Headnotes (53)

[1]    **Evidence**  ⬥  Material from Other Cases
       **Evidence**  ⬥  As establishing truth of facts or
       matters noticed in general

       A court may take judicial notice of a document
       filed in another court not for the truth of the
       matters asserted in the other litigation, but rather
       to establish the fact of such litigation and related
       filings.

[2]    **Attorneys and Legal Services**  ⬥  Role of
       court in general

       Although a court is ordinarily obligated to
       afford a special solicitude to pro se litigants,
       the appropriate degree of special solicitude is
       not identical with regard to all pro se litigants;
       the degree of solicitude may be lessened, for
       example, where a particular pro se litigant is
       experienced in litigation and familiar with the
       procedural setting presented.

[3]   **Attorneys and Legal Services** ← Role of
court in general

A court may exercise its discretion, based on
the totality of the relevant circumstances, to
determine what degree of solicitude, if any,
should be afforded to pro se litigants.

[4]   **Public Employment** ← Absolute immunity

Absolute immunity from suit gives public
officials entrusted with sensitive tasks protected
area of discretion within which to carry out their
responsibilities.

[5]   **Public Employment** ← Privilege or
immunity in general

Defendant bears burden of showing that absolute
immunity is warranted for function in question
which gives rise to plaintiff's claim.

[6]   **Federal Civil Procedure** ← Immunity
**Federal Civil Procedure** ← Construction of
pleadings

Immunity may be asserted as defense in motion
to dismiss for failure to state claim where facts
supporting defense appear on face of complaint,
and the court must draw all reasonable inferences
in favor of the plaintiff, including those that
defeat the immunity defense.

1 Case that cites this headnote

[7]   **Public Employment** ← Absolute immunity

Absolute immunity protects government
officials from suit arising out of acts associated
with their function as an advocate.

[8]   **Public Employment** ← Absolute immunity

In determining whether an official is entitled to
absolute immunity, courts employ a functional
approach, looking at the nature of the function
performed, not the identity of the actor who
performed it.

1 Case that cites this headnote

[9]   **Attorneys and Legal Services** ← Privilege or
immunity

Absolute immunity extends to government
attorneys defending civil suits and government
attorneys who initiate civil suits.

1 Case that cites this headnote

[10]   **Attorneys and Legal Services** ← Privilege or
immunity

Absolute immunity applies to functions of
a government attorney that can fairly be
characterized as closely associated with the
conduct of litigation or potential litigation in civil
suits, including the defense of such actions.

1 Case that cites this headnote

[11]   **Public Employment** ← Absolute immunity

Once a court determines that challenged
conduct involves a function covered by absolute
immunity, the actor is shielded from liability for
damages regardless of the wrongfulness of his
motive or the degree of injury caused.

[12]   **Civil Rights** ← Defenses; immunity and
good faith

Sergeant and first assistant corporation counsel
failed to show at motion to dismiss stage that
they were performing functions as advocates
of city when they allegedly modified metadata
when producing two CDs of 22 photographs
sought by requester in New York Freedom
of Information Law (FOIL) request, and thus
were not entitled to absolute immunity from
requester's § 1983 claims for violation of the
Equal Protection Clause, denial of access to
courts and retaliation in violation of the First
Amendment, and fraud on the court; complaint
did not allege that attorney and sergeant were
involved in requester's criminal case or Article
78 proceeding challenging response to his
FOIL request, and instead simply indicated that
sergeant and attorney produced photographs at

issue in response to state-court order. U.S. Const. Amends. 1, 14; 42 U.S.C.A. § 1983.

[13]  **Conspiracy**  Judges, court personnel, and attorneys

Absolute immunity barred plaintiff's § 1983 claim against first assistant corporation counsel for civil conspiracy based on counsel's entering into joint defense agreement with city and private attorney to defend police officer against requester's prior federal action arising from his arrest, where plaintiff alleged that agreement required attorney to make sure that police officer did not testify truthfully in prior action. 42 U.S.C.A. §§ 1983, 1985.

[14]  **Civil Rights**  Attorneys, jurors, and witnesses; public defenders

Corporation counsel and first assistant corporation counsel were entitled to absolute immunity from requester's § 1983 claims for violation of the Equal Protection Clause, denial of access to courts and retaliation in violation of the First Amendment, and fraud on the court arising from failure to provide photographs sought in New York Freedom of Information Law (FOIL) request made in connection with criminal case; counsel took actions in their role as advocates for city and city defendants in requester's prior federal action challenging his arrest, as counsel's response to FOIL request expressly referenced orders of federal court, both federal action and Article 78 proceeding challenging other FOIL responses were pending at time request was denied, and photographs were related to federal action challenging arrest. U.S. Const. Amends. 1, 14; 42 U.S.C.A. § 1983.

[15]  **Civil Rights**  Attorneys, jurors, and witnesses; public defenders

**Civil Rights**  Municipalities and counties and their officers

City records access officer was entitled to absolute immunity from requester's § 1983 claims for violation of the Equal Protection

Clause, denial of access to courts and retaliation in violation of the First Amendment, and fraud on the court arising from failure to provide photographs sought in New York Freedom of Information Law (FOIL) request made in connection with criminal case, where officer acted at direction of government attorneys performing functions closely tied to judicial process who were entitled to absolute immunity. U.S. Const. Amends. 1, 14; 42 U.S.C.A. § 1983.

[16]  **Public Employment**  Judicial immunity

Absolute immunity extends to persons assisting and working under direction of government attorneys entitled to absolute immunity when they perform functions closely tied to judicial process.

[17]  **Limitation of Actions**  Suspension or stay in general; equitable tolling

Generally, litigant seeking equitable tolling of limitations period bears burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way.

[18]  **Federal Courts**  Limitations and laches

**Limitation of Actions**  Suspension or stay in general; equitable tolling

Equitable tolling of limitations period is appropriate in rare and exceptional circumstances, and district court's decision to deny equitable tolling is reviewed for abuse of discretion.

[19]  **Federal Civil Procedure**  Limitations, laches and prematurity

Court may evaluate whether statute of limitations may be equitably tolled on motion to dismiss where factual basis for equitable tolling is apparent from face of complaint and other documents properly considered on motion to dismiss.

**[20]** **Limitation of Actions** — Suspension or stay in general; equitable tolling

Requester was not entitled to equitable tolling of three-year limitations period for his § 1983 claims against first assistant corporation counsel and sergeant for violation of the Equal Protection Clause, denial of access to courts and retaliation in violation of the First Amendment, and fraud on the court arising from failure to provide photographs sought in New York Freedom of Information Law (FOIL) request; though requester alleged that fraudulent conduct of others concealed counsel's and sergeant's conduct from him, he knew that he had been provided with modified metadata and changed file names for photographs approximately four years before he filed suit and did not explain what prevented him from filing between date he learned of modified metadata and date suit was filed. U.S. Const. Amends. 1, 14; 42 U.S.C.A. § 1983.

**[21]** **Civil Rights** — Particular Causes of Action

Requester failed to allege any facts suggesting that any alleged violation of his constitutional rights was result of municipal custom or policy, and thus failed to § 1983 state claim against city and corporation counsel, police officers, and city records access officer in their official capacities for violation of the Equal Protection Clause, denial of access to courts and retaliation in violation of the First Amendment, and fraud on the court arising from failure to provide photographs sought in New York Freedom of Information Law (FOIL) request made in connection with criminal case. U.S. Const. Amends. 1, 14; 42 U.S.C.A. § 1983.

**[22]** **Civil Rights** — Governmental Ordinance, Policy, Practice, or Custom

**Civil Rights** — Liability of Public Employees and Officials

A § 1983 claim against a municipality or against an official sued in his or her capacity cannot be sustained unless the plaintiff shows that the violation of his federal rights was the result of a municipal custom or policy. 42 U.S.C.A. § 1983.

**[23]** **Civil Rights** — Color of Law

A plaintiff alleging a violation of his constitutional rights under § 1983 must show that the defendant acted under color of state law. 42 U.S.C.A. § 1983.

**[24]** **Civil Rights** — Private Persons or Corporations, in General

**Civil Rights** — Cooperation with state actor

While private parties generally are not state actors, their conduct can be attributed to the state for § 1983 purposes if (1) the State compelled the conduct the compulsion test, (2) there is a sufficiently close nexus between the State and the private conduct (the joint action test or close nexus test), or (3) the private conduct consisted of activity that has traditionally been the exclusive prerogative of the state (the public function test). 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[25]** **Civil Rights** — Private Persons or Corporations, in General

The fundamental question for determining whether private parties are state actors for purposes of § 1983 is whether the private party's conduct is fairly attributable to the state such that it bears responsibility. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[26]** **Civil Rights** — Cooperation with state actor

For purposes of determining whether a private party acted under color of state law under § 1983, a close nexus between a private actor and a state official may be found where the private actor conspired with a state official to violate the plaintiff's constitutional rights. 42 U.S.C.A. § 1983.

2023 WL 2931863

1 Case that cites this headnote

**[27]**    **Civil Rights**    Color of law; state action

When analyzing allegations of state action, for purposes of determining whether to hold private party liable under § 1983, the court must begin by identifying the specific conduct of which the plaintiff complains. 42 U.S.C.A. § 1983.

**[28]**    **Civil Rights**    Attorneys and witnesses

Requester adequately alleged that private attorney, who was hired by city to defend police officer in connection with requester's prior federal action challenging his arrest, acted under color of state law, for purposes of his § 1983 claims against first assistant corporation counsel and sergeant for violation of the Equal Protection Clause and denial of access to courts and retaliation in violation of the First Amendment, arising from failure to provide photographs sought in New York Freedom of Information Law (FOIL) request; requester alleged that attorney, along with city corporation counsel, directed records access officer to withhold requested photographs to assist them in defending their clients and entered into joint defense agreement which required police officer to testify untruthfully. U.S. Const. Amends. 1, 14; 42 U.S.C.A. § 1983.

**[29]**    **Civil Rights**    Cooperation with state actor

To act under color of state law for purposes of § 1983, it is enough that the private party is a willful participant in joint action with the State or its agents. 42 U.S.C.A. § 1983.

**[30]**    **Civil Rights**    Cooperation with state actor

When determining whether private party acted under color of state law for purposes of § 1983, the touchstone of joint action is often a plan, prearrangement, conspiracy, custom, or policy shared by the private actor and the state. 42 U.S.C.A. § 1983.

**[31]**    **Civil Rights**    Cooperation with state actor

While a private actor does not act under color of state law for purposes of § 1983 merely by communicating or cooperating with a state actor, he does act under color of state law by taking a more active role. 42 U.S.C.A. § 1983.

**[32]**    **Civil Rights**    Cooperation with state actor

Private persons, jointly engaged with state officials in challenged action, are acting under color of law for purposes of § 1983 claims, even if state actor himself is immune from liability. 42 U.S.C.A. § 1983.

**[33]**    **Constitutional Law**    Enforcement, application, or administration in general

To state a claim for an equal protection violation based on selective enforcement a plaintiff must allege that: (1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person. U.S. Const. Amend. 14.

**[34]**    **Constitutional Law**    Enforcement, application, or administration in general

To state a claim for an equal protection violation based on selective enforcement, a plaintiff must show both disparate treatment and impermissible motivation. U.S. Const. Amend. 14.

**[35]**    **Constitutional Law**    "Class of one" claims
           **Constitutional Law**    "Class of one" claims

In a "class of one" equal protection claim, a plaintiff alleges that he was intentionally treated differently from others similarly situated and that

there was no rational basis for the difference in treatment. U.S. Const. Amend. 14.

**[36]    Constitutional Law**  ⬅  "Class of one" claims
**Constitutional Law**  ⬅  "Class of one" claims

"Class of one" equal protection claim requires extremely high similarity between plaintiff and comparator, and plaintiff must ultimately prove that no rational person could regard circumstances of plaintiff to differ from those of comparator to degree that would justify differential treatment on basis of legitimate government policy, and similarity in circumstances and difference in treatment are sufficient to exclude possibility that defendant acted on basis of mistake. U.S. Const. Amend. 14.

**[37]    Constitutional Law**  ⬅  Similarly situated persons; like circumstances

To prevail on a Fourteenth Amendment equal protection claim under a theory of selective treatment, plaintiff's and comparator's circumstances must bear reasonably close resemblance but need not be identical; in other words, plaintiff must show that he was similarly situated in all material respects to individuals with whom he seeks to compare himself. U.S. Const. Amend. 14.

**[38]    Constitutional Law**  ⬅  Other Particular Issues and Applications
**Records**  ⬅  Pleading, petition, application, or motion

Requester's complaint failed to adequately allege any comparator with circumstances bearing reasonably close resemblance to his own, and thus failed to state § 1983 claim against private attorney for violation of the Equal Protection Clause based on theory of selective treatment, arising from failure to provide photographs sought in New York Freedom of Information Law (FOIL) request; allegations regarding alleged comparators made no mention of their protected characteristics, if any, which were

allegedly relevant to attorney's treatment of him, and requester's allegation that he was only African/Black person who had submitted FOIL request and was denied because he had federal lawsuit against city employees was conclusory and did not allege existence of comparator. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[39]    Constitutional Law**  ⬅  Other Particular Issues and Applications
**Records**  ⬅  Pleading, petition, application, or motion

Information about alleged white comparator in his opposition to private attorney's motion to dismiss did not plausibly allege existence of comparator with reasonably close circumstances to those of Black requester's, and thus requester failed to state § 1983 claim against private attorney for violation of the Equal Protection Clause based on theory of selective enforcement, arising from failure to provide photographs sought in New York Freedom of Information Law (FOIL) request; though requester alleged that white alleged comparator sued city, sought records under FOIL request, and received records, requester also received records, and there was years-long history of litigation between requester and city defendants regarding requested photographs that did not occur with white comparator. U.S. Const. Amend. 14.

**[40]    Constitutional Law**  ⬅  Right to Petition for Redress of Grievances

The First Amendment right to petition the government, which applies to the states through the Fourteenth Amendment, extends to all departments of the government, including the courts. U.S. Const. Amend. 1.

**[41]    Constitutional Law**  ⬅  Conditions, Limitations, and Other Restrictions on Access and Remedies

A plaintiff's First Amendment right of access to the courts is violated where government

officials obstruct legitimate efforts to seek judicial redress. U.S. Const. Amend. 1.

1 Case that cites this headnote

[42]    **Constitutional Law** ← Conditions, Limitations, and Other Restrictions on Access and Remedies

There are two variants of right-of-access claims under the First Amendment: (1) forward-looking suits, in which plaintiffs allege that systemic official action' frustrated their ability to file a suit, and (2) backward-looking claims covering suits that cannot now be tried or tried with all material evidence, no matter what official action may be in the future. U.S. Const. Amend. 1.

[43]    **Constitutional Law** ← Conditions, Limitations, and Other Restrictions on Access and Remedies

A plaintiff may have a backward-looking right-of-access claim under the First Amendment where the official action caused the loss or inadequate settlement of a meritorious case. U.S. Const. Amend. 1.

1 Case that cites this headnote

[44]    **Constitutional Law** ← Conditions, Limitations, and Other Restrictions on Access and Remedies

**Records** ← Pleading, petition, application, or motion

Requester failed to state a forward-looking claim against private attorney for First Amendment denial of right of access to courts arising from failure to provide photographs sought in New York Freedom of Information Law (FOIL) request, where requester made no allegations of systemic official action which had frustrated his ability to file a lawsuit, and requester had in fact filed many suits. U.S. Const. Amend. 1.

[45]    **Constitutional Law** ← Conditions, Limitations, and Other Restrictions on Access and Remedies

**Records** ← Pleading, petition, application, or motion

Requester failed to state a backward-looking claim against private attorney for First Amendment denial of right of access to courts arising from failure to provide photographs sought in New York Freedom of Information Law (FOIL) request, to extent cause of action was viable; even though failure to provide photographs and their metadata deprived requester of evidence which would have helped him in his federal action challenging his arrest, requester did not allege any facts of which he was unaware at relevant times of action and in fact stated that he was aware of alleged modifications to metadata several years earlier, and issue of allegedly modified metadata associated with photographs was raised multiple times, including before close of discovery in federal case. U.S. Const. Amend. 1.

[46]    **Constitutional Law** ← Conditions, Limitations, and Other Restrictions on Access and Remedies

A plaintiff cannot maintain a backward-looking right-of-access claim under the First Amendment alleging that government defendants concealed or manipulated relevant facts if the plaintiff was aware of the facts giving rise to his claim at the time of the earlier lawsuit. U.S. Const. Amend. 1.

1 Case that cites this headnote

[47]    **Conspiracy** ← Definition and Elements in General

To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. 42 U.S.C.A. § 1983.

**[48]    Conspiracy** ⬅ Definition and Elements in General

To state a conspiracy claim under § 1985(3), a plaintiff must allege: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. 42 U.S.C.A. § 1985(3).

**[49]    Conspiracy** ⬅ Intent, motive, or animus

To state a conspiracy claim under § 1985(3), a plaintiff must show that the conspiracy was motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus. 42 U.S.C.A. § 1985(3).

**[50]    Conspiracy** ⬅ Civil rights conspiracies

Requester's claim that private attorney, along with corporation counsel and police officers, conspired to have city records access officer not respond to his New York Freedom of Information Law (FOIL) request for photographs related to criminal case against him were general and conclusory, and thus requester could not state § 1983 and § 1985 claims against attorney for civil conspiracy. 42 U.S.C.A. §§ 1983, 1985(3).

**[51]    Conspiracy** ⬅ Civil rights conspiracies

Mere conclusory or general allegations of conspiracy are insufficient to state claim of conspiracy under § 1983 or § 1985. 42 U.S.C.A. §§ 1983, 1985(3).

**[52]    Conspiracy** ⬅ Civil rights conspiracies

To state viable conspiracy claim under § 1983, plaintiff must provide some factual basis supporting meeting of minds, such that defendants entered into agreement, express or tacit, to achieve unlawful end. 42 U.S.C.A. § 1983.

**[53]    Federal Civil Procedure** ⬅ Pleading over

Ordinarily, court should not dismiss pro se complaint without granting leave to amend at least once when liberal reading of complaint gives any indication that valid claim might be stated; however, court can deny request to amend as futile where problem with claim is substantive and better pleading will not cure it. Fed. R. Civ. P. 15(a)(2).

1 Case that cites this headnote

**Attorneys and Law Firms**

**\*103** Plaintiff pro se: Vladimir Jeanty, Arverne, NY 11692.

For Defendants City of Utica, Brown, Martino, Selimovic, Sciortino, Borrill, and Oren: David A. Longeretta, Assistant Corporation Counsel, One Kennedy Plaza, Utica, NY 13502.

For Defendant Bagley: Laura L. Spring, Cohen Compagni Beckman Appler & Knoll, PLLC, 507 Plum Street, Suite 310, Syracuse, NY 13204.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, Chief United States District Judge:

**I. INTRODUCTION**

**\*\*1** Pro se plaintiff Vladimir Jeanty brings this action against Defendants under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments arising out of Defendants' alleged failure to provide photographs sought in a New York Freedom of Information Law ("FOIL") request made by Plaintiff. (*See generally* Dkt. No. 32 (amended complaint)). [1] Presently before the Court are two motions to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by (1) Defendants City of Utica, Charles Brown, Anthony Martino, Edin Selimovic, Melissa Sciortino, William Borrill, and Zachary Oren (the "City Defendants"), (Dkt. No. 56), and (2) Defendant David Bagley, (Dkt. No. 50). Plaintiff opposed both motions, (Dkt. No. 61), and all Defendants replied in support of their

respective motions, (Dkt. Nos. 67, 68). For the following reasons, the Court grants the City Defendants' motion to dismiss and grants **\*104** in part and denies in part Bagley's motion to dismiss.

<sup>1</sup>  Plaintiff amended his complaint once as a matter of course in response to Defendants' motions to dismiss the original complaint. (*See* Dkt. Nos. 29, 30). Defendants subsequently withdrew those motions to dismiss. (Dkt. Nos. 35–38).

## II. FACTS <sup>2</sup>

<sup>2</sup>  The facts are drawn from the amended complaint, as well as Plaintiff's opposition to Defendants' motions to dismiss, to the extent that submission is "consistent with the allegations in the complaint." *Crum v. Dodrill*, 562 F. Supp. 2d 366, 373–74 & n.13 (N.D.N.Y. 2008) (noting that "the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum," to the extent those materials "are consistent with the allegations in the complaint" (citations omitted)); *see also Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013). The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

### A. The First FOIL Request for the Photographs

In 2009 or 2010, Plaintiff filed a FOIL request with the City of Utica Clerk's Office for "files and Metadata" needed to "defend himself in a criminal matter initiated by [Utica Police Department ("UPD")] officers." (Dkt. No. 32, ¶¶ 10, 13; *see also* Dkt. No. 61, at 9 (alleging that Plaintiff filed a FOIL request on March 3, 2010 for photographs and metadata taken on October 15, 2009 in connection with Plaintiff's arrest)). Plaintiff asserts that the request was "ignored and not responded to in the prescribe[d] time period." (Dkt. No. 61, at 9). After Plaintiff filed an Article 78 petition, Defendant Charles Brown, First Assistant Corporation Counsel for the City of Utica, provided Plaintiff with black and white paper copies of the photographs. (*Id.* at 10; Dkt. No. 32, ¶ 8). After Plaintiff filed a second Article 78 petition, Brown was ordered to produce "2 CDs with 22 photographs." (Dkt. No. 32, ¶ 11). Brown "instructed" Defendant Sergeant Anthony Martino "to alter the Metadata ... and to change the file names" and

provided Plaintiff with "2 CDs with 22 photographs on them" in early 2012. (*Id.* ¶¶ 11–12; Dkt. No. 61, at 10).

### B. The 2016 Action

**\*\*2** **[1]** In 2016, Plaintiff filed a lawsuit in the Northern District of New York against "multiple City of Utica employees" arising out of his October 2009 arrest (the "2016 Action"). (Dkt. No. 32, ¶ 15); *see Jeanty v. City of Utica*, No. 16-cv-966, 2016 WL 11756746 (N.D.N.Y. Aug. 3, 2016). <sup>3</sup> The "majority" of Plaintiff's claims in the 2016 Action were dismissed at summary judgment. (Dkt. No. 32, ¶ 16). One claim for denial of a fair trial against defendant Michael Cerminaro proceeded to trial, and the jury returned a verdict in favor of Cerminaro. (*Id.* ¶¶ 17–19). Defendant Zachary Oren, First Assistant Corporation Counsel for the City of Utica, represented City defendants in the 2016 Action, and Defendant David Bagley, a private attorney, was hired by the City of Utica to represent defendant Sean Dougherty. (*Id.* ¶¶ 6–7, 33).

<sup>3</sup>  The Court, which presided over the 2016 Action, takes judicial notice of the fact of that lawsuit and of the documents filed therein. A court "may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such filings and related filings." *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (citation omitted). Furthermore, there "seems to be no doubt as to the power of the court to take judicial notice of its own records in the same or in an interrelated case." *Rosado-Acha v. Red Bull GmbH*, No. 15-cv-7620, 2016 WL 3636672, at \*7, 2016 U.S. Dist. LEXIS 84543, at \*19 (S.D.N.Y. June 29, 2016) (citation omitted).

Plaintiff alleges that Bagley, Oren, and the City of Utica "entered into a Joint Defense Agreement" which "required Bagley to represent Dougherty and [e]nsure **\*105** that Dougherty provided evidence [and] testimony that would assist the other UPD defendants." (*Id.* ¶ 34). The Joint Defense Agreement also required Bagley to "make sure Dougherty did not testify truthfully about the circumstances regarding the taking of photographs on 10/15/2009 involving [Plaintiff's] arrest" or regarding "how many photographs were taken and when they were uploaded in the UPD [Records Management System ("RMS")]." (*Id.* ¶¶ 35–36). The agreement further required that Bagley not "divulge"

to Plaintiff or the Court "how the photographs" provided to Plaintiff during discovery were modified. (*Id.* ¶ 37).

Oren and Bagley provided Plaintiff with a CD containing 22 photographs and "modified" metadata in 2018 and again in 2020. (*Id.* ¶¶ 38–39). Defendant Lieutenant Edin Selimovic prepared these CDs and was "instructed" by Oren and Bagley to "change the file names." (*Id.* ¶¶ 40–41). Selimovic prepared an affidavit containing a false statement that the photographs had not been modified by him in any way. (*Id.* ¶ 85). Plaintiff generally alleges that Brown, Oren, and Bagley "had the 22 photographs['] Metadata modified to deprive [Plaintiff] of the evidence he needed to defend himself in the criminal matter and to prove his allegations in the [2016 Action]." (*Id.* ¶ 46).

### C. October 2019 FOIL Request
Plaintiff filed a FOIL request with Defendant City of Utica Records Access Officer Melissa Sciortino on October 29, 2019 and amended the request on October 30, 2019. (Dkt. No. 61, at 8). Oren submitted a letter request in the 2016 Action requesting a protective order relieving all City of Utica officials of their duties to respond to the request. (*Id.*). Plaintiff filed an Article 78 petition in state court on January 29, 2020 to challenge the failure to respond to this FOIL request. (*Id.*).

### D. March 2020 FOIL Request for the Photographs
Plaintiff filed another FOIL request with the City of Utica Clerk's Office on March 11, 2020, in which he requested:

> All photographs stored in UPD RMS system from the time period of October 10 2009 to October 15, 2015 (specifically and including photographs entered by PO Cerminaro, Paladino, Dougherty and Uryniak). Please provide these in color on a Compact Disk WITH METADATA ATTACHED.

**\*\*3** (Dkt. No. 32, ¶ 20). Sciortino responded the same day, stating that Plaintiff's request was being reviewed and that she anticipated Plaintiff would be contacted regarding the request by April 8, 2020. (*Id.* ¶ 21). Plaintiff did not receive another response from Sciortino, even after he wrote her about his request. (*Id.* ¶¶ 22–23). On April 20, 2020, Plaintiff wrote

Defendant William Borrill, City of Utica Corporation Counsel and Records Access Appeals Officer, regarding his request. (*Id.* ¶ 24). [4] Borrill responded on May 1 and indicated that the "City of Utica will not be able to respond to your purported FOIL request absent judicial intervention." (*Id.*; *see* Dkt. No. 61, at 9 ("The City of Utica will not be complicit in your scheme to subvert lawful Orders of a United States District Court.")). Plaintiff filed an Article 78 petition in state court on May 21, 2020 to challenge this response to his FOIL request. (Dkt. No. 61, at 9).

4
> Plaintiff contradictorily alleges that Borrill both was and was not the Records Access Appeals Officer. (*Id.* ¶¶ 5, 32).

**\*106** Plaintiff alleges that Sciortino "never responded or communicated" with Plaintiff regarding his FOIL request between March 11, 2020 and approximately October 1, 2021, despite her awareness that New York Public Officers Law required her to respond to the request within 30 days. (Dkt. No. 32, ¶¶ 25–26; *see id.* ¶ 48 (alleging that Oren, Borrill, and Bagley "informed Sciortino that she was not to respond to [Plaintiff's] specific request relating to photographs in the possession of the Utica Police Dep[artment]")). He further alleges that Sciortino "was told, informed and convinced by Oren, Borrill and Bagley not to respond to [Plaintiff's] FOIL requests that related directly to" the 2016 Action, (*id.* ¶ 29), and that Sciortino "agreed" not to provide the requested records, (*id.* ¶¶ 51–52). Plaintiff alleges that Sciortino is withholding the requested records "solely because she did not want [Plaintiff] [to] use these photographs in the federal litigation and to succeed in His Federal lawsuit." (*Id.* ¶ 56; *see id.* ¶ 57 (alleging that Sciortino is withholding the records "to assist Oren and Bagley in defending their clients[,] all of [whom] are City of Utica employees and friends of [D]efendants")). Plaintiff alleges that, if Sciortino had produced the photographs requested in his March 2020 FOIL request, his claims in the 2016 Action "would not have been dismissed at summary judgment or after trial." (*Id.* ¶¶ 60–64).

Plaintiff alleges that "John Roe submitted a FOIL request in 2019 and 2020 requesting photographs from the UPS RMS system" and his request was "complied with in accordance [with] FOIL requirements." (*Id.* ¶ 65). Similarly, "Jane Roe submitted a FOIL request in 2019 and 2020 requesting ... photographs from the UPS RMS system" and this request was "complied with." (*Id.* ¶ 66). A woman named Latisha Bradford requested "records pursuant to FOIL in 2020" and this request was also "complied with." (*Id.* ¶ 67). Plaintiff

alleges that he "is the only African/black person who has submitted a FOIL request and was denied because of His race/ethnicity and that he had a Federal Lawsuit against City of Utica employees (police officers) and friends of the [D]efendants." (*Id.* ¶ 68; *see id.* ¶¶ 78–79 (alleging he was "treated differently" than "all other white, non-immigrant persons filing FOIL requests" and than "all other white, non-immigrant persons filing FOIL requests who were not suing City of Utica employees or friends of defendants")).[5] Plaintiff has not filed any new FOIL requests with the City of Utica because he "fears and knows that they will not be complied with." (*Id.* ¶ 82).

5    Plaintiff also refers to his immigration status, without providing additional details.

In his opposition to the motions to dismiss, Plaintiff alleges an additional comparator: George Kuchma, "a white male," who sued the City of Utica and one of its officers for excessive force. (Dkt. No. 61, at 20). Plaintiff asserts that Mr. Kuchma filed a FOIL request for police photographs of his injuries, and that the City "complied with FOIL and provided Mr. Kuchma the photographs he requested despite the ongoing lawsuit he had at the time." (*Id.*).[6]

6    Plaintiff also attached to his opposition copies of seven FOIL requests filed with the City of Utica by other individuals. (Dkt. No. 61-1). Defendants argue that the Court should not consider these newly submitted documents. (Dkt. No. 67, at 6–7; Dkt. No. 68, at 8). Even if the Court were to consider these materials, which were not submitted with the amended complaint, these documents contain no indication of the requesters' protected characteristics, if any, or the disposition of the requests.

### III. STANDARD OF REVIEW

**\*\*4**  To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a **\*107** complaint must provide 'enough facts to state a claim to relief that is plausible on its face.' " *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the

plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

**[2]**  **[3]**  Although a court "is ordinarily obligated to afford a special solicitude to *pro se* litigants," the "appropriate degree of special solicitude is not identical with regard to all *pro se* litigants." *Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010). The "degree of solicitude may be lessened," for example, where a particular pro se litigant is "experienced in litigation and familiar with the procedural setting presented." *Id.* A court may exercise its discretion, "based on the totality of the relevant circumstances," to determine "what degree of solicitude, if any, should be afforded." *Id.* at 102–03. Here, Plaintiff has litigated issues arising out of his 2009 arrest extensively and thoroughly in fully briefed memoranda, which are comparable to submissions from skilled counsel, in the 2016 Action, in FOIL litigation in this Court, in the Second Circuit appeal of the 2016 Action, in a motion for relief from judgment in the 2016 Action, and in the present action. While this weighs in favor of granting Plaintiff less solicitude than an ordinary pro se litigant, in an abundance of caution the Court has afforded Plaintiff solicitude by considering the assertions in his opposition and by giving him a limited opportunity to amend the complaint. However, given Plaintiff's adeptness in litigation, the Court expects him to comply with the Federal Rules of Civil Procedure and this Court's Local Rules in all submissions in this action.

### IV. DISCUSSION

Plaintiff's amended complaint contains three causes of action: (1) violation of Plaintiff's Fourteenth Amendment Equal Protection rights, (2) a claim for First Amendment denial of access to courts and retaliation, and (3) fraud on the court. (Dkt. No. 32, at 13–16).[7] In his opposition, Plaintiff stipulates to the dismissal of Defendant Selimovic and of his fraud on the court claim. (Dkt. No. 61, at 7). Plaintiff's opposition also references a claim for conspiracy under 42 U.S.C. §§ 1983, 1985, (*id.* at 20–22), which the Court considers below. The City Defendants and Bagley each move to dismiss the amended complaint in its entirety. (*See generally* Dkt. Nos. 50-1, 56-1).

7

The amended complaint also refers to "Section
Twelve, Article One of the New York State
Constitution," (Dkt. No. 32, at 1), which protects
"[s]ecurity against unreasonable searches, seizures
and interceptions," N.Y. Const., art. I, § 12. As
Plaintiff's factual allegations do not appear to
implicate this provision, the Court does not address
it further.

### A. City Defendants' Motion to Dismiss

#### 1. Absolute Immunity

The City Defendants first argue that all of Plaintiff's claims
against them are barred by the doctrine of absolute immunity
**\*108** because the actions underlying Plaintiff's claims were
"advocacy functions." (Dkt. No. 56-1, at 7–11). Plaintiff
responds that the City Defendants are not entitled to absolute
immunity because they were acting "in an administrative
role," not as advocates. (Dkt. No. 61, at 22–25).

**\*\*5** **[4]** **[5]** **[6]** Absolute immunity from suit "gives
`public officials entrusted with sensitive tasks a protected area
of discretion within which to carry out their responsibilities.'
" *Mangiafico v. Blumenthal*, 471 F.3d 391, 394 (2d Cir.
2006) (quoting *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir.
1987)). A defendant bears the burden of showing that absolute
immunity "is warranted for the function in question" which
gives rise to the plaintiff's claim. *Id.* "Immunity may be
asserted as a defense in a 12(b)(6) motion where 'the facts
supporting the defense appear on the face of the complaint.' "
*Buari v. City of New York*, 530 F. Supp. 3d 356, 378 (S.D.N.Y.
2021) (quoting *McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir.
2004)) (brackets omitted). The court must draw all reasonable
inferences in favor of the plaintiff, including those "that defeat
the immunity defense." *Id.* (quoting *McKenna*, 386 F.3d at
436).

**[7]** **[8]** **[9]** **[10]** **[11]** Absolute immunity protects
government officials from suit arising out of acts associated
with their "function as an advocate." *Id.* In determining
whether an official is entitled to absolute immunity, courts
employ a "functional" approach, "looking at 'the nature
of the function performed, not the identity of the actor
who performed it.' " *Mangiafico*, 471 F.3d at 394 (citation
omitted). Absolute immunity extends to "government
attorneys defending civil suits" and "government attorneys
who initiate civil suits." *Spear v. Town of West Hartford*,
954 F.2d 63, 66 (2d Cir. 1992) (citations omitted). The

principle applies to "functions of a government attorney 'that
can fairly be characterized as closely associated with the
conduct of litigation or potential litigation' in civil suits—
including the defense of such actions." *Mangiafico*, 471 F.3d
at 396 (quoting *Barrett v. United States*, 798 F.2d 565, 572
(2d Cir. 1986)). "[O]nce a court determines that challenged
conduct involves a function covered by absolute immunity,
the actor is shielded from liability for damages regardless
of the wrongfulness of his motive or the degree of injury
caused." *Bernard v. County of Suffolk*, 356 F.3d 495, 503 (2d
Cir. 2004) (citing *Cleavinger v. Saxner*, 474 U.S. 193, 199–
200, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985)).

#### a. Defendants Martino and Brown

The City Defendants argue that Sergeant Martino and Brown,
First Assistant Corporation Counsel, are entitled to absolute
immunity with regard to claims arising out of the allegations
that they modified metadata when producing two CDs of
the 22 photographs in response to a court order. (Dkt. No.
56-1, at 10–11). Specifically, the City Defendants argue
that such actions "would be associated with advocacy in
the FOIL Article 78 proceeding and not part of any kind
of investigation." (*Id.*). Plaintiff does not address absolute
immunity as it relates to Martino and Brown.

[12] Accepting the amended complaint's factual allegations
as true, the Court concludes that Martino and Brown have not
demonstrated their entitlement to absolute immunity at this
juncture. Plaintiff alleges that Brown "instructed Martino"
to alter the metadata associated with the photographs and
produced two CDs containing the photographs after being
"ordered by a NYS Court." (Dkt. No. 32, ¶¶ 11–12). While
Plaintiff's amended complaint and opposition reference an
Article 78 proceeding relating to that FOIL request and a
"criminal matter," (*id.* ¶ 13; Dkt. No. 61, at 10), the facts
as alleged do **\*109** not indicate that Brown or Martino had
any involvement in that Article 78 proceeding or criminal
matter, much less that they were performing functions as
advocates for the City of Utica. Drawing all reasonable
inferences in Plaintiff's favor, the amended complaint simply
indicates that Brown and Martino produced the photographs
at issue in response to a state-court order. While the City
Defendants argue that Brown's and Martino's actions were
"not part of any kind of investigation," (Dkt. No. 56-1, at
10), that does not necessarily mean the actions were taken
in an advocative capacity. *See Mangiafico*, 471 F.3d at 396
(distinguishing between advocative functions—for which a

government attorney may be entitled to absolute immunity—and "administrative or investigative" functions—for which a government attorney is entitled only to qualified immunity).

**\*\*6** Thus, the Court denies Brown and Martino's request for absolute immunity at this stage.

### b. Defendants Borrill, Oren, and Sciortino

The City Defendants argue that Borrill, Corporation Counsel, and Oren, First Assistant Corporation Counsel, are entitled to absolute immunity because "the processing of [Plaintiff's] FOIL request, its subsequent Article 78 litigation[,] and the defense of the [2016 Action]" are "all actions concerning advocacy." (Dkt. No. 56-1, at 9–10). They further argue that Sciortino, the Records Access Officer, is entitled to absolute immunity because she simply "processed the FOIL request, as directed by Defendant Borrill." (*Id.* at 10). Plaintiff responds that the conduct he challenges relates to Borrill's and Oren's roles in the "administrative process of FOIL, not during any advocative function," and that Borrill and Oren "had no authority to become involved in the FOIL administrative process." (Dkt. No. 61, at 22–25).

**[13]** As an initial matter, to the extent Plaintiff intends to assert a claim for conspiracy based on Oren's entering into a "Joint Defense Agreement" with the City of Utica and Bagley, such a claim against Oren would be barred by absolute immunity. Such conduct, which Plaintiff alleges required Bagley to "make sure Dougherty did not testify truthfully" in the 2016 Action, (Dkt. No. 32, ¶¶ 34–37), is clearly related to Oren's defense of the 2016 Action and his role as advocate. *Cf. Gugliara v. N.Y. City Human Res. Ctr.*, No. 08-cv-909, 2008 WL 11471011, at \*2, 2008 U.S. Dist. LEXIS 134111, at \*5 (E.D.N.Y. Mar. 28, 2008) (holding that absolute immunity barred suit for damages against government employees who allegedly "act[ed] improperly during the defense of their clients during a civil suit that Plaintiff initiated"); *Buari*, 530 F. Supp. 3d at 378–79 (noting that absolute immunity has been extended to the falsification of evidence, the knowing use of perjured testimony, and the "deliberate withholding of exculpatory information" (citations omitted)).

With regard to Plaintiff's claims arising out of the failure to respond to his March 2020 FOIL request, Plaintiff alleges that Borrill, Corporation Counsel for the City of Utica, responded to the FOIL request by stating: "The City of Utica will not be complicit in your scheme to subvert lawful Orders of a

United States District Court. Accordingly, the City of Utica will not be able to respond to your purported FOIL request absent judicial intervention." (Dkt. No. 61, at 9; Dkt. No. 32, ¶ 24).[8]

> [8]
>
> At the time of Plaintiff's March 2020 FOIL request, the discovery deadline in the 2016 Action had terminated. *See Jeanty*, No. 16-cv-966, Dkt. No. 247 (Text Order directing that discovery be completed by October 29, 2019). First Assistant Corporation Counsel for the City of Utica Oren argued in the 2016 Action that Plaintiff was not entitled to obtain by FOIL discovery that he had been denied by this Court in civil discovery. *Id.*, Dkt. No. 253, at 2.

**\*110** **[14]** Plaintiff further alleges that Borrill, Oren, and Bagley told Sciortino not to respond to Plaintiff's FOIL request for photographs. (Dkt. No. 32, ¶¶ 29, 48). Plaintiff acknowledges in his opposition that he filed an Article 78 petition on May 21, 2020 to challenge the response to his March 2020 FOIL request. (Dkt. No. 61, at 9).[9] Taking all of these allegations as true, the Court concludes that Borrill and Oren are entitled to absolute immunity for any claims arising out of the conduct alleged. It is clear that Borrill and Oren took the alleged actions in their role as advocates for the City and City defendants in the 2016 Action, as Borrill's response expressly references orders of this Court. Although Plaintiff argues that "there was no ongoing legal/court proceeding relating to or regarding the 3/11/2020 FOIL request" between "10/30/2019 and 5/21/2020," (*id.*), this ignores the fact that both the 2016 Action and an Article 78 proceeding relating to the October 2019 FOIL request were pending. Because Borrill and Oren's complained-of actions were taken in an advocative capacity relating to the pending litigation, they are entitled to absolute immunity from suit for claims arising from those actions, and whether or not the litigation specifically concerned or arose out of the March 2020 FOIL request is not determinative. *See Mangiafico*, 471 F.3d at 396 (noting that absolute immunity applies to functions "that can fairly be characterized as closely associated with the conduct of litigation or potential litigation"). As Plaintiff's amended complaint makes clear, the photographs requested in his March 2020 FOIL are plainly related to the 2016 Action.

> [9]
>
> The Utica Respondents in the Article 78 Proceeding removed that action to this Court asserting that Plaintiff sought to obtain records in FOIL that this Court found were not subject to

discovery in the 2016 Action. *See generally Jeanty v. Utica Police Dep't*, Nos. 20-cv-221, 20-cv-756, 2021 WL 1055153, 2021 U.S. Dist. LEXIS 51977 (N.D.N.Y. Mar. 19, 2021).

**\*\*7** Plaintiff's argument that Borrill and Oren are not entitled to absolute immunity because they "had no authority to become involved in the FOIL administrative process" and therefore acted in no "legal role," (Dkt. No. 61, at 24), is not compelling. As the City Defendants respond, it is "squarely" within the authority of Corporation Counsel to draft legal correspondence and advise Sciortino regarding a FOIL request, given the "current litigat[ion] against the City by Plaintiff and the threat of more litigation against the City by Plaintiff." (Dkt. No. 67, at 8–9).

**[15]  [16]** Finally, the Court concludes that, because Borrill and Oren are entitled to absolute immunity, Sciortino is as well. Absolute immunity "extends to persons assisting and working under the direction of" government attorneys entitled to absolute immunity, "when they perform functions closely tied to the judicial process." *Buari*, 530 F. Supp. 3d at 382 (citation omitted); *see also Bernard*, 356 F.3d at 502 (noting that absolute immunity extends to prosecutors "and persons working under their direction"). Plaintiff alleges that Borrill and Oren "informed" and "convinced" Sciortino not to respond to his March 2020 FOIL request. Thus, because Sciortino acted at the direction of government attorneys performing functions closely tied to the judicial process who are entitled to absolute immunity, Plaintiff's claims against Sciortino are barred as well.

### \*111  2. Claims Against Brown and Martino

The City Defendants argue that all claims against Brown and Martino should be dismissed as untimely because the only actions Plaintiff alleges these two Defendants took occurred in 2009. (Dkt. No. 56-1, at 24–25).[10] Plaintiff argues in response that Defendants' fraudulent conduct equitably tolled the statute of limitations. (Dkt. No. 61, at 18–19). The City Defendants reply that Plaintiff cannot demonstrate that he is entitled to equitable tolling of the statute of limitations because he has not been diligent in pursuing his rights and because no extraordinary circumstances prevented him from filing suit. (Dkt. No. 67, at 5–6).

[10]   While the amended complaint's allegations regarding Brown and Martino are in connection

with a 2009 FOIL request, (*see* Dkt. No. 32, ¶ 10), Plaintiff's opposition states that Brown provided the records at issue "in early 2012," (Dkt. No. 61, at 10).

**[17]  [18]  [19]** Generally, a litigant seeking equitable tolling of a limitations period "bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 144 (2d Cir. 2011) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005)). Equitable tolling is appropriate in "rare and exceptional circumstance[s]," and a district court's decision to deny equitable tolling is reviewed for abuse of discretion. *Zerilli-Edelglass v. N.Y. City Transit Auth.*, 333 F.3d 74, 80–81 (2d Cir. 2003) (citations omitted). A court may "evaluate whether a statute of limitations may be equitably tolled" on a motion to dismiss "where the factual basis for equitable tolling is apparent from the face of the complaint and other documents properly considered on a motion to dismiss." *In re Bibox Grp. Holdings Ltd. Secs. Litig.*, 534 F. Supp. 3d 326, 338 (S.D.N.Y. 2021) (citations omitted).

**[20]** Here, the Court concludes that Plaintiff has not demonstrated that he is entitled to equitable tolling of the statute of limitations applicable to his claims against Brown and Martino, because he has not shown either that he had been pursuing his rights diligently or that any extraordinary circumstance stood in his way of filing a lawsuit against them. Plaintiff argues generally that the allegedly fraudulent conduct of Bagley, Oren, and Selimovic "conceal[ed]" Brown and Martino's conduct from him. (Dkt. No. 61, at 18). However, Plaintiff also states that the earliest he became aware that Brown and Martino had provided him with "modified metadata and changed filenames" was "approximately 2018 when Defendants Oren and Bagley provided [Plaintiff] with 2 more CD's with the 22 photographs and modified Metadata and changed filenames." (*Id.* at 10).[11] Plaintiff states that he "made multiple attempts at exposing the fraudulent conduct" of Brown and Martino, (*id.* at 18), but does not explain what prevented him from filing a lawsuit against Brown and Martino between 2018 and April 5, 2022, the date this action was filed.

[11]   The Court notes that, in a sworn affidavit submitted in support of a Rule 60 motion for relief from the judgment in the 2016 Action, Plaintiff asserted that he has "continuously requested ... copies of

all the photographs and Metadata" at issue "[f]or years dating back to 2010" and that in 2013 he examined the CDs provided in response to his initial FOIL request "to try to determine how the files were 'modified.' " *Jeanty*, No. 16-cv-966, Dkt. No. 484-4, ¶¶ 2, 10.

**\*\*8** Thus, Plaintiff has not advanced any allegations that suggest this is an exceptional circumstance where the statute of limitations should be equitably tolled, and **\*112** all of his claims against Brown and Martino are dismissed as barred by the three-year statute of limitations. *See Lucente v. County of Suffolk*, 980 F.3d 284, 308 (2d Cir. 2020) ("The statute of limitations for § 1983 actions arising in New York is three years."); *Paige v. Police Dep't of City of Schenectady*, 264 F.3d 197, 199 n.2 (2d Cir. 2001) (statute of limitations for Section 1985 claims is three years).

### 3. Claims Against City of Utica and Official Capacity Claims

The City Defendants move to dismiss the City of Utica as a Defendant because the amended complaint does not plead any causes of action against the City or "state any viable *Monell* theories of liability." (Dkt. No. 56-1, at 24). Plaintiff responds that the City of Utica may be named as a Defendant because the named individual Defendants "can be sued in their official capacities." (Dkt. No. 61, at 26–27).

 **[21]**  **[22]**  A Section 1983 claim against a municipality, such as the City of Utica, or against an official sued in his or her capacity "cannot be sustained unless the plaintiff shows that the violation of h[is] federal rights was the result of a municipal custom or policy." *Lore v. City of Syracuse*, 670 F.3d 127, 168 (2d Cir. 2012) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Here, Plaintiff has not alleged any facts suggesting that any alleged violation of his constitutional rights was the result of a municipal custom or policy. Thus, Plaintiff's official capacity claims and claims against the City of Utica must be dismissed. Having dismissed all claims against the City Defendants, the Court does not reach their remaining arguments for dismissal.

### B. Bagley's Motion to Dismiss

#### 1. Color of State Law

Bagley first argues that he cannot be liable under Section 1983 because he is not a state actor, but rather a private attorney who was retained by the City of Utica to represent Sean Dougherty in the 2016 Action. (Dkt. No. 50-1, at 11–14). [12] Plaintiff responds that Bagley was acting under color of state law because he, along with Borrill and Oren, "direct[ed]" Sciortino "to retaliate against Plaintiff by not providing records responsive to" his FOIL requests. (Dkt. No. 61, at 19–20).

[12]    Bagley also argues that he has no official capacity in which to be sued. (Dkt. No. 50-1, at 12; *see* Dkt. No. 32, ¶ 7 (purporting to sue Bagley "in his individual and official capacities")). The Court agrees. Bagley, as a private attorney, has no official capacity, and any official capacities claims asserted against him are therefore dismissed.

 **[23]**  **[24]**  **[25]**  **[26]**  It is well-settled that a plaintiff alleging a violation of his constitutional rights under Section 1983 must show that the defendant acted under color of state law. *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012); *see also* 42 U.S.C. § 1983 (imposing liability on persons who act "under color of any [state] statute, ordinance, regulation, custom, or usage"). While private parties generally are not state actors, their conduct can be attributed to the state for Section 1983 purposes if "(1) the State compelled the conduct [the "compulsion test"], (2) there is a sufficiently close nexus between the State and the private conduct [the "joint action test" or "close nexus test"], or (3) the private conduct consisted of activity that has traditionally been the exclusive prerogative of the state [the "public function test"]." *Hogan v. A.O. Fox Mem'l Hosp.*, 346 F. App'x 627, 629 (2d Cir. 2009) (summary order) (citing **\*113** *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)). [13] The "fundamental question" for each test is whether the private party's conduct is "fairly attributable" to the state such that it bears responsibility. *Fabrikant*, 691 F.3d at 207.

[13]    A close nexus may also be found where the private actor conspired with a state official to violate the plaintiff's constitutional rights. *See Harrison v. New York*, 95 F. Supp. 3d 293, 322 (E.D.N.Y. 2015). While the "concepts of acting 'jointly' or 'in conspiracy with' state actors are intertwined," *id.* (citation omitted), as discussed below, *infra*

Section IV.B.4, Plaintiff's claims of conspiracy are too conclusory.

**\*9** As Plaintiff appears to concede, the mere fact that Bagley was retained by the City of Utica to represent a police officer defendant in the 2016 Action does not convert him into a state actor who may be held liable under Section 1983. (Dkt. No. 61, at 19 ("Bagley cannot be sued for His representation of PO Sean Dougherty."); *cf. Shaw v. Rondout Valley Centr. Sch. Dist.*, No. 15-cv-215, 2015 WL 8492487, at \*7, 2015 U.S. Dist. LEXIS 165415, at \*20–21 (N.D.N.Y. Dec. 10, 2015) ("Defendant Lambert's position as an attorney in private practice who was retained by the School District does not make him a state actor for purposes of section 1983." (collecting cases)) Thus, for Bagley's conduct to be state action, it would have to satisfy one of the three tests making his actions "fairly attributable" to the state.

[27] [28] "When analyzing allegations of state action, the Court must begin 'by identifying the specific conduct of which the plaintiff complains.' " *Anilao v. Spota*, 774 F. Supp. 2d 457, 499 (E.D.N.Y. 2011) (quoting *Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003)). Here, the alleged conduct of Bagley underlying Plaintiff's Fourteenth and First Amendment claims is that Oren, Borrill, and Bagley "told, informed and convinced" Sciortino not to respond to Plaintiff's March 2020 FOIL request. (*E.g.*, Dkt. No. 32, ¶ 29; *see also id.* ¶¶ 47–50 (alleging that "Oren, Borrill and Bagley informed Sciortino of the substance of [the 2016 Action]," that "she was not to respond" to his request, and "not to provide the photographs")). Plaintiff further alleges that these three Defendants "resorted" to this conduct after Defendant Oren "failed to obtain a protective order" from this Court relieving City of Utica officials from their duty to respond to Plaintiff's FOIL requests. (*Id.* ¶¶ 71–72). According to the amended complaint, Sciortino "is withholding the records to assist Oren and Bagley in defending their [City of Utica] clients," and "[w]ere it not for Oren, Bagley and Borrill, Sciortin[o] would have provided the requested photographs." (*Id.* ¶¶ 57–58).

[29] [30] [31] [32] Taking these allegations as true, together with the allegations about the Joint Defense Agreement, and drawing all reasonable inferences in Plaintiff's favor, at this stage of the proceedings the Court cannot find as a matter of law that Bagley was not engaged in joint action with state actors. To act under color of state law, "it is enough that the private party is a willful participant in joint action with the State or its agents." *Forbes v. City of New York*, No. 05-cv-7331, 2008 WL 3539936, at \*5, 2008

U.S. Dist. LEXIS 63021, at \*12 (S.D.N.Y. Aug. 12, 2008) (quoting *Dennis v. Sparks*, 449 U.S. 24, 27, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980)) (brackets omitted). The "touchstone of joint action is often a 'plan, prearrangement, conspiracy, custom, or policy' " shared by the private actor and the State. *Id.*, 2008 WL 3539936, at \*5, 2008 U.S. Dist. LEXIS 63021, at \*13. While a private actor does not act under color of state law merely by communicating or cooperating with a state actor, he does act under color of state law by taking a "more active role." *Anilao*, 774 F. Supp. 2d at 498–99, 501–02. **\*114** Here, the amended complaint alleges that, in addition to willingly participating in joint action with Oren and Borrill, Bagley exerted influence over Sciortino, another state actor, and thus was acting under color of state law. *Cf. id.* at 502 (finding that the plaintiffs plausibly alleged that private parties acted under color of state law where they were "actively involved in the investigation and prosecution" of the plaintiffs and the public defendants "did not exercise independent judgment"); *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 941–42, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (holding that private party who sought prejudgment attachment of a debtor's property and thereby "invoke[ed] the aid of state officials to take advantage of state-created attachment procedures" acted under color of state law).[14]

[14]    Further, "[p]rivate persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 claims, even if the state actor himself is immune from liability." *Anilao*, 774 F. Supp. 2d at 503 n.34 (internal quotation marks, citation, and brackets omitted); *see Dennis*, 449 U.S. at 27–29, 101 S.Ct. 183 ("Under these allegations, the private parties conspiring with the judge were acting under color of state law; and it is of no consequence in this respect that the judge himself is immune from damages liability."). Thus, the fact that the City Defendants are immune for this same conduct does not alter the Court's conclusion.

**\*10** Thus, the Court denies Bagley's motion to dismiss for failure to plausibly allege that he acted under color of state law.

### 2. Fourteenth Amendment Equal Protection Claim

Bagley moves to dismiss Plaintiff's Fourteenth Amendment Equal Protection claim, arguing that Plaintiff has not stated

a class-of-one or class-based claim. (Dkt. No. 50-1, at 17–18). [15] In response, Plaintiff provides information regarding comparator George Kuchma, (Dkt. No. 61, at 20), but does not otherwise address his Equal Protection claim.

15    As an initial matter, Bagley argues that an alleged violation of FOIL "does not give rise to a federal claim under Section 1983." (Dkt. No. 50-1, at 15–16). The Court does not read the amended complaint as asserting claims for violations of FOIL per se. Rather, Plaintiff asserts standalone claims to vindicate his Fourteenth and First Amendment rights.

[33]  [34]  [35]  [36] While not entirely clear, it appears reading the amended complaint liberally, that Plaintiff intends to assert a Fourteenth Amendment Equal Protection claim based on a theory of selective treatment. *See generally LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980). [16] To state a claim for an Equal Protection violation based on selective enforcement under *LeClair*, a plaintiff must allege that: "(1) the **\*115** person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Hu*, 927 F.3d at 91 (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)). Thus, under this test, a plaintiff must show both "disparate treatment and impermissible motivation." *Id.* (quoting *Bizzarro v. Miranda*, 394 F.3d 82, 87 (2d Cir. 2005)).

16    Plaintiff's allegations do not appear to support a class-based Equal Protection claim, as he does not allege that Defendants treat classes of people differently but rather that he was "singled out" for treatment. (Dkt. No. 32, at 13). Further, Plaintiff's allegations do not support a "class of one" Equal Protection claim, in which a plaintiff alleges that he was "intentionally treated differently from others similarly situated and that there [was] no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). An *Olech* class of one claim requires "extremely high" similarity between the plaintiff and a comparator, and the plaintiff must ultimately prove that "(i) no rational person could regard the circumstances of

the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Hu v. City of New York*, 927 F.3d 81, 94 (2d Cir. 2019) (citation omitted); *see id.* at 91–96 (distinguishing between *LeClair* and *Olech* claims). Plaintiff has not plausibly alleged "extremely high" similarity between him and any of the alleged comparators.

**\*\*11**  [37]  [38] To prevail on a *LeClair* selective treatment claim, "the plaintiff's and comparator's circumstances must bear a reasonably close resemblance" but need not be "identical." *Id.* at 96 (citations omitted). In other words, a plaintiff must show that he "was similarly situated in all material respects to the individuals with whom [ ]he seeks to compare [him]self." *Id.* (citation omitted). Here, the Court agrees with Bagley, (Dkt. No. 50-1, at 17–18), that the amended complaint itself does not allege any comparator with circumstances bearing a "reasonably close resemblance" to Plaintiff's: the allegations regarding John Roe, Jane Roe, and Latisha Bradford make no mention of their protected characteristics, if any, which Plaintiff alleges were relevant to Defendants' treatment of him, including race, ethnicity, and litigation status, (*see* Dkt. No. 32, ¶¶ 65–67). Furthermore, Plaintiff's allegation that he was "the only African/black person who has submitted a FOIL request and was denied because of His race/ethnicity and that he had a Federal Lawsuit against City of Utica employees (police officers) and friends of the defendants" is conclusory and does not plausibly allege the existence of any comparator. (*Id.* ¶ 68).

[39] Nor does the information Plaintiff provided about George Kuchma in his opposition plausibly allege the existence of a comparator with "reasonably close" circumstances in material respects. Plaintiff asserts that Kuchma (1) is white, (2) sued the City of Utica and a City police officer, (3) filed a FOIL request for UPD photographs while his lawsuit was pending, and (4) received the photographs requested in his FOIL request. (Dkt. No. 61, at 20). However, there are other significant salient facts which distinguish Plaintiff's circumstances from those of Kuchma: (1) Plaintiff was provided the photographs at issue in response to his 2009 or 2010 FOIL request, first in black and white and then on CDs; (2) Plaintiff filed the FOIL requests at issue in this case after the close of discovery in the 2016 Action; (3) the March 2020 FOIL request for the

photographs was repetitive; and (4) Defendants objected to FOIL requests beyond what was discoverable in the 2016 Action, by seeking a protective order and then removing the Article 78 proceedings to this Court and arguing that there was supplemental jurisdiction. Given this years-long history of FOIL requests and litigation between the parties, Plaintiff has not plausibly alleged that his and Kuchma's circumstances bear a reasonably close resemblance in material respects. *Cf. Marom v. Town of Greenburgh*, No. 18-cv-7637, 2020 WL 978514, at *8, 2020 U.S. Dist. LEXIS 34724, at *19–23 (S.D.N.Y. Feb. 28, 2020) (finding that the plaintiff had not plausibly alleged a comparator with reasonably close circumstances where the plaintiff's "additional [building] violations further distinguish[ed]" him from two alleged developer comparators).

Accordingly, the Court grants Bagley's motion to dismiss Plaintiff's Fourteenth Amendment Equal Protection claim.

### *116 3. First Amendment Denial of Access to the Courts Claim [17]

17      Plaintiff's second cause of action is labeled as a claim for "1st Amendment Denial of Access to Court, Retaliation." (Dkt. No. 32, at 14). Bagley's motion to dismiss does not address Plaintiff's First Amendment retaliation claim.

Bagley moves to dismiss Plaintiff's claim for denial of access to the courts on the ground that Plaintiff's allegations are "conclusory and formulaic" and that the dismissal of claims in the 2016 Action at summary judgment "had nothing to do" with Plaintiff's not having all of the requested photographs. (Dkt. No. 50-1, at 18–20). Plaintiff responds that he has plausibly alleged a right-of-access claim based on the allegations that Plaintiff was not provided with the photographs' unmodified metadata, which was "evidence [he] needed" in the 2016 Action or that, "[a]t worst," his claim has not yet accrued. (Dkt. No. 61, at 16–18).

 [40]    [41]    [42]    [43] The First Amendment right to petition the government, which applies to the states through the Fourteenth Amendment, "extends to all departments of the Government, including the Courts." *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 90 (2d Cir. 2017) (citation omitted). "A plaintiff's constitutional right of access to the courts is violated where government officials obstruct legitimate efforts to seek judicial redress." *Id.* (citation and internal

quotation marks omitted). Circuit Courts of Appeals have "recognized two variants of right-of-access claims": (1) "forward-looking suits," in which plaintiffs allege that " 'systemic official action' frustrated their ability to file a suit," and (2) "backward-looking" claims "covering suits that 'cannot now be tried (or tried with all material evidence), no matter what official action may be in the future.' " *Sousa v. Marquez*, 702 F.3d 124, 127–28 (2d Cir. 2012) (citation omitted). A plaintiff may have a backward-looking right-of-access claim, for example, where the official action "caused the loss or inadequate settlement of a meritorious case." *Id.* at 128.

 **12    [44] Here, although Plaintiff argues that he has plausibly alleged a right-of-access claim under either theory, the amended complaint contains no factual allegations that would support a forward-looking claim. Plaintiff makes no allegations of "systemic official action" which has frustrated his ability to file a lawsuit, and he has in fact filed many.

 [45]    [46] Moreover, the Second Circuit has not recognized the viability of backward-looking right-of-access claims. *See id.* (noting that the "viability of backward-looking right-of-access claims is far from clear in this Circuit" and declining to decide the issue); *Kern v. Contento*, No. 21-cv-1672, 2022 WL 1112767, at *3, 2022 U.S. App. LEXIS 10073, at *7 (2d Cir. Apr. 14, 2022) (summary order) (noting that *Sousa* "declined to decide whether to follow other circuits in recognizing a backward-looking claim"). However, the Second Circuit has noted that such claims, "if recognized," would be available only if the official action "caused the plaintiff's suit to be dismissed as untimely" or "was so severe as to render hollow his right to seek redress." *Sousa*, 702 F.3d at 128 (internal quotation marks, brackets, and citations omitted). Therefore, a plaintiff cannot maintain a backward-looking access claim alleging that government defendants "concealed or manipulated relevant facts" if the plaintiff was aware of the facts giving rise to his claim at the time of the earlier lawsuit. *Id.* (explaining that a plaintiff who has such knowledge of the facts giving rise to his access claim "*does* have adequate access to a judicial remedy"). Here, even accepting as true Plaintiff's allegations that the failure *117 to respond to his March 2020 FOIL request deprived him of evidence which would have helped him in the 2016 Action, he has not alleged any facts of which he was unaware at the relevant times of the 2016 Action. Indeed, Plaintiff states in his opposition that he was aware of the alleged modifications to the metadata as early as 2018. The Court further takes judicial notice of documents and filings in the 2016 Action

indicating that the issue of the allegedly modified metadata associated with the 22 photographs was raised multiple times, including before the close of discovery. *See, e.g., Jeanty*, No. 16-cv-966, Dkt. Nos. 279 (ordering Defendants to "produce another CD with all of the color photographs and accompanying metadata ... along with a sworn statement from Sgt. Selimovic" that, among other things, "the photographs on the CD are all of the photographs related to [the incident], [and] that the metadata is complete"), 300-7 (sworn Selimovic affidavit). Thus, even assuming the viability of a backward-looking right-of-access claim, Plaintiff's claim "would fall outside the scope of that purported right." *Cf. Kern*, 2022 WL 1112767, at *3, 2022 U.S. App. LEXIS 10073, at *7.

Accordingly, the Court grants Bagley's motion to dismiss Plaintiff's claim for denial of access to the courts.

### 4. Conspiracy

The amended complaint, while not expressly asserting a claim for conspiracy, alleges that the named Defendants "conspired and agreed that Sciortino would not follow and/or apply the requirements of [Public Officers Law] Sections 84–90 to Plaintiff because Plaintiff was suing City of Utica employees and friends of defendants" and "because Plaintiff is black and an immigrant." (Dkt. No. 32, ¶¶ 56–57). Bagley moves to dismiss any conspiracy claims, arguing that Plaintiff's allegations of conspiracy are too conclusory. (Dkt. No. 50-1, at 20–21). Plaintiff generally responds that he has adequately pleaded a conspiracy claim pursuant to both Section 1983 and Section 1985. (Dkt. No. 61, at 20–22).

**\*\*13** **[47]** **[48]** **[49]** "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). To state a conspiracy claim under 42 U.S.C. § 1985(3), a plaintiff must allege: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007). A plaintiff must also show that that the conspiracy was

"motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus." *Id.*

**[50]** **[51]** **[52]** Mere conclusory or general allegations of a conspiracy, however, are insufficient to state a claim of conspiracy. *Walker v. Jastremski*, 430 F.3d 560, 564 n.5 (2d Cir. 2005); *see Ciambriello v. County of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) ("[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." (citation omitted)). To state a viable conspiracy claim, a plaintiff **\*118** "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2013) (internal quotation marks and citations omitted). Here, the Court agrees with Bagley that Plaintiff's conclusory allegations that the named Defendants "conspired" to have Sciortino not respond to his FOIL request are insufficient to state a conspiracy claim. [18]

18    The Court further notes that while "a plaintiff may assert a civil conspiracy claim under § 1983 for the deprivation of a constitutional right, he must first show a violation of the underling constitutional right." *DeMartino v. New York State Dep't of Labor*, 167 F. Supp.3d 342, 373 (E.D.N.Y. 2016).

Accordingly, the Court grants Bagley's motion to dismiss any conspiracy claim asserted under Section 1983 or 1985.

## V. LEAVE TO AMEND

Plaintiff requests an opportunity to amend the amended complaint but offers no details about what amendments he seeks to make. (Dkt. No. 61, at 29). Defendants argue that Plaintiff should not be given leave to amend. (Dkt. No. 67, at 10–11; Dkt. No. 68, at 9).

**[53]** Ordinarily, a court "should not dismiss" a pro se complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795–96 (2d Cir. 1999) (quoting *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991)); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). However, a court can deny a request to amend as futile where the problem with the claim is

"substantive" and "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted). Here, any amendment of the claims against Sciortino, Borrill, and Oren which are barred by absolute immunity would be futile, and Plaintiff is not granted leave to amend those claims. Given the fact that Plaintiff has already amended once, and has not identified any additional facts or basis for amendment, the Court is skeptical as to whether there is any viable basis to amend. [19] However, in recognition of Plaintiff's status as a pro se litigant and because it may be possible for Plaintiff to assert additional cognizable claims with better pleading, Plaintiff is otherwise granted leave to seek to amend.

[19]  The Court notes that Plaintiff already took advantage of the opportunity to amend his original complaint as a matter of course in response to Defendants' original motions to dismiss. Although Defendants' original motions to dismiss raised mostly the same arguments Defendants make in the motions to dismiss presently under consideration, (*see* Dkt. Nos. 29, 30), Plaintiff amended the original complaint by, for example, (1) adding the City of Utica as a defendant, without including any allegations about the City; (2) adding Defendant Selimovic and a cause of action for fraud on the court, both of which he promptly agreed to dismiss in response to Defendants' motions; and (3) adding Defendants Brown and Martino, whose only alleged conduct occurred in 2009. (*Compare* Dkt. No. 1, *with* Dkt. No. 32).

**\*\*14** If Plaintiff seeks to amend, Plaintiff must file a second amended complaint within twenty-one (21) days of this Order. Plaintiff is reminded that the second amended complaint will replace the existing amended complaint and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes **\*119** the original, and renders it of no legal effect." (quotation marks and citations omitted)). Any second amended complaint should contain *all* factual allegations relevant to Plaintiff's claims, and the paragraphs should be correctly numbered.

## VI. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants City of Utica, Charles Brown, Anthony Martino, Edin Selimovic, Melissa Sciortino, William Borrill, and Zachary Oren's motion to dismiss (Dkt. No. 56) is **GRANTED**; and it is further

**ORDERED** that Defendant David Bagley's motion to dismiss (Dkt. No. 50) is **GRANTED in part**; and it is further

**ORDERED** that all claims against Defendants City of Utica, Charles Brown, and Anthony Martino are **DISMISSED without prejudice**; and it is further

**ORDERED** that all claims against Defendants Edin Selimovic, Melissa Sciortino, William Borrill, and Zachary Oren are **DISMISSED with prejudice**; and it is further

**ORDERED** that the following claims against Defendant Bagley are **DISMISSED without prejudice**: the First Amendment denial of access to the courts claim, the Fourteenth Amendment Equal Protection claim, and any conspiracy claims; and it is further

**ORDERED** that Defendant Bagley's motion to dismiss (Dkt. No. 50) is otherwise **DENIED** and Plaintiff's First Amendment retaliation claim against Bagley survives; and it is further

**ORDERED** that if Plaintiff seeks to amend, Plaintiff must file the second amended complaint within twenty-one (21) days of this Order; and it is further

**ORDERED** that if Plaintiff does not file an amended complaint within twenty-one days of this Order, the above claims that are dismissed without prejudice shall be dismissed with prejudice, without further Order of the Court, and any Defendant for whom there is no remaining claim left shall be terminated, without further Order of the Court; and it is further

**ORDERED** that the Clerk of the Court is directed to serve this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

669 F.Supp.3d 96, 2023 WL 2931863

**Jeanty v. Sciortino, 669 F.Supp.3d 96 (2023)**

2023 WL 2931863

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.